**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SHAQUILLE HOWARD, JAMES BYRD, JASON PORTER, KEISHA COHEN and ALBERT CASTAPHANY, on their own behalf and on behalf of all others similarly situated,** | : : : : : : : : | **Case No.** 2:20-cv-1389 |
| **Plaintiffs,** | : : | |
| **v.** | : : | **ELECTRONICALLY FILED** |
| **LAURA WILLIAMS, Chief Deputy Warden of Healthcare Services; ORLANDO HARPER, Warden of Allegheny County Jail; MICHAEL BARFIELD, Mental Health Director; ALLEGHENY COUNTY;** | : : : : : : : : | **JURY TRIAL DEMANDED** |
| **Defendants.** | : | |

## INTRODUCTION

The mental health care system at the Allegheny County Jail ("ACJ") is rife with systemic deficiencies that deprive people with psychiatric disabilities of necessary care, and indeed, make their conditions worse. Superficial or non-existent diagnostic care, the lack of counseling or group therapy, medication mismanagement, and a culture of punishment rather than treatment amount to a system of mental health care that rarely provides any actual treatment. When treatment is provided, it is inadequate and fails to adhere to a minimally accepted standard of care. The mental health care department is, and for many years has been, severely understaffed, and ACJ does not provide staff members with the tools or resources necessary to adequately diagnose, care for, and treat their patients.

Consequently, individuals with psychiatric disabilities at ACJ experience serious psychological and emotional pain and suffering, routine decompensation, increased disciplinary

infractions resulting in harmful imposition of solitary confinement and excessive use of force, as well as a dangerously elevated risk and incidence of self-harm and suicide attempts. ACJ has one of the highest suicide rates of any jail in the nation. Instead of treatment, Defendants rely primarily and unconstitutionally on force and solitary confinement, greatly exacerbating already existing mental health problems and causing significant suffering and harm. This systematic use of force and solitary confinement against some of the most vulnerable people in our society constitutes cruel, inhumane torture prohibited by the Constitution. Plaintiffs are among the 75% to 80% of those held at ACJ who are constitutionally presumed innocent,[1] not convicted of any offense or serving a sentence, and may not be lawfully subjected to *any* punishment by the state, let alone unconstitutional punishment. This system violates the Fourteenth Amendment to the U.S. Constitution, the Americans with Disabilities Act and the Rehabilitation Act.

These dehumanizing and unlawful conditions have severe and lasting impact beyond the walls of the jail, especially in those communities most impacted by incarceration. In Pittsburgh and Allegheny County, the overwhelming brunt of the conditions of incarceration at ACJ is born by the Black community. Although Black people only account for 13.4% of the population of

---

[1] University of Pittsburgh, Institute of Politics, "Criminal Justice in the 21st Century: Improving Incarceration Policies and Practices in Allegheny County," p. 6 (2016), accessed at: http://iop.pitt.edu/sites/default/files/Reports/Status_Reports/Criminal%20Justice%20in%20the%202021st%20Century%20-%20Improving%20Incarceration%20Policies%20and%20Practices%20in%20Allegheny%20County.pdf. This same report notes that the national average for non-convicted people held in jail is 62% compared to 81% in Allegheny County. *See also* Allegheny County Safety + Justice Challenge Year One Report, October 2018-October 2019, p. 2, accessed at: http://iop.pitt.edu/sites/default/files/Reports/Status_Reports/Criminal%20Justice%20in%20the%202021st%20Century%20-%20Improving%20Incarceration%20Policies%20and%20Practices%20in%20Allegheny%20County.pdf.

Allegheny County,[2] they constitute an astoundingly disproportionate 67% of the population at ACJ.[3] Conditions at ACJ cause tremendous harm that disproportionately impacts the Black community and those with psychiatric disabilities. People leave ACJ worse than they entered, and the deprivation of care complicates re-integration into the community and heightens the likelihood of future interactions with the criminal legal system. In this context, enforcement of the constitutional prohibition against cruel and unusual punishment and the Americans with Disabilities Act not only is legally mandated, but is also a vital component of the imperative for racial justice that has arisen with renewed vitality and resonance in recent months.

## JURISDICTION AND VENUE

1. This case is brought pursuant to 42 U.S.C.§ 1983, 28 U.S.C. §§ 2201, 2202, the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), seeking declaratory and injunctive relief.

2. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4).

3. This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred in Allegheny County, in the Western District of Pennsylvania.

## PARTIES

4. Plaintiff Shaquille Howard is currently incarcerated at ACJ and suffers from psychiatric disabilities, including depression, anxiety, post-traumatic stress disorder ("PTSD"), and Adjustment Disorder with mixed anxiety and depressed mood. Mr. Howard has spent over a

---

[2] *See* U.S. Census 2019 estimate, accessed at: https://www.census.gov/quickfacts/fact/table/alleghenycountypennsylvania/RHI225219#RHI225219.

[3] *See* Allegheny County Analytics daily population tracker for ACJ. Accessed on **August 19, 2020** at: https://www.alleghenycountyanalytics.us/index.php/2019/11/04/allegheny-county-jail-population-management-dashboards-2/.

year in solitary confinement, causing worsening depression and recurring suicidality. He has been sprayed with Oleoresin Capsicum ("OC") in the face while handcuffed and placed in the restraint chair on multiple occasions when in need of mental health care.

5.     Plaintiff James Byrd is currently incarcerated at ACJ and has been since February 2015. He suffers from psychiatric disabilities, including bipolar disorder, depression, anxiety, and PTSD. Mr. Byrd has been repeatedly issued misconducts and kept in solitary confinement for seeking mental health or medical care, and he has been repeatedly assaulted with a taser, sprayed with OC spray, and placed in the restraint chair. He has been placed in the restraint chair approximately 20 times or more, including one instance of being strapped to the chair for 28 hours.  These conditions have caused his mental health to deteriorate, and led to a series of self-harm attempts.

6.     Plaintiff Jason Porter is currently incarcerated at ACJ and suffers from psychiatric disabilities, including severe anxiety, depression, and PTSD. He has been subjected to excessive force by correctional officers, including tasing and the restraint chair, and placed in solitary confinement for over a year, during which time his mental health has seriously deteriorated, leaving him with recurring nightmares and increased thoughts of self-harm.

7.     Plaintiff Keisha Cohen is currently incarcerated at ACJ and suffers from psychiatric disabilities, including schizoaffective disorder, manic depressive disorder, anxiety, depression, and PTSD. Ms. Cohen has been placed in solitary confinement despite her serious psychiatric conditions, and she has been attacked with OC spray and strapped in the restraint chair for hours while suffering from psychological decompensation.

8.     Plaintiff Albert Castaphany is currently incarcerated at ACJ and suffers from psychiatric disabilities, including anxiety, depression, and PTSD. Mr. Castaphany has been

assaulted by staff and placed in solitary confinement despite his disabilities. On one occasion he was punched, tased, and choked while he was strapped in the restraint chair.

9.      Defendant Allegheny County is a county government organized and existing under the laws of the Commonwealth of Pennsylvania. Allegheny County is in possession and control of ACJ.

10.     Laura Williams is the Chief Deputy Warden of Healthcare Services at ACJ and as such is responsible for ensuring the delivery of mental health care, security and use of force policies and practices as applied to individuals with psychiatric disabilities, inmate discipline and use of solitary confinement upon those with mental health conditions, ensuring adequate staffing, staff training in the aforementioned areas, and ensuring accommodations for incarcerated people with psychiatric disabilities. Defendant Williams is sued in her official capacity.

11.     Orlando Harper is the Warden at ACJ and as such is responsible for the overall operations at the jail, including delivery of mental health care, security and use of force policies and practices, inmate discipline and use of solitary confinement, ensuring adequate staffing, staff training, and ensuring accommodations for incarcerated people with psychiatric disabilities. Defendant Harper is sued in his official capacity.

12.     Michael Barfield is the Mental Health Director at ACJ and as such he is responsible for ensuring the delivery of mental health services, including psychiatric and psychological care, and adherence to professional standards of care. He is sued in his official capacity.

## STATEMENT OF FACTS

13.    It has long been recognized that the jail population in this country disproportionately suffers from a variety of psychiatric disabilities. An estimated 64% of people in jail have a mental health condition.[4] According to a 2017 report from the Bureau of Justice Statistics of the U.S. Department of Justice, 44% of people in jail had been told by a mental health professional that they had a mental health disorder, and 26% "met the threshold for serious psychological distress" (compared to 5% for the general population).[5] Jails and prisons house more people with serious mental health conditions than do psychiatric hospitals or facilities.[6]

14.    Those who are incarcerated in this country, including at ACJ, are far more likely to have experienced violence and trauma in their lives compared to the non-incarcerated population, including surviving childhood or adolescent abuse, sexual violence, and/or gun violence.[7] Such traumatic experiences correlate with higher instances of mental health conditions that are in need of treatment.

---

[4] Kim, Cohen & Serakos, *The Processing and Treatment of Mentally Ill Persons in the Criminal Justice System: A Scan of Practice and Background Analysis* (Urban Institute, March 2015).

[5] Bronson, J, Berzofsky, M, *Indicators of Mental Health Problems Reported by Prisoners and Jail Inmates, 2011-2012* (Bureau of Justice Statistics, June 22, 2017, NCJ 250612).

[6] Torrey, EF, Kennard AD, Eslinger D et al., *More Mentally Ill Persons are in Jails and Prisons than Hospitals:  A Survey of the States* (Arlington, VA: Treatment Advocacy Center, 2010).

[7] *See* James A Reavis et al., *Adverse Childhood Experiences and Adult Criminality: How Long Must We Live before We Possess Our Own Lives?*, 17 PERMENENTE J. 44, 47 (2013) (finding that individuals convicted of crimes were four times more likely to have four or more adverse childhood experiences than those who were not); Caroline Wolf Harlow, *Prior Abuse Reported by Inmates and Probationers*, U.S. DEP'T JUST. BUREAU JUST. STAT. (1999) (finding that over 57% of all female probationers, jail inmates, state prison inmates, and federal prison

15.     In ACJ, however, where the need for mental health care is greatest, the provision of that care is severely lacking.

## Inadequate Intake Process

16.     At ACJ, the superficial to non-existent provision of mental health care begins during the intake process.

17.     Initial interviews with an intake staff member vary widely depending on the particular staff member.  With some, the interview lasts less than a minute.[8]

18.     In many instances, no assessment is performed other than the staff member observing the patient and asking very general questions.

19.     Due to understaffing, sometimes persons who lack the requisite medical and mental health training sometimes conduct these assessments.

20.     Patient histories often are not taken, even when the patient self-reports a serious psychiatric diagnosis.

21.     In many instances, staff do not ask questions about prior psychiatric hospitalizations and do not obtain medical or psychiatric records.

---

inmates had experienced sexual and/or physical abuse prior to admission); Lena J. Jäggi et al., *The Relationship between Trauma, Arrest, and Incarceration History among Black Americans: Findings from the National Survey of American Life*, 6 SOC'Y & MENTAL HEALTH 187, 200 (2016) (finding that, among Black Americans, "frequency of trauma exposure was significantly associated with elevated odds for involvement with all indicators of contact with the criminal justice system").

[8] "We observed the booking observation questions being asked by officers sitting at their station with a computer. The inmate is in front of the officer on the other side of the podium. The questions were asked quickly, loudly, and robotically, with the officer looking at the computer screen rather than observing the inmate for affect or critical red flag behaviors. The series of questions takes about half a minute." NCCHC Resources, Inc., Suicide Prevention Program Assessment – Allegheny County Bureau of Correction (October 2019), at p. 5, found at: https://www.alleghenycourts.us/downloads/Administration/NCCHCSuicideReview.pdf. (referring to intake generally, not specifically to mental health screening).

22.     There is little to no privacy provided to the individual during the screening process, even as staff ask for confidential medical information and questions related to prior sexual assaults and other potentially traumatic incidents.[9]

23.     Defendants are aware that some intake staff members are not performing an adequate assessment, and that some are even hostile to patients.  Yet Defendants refuse to take any corrective action with respect to these individuals.

24.     As a result, many individuals with serious mental health conditions are never referred for mental health treatment.

### Absence of Meaningful Counseling or Therapy

25.     ACJ provides no individual counseling or therapy services to its mental health patients.

26.     ACJ does not provide group therapy, even on the two housing units, 5MD for women and 5C for men, that are reserved for those incarcerated individuals that ACJ determines to have more acute, serious mental health conditions.

27.     ACJ does not provide any type of trauma therapy.

28.     Defendant Barfield has acknowledged that the Jail provides "support," but not "treatment." Defendant Barfield has explained this intentional denial of care by stating that "at the jail, it's not the environment to open up a can of worms, because you often can't close it."

29.     For those patients incarcerated in ACJ for a short period of time, counseling or therapy may not be indicated, but most individuals remain at the jail for months or even years,

---

[9] "Privacy was inadequate due to the sensitive nature of the series of questions being asked. These questions are difficult to answer honestly with an audience of other people waiting in the booking area." NCCHC Report at p. 5.

and under those circumstances, counseling is one of the basic, most appropriate types of treatment that could be offered.

30.     The American Psychological Association and the National Commission on Correctional Health Care identify psychotherapy, where clinically indicated, as one of the "basic" services that jails should provide "at a minimum."[10]

31.     Due to the severe staffing shortages and lack of appropriate training, rather than provide any meaningful counseling, mental health staff simply "make rounds" during which they only ask patients how they are doing and whether they want to hurt themselves.

32.     The lack of any psychologist at the jail for over a year has made the provision of any psychotherapy impossible.

33.     The psychiatrist(s) and their staff do not have the time or resources to conduct any meaningful therapy, especially with the chronic staffing shortages discussed below.

34.     When ACJ has a single full-time psychiatrist, they are assigned to work on the acute mental health pods, where they are responsible for fifty patients with acute and sub-acute or chronic symptoms, plus another 25 patients in the step-down unit. When ACJ has two full-time psychiatrists, the other psychiatrist is responsible for all patients outside the acute units. For multiple months over the past year, ACJ has been without *any* full-time psychiatrist.

35.     When psychiatrists or mental health staff see patients at the jail, Defendants do not provide sufficient support in the form of space or confidentiality for such patient interactions.

36.     Most pods, including the two acute mental health pods, do have adequate interview rooms, designed for confidential and medically appropriate interactions between providers and patients. Despite this, psychiatrists have to see patients through the cell door or in

---

[10] *See, e.g.,* National Commission on Correctional Health Care, Standards for Mental Health Services in Correctional Facilities (2015), at 103.

open recreational areas where there is no confidentiality and both the patients and the providers frequently have to shout in order to be heard by one another.[11]

37.     Due to the lack of adequate staffing, psychiatrists and mental health staff respond to "sick requests' with "drive-by" consultations.  Mental health specialists will stop by a patient's cell to find out the reason for the sick request, and rarely are able to spend more than a few minutes with the patient.

38.     Due to the lack of therapeutic options available, there is little the staff can provide to the patient in any event.

## Medication Mismanagement

39.     For the overwhelming majority of those in need of mental health care at ACJ, the only treatment offered is medication.

40.     Medication treatment, however, is regularly mismanaged in a variety of ways, including:

- Delays in receiving prescribed medications after admission to the jail, resulting in days without proper medication;

- Sudden changes to medication regimes without first being evaluated;

- Failure to advise patients of the reasons for prescribing medications, their benefits, risks, and side effects;

- Interruptions in delivery of medications upon transfer to a new housing unit;

- Interruptions in delivery of medications due to staffing shortages;

---

[11] The NCCHC investigation and report confirms this: "[M]ost patients interviews are [conducted] at cellside, creating privacy issues and barriers to clinical/client relationships." NCCHC Report, p. 13, 28.

- Interruptions in delivery of medications due to failure to properly plan and ensure adequate amounts of prescribed medication on hand at ACJ;

- Failure to prescribe medications that are clinically indicated, including medications that have been previously prescribed by ACJ staff;

- Failure to follow directives to crush medication.

41. Outside the acute pods, there is no system to ensure that patients take their prescribed medication.

42. Defendants do not oversee the medication distribution, and it is apparent to the psychiatrists that patients are not getting their medication on a regular basis, even in instances where the patient's chart indicates that medication was provided.

43. Because Defendants refused to make accommodations for patients observing Ramadan, many went without medication for the entire month (because they could not take medication orally from sunrise to sunset).

44. Defendants are particularly aware of the myriad problems with medication delivery because these problems are the subject of routine complaints, and many instances of non-delivery of prescribed medications are documented improperly as medication refusal.

**Inadequate Medical Records**

45. ACJ maintains inadequate medical records sufficient to identify individuals with psychiatric disabilities and provide appropriate treatment.

46. For example, the booking form, which includes police officers' statements of the individual's condition at time to arrest, and health information from transfer facilities, is not made part of the electronic record, and is not made available to anyone other than the person conducting screenings in intake.

47.     Staff regularly fail to include mental health diagnoses in the "problem lists" in the electronic medical record.

48.     Treatment plans are rarely prepared at all, and when they are, they are incomplete and fail to meet standards of the National Commission on Correctional Health Care.

49.     Documentation regarding medication distribution is notoriously unreliable.  On numerous occasions, psychiatrists could easily determine that patients had not received their medication, even though medication was marked as distributed on the patient's chart.

50.     Mental health staff are regularly discouraged from including in the record anything critical of the care the patients were being offered. And sometimes when critical mental heath care events have been recorded in the patient's medical record, Defendants have expunged them.

51.     Some patients are not provided copies of sick call requests, and oral requests are rarely documented by correctional officers or mental health staff.

### Chronic Staffing Shortages

52.     The afore-mentioned problems are, at least in part, a direct result of chronic staffing shortages and a complete disregard by the Defendants of the serious needs of incarcerated individuals with psychiatric disabilities.

53.     Prior to the COVID pandemic, as of March 1, 2020, the population of ACJ was 2,224.

54.     According to the Bureau of Justice Statistics cited earlier, 44% or approximately 979 (44% of 2,224) incarcerated individuals at ACJ have been diagnosed with a mental health disorder, and 26% or approximately 578 (26% of 2,224) meet the threshold for serious psychological distress.

55.     In the past several years, for a substantial period of time, ACJ did not have any psychologist on staff.

56.     In the past several years, ACJ had at most two full-time psychiatrists at a time and one "tele-psych" psychiatrist.  At times, both on-site psychiatrist positions have been vacant, most recently for seven months, from February 2020 to August 2020. Currently, ACJ has only one full-time psychiatrist (who was hired in August 2020) and one part-time tele-psychiatrist.

57.     When the Jail had two psychiatrists, one was responsible for the acute pods, thus treating 75 acute patients. The other psychiatrist was responsible for all other pods at ACJ. When there is only one psychiatrist, as has often been the case during the past year, that psychiatrist is responsible for the entirety of ACJ's population.

58.     As of August 6, 2020, ACJ had 49 healthcare staff vacancies, including two psychiatrist positions, three mental health specialists, four mental health registered nurses, and three psychiatric aides, along with two assistant directors of nursing, seven licensed practice nurse positions and 14 registered nurse positions. These vacancies represent approximately 40 % of the total healthcare staff.

59.     While even with normal staffing, the jail was unable to provide adequate mental health care, the chronic staffing shortages make it impossible for the remaining staff to provide adequate or appropriate mental health care to the incarcerated population.

60.     As a result of the insufficient staffing, staff members are required to perform tasks for which they are not qualified or trained.

## Unreasonable Use of Force against Individuals with Psychiatric Disabilities

61.     The unmet need for mental health care at ACJ frequently results in not only requests for help being ignored or denied, but also the repeated use of brutal force against individuals with psychiatric disabilities.

62.     OC spray, electro-shock tasers, stun shields, extraction teams, forced nudity, blunt, physical force, and immobilization for hours on end in a "restraint chair" are all deployed excessively and without penological justification at ACJ against class members with psychiatric disabilities.

63.     Rather than contacting mental health staff, a pattern and practice exists at ACJ of using force to respond to mental health needs.

64.     Requests for mental health care, refusals to enter or leave a cell, inability to care for one's self, incidents of self-harm, verbal outbursts, and decompensation while in solitary confinement are all routinely responded to with OC spray, tasers, extraction teams, and restraint chairs.

65.     Force is regularly used without first pursuing alternatives, even when the person involved does not present a risk of harm to themselves or others.

66.     Force is routinely used against people with psychiatric disabilities without first seeking intervention of mental health staff, even when the person is pleading for mental health treatment.

67.     At ACJ, OC spray is deployed from canisters or guns that fire an explosive ball of OC.

68.     OC spray is used excessively at ACJ, in instances where it is not necessary to maintain order or safety, and is deployed in place of mental health care.

69. Frequently, it is fired into cells holding a person with a psychiatric disability because that person is not being compliant with instructions from jail staff, even if the person presents no risk of harm to themselves or others.

70. Likewise, hand-held tasers are routinely used against people with psychiatric disabilities in response to their mental health needs. This occurs without effective oversight, and often in situations where the person being shocked has already been subdued.

71. Some patients in the acute units are tased routinely. Patients with severe psychoses, who cannot understand directions, have been tased multiple times per day.

72. The use of the restraint chair at ACJ is commonplace and lasts for several hours. Patients are immobilized with their arms and legs strapped to the chair, and sometimes their head can be fettered with a spit mask. The chair itself, while mobile, is then secured to the floor, in a room where the individual is frequently placed alone, facing a blank wall.

73. The restraint chair is used without any oversight or care from mental health or medical care staff.

74. The restraint chair is used for nearly any issue: following a use of force incident; in lieu of mental health care for someone experiencing thoughts of self-harm; in response to an attempt at self-harm; as a consequence for non-compliance with an order; and sometimes for no identifiable reason at all, but in a purely punitive and vindictive manner.

75. ACJ staff use the restraint chair without adequate health safeguards. There are rarely any checks by mental health or medical care staff at short intervals to ascertain if the person can be released from the chair, or if continued placement in the chair presents a risk to their health. When there are any medical or mental health checks, they are cursory in nature.

76.     Despite an obligation under policy and recognized in case law that periodic movement of one's limbs is a necessary safeguard, this rarely happens at ACJ.

77.     Bathroom breaks are typically not provided to a person in the restraint chair, although it is common for a person to spend up to 8 hours in the chair.

78.     Many people have urinated or defecated on themselves while in the chair. Others have endured extreme pain and discomfort in an effort to not do so.

79.     Patients are also commonly deprived of food, water, and medications while in the restraint chair.

80.     The chair, like the other types of force described herein, is disproportionately used against people with psychiatric disabilities.

81.     Staff use of force occurs without effective oversight. Virtually all uses of force are condoned. Officers are rarely if ever disciplined, and investigations into allegations of physical abuse either do not occur or are conducted in such a superficial manner as to be meaningless.

82.     The spectrum of use of force practices at ACJ that are deployed against people with psychiatric disabilities serves to further traumatize class members and deprives them of necessary mental health care.

### Lack of Training for Working with Individuals with Psychiatric Disabilities

83.     Defendants have failed to provide necessary training to staff on a myriad of issues relating to use of force and individuals with psychiatric disabilities.  For example, Defendants have failed to ensure that staff are trained in the following areas:

- How to interact with and respond to individuals with serious mental health concerns;

- How to de-escalate and respond to situations where a person with a psychiatric disability is being non-compliant, disruptive, or decompensating.

- How and when it is appropriate to use force against an individual with a psychiatric disability;

- The importance of adhering to a use of force spectrum that seeks to resolve conflict without force in the first instance, and with the least amount of force whenever it is used;

84.     Staff are also not trained nor instructed to obtain the assistance of mental health staff to respond to situations where an incarcerated person is manifesting signs of a mental illness in need of intervention.

85.     Nor have staff been trained or otherwise advised regarding suicide prevention, how to identify behaviors and symptoms associated with an increased risk of suicide, nor when to contact mental health for purposes of treatment interventions in instances of suicide risk.

86.     This lack of training is confirmed in the NCCHC report.[12]

87.     As a result of Defendants' failure to train staff at ACJ, requests for mental health intervention are frequently ignored, misinterpreted, and/or result in staff escalating the problem by giving commands and threats to a person who is seeking mental health care.

88.     As a consequence of the Defendants' lack of policies and training on how staff should respond to behaviors caused or influenced by a person's psychiatric disability, staff routinely and wantonly seek to enforce compliance through use of force.

---

[12] "We asked the custody staff if they received any specialized training in order to work on [the acute mental health] unit. They did not." NCCHC Report at p. 7.

**Use of Solitary Confinement**

89.     Solitary confinement refers to conditions of extreme isolation, typically 22-24 hours per day, in a small cell and subject to severe limitations on social interaction, stimulation, property, and other privileges.

90.     ACJ refers to its solitary confinement status as the Restricted Housing Unit ("RHU").

91.     RHU cells are found throughout the jail, and anybody can be placed on RHU status no matter where they are held at ACJ.

92.     There are two broad categories of RHU confinement at ACJ: disciplinary or administrative custody. Disciplinary custody is imposed pursuant to an alleged rule violation. Administrative custody is a catchall term that is used to impose indefinite solitary confinement.

93.     While in the RHU, people are typically forced to spend at least 23 hours of every day in a tiny concrete cell. The cell is approximately 10 X 7 feet.

94.     On weekdays, if staff complies with policy, people in the RHU are let out for one hour into a cage where they exercise alone. The cages have no exercise or athletic equipment, or anything whatsoever within them.

95.     Incarcerated people in the RHU are frequently deprived of any hygiene items. At times, they have not been permitted soap, toothpaste, or a toothbrush while in solitary confinement.

96.     ACJ often deprives people of reading materials and any writing implement in the RHU, especially those on 5MD, the women's acute mental health pod.

97.     Due to being placed in the RHU despite, or because of, their psychiatric disabilities, class members are denied access to services and programs offered at ACJ, including

but not limited to group recreation, congregate meals and exercise, religious services, eligibility for employment, and access to the law library.

98.     Solitary confinement results in a common cluster of adverse, painful psychological symptoms that include heightened anxiety, depression, cognitive impairments such as difficulty concentrating and memory loss, increased anger, loss of impulse control resulting in chronic disciplinary problems, and a dramatically increased risk of self-harm and suicide.

99.     While at least some of these adverse symptoms, sometimes referred to as "SHU-Syndrome," are likely to impact anyone in solitary confinement, people with psychiatric disabilities are at a substantially greater risk for experiencing these harmful effects sooner and more severely.

100.    There is an indisputable consensus among psychiatric experts, correctional experts, and courts that the well-known, clearly established risks and harms of solitary confinement are so severe that individuals with psychiatric disabilities must be precluded from such conditions of confinement altogether.

101.    The Commonwealth of Pennsylvania has agreed that mentally ill individuals will not be placed and retained in solitary confinement units due to the severe risk of deterioration and serious harm that is likely to occur.[13]

102.    As was recently observed by the Chief Judge for the U.S. District Court for the Middle District of Pennsylvania, "Researchers have observed that 'psychological stressors such as isolation can be as clinically distressing as physical torture.'" *Johnson v. Wetzel*, 209

---

[13] *See* "The Pennsylvania prison system will stop putting mentally ill individuals in solitary," Mark Berman, Washington Post, January 8, 2015; "No Safe Harbor, Part II: Prisons cope with mental health," Rich Lord and Joe Smydo, Pittsburgh Post-Gazette, Feb. 7, 2016.

F.Supp.3d 766, 779 (M.D.Pa. 2016) (quoting Jeffrey L. Metzner, M.D., et al., *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics,* 38 J. AM. ACAD. Psychiatry & Law 104, 104 (2010)).

103.    The risks presented by solitary confinement on vulnerable individuals have led the United Nations Special Rapporteur on Torture to declare that "solitary confinement can never be lawfully imposed on certain categories of prisoners, including juveniles, pregnant or breastfeeding women, or *persons with mental disabilities*." (emphasis added).[14]

104.    Nonetheless, ACJ routinely places class members with psychiatric disabilities in prolonged solitary confinement which exacerbates their disabilities and causes severe anguish.

105.    The risks of solitary confinement for individuals with serious mental illness are so obvious and well-known in the corrections profession that Defendants cannot be unaware of these risks, as well as the recognition that people with mental illness should never be placed in such dangerous conditions.

106.    In fact, Defendants have already been put on repeated notice of these risks by lawyers, incarcerated people, and by their supervision of people with psychiatric disabilities who routinely decompensate and engage in self-harm when held in solitary confinement at ACJ.

107.    Despite the undeniable pain, suffering, and risk of acute psychological decompensation inherent when imposing solitary confinement on people with serious mental illness, not a day goes by in which defendants are not holding substantial numbers of people with serious mental illness in such torturous, suicide-inducing conditions of isolation at ACJ.

---

[14] *Seeing into Solitary: A Review of the Laws and Policies of Certain Nations Regarding Solitary Confinement of Detainees,* Juan Mendez, et al., p. 3-4, found at: https://www.weil.com/~/media/files/pdfs/2016/un_special_report_solitary_confinement.pdf.

108.    ACJ regularly places people with psychiatric disabilities in solitary confinement for relatively minor and non-violent offenses.

109.    Defendants refuse to consider the impact of solitary confinement upon a person with a psychiatric disability when determining the appropriateness or duration of such confinement or the type of privileges to deny.

110.    Defendants' disciplinary practices do not give consideration to the role that an incarcerated person's psychiatric disability plays in alleged institutional misconduct.

111.    Mental health staff are not involved in the disciplinary proceedings of people who have psychiatric disabilities. This results in people with psychiatric disabilities being punished for manifestations of their psychiatric conditions.

112.    So long as a patient is not suicidal or demonstrating psychotic behavior at the time of admission to the RHU, and does not need admission to an acute mental health pod, mental health staff have no say, and are not consulted as to whether people with psychiatric disabilities should be placed in RHU.

113.    In fact, ACJ does not have any disciplinary alternatives to accommodate people with psychiatric disabilities.

114.    Consequently, people with psychiatric disabilities are punished instead of treated, and placed in conditions of isolation that all but guarantee additional disciplinary issues will occur due to the psychological decompensation caused by solitary confinement.

115.    People with psychiatric disabilities are more likely to end up in the RHU and to spend a longer period of time there.

116.    The acute mental health pods primarily rely on solitary confinement. Even those who are on those pods and not on RHU status remain in their cells approximately 20-21 or more hours per day.

117.    When on RHU status in the acute mental health pods, patients receive only 1 hour outside their cell, during which they are handcuffed to a table by themselves.  They are thus deprived of any opportunity to exercise.

118.    Defendants' use of solitary confinement deprives people with psychiatric disabilities of their basic human need for mental health, physical health, exercise, social interaction, and environmental stimulation, causing serious injury and creating a substantial risk of future harm.

119.    ACJ's use of solitary confinement is cruel, lacking in penological justification, and counter-productive, as it fuels further disciplinary issues that prolong solitary confinement terms, generating trauma and lasting psychological and emotional injuries.

120.    The widespread use of solitary confinement on people with psychiatric disabilities at ACJ causes severe harm, resulting in class members leaving ACJ in worse condition than when they arrived, causing additional burdens and challenges to successful re-integration, and thereby contributing to a cycle of recidivism.

### Placement in Solitary Confinement Without Due Process

121.    Pretrial detainees are presumed innocent and cannot be punished by the state absent due process protections.

122.    ACJ, however, places pretrial detainees in solitary confinement on RHU status upon a mere accusation of a rule violation without first holding a hearing to determine the facts.

123.    ACJ policy allows for ten business days to transpire prior to a hearing being required under their disciplinary policy. This means people regularly spend two weeks in solitary confinement without having been found guilty of any offense.

124.    This practice of pre-hearing solitary confinement is imposed in response to a range of alleged rule violations, including trivial or non-violent offenses.

125.    There are no limiting criteria that staff must follow when determining whether an alleged rule violation warrants pre-hearing solitary confinement.

126.    ACJ's practice of pre-hearing solitary confinement lacks a legitimate penological justification.

127.    Those held in pre-hearing solitary confinement are often not given written notice of the charges they are facing.  Instead, they may only be provided a form with the charges and told to sign it when they have a purported "hearing."

128.    At times, people spend days or weeks in solitary confinement only to be found not guilty of the alleged rule violation they face.

129.    Sometimes ACJ places an individual in solitary confinement and then removes them from that status without even providing a hearing.

130.    When a hearing is held, the result is often foreordained, the proceeding is perfunctory, and incarcerated people are refused witnesses.

131.    This deficient system of discipline results in rampant imposition of punishment, especially on the psychiatrically disabled, without any due process, even though the vast majority in custody at ACJ are constitutionally innocent and may not be punished or placed in punitive conditions without first being provided due process.

132.    Adequate due process requires at a minimum advanced written notice of the charges, a hearing, an ability to call witnesses and present evidence when it would aid the determination, and a written rationale for the decision.

### Interference with Psychiatric Care

133.    None of the individuals overseeing ACJ's mental health care system have any type of medical education or training.

134.    Defendant Michael Barfield is the Director of Mental Health.  Dr. Barfield is not a medical doctor—he obtained a doctorate of education degree in organizational leadership and management while he was employed at ACJ, and previously served as a drug and alcohol counselor.  He has no medical or mental health experience prior to his current position.  In his current position, he administratively supervises ACJ psychologists and psychiatrists, and oversees all mental health specialists and mental health nurses.

135.    Two other officials are responsible for health services generally at ACJ.  Dr. Aloysius Joseph was (until recently) the Health Services Administrator and made final decisions regarding policies and procedures for mental health treatment. He is a psychologist, and previously served as director of the drug and alcohol programs.  Dr. Joseph left ACJ in March 2020.  The position of Health Services Administrator remains vacant.

136.    Defendant Laura Williams is the Chief Deputy Warden of Healthcare Services.  Prior to her current position, Chief Deputy Warden Williams served as a drug and alcohol counselor before being promoted to Deputy Health Services Administrator.  She has no training, experience or qualifications for prescribing medications or making medical diagnoses, and has no experience in the mental health field. Nor does she have the training, experience or qualifications for overseeing the operations of the health care department.

137.     Due to staffing shortages, Defendants Barfield and Williams have themselves performed tasks typically performed by Mental Health Specialists, despite their lack of training or qualifications.

138.     Moreover, they sometimes overrule psychiatrists' decisions.  For example, they place individuals in the acute pods for behavioral reasons, over the psychiatrists' objections, and overrule psychiatrists' determinations that individuals may be returned to general population.

139.     Defendants systematically placed mental health patients in the same pod as those who were de-toxing, even though the proper mental health procedure is to keep these two categories of incarcerated people separate.

140.     On at least one occasion, Defendant Williams overrode a psychiatrist's order and provided a blanket to a patient on suicide watch.

141.     Defendants consistently refuse input from psychologists, psychiatrists, or other mental health staff in decisions affecting mental health patients.  For example, they did not invite these providers, or even seek their input, when investigating the root cause of several suicides at ACJ.

142.     When staff members pointed out deficiencies in ACJ's procedures, they were chastised for putting "criticisms" in writing.

143.     When other staff members try to raise issues regarding the lack of appropriate mental health care, Defendants "shut them out," instructing officers not to interact with those staff members.

144.     On several occasions, when medical or mental health professionals would document the lack of proper assessment, such notes would sometimes disappear from the patient's records.

145.    An environment exists at the jail where correctional officers are hostile to psychiatrists' efforts to meet and treat patients, and to incarcerated individuals' efforts to seek mental health treatment or counseling.

146.    Correctional officers routinely interfere with psychiatrists' ability to provide mental health care to prisoners.

147.    Some correctional officers are overtly hostile to the psychiatrists' efforts to meet with patients.

148.    On at least one occasion, due to statements and conduct of a correctional officer, a psychiatrist felt unsafe providing care to patients on one pod. In particular, the officer disparaged the psychiatrist in front of the entire pod and encouraged the population to interfere with their attempts to provide care.

149.    Some correctional officers refuse to relay "sick requests" to mental health staff, or do so only after a delay of some days or weeks.

150.    In some instances, correctional staff members intimidate patients into not requesting help or tell them they cannot obtain care unless they are suicidal.

151.    Defendant Harper has even ordered staff on 8E, the men's RHU, that if a person requests mental health care, staff are to threaten to withhold privileges or use force against them in order to compel the person requesting help to be silent.

**People with Psychiatric Disabilities at ACJ Suffer Grave Consequences**

152.     The grossly deficient mental health care services at ACJ, along with the excessive and inappropriate use of force and solitary confinement, have further traumatized people with psychiatric disabilities at ACJ, often compounding existing trauma they have survived.

153.     People leave ACJ worse than they entered, at risk for debilitating flashbacks, anxiety, depression, and suicidality.

154.     Numerous Class Members have attempted suicide as a result of a lack of constitutionally adequate care as described herein and the consequent decompensation and exacerbation of their conditions.

155.     There have been nine deaths by suicide at ACJ since 2016.[15]

156.      The number of attempted suicides is considerably higher.

157.     A Bureau of Justice Statistics Study in 2011 found that ACJ had the second highest suicide rate in the nation between 2000 and 2007, when it averaged 1 2/3 suicides per year.[16] The rate since 2016 is even greater than it was at that time.

158.     Depriving people with psychiatric disabilities of mental health care also increases the likelihood they will have an adverse legal outcome in criminal proceedings and/or compels them to accept a plea just to get out of the jail, even where that person asserts his or her innocence.

---

[15] K. Giammarise, Report cites issues with suicide prevention in Allegheny County Jail (Pittsburgh Post-Gazette, June 4, 2020), https://www.post-gazette.com/news/crime-courts/2020/06/04/Allegheny-County-Jail-suicide-prevention-issues-report-oversight-board-committee/stories/202006040123.

[16] Allegheny County Jail's Suicide Rate Among Nation's Highest (WPXI, July 5, 2011), found at: https://www.wpxi.com/news/allegheny-county-jails-suicide-rate-among-nations-/201418869/.

159.     This deprivation of care also increases the likelihood they will not be able to reintegrate into their home community without further entanglements with the criminal legal system. The failure to provide mental health care thus fuels a cycle of recidivism that is cruel, counter-productive, and preys upon the most vulnerable people in our communities.

### Defendants' Involvement in Mental Health Care Policies And Practices

160.     As Warden, Defendant Harper sets policy for the ACJ, including the mental health, disciplinary, and use of force procedures, practices, and policies described above.

161.     As Chief Deputy Warden of Healthcare Services, Defendant Williams sets policy for healthcare at the ACJ, including the mental health procedures, practices, and policies described above.

162.     As Director of Mental Health, Defendant Barfield sets policy for the ACJ, including the mental health procedures, practices, and policies described above.

163.     Due to Defendants Harper, Williams, and Barfield's policies and practices, the Class Members have been deprived of necessary care for their serious mental health conditions.

164.     Defendants Harper, Williams and Barfield also make decisions with respect to staffing levels and the resources that will be made available to ACJ's mental health staff. Defendants have failed to maintain adequate staffing and have failed to provide existing staff with sufficient training and resources that are necessary and appropriate to care for the serious conditions of Class Members.

165.     Defendants are aware that Class Members are not receiving appropriate care, and have failed to make changes to address these deficiencies.

166.     Defendants have failed to supervise staff to ensure that they are able to provide, and do provide, necessary and appropriate mental health care to Class Members.

167.    Defendants have interfered with attempts by mental health professionals to improve the care offered to Class Members.

168.    Defendants instructed staff to shun or exclude staff members that have reported deficiencies in ACJ's mental health program.

169.    Defendants are aware correctional staff routinely use force, such as mace, OC spray, tasers, physical force and the restraint chair to punish Class Members for requesting mental health care and for non-violent acts that are manifestations of their serious mental illness, and have failed to prevent this use of force.

170.    Defendants have refused to change the policies and practices in a way that prevents or ameliorates the unnecessary and inappropriate use of force against those with psychiatric disabilities.

171.    Defendants are aware of the almost universal conclusion that individuals with serious mental illness should not be placed in solitary confinement.

172.    Defendants are aware that Class Members are routinely placed in solitary confinement, and that they are placed in solitary confinement for requesting mental health care or for non-violent acts that are manifestations of their psychiatric disabilities.

173.    Defendants have refused to change the policies and practices in a way that prevents or ameliorates the use of solitary confinement against those with serious mental health conditions.

174.    Defendants have failed to provide training to staff as to how to interact with individuals with psychiatric disabilities, that force should not be used to punish Class Members for requesting mental health care or for non-violent acts that are manifestations of their serious mental illness, and that Class Members should not be placed in solitary confinement.

175.    Defendants have acted and continue to act wantonly, willfully and in reckless disregard of the Class Members' rights.

## CLASS REPRESENTATIVES

### Shaquille Howard

176.    Mr. Howard was incarcerated at ACJ in June 2017 and has remained there since that time.

177.    Mr. Howard suffers from adjustment disorder with mixed anxiety and depression, and PTSD.

178.    Mr. Howard has been housed on pod 6D, or in RHU on either 1C or 8E.  Over half of his three and a half years at ACJ have been spent in solitary confinement.

179.    During his time in solitary, Mr. Howard spent about 23 hours a day in a tiny, dirty, concrete cell, with little to no opportunity for human interaction, exercise, or recreation.

180.    He experienced deprivation of exercise, food, severe stress, and emotional suffering, and increasingly reoccurring thoughts of suicide.

181.    Correctional officers and mental health staff have ignored Mr. Howard's frequent requests for mental health care and have told him that he cannot receive treatment unless he is suicidal.

182.    He specifically requested counseling or therapy, which was never provided.

183.    Defendant Williams told him that ACJ does not offer counseling.

184.    Mental health staff conduct "rounds" periodically, but do not provide any care or treatment; rather, they merely ask if he has any medical or mental health needs.  If he asks about

medication, he is told to await his next evaluation.  If he asks about counseling, he is told they will look into it.

185.    Mr. Howard receives psychiatric medication.  Recently, one medication that is used for his PTSD nightmares was discontinued without notice and without any explanation.

186.    Mr. Howard is not aware of any mental health treatment plan for him.

187.    At various times, attempting to get attention of the staff to request mental health treatment, Mr. Howard would hold his slot open or cover the window on his cell door.  Rather than listening to his requests, correctional officers considered these actions to be disciplinary infractions and responded by using force, including mace, physical force and tasing.

188.    Mr. Howard has also said he was suicidal in an effort to get help.  When he does so, he is placed on suicide watch and left alone with no clothes and with no treatment offered at all.  After a period of time, mental health staff ask him some questions, determine that he is not suicidal and return him to his pod.

189.    On or about September 6, 2018, medical staff at ACJ diagnosed Mr. Howard with asthma and, upon information and belief, issued a medical directive forbidding correctional officers from using OC spray on him.  However, correctional officers have ignored that directive and have consistently threatened and at times sprayed him with OC.

190.    After mental health staff and correctional officers ignored his repeated requests for treatment, and an officer actually encouraged him to commit suicide, Mr. Howard felt that the only course of action to get help was to kill himself.  On February 10, 2020, while in solitary, Mr. Howard attempted to hang himself.

191.    ACJ initially disciplined Mr. Howard for his suicide attempt, finding that he was not truly trying to kill himself but merely was trying to get help.  They accused him of "being manipulative for secondary gain."

192.    ACJ eventually dismissed the misconduct charge.

193.    On February 26, 2020, Mr. Howard was again transferred to solitary because he initially refused to lock in to his cell due to his worsening mental health symptoms, which include auditory hallucinations and severe paranoia, fearing that law enforcement agents are trying to kill him.

194.    As correctional officers escorted Mr. Howard to the strip cage, Mr. Howard told them that he was feeling anxious, extremely depressed, and hopeless. He repeatedly requested to see a mental health nurse. Mr. Howard then sat on floor, with his hands cuffed in front of him, and pleaded with correctional officers to get him treatment.

195.    A nurse who was nearby said they didn't care if Mr. Howard was "stripped" or "sprayed with OC."

196.    The correctional officer then sprayed OC in Mr. Howard's face.

197.    Staff then placed Mr. Howard in a restraint chair, while he was still covered with mace.

198.    Mr. Howard has been placed in the restraint chair numerous times for requesting help or covering his window in order to get someone to respond.  When in the restraint chair, he is provided no bathroom breaks, no food, drink or medication, and he was not allowed any breaks for stretching.

199.    Defendants failed to provide Mr. Howard with any medical or mental health care while in the restraint chair or before placing him in solitary confinement.

200.    Mr. Howard also has been pepper sprayed for refusing to crawl for a correctional officer's amusement.  On one occasion, while he was lying on his stomach on the ground, an officer shot him with pepper balls nine times in his back.

201.    Mr. Howard recently complained to Defendant Harper about various violations of policy at ACJ, and Defendant Harper responded by saying that he makes the rules and decides what the policy is.

202.    Mr. Howard's condition continues to deteriorate, especially when in solitary confinement. He is extremely anxious, severely depressed, and feels hopelessness. He becomes claustrophobic, believing the walls are closing in on him. He has auditory hallucinations. He struggles to sleep, having nightmares and fearing that law enforcement agents are trying to kill him.

**James Byrd**

203.    Mr. Byrd was incarcerated at ACJ on February 23, 2015 and has remained there since that time.

204.    Mr. Byrd suffers from anxiety, depression, bipolar disorder, and PTSD.  Prior to entering ACJ, he had a mental health treatment plan and weekly counseling sessions.

205.    Defendants have placed Mr. Byrd on RHU status several dozen times in retaliation for seeking medical or mental health care, or acting out in an effort to receive care. He has been consistently in solitary confinement since 2018.

206.    For this entire time, Mr. Byrd has been confined in a tiny, dirty, concrete cell for more than 23 hours a day with little to no opportunity for social interaction or exercise. He has experienced hunger, deprivation of exercise, severe stress, and emotional suffering.

207.     For much of his experience in solitary confinement, Mr. Byrd has been denied access to contact visits, commissary, as well as phone privileges, which have prevented Mr. Byrd from speaking with his mother, who is dying from cancer.

208.     Staff also have refused to renew Mr. Byrd's psychiatric medications that ACJ previously prescribed to him. A nurse told Mr. Byrd that missing doses of medication will not affect the way the medicine works.

209.     Staff have ignored or denied Mr. Byrd's nearly daily requests for mental health care.  Correctional officers and medical staff have often told Mr. Byrd that he will not get mental health treatment unless he is suicidal.

210.     Mr. Byrd has developed a number of strategies to get officers to respond to his requests for mental health care.  For example, he will write "I need mental health care" on a piece of paper, and cover his door window with that paper so they cannot see into his cell.  When he utilizes these strategies, sometimes he gets to speak with mental health staff, and sometimes the Special Emergency Response Team ("SERT") shows up to discipline him.

211.     Since 2018, correctional officers have used force on Mr. Byrd more than twenty times, sometimes for manifesting symptoms of his conditions and sometimes for requesting help.

212.     For example, in August 2019, Mr. Byrd suffered from a panic attack and lost consciousness. When staff found him unresponsive, they did not call for medical attention but instead called for the restraint chair and strapped his legs, arms, and shoulders to the device.

213.     On or about November 22, 2019, Mr. Byrd told staff that he was hearing voices but that he was not suicidal. Mr. Byrd slapped his head in an attempt to silence the voices. A mental health provider observed that Mr. Byrd did not injure himself. ACJ then placed Mr. Byrd into a restraint chair for several hours.

214.    As another example, in January 2020, Mr. Byrd was having a panic attack because he was worried that the SERT officers who were on his housing pod were going to physically assault him.  Mr. Byrd asked to speak with a mental healthcare provider four times, but no mental healthcare treatment was provided.  Instead, Mr. Byrd was written up for a misconduct and placed in a restraint chair for several hours.

215.    On January 24, 2020, Mr. Byrd was on suicide watch and repeatedly requested to speak with a mental health nurse. After two hours, Mr. Byrd threatened to break the lights in his cell if he did not receive treatment. A correctional officer ordered Mr. Byrd to cuff up. Mr. Byrd responded that he would not comply until he had been seen by the nurse.

216.    After speaking with the nurse, Mr. Byrd complied with the officer's orders.  The officer then placed Mr. Byrd in a restraint chair even though he was not exhibiting any threatening or self-harming behaviors.  He was then returned to 8E.

217.    More recently, in July 2020, SERT officers came to Mr. Byrd's cell, and informed him that Defendant Williams reported that Mr. Byrd was suicidal, and they had come to take Mr. Byrd to the suicide watch housing unit, 5C.  Earlier that day, Mr. Byrd had spoken with mental health staff and specifically said he was not suicidal.

218.    When Mr. Byrd informed the officers that he was not having suicidal thoughts, an officer sprayed a can of mace into Mr. Byrd's cell. Mr. Byrd struggled to breathe because he has asthma.

219.    Mr. Byrd was then placed in a restraint chair. After sitting in the restraint chair for several hours, Mr. Byrd was returned to solitary confinement, having never been sent to suicide watch.

220. When he returned to his cell, officers had removed all of his legal work, which included some documentation concerning Defendant Williams.

221. Since 2018, Mr. Byrd has been put in the restraint chair repeatedly, for varying amounts of time, including on one occasion for 28 hours.

222. In May 2020, after years of no treatment and being punished each time he requested help, Mr. Byrd was taken to the hospital three times in a row for attempting suicide by overdosing on medication.

223. When Mr. Byrd returned to ACJ, the medical department abruptly suspended all his psychiatric medications indefinitely. Since then, ACJ has refused to provide Mr. Byrd any alternative medications or mental health treatment.

224. ACJ staff interpreted his suicide attempts as calls for help, rather than true suicide attempts. Mr. Byrd's medical records indicate that "it was decided this was not true suicidal behavior, but was a maladaptive behavior for secondary gain, reflecting symptoms of his personality disorder."

225. Even though they recognize these acts reflected his personality disorder, they nevertheless responded by refusing to provide him his medication, even in crushed form. The medical staff has repeatedly told Mr. Byrd that he is being denied all his medications because he attempted suicide.

226. Staff recognize that Mr. Byrd engages in "maladaptive behaviors" because that is the only behavior that gets any results when he needs help, and further recognize that he is punished for engaging in that conduct and ultimately receives less care as a result.

227. Mr. Byrd's condition has continued to deteriorate, especially when in solitary confinement.

**Jason Porter**

228.     Mr. Porter was incarcerated at ACJ in August 2019 and has remained there since that time.

229.     Mr. Porter has physical and psychiatric disabilities. Prior to incarceration at ACJ, Mr. Porter was blinded in his left eye when he was shot in the face.

230.     Mr. Porter also suffers from severe anxiety, depression, and PTSD.  Prior to entering ACJ, he was having weekly therapy sessions.

231.     When he arrived at ACJ, he had a cursory screening where he was asked if he wanted to harm himself or anyone else.

232.     Except for a few days when the RHU had no availability, Mr. Porter has spent his entire time in administrative custody on pod 8E.  He is not in RHU for any disciplinary reason, but rather, because his vision problem allegedly would pose a problem for him in general population and there is no room on the medical pod.

233.     While confined to a tiny cell for 23 hour a day, Mr. Porter has experienced deprivation of social interaction and exercise, severe stress, and emotional suffering. Mr. Porter has had minimal access to fresh air and natural sunlight, and has limited access to showers, recreation, phones, books, and visitation privileges.

234.     Defendants have denied Mr. Porter's repeated requests for mental health care.

235.     He has requested counseling, but has never received any counseling. Defendant Barfield advised him that ACJ does not offer counseling sessions.

236.     Correctional officers have refused to contact mental health unless he admits to being suicidal. Even when Mr. Porter has told correctional officers that he needs emergency

mental health intervention, they have told him to wait until the next shift change of correctional officers.

237.    Although Mr. Porter had been approved by an outside care provider for surgery to resolve vision problems associated with the shooting described above, Defendant Williams cancelled his surgery and refuses to reschedule it.  The inability to see, and the interference in his attempt to get treatment, has caused him profound distress and emotional harm.

238.    Recently, when his requests to speak with someone from mental health continued to be ignored, he told medical staff that he was feeling suicidal.  Medical staff alerted the mental health department, and when mental health staff arrived, Mr. Porter explained that he was not really suicidal but said so because that was the only way he could actually speak to someone. The staff person then walked away without listening to his concerns.

239.    Mr. Porter is not aware of any treatment plan for his mental health conditions.

240.    On January 23, 2020, while conducting a shakedown of the unit, correctional officers disposed of Mr. Porter's property, including his legal paperwork.

241.    To interrupt the destruction of his property and seek help, Mr. Porter held open the slot in his cell door, and an officer ordered him to release the slot. Mr. Porter began to explain the problem, but the officer ignored him and tased his arm.

242.    Even though Mr. Porter then released the slot, the correctional officer entered Mr. Porter's cell. After cuffing Mr. Porter, the officer again tased him, slammed his head into the ground, and then placed him in a restraint chair for at least 6 hours.

243.    During this time, Mr. Porter was offered no bathroom breaks, and no food, water or medication.  Upon being released from the restraint chair, he tried to get the psychiatric medication that he missed, but was told that was not permitted.

244.    Mental health staff were not consulted prior to or during his placement in a restraint chair.

245.    Mr. Porter's condition continues to deteriorate due to the lack of adequate care. Mr. Porter struggles to sleep at night. When he does, he suffers from reoccurring nightmares of being shot in the face or assaulted by corrections officers. He also gets increasingly upset when he sees excessive use of force against other incarcerated individuals, which happens frequently.

**Keisha Cohen**

246.    Ms. Keisha Cohen was incarcerated at ACJ in January 2020, and has remained there since that time.

247.    Ms. Cohen suffers from psychiatric disabilities, including schizoaffective disorder, manic depressive disorder, anxiety, depression, and PTSD.

248.    Prior to her current incarceration at ACJ, Ms. Cohen was hospitalized due to her psychiatric disabilities.  She also received mental health therapy daily.

249.    At ACJ, Ms. Cohen was placed on the women's mental health housing unit, 5MD, and remained there until July 2020, when she was transferred to general population.

250.    ACJ did not provide Ms. Cohen with any therapy or counseling at any time.

251.    Officers discouraged her from requesting mental health treatment by embarrassing her when she did, calling her crazy.

252.    Further, when she did request help, she learned there was little that the mental health staff could do for her.  Instead, she was told to "suck it up."

253.    Ms. Cohen's therapeutic medications were not consistently administered to her, ACJ either distributed them at the wrong time or did not refill them.

254.    In February 2020, Ms. Cohen attempted to hang herself by creating a noose from her shirt and tying it to a pole. When a corrections officer learned that she was attempting suicide, he threatened to tase Ms. Cohen if she did not cease her suicide attempt.

255.    ACJ placed Ms. Cohen on suicide watch for approximately three days after that incident.  For most of that time, Ms. Cohen did not have any clothes or a blanket. She was denied all personal belongings and could not call family or friends.

256.    Ms. Cohen received no therapy or treatment while she was on suicide watch. On her third day, a healthcare provider spent a few minutes asking Ms. Cohen superficial questions about her health and then told her she was fine to be discharged from suicide watch.

257.    After being cleared from suicide watch, Ms. Cohen was punished by being placed on RHU status for more than 10 days.  During this time, her only "exercise" was being chained to a table outside her cell.   She had no hearing associated with her placement into RHU.

**Albert Castaphany**

258.    Mr. Castaphany was incarcerated at ACJ on May 7, 2019, and has remained there since that time.

259.    Mr. Castaphany suffers from anxiety, depression, and PTSD.

260.    While at ACJ, Mr. Castaphany has received no treatment for these conditions other than medication.

261.    Mr. Castaphany repeatedly requested mental health treatment, but Defendants have failed to provide any treatment other than medication.  It routinely took two weeks to respond to any request to be seen.  When he follows up on prior requests to speak with someone, he is told that the more he writes, the longer it will take before he will be seen.

262.    For six months, Mr. Castaphany was prescribed melatonin to treat sleeping problems related to his serious mental illness. Around February 17, 2020, a healthcare provider confirmed his melatonin would be refilled, but over six months later, he still has not received it.

263.    On or about January 8, 2020, while Mr. Castaphany was housed in general population, a fight broke out on the pod. Mr. Castaphany was not involved in the fight. As he was attempting to return to his cell, a sergeant pointed a taser in his face and ordered him to get on the ground.

264.    Even though Mr. Castaphany complied, he was tased before he could get on the ground.  Once cuffed on the ground, the sergeant and two other correction officers continued to tase, punch, and mace him in the face.

265.    Although there were several corrections officers present and Mr. Castaphany presented no risk of danger, staff then placed Mr. Castaphany in the restraint chair for 8 hours.

266.    While Mr. Castaphany was shackled and strapped to the chair, corrections officers continued to punch and tase him, and choked him with a spit mask.

267.    Defendants denied Mr. Castaphany a shower to wash off the mace before placing him in the restraint chair. For eight hours, Mr. Castaphany suffered in agony as he was helpless to stop the mace, which had permeated his hair, streaming into his eyes.

268.    Officers then took Mr. Castaphany to the strip cage, readying him for solitary confinement as further punishment.  Mr. Castaphany told the officers he was mentally unstable as a result of the attacks on him, and he needed to talk to mental health.  The officers told him that the only way he could be seen by mental health was if he was going to kill himself.  Mr. Castaphany responded by saying he did not know what he would do.

269.    Eventually, Mr. Castaphany was placed on suicide watch.  While in the strip cage, he was given a smock to wear, which wraps around the torso, is secured by Velcro, and is colored green like a Christmas tree.

270.    While escorting Mr. Castaphany across the 8E pod to suicide watch on 5C, corrections officers and others began singing "Oh, Christmas Tree. Oh, Christmas Tree."

271.    For days, Mr. Castaphany sat in a mace covered smock in his cell and received no mental health treatment. Because he was not receiving any treatment, and was not provided a shower, his clothes, or anything to remove mace from his face, he eventually told staff that he was stable.

272.    Defendants then placed Mr. Castaphany in solitary confinement even though he did not pose a risk of harm to himself or others.  He eventually had a hearing, but was told that he was being found guilty because he had been placed in a restraint chair, even though he was not involved in any fighting.

273.    Mr. Castaphany was in solitary confinement from January 2020 to March 2020. He was confined in a tiny concrete cell nearly 23 hours a day, with little to no opportunity for exercise, minimal access to sunlight or fresh air, and limited access to showers, phones, books, and commissary privileges. Mr. Castaphany agreed to be double-celled so that he would at least have some human interaction.

274.    Mr. Castaphany's condition deteriorated while in solitary confinement. He grew increasingly despondent; he was hopeless and depressed. He was extremely concerned because he could not call his father, who was dying from stage 4 cancer. Mr. Castaphany also suffered from severe anxiety and had nightmares that correction officers would attack him. His hands would shake and he would wake in night covered in sweat.

## CLASS ACTION ALLEGATIONS

275.     Plaintiffs bring this action under Fed. R.Civ.P. 23 (b)(2) on behalf of themselves

and the following class of similarly situated persons (the "Class"):

> All individuals currently or in the future incarcerated at Allegheny County Jail and who
> have, or will in the future have, a serious mental health diagnosis, disorder or disability as
> recognized in the DSM-V, including but not limited to depression, anxiety, post-
> traumatic stress disorder, schizophrenia, bipolar disorder, or borderline personality
> disorder and are now or in the future will be subject to Defendants' policies and practices.

276.     The members of this Class number at least in the hundreds, and likely in the

thousands such that joinder of all of the individual class members is impracticable.  The exact

size of the Class and the identities of the individual members of the Class (other than future

members) can be determined largely through Defendants' records.

277.     Plaintiffs' claims are typical of the claims of all other members of the Class.  The

claims of Plaintiffs and the other members of the Class are based on the same legal theories and

arise from the same unlawful conduct.  The Class Members all have suffered similar injuries as a

result of Defendants' conduct.

278.     Plaintiffs and their counsel will adequately represent the interests of the Class.

They seek relief that will benefit the entire class.  Plaintiffs' counsel are experienced in civil

rights, prisoner rights, and class action litigation.

279.     There are many questions of law and fact common to the claims of Plaintiffs and

the other members of the Class, and those questions predominate over any questions that may

affect individual Class Members.

280.     Common questions of law and fact affecting members of the Class include, but

are not limited to:

a.      Whether, by virtue of the lack of an adequate mental health care system and inappropriate use of punitive measures against mental health patients, Defendants acted with objective unreasonableness or deliberate indifference to the Class Members' serious medical conditions;

b.      Whether there are such systemic and gross deficiencies in staffing, facilities or procedures that Class Members are effectively denied access to adequate mental health care;

c.      Whether Defendants' policies and practices allow for use of punitive measures greater than necessary, or on mental health patients who are unable to comply with directives because of their mental illness, and thus violate the Class Members' Fourteenth Amendment rights;

d.      Whether Defendants' failure to adequately train staff denies Class Members their  Fourteenth Amendment rights;

e.      Whether Defendants' policies and practices of permitting the placement of Class Members in solitary confinement violates the Fourteenth Amendment;

f.      Whether Defendants' policy of placing pretrial detainees in solitary confinement without a hearing for up to 10 business days violates the Fourteenth Amendment;

g.      Whether Class Members are denied the benefits of ACJ services, programs or activities or otherwise discriminated against by reason of their disabilities.

281.    Defendants have acted or refused to act on grounds that apply generally to the Class, and which make declaratory or injunctive relief appropriate for the Class as a whole.

282.     Absent a class action, most Class Members would find the cost of litigating their claims to be prohibitive, or would be unable to locate counsel, and thus would have no effective remedy.

283.     The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

## CAUSES OF ACTION

### COUNT I:  Fourteenth Amendment – Failure to Provide Adequate Mental Health Care Against All Defendants

284.     Plaintiffs incorporate by reference the allegations set forth in paragraph 1 through 283 of this Complaint as though set forth fully herein.

285.     The Class Members have serious medical needs in that they each have been diagnosed with at least one psychiatric disability as defined in the DSM-V, including but not limited to anxiety, depression, post-traumatic stress disorder, bipolar disorder, schizophrenia, or other conditions.

286.     Defendants are aware of the Class Members' serious medical conditions.

287.     Defendants are aware that Class Members' conditions can be substantially alleviated or controlled with appropriate care and treatment.

288.     Defendants are aware that denial of care for these conditions can cause substantial harm.

289.     Defendants have acted and continue to act with objective unreasonableness, or have been and continue to be deliberately indifferent to the Class Members' serious mental health conditions, in that they:

a. Do not have a reliable system of diagnosing or screening for mental health conditions, but instead rely on self-reporting and casual observation;

b. Do not regularly request past treatment records for patients with mental health histories;

c. Do not regularly provide comprehensive evaluations of individuals identified as in need of mental health treatment;

d. Do not regularly prepare written treatment plans, or any treatment plans;

e. Do not appropriately respond to requests for mental health treatment;

f. Do not respond in a timely fashion to requests for mental health care or treatment;

g. Do not provide any counseling or therapy;

h. Do not appropriately manage Class Members' medications;

i. Do not provide for adequate confidentiality necessary for mental health care;

j. Do not provide sufficient staffing to ensure appropriate mental health care;

k. Do not provide sufficient resources to ensure that existing staff can provide appropriate mental health care;

l. Do not provide sufficient training to staff to ensure appropriate mental health care;

m. Permit the use of punitive measures in response to requests for mental health treatment;

n. Permit the use of punitive measures in response to behaviors that are expected from and consistent with the mental health conditions of the Class Members;

o. Fail to allow mental health staff to interrupt use of punitive measures when appropriate;

     p.   Place Class Members in solitary confinement notwithstanding their serious mental health conditions;

     q.   Place Class Members in solitary confinement as punishment for requesting mental health treatment;

     r.   Place Class Members in solitary confinement as punishment for behaviors that are expected from and consistent with the mental health conditions of the Class Members.

290.    There are such systemic and gross deficiencies in staffing, facilities and procedures that the Class Members are effectively denied access to adequate mental health care.

291.    Based on the acts and omissions described above, Defendants subject the Class Members to a substantial risk of serious harm and injury from inadequate mental health care, and deprive the Class Members of an appropriate measure of life's necessities and human dignity, in violation of the Class Members' rights to due process under the Fourteenth Amendment.

292.    The Defendants' acts and omissions as described above have proximately caused the Class Members ongoing deprivation of rights, have exacerbated their serious medical conditions and have caused the Class Members to suffer physical and psychological harm, severe pain and extreme mental anguish.

**COUNT II:  Fourteenth Amendment – Unconstitutional Use of Solitary Confinement**

**Against All Defendants**

293.    Plaintiffs incorporate by reference the allegations set forth in paragraph 1 through 283 of this Complaint as though set forth fully herein.

294.    The Class Members have psychiatric disabilities that place them at heightened risk of decompensation, emotional pain and suffering, elevated anxiety, panic attacks, severe depression, and suicidality if they are placed in solitary confinement.

295.    Class Members are at substantial risk of serious harm due to the Defendants' disciplinary policies and practices that do not protect people with psychiatric disabilities from solitary confinement.

296.    Solitary confinement of Class Members deprives them of basic human needs for mental and physical health, social interaction, exercise, and environmental stimulation.

297.    Defendants are aware that Class Members' psychiatric disabilities place them at risk of substantial harm when placed in solitary confinement and deprive them of basic human needs such as mental and physical health, social interaction, exercise, and environmental stimulation

298.    Defendants have acted and continue to act with objective unreasonableness, or have been and continue to be deliberately indifferent to the Class Members' serious mental health conditions, in that they place class members in solitary confinement despite the well known risk of substantial harm to these prisoners life and health from such placement

299.    The placement of class members in solitary confinement despite the general consensus that such confinement harms their health, deprives them of basic human needs, and presents a substantial risk to their life violates the 14th Amendment to the Constitution.


**COUNT III:  Fourteenth Amendment – Excessive Use of Force**
**Against All Defendants**

300.    Plaintiffs incorporate by reference the allegations set forth in paragraph 1 through 283 of this Complaint as though set forth fully herein.

301.    Defendants have imposed and continue to impose cruel and unusual punishment on Class Members in that they:

    a.  Do not provide sufficient training to staff to ensure force is only used when necessary, is not used excessively, unreasonably, or in situations that can be resolved without the use of force;

    b.  Do not prohibit or prevent correctional staff from using force in response to requests for mental health care or treatment;

    c.  Condone the use of force in response to requests for mental health care or treatment;

    d.  Do not provide training to correctional staff to determine when conduct may be a manifestation of one's mental health condition, and thus requires treatment rather than punishment;

    e.  Do not prohibit or prevent correctional staff from using force in response to behaviors that are expected from and consistent with the mental health conditions of the Class Members;

    f.  Condone the use of force in response to behaviors that are expected from and consistent with the mental health conditions of the Class Members;

    g.  Do not provide training to correctional staff on de-escalation;

    h.  Permit the use of punitive measures that are greater than necessary to maintain discipline or protect others from harm, including but not limited to:

        i.  Use of OC spray in situations where psychiatrically disabled Class Members do not present any physical risk;

    ii.  Use of OC spray wantonly to effect compliance, impose punishment, or without any identifiable reason;

    iii.  Wanton use of tasers;

    iv.  Use of restraint chair without appropriate, or in some cases without any, health safeguards, including mental health and medical checks, bathroom usage, food, and water;

  h.  Fail to provide any effective oversight of use of force practices that would identify instances of excessive force and hold staff accountable in order to prevent recurrence.

302.    Based on the acts and omissions described above, Defendants subject the Class Members to a substantial risk of serious harm and injury through objectively unreasonable use of force policies and practices at ACJ, depriving Class Members of an appropriate measure of life's necessities and human dignity, in violation of the Class Members' rights to be free from cruel and unusual punishment under the Fourteenth Amendment.

**COUNT IV:  American with Disabilities Act, 42 U.S.C. §12132**

**Against Defendant Allegheny County**

303.    Plaintiffs incorporate by reference the allegations set forth in paragraph 1 through 283 of this Complaint as though set forth fully herein.

304.    Plaintiffs and Class Members are qualified individuals with disabilities that substantially limit many of their major life activities including but not limited to learning, reading, concentrating, thinking, communicating and interacting with others.

305.    Defendant Allegheny County is a public entity within the meaning of 42 U.S.C. §12131.

306.    The Class Members are entitled to be free from discrimination under the Americans with Disabilities Act, 42 U.S.C. §12131 *et seq.*

307.    Defendants have discriminated against Class Members on the basis of their psychiatric disabilities by *inter alia*, using excessive force against and placing Class Members in solitary confinement on the basis of their psychiatric disabilities and manifestations thereof.

308.    Defendants have failed to reasonably accommodate the Class Members' psychiatric disabilities, and denied them the benefits and services at ACJ by reason of their psychiatric disabilities in that they failed to adequately identify and ensure that people with psychiatric disabilities have equal access to programs, services and activities at ACJ.

309.    In particular, Defendants have failed to adequately identify and provide accommodation to Class Members in that they:

      a.    Do not have a reliable system of diagnosing or screening for mental health conditions, but instead rely on self-reporting and casual observation of obviously psychotic behavior;

      b.    Do not regularly request past treatment records for patients with mental health histories;

      c.    Do not conduct a trauma assessment upon intake;

      d.    Do not provide for adequate confidentiality when discussing a patient's mental health concerns;

      e.    Do not provide sufficient training to staff on interacting with individuals with psychiatric disabilities;

f.   Permit the use of punitive measures in response to requests for mental health treatment, and in some cases, actually instruct staff to use punitive measures in such circumstances;

g.   Permit the use of punitive measures in response to behaviors that are expected from and consistent with the mental health conditions of the Class Members;

h.   Permit the use of punitive measures that are greater than necessary to maintain discipline or protect others from harm;

i.   Fail to allow mental health staff to interrupt use of punitive measures when appropriate;

j.   Place Class Members in solitary confinement notwithstanding their serious mental health conditions;

k.   Place Class Members in solitary confinement as punishment for requesting mental health treatment;

l.   Place Class Members in solitary confinement as punishment for behaviors that are expected from and consistent with the mental health conditions of the Class Members thereby denying Class Members access to services and programs at ACJ on the basis of their psychiatric disability.

310.   The Defendants also violate the American with Disabilities Act by failing to make reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability.

## COUNT V:  Rehabilitation Act, 29 U.S.C. §794

### Against Defendant Allegheny County

311.    Plaintiffs incorporate by reference the allegations set forth in paragraph 1 through 283 of this Complaint as though set forth fully herein.

312.    Plaintiffs and Class Members are qualified individuals with disabilities that substantially limit many of their major life activities including but not limited to learning, reading, concentrating, thinking, communicating and interacting with others.

313.    Defendant Allegheny County receives federal financial assistance within the meaning of the Rehabilitation Act.

314.    The Class Members are entitled to be free from discrimination under section 504 of the Rehabilitation Act.

315.    Defendants have discriminated against Class Members' on the basis of their psychiatric disabilities by *inter alia*, using excessive force against and placing Class Members in solitary confinement on the basis of their psychiatric disabilities and manifestations thereof.

316.    Defendants have failed to reasonably accommodate the Class Members' psychiatric disabilities, and denied them the benefits and services at ACJ by reason of their psychiatric disabilities in that they failed to adequately identify and ensure that people with psychiatric disabilities have equal access to programs, services and activities at ACJ.

317.    In particular, Defendants have failed to adequately identify and provide accommodation to Class Members in that they:

      a.  Do not have a reliable system of diagnosing or screening for mental health conditions, but instead rely on self-reporting and casual observation of obviously psychotic behavior;

b.  Do not regularly request past treatment records for patients with mental health histories;

c.  Do not conduct a trauma assessment upon intake;

d.  Do not provide for adequate confidentiality when discussing a patient's mental health concerns;

e.  Do not provide sufficient training to staff on interacting with individuals with psychiatric disabilities;

f.  Permit the use of punitive measures in response to requests for mental health treatment, and in some cases, actually instruct staff to use punitive measures in such circumstances;

g.  Permit the use of punitive measures in response to behaviors that are expected from and consistent with the mental health conditions of the Class Members;

h.  Permit the use of punitive measures that are greater than necessary to maintain discipline or protect others from harm;

i.  Fail to allow mental health staff to interrupt use of punitive measures when appropriate;

j.  Place Class Members in solitary confinement notwithstanding their serious mental health conditions;

k.  Place Class Members in solitary confinement as punishment for requesting mental health treatment;

l.  Place Class Members in solitary confinement as punishment for behaviors that are expected from and consistent with the mental health conditions of the Class

Members thereby denying Class Members access to services and programs at ACJ on the basis of their psychiatric disability.

318.    The Defendants also violate the Rehabilitation Act by failing to make reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability.

## COUNT VI:  Fourteenth Amendment – Procedural Due Process
### Against All Defendants

319.    Plaintiffs incorporate by reference the allegations set forth in paragraph 1 through 283 of this Complaint as though set forth fully herein.

320.    Defendants have violated and continue to violate Class Members' right to procedural due process in that they:

  a.  Impose punishment via placement in solitary confinement without first – or, in some cases, ever – holding a hearing;

  b.  Not providing those charged with rule violations with a written copy of the rule violation ahead of any hearing that may be held;

  c.  Not permitting individuals charged with rule violations to call witnesses or present evidence when determining whether they are guilty of the charge or not;

  d.  Not providing Class Members with copies of a written determination as to the disposition of the charges against them.

## COUNT VII:  Fourteenth Amendment – Substantive Due Process
### Against All Defendants

321.    Plaintiffs incorporate by reference the allegations set forth in paragraph 1 through 283 of this Complaint as though set forth fully herein.

322.    As pretrial detainees, Plaintiffs and Class Members have a right to be free from punishment.

323.    Defendants have chosen to place Plaintiffs and Class Members in solitary confinement in order to punish them.

324.    Defendants' policy and practice of placing individuals with psychiatric disabilities in solitary confinement for requesting mental health care or for manifestations of their psychiatric disabilities is not rationally related to any legitimate non-punitive government purpose.

325.    To the extent Defendants' treatment of Plaintiffs and Class Members bears some rational relationship to a legitimate non-punitive government purpose, it is excessive in light of that purpose.

## COUNT VIII:  Fourteenth Amendment – Failure to Train
### Against All Defendants

326.    Plaintiffs incorporate by reference the allegations set forth in paragraph 1 through 283of this Complaint as though set forth fully herein.

327.    Defendants Harper and Williams have failed to train ACJ staff on how to manage and interact with incarcerated people with psychiatric disabilities despite the knowledge that a high proportion of the jail's population are individuals with psychiatric disabilities.

328.     Defendants have acted with objective unreasonableness or deliberate indifference to the need to train ACJ staff on how to manage and interact with individuals with psychiatric disabilities despite knowing that the lack of training causes serious risks and harm to those with psychiatric disabilities.

329.     The failure to train has resulted in the unlawful conduct that is alleged in this Complaint.

330.     The training that supervisory Defendants failed to provide includes but is not limited to:

    a.   Training on how to recognize behaviors and patterns of behavior that are indicative of psychiatric disability;

    b.   Training on how to de-escalate conflict with individuals who have psychiatric disabilities;

    c.   Training on the adverse psychological impact of solitary confinement upon those with psychiatric disability and those who are vulnerable to suicide;

    d.   Training on suicide prevention;

    e.   Training on the importance and necessity of consulting with mental health staff when a person with psychiatric disability engages in problematic behavior, rule violations, or manifests symptoms of their serious mental health condition that suggest a need for intervention.

331.     Knowing of the prior suicides, suicide attempts, and incidents of self-harm in the solitary confinement units at ACJ, Defendants Harper and Williams acquiesced in a long-standing practice of failing to train personnel in suicide prevention, management of individuals with psychiatric disabilities, or consultation with mental health staff prior to placing individuals

with mental health issues in isolation. The need for more training was obvious and so likely to result in the violation of constitutional rights that the failure to train was objectively unreasonable and constituted deliberate indifference to the needs of those in their custody.

## Prayer for Relief

WHEREFORE, Plaintiffs request that the Court grant the following relief:

A.      Declare that the above-captioned matter is maintainable as a Class Action pursuant to Federal Rule of Civil Procedure 23;

B.      Adjudge and declare that the acts and omissions of Defendants as described herein are in violation of the rights of Plaintiffs and the Class under the Fourteenth Amendment to the U.S. Constitution, the Americans with Disabilities Act and the Rehabilitation Act;

C.      Enjoin Defendants and all persons acting in concert with them, or acting as their agents, from continuing these unlawful acts, conditions and practices, as described in the Complaint;

D.      Order Defendants to provide necessary and adequate mental health care to Plaintiffs, including but not limited to diagnostic assessments, therapeutic interventions, counseling, appropriate responses to requests for mental health care, confidential clinician-patient interactions, and properly managed medication treatment, as well as any other care determined necessary and proper based on the record before the Court, with appropriate staffing, resources and training;

E.      Enjoin Defendants and all persons acting in concert with them, or acting as their agents, from using punitive measures against Class Members for requesting mental health care or for behaviors that are expected from and consistent with the Class Members' conditions;

F.     Enjoin Defendants and all persons acting in concert with them, or acting as their agents, from placing Class Members in solitary confinement;

G.     Order Defendants and all persons acting in concert with them, or acting as their agents, to provide a hearing prior to imposing punishment upon Class Members, including proper notice of charges, opportunity to produce witnesses, and notice of disposition;

H.     Grant attorneys' fees and costs;

I.     Retain jurisdiction of this case until Defendants have fully complied with the orders of this Court and there is reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction;

J.     Award such other relief as the Court deems just and proper.


**JURY DEMAND**

Plaintiffs request a trial by jury with respect to all matters and issues properly triable by a jury.


Respectfully submitted,


*/s/ Keith E. Whitson*
Keith E. Whitson
Pa. I.D. No. 69656

**SCHNADER HARRISON SEGAL & LEWIS LLP**
2700 Fifth Avenue Place
120 Fifth Avenue
Pittsburgh, PA  15222
Telephone: (412) 577-5220
Facsimile: (412) 577-5190
kwhitson@schnader.com


*/s/ Alexandra Morgan-Kurtz*
Alexandra Morgan-Kurtz, Esq.
PA ID No. 312631

**Pennsylvania Institutional Law Project**
100 Fifth Ave, Ste 900
Pittsburgh, Pa 15222
Tel: (412) 434-6175
amorgan-kurtz@pailp.org


*/s/ Bret Grote*
Bret Grote, Esq.
PA ID No. 317273
*s/ Jaclyn Kurin*
Jaclyn Kurin
D.C. Bar ID No. 1600719
Pro Hac Vice Application To Be Filed
*/s/ Swain Uber*
Swain Uber, Esq.
PA I.D. No. 323477
*/s/ Quinn Cozzens*
Quinn Cozzens, Esq.
PA ID No. 323353

**Abolitionist Law Center**
P.O. Box 8654
Pittsburgh, PA  15221
Tel:  (412) 654-9070
bretgrote@abolitionistlawcenter.org
jkurin@alcenter.org
swain.uber@gmail.com
qcozzens@alcenter.org