# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **SHAQUILLE HOWARD, BROOKE GOODE, JASON PORTER, KEISHA COHEN and ALBERT CASTAPHANY, on their own behalf and on behalf of all others similarly situated,** | : : : : : : : | **Case No. 20-cv-1389** |
|  | : | |
| **Plaintiffs,** | : | **ELECTRONICALLY FILED** |
|  | : | |
| **v.** | : | **JURY TRIAL DEMANDED** |
|  | : | |
| **LAURA WILLIAMS, Chief Deputy Warden of Healthcare Services; ORLANDO HARPER, Warden of Allegheny County Jail; MICHAEL BARFIELD, Mental Health Director; ALLEGHENY COUNTY;** | : : : : : : | |
|  | : | |
| **Defendants.** | | |

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

Table of Authorities…………………………………….…………………………………………ii

**FACTUAL BACKGROUND** ...................................................................................................2

    A.    ACJ's Failures to Meet Recognized Standards for the Provision of Mental Health Care ...........................................................................................................3

        i.    Grossly Inadequate Staffing.............................................................................3

        ii.    Lack of Training .............................................................................................5

        iii.    Ineffective Intake Procedures ........................................................................9

        iv.    Insufficient Treatment Plans........................................................................10

        v.    No Counseling or Therapy, and Only Minimal Interaction with Staff...........11

        vi.    Non-existent Quality Improvement Program .................................................14

    B.    Unreasonable Punishment of Individuals with Psychiatric Disabilities....................15

    C.    Overuse of Solitary Confinement for Putative Class Members ...............................17

    D.    These Failures Cause Significant Harm to Class Members......................................19

**ARGUMENT** .........................................................................................................................21

    A.    The Proposed Class Definition is Readily Discernible and Clear ...........................23

    B.    The Class Satisfies the Prerequisites of Rule 23(a) ................................................25

        i.    The Proposed Class is So Numerous That Joinder is Impracticable ..............25

        ii.    The Constitutional Challenges to Defendants' Patterns, Practices, or Policies Present Common Questions of Law and Fact .............................29

        iii.    Plaintiffs' Claims are Typical of the Class .................................................35

        iv.    The Plaintiffs and Their Attorneys Will Fairly and Adequately Protect the Interests of the Class....................................................................37

    C.    Plaintiffs' Challenge to Defendants' Patterns, Practices, or Policies Satisfies Rule 23(b)(2)...............................................................................................39

**CONCLUSION**……………………………………………………………..……...40

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Baby Neal for & by Kanter v. Casey*,
    43 F.3d 48 (3d Cir. 1994) ............................................................................................ *passim*

*Beck v. Maximus, Inc.*
    457 F.3d 291 (3d Cir. 2006) ........................................................................................... 35

*Braggs v. Dunn*,
    317 F.R.D. 634 (M.D. Ala. 2016) ................................................................................... 23

*Brown v. Transurban USA Inc.*,
    144 F.Supp. 3d 809 (E.D. Va. 2015) ................................................................................ 7

*In re Chiang*,
    385 F.3d 256 (3d Cir. 2004) ........................................................................................... 34

*City of Mesquite v. Aladdin's Castle*,
    455 U.S. 283 (1982) ......................................................................................................... 7

*Clark v. Lane*,
    267 F.R.D. 180 (E.D. Pa. 2010) ................................................................... 23, 30, 35, 39

*In re Cmty. Bank of N. Va.*,
    622 F.3d 275 (3d Cir. 2010) ........................................................................................... 22

*Coleman v. Wilson*,
    912 F. Supp. 1282 (E.D. Cal. 1995) ............................................................................... 23

*Coley v. Clinton*,
    635 F.2d 1364, 1378 (8th Cir. 1980) .............................................................................. 22

*Dean v. Coughlin*,
    107 F.R.D. 331 (S.D.N.Y. 1985) .................................................................................... 29

*Death Row Prisoners of Pa. v. Ridge*,
    169 F.R.D. 618 (E.D. Pa. 1996) ..................................................................................... 40

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*
    528 U.S. 167 (2000) ......................................................................................................... 7

*Grant v. Sullivan*,
    131 F.R.D. 436 (M.D. Pa. 1990) .................................................................................... 26

*Hagan v. Rogers*,
    570 F.3d 146 (3d Cir. 2009)..................................................................................29

*Hassine v. Jeffes*,
    846 F.2d 169 (3d Cir. 1988)...........................................................................22, 24

*Inmates of the Northumberland County Prison v. Reish*,
    2009 U.S. Dist. LEXIS 126479 (M.D. Pa. March 17, 2009)................................24, 26, 30, 38

*Johnson v. Wetzel*,
    209 F.Supp.3d 766 (M.D. Pa. 2016) ....................................................................18

*Kilgo v. Bowman Transp., Inc.*,
    789 F.2d 859 (11th Cir. 1987) .............................................................................29

*L.A. v. Lyons*,
    461 U.S. 95 (1983).............................................................................................7

*Lerch v. Citizens First Bancorp, Inc.*,
    144 F.R.D. 247 (D.N.J. 1992)...............................................................................25

*Manning v. Princeton Consumer Disc. Co.*,
    390 F. Supp. 320 (E.D. Pa. 1975) .........................................................................26

*Milwaukee Police Ass'n v. Jones*,
    192 F.3d 742, 747 (7th Cir. 1999) .........................................................................7

*New Directions Treatment Servs. v. City of Reading*,
    490 F.3d 293 (3d Cir. 2007)................................................................................37

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001)................................................................................35

*Parsons v. Ryan*,
    289 F.R.D. 513 (D. Ariz. 2013), *aff'd*, 754 F.3d 657 (9th Cir. 2014), *reh'g
    denied*, 784 F.3d 571 (9th Cir. 2015).....................................................................23

*Pashby v. Delia*,
    709 F.3d 307 (4th Cir. 2013) ...............................................................................7

*Rasho v. Walker*,
    No. 07-1298-MMM, 2016 WL 11514940 (C.D. Ill. Feb. 8, 2016) ................................23, 25

*Santiago v. City of Phila.*,
    72 F.R.D. 619 (E.D. Pa. 1976)......................................................................26, 39, 40

*Sefick v. Gardnes*,
    164 F.3d 370 (7th Cir. 1990) ...............................................................................7

*Shelton v. Bledsoe*,
    775 F.3d 554 (3d Cir. 2015)....................................................................22, 23, 39

*Stewart v. Abraham*,
    275 F.3d 220 (3d Cir. 2001)...............................................................................35

*Sullivan v. DB Invs., Inc.*,
    667 F.3d 273 (3d Cir. 2011).................................................................................22

*Tyler v. Rapone*,
    603 F. Supp. 268 (E.D. Pa. 1985) ........................................................................2

*Wachtel ex rel. Jeffe v. Guardian Life Ins. Co. of Am.*,
    453 F.3d 179 (3d Cir. 2006)................................................................................23

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)...............................................................................22, 31, 39

*Weiss v. York Hosp.*,
    745 F.2d 786 (3d Cir. 1984)..........................................................................26, 39

*Williams v. City of Phila.*,
    270 F.R.D. 208 (E.D. Pa. 2010).....................................................................24, 37

## Statutes

Americans with Disabilities Act, 42 U.S.C. §12131 ...........................................1, 21

Rehabilitation Act, 29 U.S.C. §794 ...................................................................1, 21

## Other Authorities

U.S. Constitution, Fourteenth Amendment ...............................................................1

37 Pa. Code §95.220b ..............................................................................................2

37 Pa. Code §95.232(6),(7).....................................................................................14

37 Pa. Code §95.241(1)(ii)........................................................................................3

37 Pa. Code §95.241(2)) ................................................................................... 15-16

37 Pa. Code §95.243(2) ..........................................................................................11

Fed. R. Civ. P. 23 ...................................................................................................39

Fed. R. Civ. P. 23(a) ............................................................................1, 21, 22, 25

Fed. R. Civ. P. 23(a)(1).................................................................................25, 29

Fed. R. Civ. P. 23(a)(2)........................................................................................31

Fed. R. Civ. P. 23(a)(4)...................................................................................37, 38

Fed. R. Civ. P. 23(b)(2).................................................................1, 21, 22, 39

Fed. R. Civ. P. 23(c)(1)(B) ..................................................................................38

Fed. R. Civ. P. 23(g)...........................................................................................38

*Advisory Committee's Notes to Proposed Rules of Civil Procedure,* 39 F.R.D. 69
    (1966)...........................................................................................................39

Bronson, J, Berzofsky, M, *Indicators of Mental Health Problems Reported by
    Prisoners and Jail Inmates, 2011-2012* (Bureau of Justice Statistics, June 22,
    2017, NCJ 250612) ......................................................................................28

E. Fuller Torrey et al., *More Mentally Ill Persons Are in Jails and Prisons Than
    Hospitals: A Survey of the States*, Treatment Advocacy Center (2010) ...................19

Holly Hills, Christine Siegfried, Alan Ickowitz, *Effective Prison Mental Health
    Services: Guidelines to Expand and Improve Treatment,* U.S. Department of
    Justice, National Institute of Corrections (2004) ....................................................19

K. Giammarise, "Report cites issues with suicide prevention in Allegheny County
    Jail" (Pittsburgh Post-Gazette, June 4, 2020) .........................................................20

Lord, Rich and Smydo, Joe, "No Safe Harbor, Part II: Prisons cope with mental
    health," Pittsburgh Post-Gazette, Feb. 7, 2016 .......................................................17

Berman, Mark, "The Pennsylvania prison system will stop putting mentally ill
    individuals in solitary," Washington Post, January 8, 2015 ...................................17

"Allegheny County Jail's Suicide Rate Among Nation's Highest" (WPXI, July 5,
    2011) ...........................................................................................................20

Kim, Cohen & Serakos, *The Processing and Treatment of Mentally Ill Persons in
    the Criminal Justice System: A Scan of Practice and Background Analysis*
    (Urban Institute, March 2015) ..........................................................................28

Jeffrey L. Metzner, M.D., et al., *Solitary Confinement and Mental Illness in U.S.
    Prisons: A Challenge for Medical Ethics,* 38 J. AM. ACAD. Psychiatry &
    Law 104, 104 (2010)......................................................................................18

Terry Kupers et al., *Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs,* 36 Crim. Just. & Behavior 1037 (2009)....................................................19

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

Defendants are violating Plaintiffs' rights (and many others' rights) under the Fourteenth Amendment to the United States Constitution, the Americans with Disabilities Act, 42 U.S.C. §12131, *et seq.,* and the Rehabilitation Act, 29 U.S.C. §794.  They are doing so by failing to provide any meaningful mental health care to those in their custody, and by actually punishing them for seeking mental health care or for the manifestations of their conditions.  As a result of Defendants' unconstitutional and unreasonable conduct, Plaintiffs and the members of the proposed class have deteriorated psychologically, their conditions have worsened, they experience worse outcomes once released from jail and have a higher likelihood of returning to the jail, and they have a higher incidence of suicide attempts and suicide.

Through this Motion, Plaintiffs seek to certify a class of individuals defined as follows:

> All individuals currently or in the future incarcerated at Allegheny County Jail ("ACJ") and who have, or will in the future have, a serious mental health diagnosis, disorder or disability as recognized in the DSM-V, including but not limited to depression, anxiety, post-traumatic stress disorder, schizophrenia, bipolar disorder, or borderline personality disorder.

As set forth in this Brief, the proposed class meets all the requirements of Fed. R.C.P. 23(a).  The proposed class is so numerous that joinder of all members is impracticable, there are questions of law and fact common to the class, the claims of the Plaintiffs are typical of the class, and the Plaintiffs and counsel will fairly and adequately protect the interests of the class.  Further, Defendants have acted or refused to act on grounds generally applicable to the class, and final injunctive relief is appropriate with respect to the class as a whole.  Fed. R.C.P. 23(b)(2).  Thus, class certification is appropriate.

1

**FACTUAL BACKGROUND**

By its terms, Title 37, Chapter 95 of the Pennsylvania Code applies to county prisons and establishes "minimum requirements" that are "deemed to be essential to the safety and security of the county prison, prison staff, inmates and the public." 37 Pa. Code §95.220b. *See also Tyler v. Rapone*, 603 F. Supp. 268, 270 (E.D. Pa. 1985) (Tile 37, Chapter 95 governs county correctional institutions). Defendants are aware of and attempt to comply with Title 37. Deposition of Chief Deputy Warden Laura Williams, as designee of Allegheny County, attached as **Ex. 1**, at pp. 16-17. *See also* Deposition of Captain Stephanie Frank, attached as **Ex. 2**, at pp. 26-28, 34; **Ex. 3** ("Title 37 standards" as produced by Defendants, AC 2749-71).

In addition to state law requirements, Defendants purport to follow accepted standards as set forth by the American Correctional Association ("ACA") and the National Commission of Correctional Health Care ("NCCHC"). *See, e.g.,* **Ex. 4** (Policy 2600, AC 2504-2530, specifically citing to standards of ACA and NCCHC, among other organizations); **Ex. 5** (Policy 2100, AC 2462-68, citing NCCHC standard J-A-01); **Ex. 6** (Healthcare Services Orientation, AC 7587-7605, at 7599 and 7601, referencing ACA and NCCHC standards in staff orientation). "We model our [healthcare] policies on NCCHC ....  We are not accredited, but we strive to be and model the policies on those standards," Ex. 1, 17:6-10. As Dr. Ashley Brinkman, Allegheny County's current Health Services Administrator, testified,

> 99
> 5    Q    So as a whole, do NCCHC mental health
> 6  standards represent what, in your view, would be
> 7  minimally required?  Or is that more of your goal?
> 8         MR. BACHARACH:  Object to form.  You can
> 9     answer.
> 10      A    It's the facility's goal to be able to
> 11  reach that accreditation.  I think the difference
> 12  between it being minimum and goal is mostly we haven't

13   reached it yet.  So I suppose it is both.  I'm not
14   sure how to be more specific.

**Ex. 7** (Brinkman transcript), at p. 99.  Copies of some of the most relevant ACA standards for mental health care programs are attached as **Exhibit 8**, and copies of some of the most relevant NCCHC standards are attached as **Exhibit 9**.

Despite these aspirations, Defendants fail to comply with ACA and NCCHC standards, fail to comply with Title 37, and fail to comply even with ACJ's own deficient policies.[1]  These failures coalesce into a harmful and even deadly environment at ACJ where use of force is rampant, suicide numbers skyrocket and hundreds if not of thousands of disabled incarcerated people suffer daily without necessary treatment.

A.   ACJ's Failures to Meet Recognized Standards for the Provision of Mental Health Care

     ***i.  Grossly inadequate staffing***

Sufficient staffing is crucial to the provision of adequate and constitutional mental health care in carceral settings.  Defendant Williams acknowledged that "adequacy of care typically relates to staffing." Ex. 1, p. 122.  Title 37 requires an annual, documented staffing analysis.  37 Pa. Code §95.241(1)(ii).  As does the County's own policy (**Ex. 10**, Policy 609, no bates number).  The NCCHC likewise requires a staffing plan and identifies as unreasonable "having an understaffed, underfunded or poorly organized system with the result that it is not able to deliver

---

[1] While a full review of the merits is unnecessary at this point, Plaintiffs offer the following factual background to demonstrate that Defendants' policies and procedures, rather than individualized determinations, result in the substandard mental health care provided to the incarcerated population.

appropriate and timely care."  Ex. 9 (NCCHC standards J-A-01, J-C-07, MH-A-01, and MH-C-07).

Despite these requirements, Defendants continue to use an analysis that was performed prior to 2015 by Corizon, the private company that was running the jail at the time.  **Ex. 11** (Transcript of Williams in an earlier case), at p. 34; **Ex. 12** (Defendants' Responses to First Set of Discovery Requests), response to RFP 13 (which refers to Williams' transcript in earlier case).  In particular, the number of psychologist and psychiatrist positions at ACJ have been determined solely by the County's contract with Allegheny Health Network ("AHN"), which was entered into in 2015 (Ex. 1, p. 103-04; **Ex. 13** (AHN Contract, AC 2648-65)), and there have been no discussions about changing those numbers.  Ex. 1, p. 110.  Thus, notwithstanding state regulation, the NCCHC standards and Defendants' own policy, for seven years, Defendants have not performed any staffing analysis to ensure appropriate healthcare staffing levels.

Not only are Defendants not complying with the relevant standards or their own policies, but they have failed to maintain even these old staffing levels.  As of August 6, 2020, there were ***49 vacancies***, representing an ***astounding 40%*** of the healthcare staff. Defendants' Answer, Doc. No. 24, ¶58.  According to ACJ records, Defendants have been understaffed for quite some time— there were 32 vacancies on October 29, 2018, 40 vacancies on January 28, 2019, 43 vacancies on June 1, 2019, and 52 vacancies on June 3, 2020.  **Ex. 14** (vacancy lists, AC 7613-7621).  The NCCHC itself conducted a "suicide prevention program assessment" of ACJ in October 2019 (**Ex. 15**, AC 7857-94) and one of its "key findings and recommendations" was that:  "Current assigned health staffing must be reassessed in line with the population's medical and mental health care needs.  Staffing challenges were reported in medical nursing as well as screening and treatment services by mental health specialists" (AC 7860).  The report also noted shortages in mental health

specialists and nurses in the acute mental health units and stated: "We were also concerned with the availability of mental health specialists to provide individual and group counseling consistent with effective methodologies, psychosocial/psychoeducational program services, intake MH screening on days/evenings when there is an influx of arrests, and follow-up on inmates in the other housing areas" (AC 7884).   Amazingly, notwithstanding these explicit statements from NCCHC, Defendants have not performed a new assessment and remain grossly understaffed.

According to a November 3, 2021 Allegheny County Jail Inspection Report, two years after the NCCHC report identified above, only 44 of 92 full time treatment positions were filled, only 9 of 19 part-time treatment positions were filled, and only 9 of 18 treatment supervisor positions were filled—*a vacancy rate of at least 50% across all levels*.  **Ex. 16**.  *See also* Ex. 7, at 79.  Moreover, this staffing shortage includes the most senior members of the healthcare staff— recently, ACJ has had no Director of Mental Health, no psychiatrists and no psychologists.  Ex. 7, at 51-55, 75-76.

Without sufficient staff to meet the needs of the population, these needs go unmet.  As developed more fully below, Defendants are unable to provide therapeutic counseling—a "basic" component to mental health care—and interactions between staff and patients, when they happen at all, are necessarily brief, lack confidentiality, and focus only on acute needs.

ii.   *Lack of training*

Compounding the shortage of healthcare staff is the lack of appropriate training on how to provide mental health care in the correctional setting or even how to work with individuals with serious mental health conditions.  The NCCHC standards require specific training to mental health staff "on delivery of mental health services in the correctional setting." Ex. 9, J-C-01, J-C-03, MH-C-03.  Defendants admit that they do not comply with this standard.  **Ex. 17,** Deposition of Robyn

Smith (healthcare staff educator), at p. 101-02. "The ACJ provides pre-service orientation to Mental Health Staff, but that training relates to ACJ procedures, such as safety, security, use of and accounting for sharps, and other such non-medical training.  The ACJ does not provide professional training to licensed medical staff".  Ex. 12 (Defendants' responses to First Set of Discovery, Interrogatories Nos. 3 and 4).  Defendants still to this day do not provide any annual in-service training relating to the provision of healthcare (Ex. 17, p. 68-69), and did not even provide a basic healthcare orientation until May 2020. Ex. 17, p. 19, 43-44, 47, 50-51.  Since May 2020, that orientation has been provided only to new hires (Ex. 17, p. 142), and in any event, does not discuss the ACA or NCCHC standards other than just making general reference to the fact that some standards exist.  Ex. 17, p. 64-65.[2]  The 2019 NCCHC review specifically noted that "enhanced policies are needed" with respect to healthcare staff training, and additionally recommended advanced training for those working on the acute units.  Ex. 15, AC 7860.

Even more troubling is the lack of mental health training for correctional staff.  The NCCHC requires, at a minimum, annual training for correctional staff on (1) how to recognize signs and symptoms of mental illness, (2) communicating with incarcerated individuals who have positive signs of mental illness, and (3) procedures for appropriate referral of incarcerated individuals with mental health complaints. Ex. 9, J-C-04, MH-C-04.  The same standards require additional training for correctional staff working on acute units. *Id.  See also* Ex. 8, 5-ACI-1D-10. Defendants' own policy requires ███████████████████████████

---

[2] Ms. Smith, the person who created this orientation, is a registered nurse whose only experience with mental health services at the time was the coursework and rotation that formed part of her licensure (Ex. 17, p. 76), and she has never researched what healthcare training is offered at other jails or prisons. Ex. 17, p. 142.  She acknowledged there was no training on providing mental health services in a correctional setting.  Ex. 17, p. 102.

██████████████████████████████████████████████████.  **Ex. 18**

(Policy 2303, AC 2475-78).[3]  The same policy requires ████████████████

██████████████████████.  *Id.*

Notwithstanding the ACA and NCCHC standards and ACJ's own policy, the only training

for correctional staff that referenced mental health care in any way was training on suicide

prevention and "interpersonal communications." Ex. 1, p. 55-57; Ex. 12, Responses to

Interrogatories, Exhibit 1 thereto.[4]  The interpersonal communications training is not required

training.  **Ex. 19** (Transcript of Sergeant Randy Justice), p. 90.  Neither the interpersonal

communications training, nor the suicide prevention training, discuss (1) the signs and symptoms

---

[3] In compliance with the Court's June 1, 2022, Order, Exhibits 4, 5, 6, 10, 18, 20, 21, 24, 26, 33, 39, 41, 42, 43, 44, 46, 48 and 49 are being filed under seal.  References to the content of those exhibits are redacted herein, and an unredacted copy of this brief will be filed under seal.

[4] Between the filing of the Complaint in this action, and today, Defendants have started to adopt and implement some additional training programs.  Such voluntary, post-complaint actions, even assuming they satisfied current standards, do not undermine Plaintiffs' claims, which are based on Defendants' actions as of the filing of their Complaint.  *See, e.g., Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.* 528 U.S. 167, 189 (2000) (internal citations omitted) ("[T]he standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.");  *L.A. v. Lyons*, 461 U.S. 95, 101 (1983) (a case is not mooted by actions which are temporary in nature); *City of Mesquite v. Aladdin's Castle*, 455 U.S. 283, n.10 (1982) (internal citations omitted) ("Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave the defendant free to return to his old ways.");  *Pashby v. Delia*, 709 F.3d 307, 316 (4th Cir. 2013) ("[M]ootness does not result from a defendant's voluntary cessitation of his allegedly illegal conduct unless it is clear that the behavior is unlikely to recur.");  *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 747 (7th Cir. 1999) (internal citations omitted) ("voluntary cessation of allegedly illegal conduct does not render a case moot unless the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated.");  *Sefick v. Gardnes*, 164 F.3d 370, 372 (7th Cir. 1990) ("the current … policy, adopted after the commencement of this suit, is not implemented by statute or regulation and could be changed again, so this voluntary cessation of the challenged conduct does not eliminate the controversy.");  *Brown v. Transurban USA Inc.*, 144 F.Supp. 3d 809, 828 (E.D. Va. 2015) ("Courts are especially wary of attempts to force mootness on an unwilling plaintiff by the defendant taking unilateral, voluntary action").

of mental illness, (2) communicating with people with such conditions, or (3) referrals to mental health staff, as required by the above-referenced standards and policies.  See **Ex. 20** (suicide prevention training, two PowerPoints, not bates-stamped (also Ex. 19 and Exs. 31 and 32 thereto)); **Ex. 21** (current Interpersonal Communications training, AC 77244-89).  In fact, both the Chief Deputy Warden of Operations, Jason Beasom, and the Sergeant in Charge of the Training Department, Sergeant Randy Justice, acknowledged that they would have no way of determining whether someone at the jail was being treated for a mental illness.  Ex. 19, p. 77; **Ex. 22 (**Beasom transcript), p. 32.  As Chief Deputy Beasom testified:

> 9      Q.   How do you determine whether conduct
> 10    is related to someone's mental health
> 11    condition?
> 12        A.   I don't determine that.
> 13        Q.   Have you received any training in
> 14    how to identify the signs and symptoms of
> 15    mental illness?
> 16        A.    Past somebody verbalizing suicide
> 17    ideations or saying, you know, I'm seeing
> 18    things that aren't there -- I mean, just
> 19    obvious things that would prompt me to think
> 20    somebody was experiencing a mental health
> 21     condition, I can't think of any.

Ex. 22, p. 32.  As a result of this lack of training, correctional staff do not know when someone is manifesting symptoms of a mental health condition, or may legitimately need treatment.

Similarly, Defendants do not provide any additional training for correctional staff who serve on the acute mental health units, contrary to the above-referenced standards. Ex. 17, p. 72, 113.

This failure to train has devastating consequences.  Because correctional staff do not know when someone is manifesting symptoms or is unable to comply with directives due to their mental

illness, they punish individuals rather than referring them for treatment or accommodating their illnesses, as described more fully below.

### iii.    *Ineffective Intake Procedures*

Given the chronic staffing shortages and the grossly insufficient training offered, Defendants struggle to provide anything close to appropriate mental health care to the incarcerated population.  ACJ's mental health care system fails class members from the start.  The conditions in the pre-booking and booking areas are simply inadequate for health screening and assessment. *See* Ex. 15, AC 7862.  In particular, in describing the intake process, the NCCHC reported: "The questions were asked quickly, loudly, and robotically, with the officer looking at the computer screen rather than observing the inmate for affect or critical red flag behaviors.  The series of questions takes about half a minute" (Ex. 15, p. 5, AC 7863) and "It seemed like the purpose of the questions was being overlooked." *Id*.  Similarly, "Privacy was inadequate due to the sensitive nature of the series of questions being asked." *Id*.  Finally, the NCCHC reported: "Staff interviewed reported that due to the busy intake process they encounter times when they do not have enough time for gathering sufficient information on inmate health." Ex. 15, p. 4, AC 7862.

The NCCHC itself described why it was concerned about these problems:  In 2018, 1,894 of 13,947 commitments were referred to mental health (14%), compared with 26% of the population expected to require treatment, as reported by the Bureau of Justice. Ex. 15, p. 27, AC 7886.  "The prevailing view now is that the prevalence is closer to 30% of the jail population. Applying the BJS prevalence estimates to the above data suggests that a large number of inmates

with mental illness may not be identified in intake." *Id.*  Thus, a potentially significant number of people (perhaps half of those in need of treatment) are not even identified by Defendants at intake.

This problem continues and perhaps is getting worse.  According to the "Warden's Report" published to the Jail Oversight Board, even in late 2021, only about 5 percent of new admittees were referred for mental health services.  **Ex. 23**.[5]

Defendant's failure to ensure privacy during the intake process (as noted by the NCCHC) unquestionably interferes with the effectiveness of this process as many will feel that they cannot be forthright about their sensitive psychological history in this setting.  Defendants did not provide any training or orientation on intake procedures until Ms. Smith developed her overall orientation in 2020, and even that orientation does not include "how to do a screening."  Ex. 17, p. 72, 81-82.  Yet the NCCHC requires such training.  Ex. 9, J-E-05.   Given the lack of training and lack of privacy for screenings, the low number of referrals to mental health is perhaps not surprising.

   ***iv. Insufficient treatment plans***

Although NCCHC standards require use of a "treatment plan" (which describes the frequency of follow up necessary and documents the treatment goals and objectives) (Ex. 9, MH-G-03), and although Defendants use such treatment plans in the acute units and for the substance abuse program, for all other individuals, Defendants merely rely on progress notes as the required treatment plan. Ex. 1, p. 214-15; Defendants' Answer, ¶239 ("progress notes are a treatment plan").   The NCCHC found Defendants' treatment plans to be "incomplete or not well documented." Ex. 15, p. 23, AC 7881.  This conclusion is unsurprising; progress notes are often

---

[5] According to this report (page 9), for the period 7/16/21 to 8/15/21, there were 78 referrals out of 1,456 "pre-screens," which represents 5.4%.  For 8/16/21 to 9/15/21, there were 70 referrals out of 1,484 pre-screens, representing 4.7%.  For 9/16/21 to 10/15/21, there were 66 referrals out of 1,367 pre-screens representing 4.8%.

times very cursory, and do not include the requisite elements of a treatment plan, such as treatment objectives and goals, and the steps to achieve those goals. Rather, these "treatment plans" typically include nothing more than medication adjustments. **Ex. 24** (sampling of progress notes with "recommendations": AC 17469-78; 23348-52; 23399-403; 24831-41; 27105-13; 27170-74). Sometimes they add the following standard language each time:



Ex. 24 (AC 32651-55, 32661-75). This added boilerplate language, even when it is included, does not qualify as a treatment plan as described by the standards--it does not even identify treatment goals and objectives, or discuss how to reach such goals and objectives.

Defendants have been aware of the NCCHC standard regarding treatment plans for some time. **Ex. 25** (collectively November 30, 2015 Meeting Minutes, AC 80697-710 (emphasizing need to complete and fully utilize treatment plans), and December 19, 2018 Meeting Minutes, AC 80459-61 ("Completion of individualized MH treatment plans are necessary")). Yet the above practice continues to this day. Ex. 24.

> *v.* ***No counseling or therapy, and only minimal interaction with staff***

Defendants also fail to meet minimal standards of care by refusing to provide confidential counseling or therapy to incarcerated individuals with serious mental health conditions. Title 37 states that written local policy must "require treatment services to include . . . counseling services." 37 Pa. Code §95.243(2). NCCHC's "foundational standard" defines mental health services as "the use of a variety of psychosocial, psychoeducational and pharmacological therapies, either

11

individual or group" (Ex. 9, J-F-03, MH-A-01), and the NCCHC describes "individual and group counseling as clinically indicated" to be a "basic" outpatient service to be provided "at a minimum." Ex. 9, MH-G-01. *See also* Ex. 8, 5-ACI-5E-09. Defendants have acknowledged that they do not provide individual counseling or group mental health therapy. Answer, ¶¶25, 26. *See also* Ex. 7, at p. 172 (testifying that one prior psychologist held group sessions on one acute pod, and another psychologist offered individual sessions for a short period of time, but acknowledging there has been no other therapeutic counseling).

The interactions between mental health staff and patients are limited to "crisis intervention," brief assessments for medication renewal, and "drive by" cell door consultations to triage sick call requests from patients. Ex. 7, pp. 128-29 (Absent some special reason for follow up, the only regularly scheduled appointments with a mental health patient would be to follow up on medication and assess whether dosage is correct); Ex. 7, pp. 65-66, 192 (goal of responding to sick call request is to triage that request); Ex. 7, pp. 31-33 (acknowledging that apart from responding to crises, only current remedies were short-term "supportive encounters"). *See also* **Ex 26**, Policy 2508 (AC 76699-707; ███████████████████████████ ██████████████████████████████). According to mental health grievances, patients routinely complain of not being seen by mental health staff. **Ex 27** (sampling of mental health grievances). And the current Health Care Administrator has acknowledged "delays" with medication renewal assessments and sick call request drive-bys. Ex. 7, pp. 134, 137, 149.

The NCCHC expressed concerns regarding these limited mental health encounters on the regular housing pods. They noted that most such encounters occur cell-side, rather than in a private area, and that this "presents a barrier to the therapeutic relationship." Ex. 15, p. 23. This practice is contrary to NCCHC standards, which require consultations to be "in private, without being

observed or overheard" (Ex. 9, J-A-07, MH-A-09), and contrary to Defendants' own policy, which requires consultations to be in an "███████████████████" and must "███████████████." Ex. 26, Policy 2508, AC 2495-2503. At the merits stage, Plaintiffs will also present evidence that, given the significant staffing problems, these "drive-by" consultations are cursory and fail to provide any meaningful support.

Rather than providing any counseling or regular therapeutic treatment, Defendants do not provide any meaningful treatment until an individual's symptoms become so acute that they become suicidal.[6]  Plaintiff Shaquille Howard's requests for mental health care were largely ignored, and he explicitly was told he could not receive treatment unless he was suicidal. Complaint, ¶181. At one point, he pretended to be suicidal in order to get help, and still got no help other than placing him alone in a suicide watch cell with no clothes. *Id.,* ¶188. Similarly, Plaintiff Jason Porter's repeated requests for mental health care have been denied, and correctional staff refused to contact the mental health department unless he admitted to being suicidal. *Id.* §234, 236. *See also* **Ex. 28** (Declaration of Jason Porter)*,* ¶5-6. Eventually, in order to get care, Mr. Porter told staff that he was suicidal. When mental health staff arrived, Mr. Porter explained that he was not really suicidal, and the staff person then walked away without listening to his concerns. *Id.,* ¶7. *See also* Complaint, ¶238. Correctional staff made the same statements (need to be suicidal before receiving treatment) to Plaintiff Albert Castaphany. Complaint, ¶268. *See also* **Ex. 29** (Declaration of Albert Castaphany) ¶9. And grievances filed by other incarcerated individuals demonstrate that these statements are made routinely. **Ex 30** (sampling of mental health grievances documenting similar statements).

---

[6] This is perhaps due to the fact that the only training provided to correctional staff relating to mental health treatment is suicide prevention.

Correctional staff likewise actively discourage individuals from seeking mental health treatment. Mr. Castpahany was told that the more he makes requests, the longer it will take to be seen. Ex 29, ¶6. They sang "O Christmas Tree" to him, mocking his green suicide gown. *Id.,* ¶10. Correctional staff similarly discouraged Class Representative Keisha Cohen from requesting treatment by embarrassing her when she did, calling her crazy. **Ex. 31** (Declaration of Keisha Cohen), ¶6-7. This is the opposite of a therapeutic environment. Patients are ignored unless they express suicidal ideation, and if they do express such thoughts, they are mocked.

### vi.  *Non-existent Quality Improvement Program*

It is essential that any health care system implement some form of quality improvement or annual review system to ensure that services are being provided fairly, efficiently and adequately. Title 37 requires a written report "to demonstrate that adequate health care is being provided to inmates and reviewing findings with prison administrators annually" (37 Pa. Code §95.232(6)), and an "annual documented review of the prison's healthcare delivery system." *Id.* §95.232(7). NCCHC further recommends a continuous quality improvement program (Ex. 9, MH-A-06) and a clinical performance enhancement process. Ex. 9, MH-C-02. Defendants have no such documented reviews or processes. Ex. 1, p. 37-41, 75; Ex. 12, response to Interrogatory No. 11 (responding "not applicable" to a request to identify all such reviews or investigations).[7] As a result, Defendants have failed to correct their grossly deficient mental health care system.

---

[7] During discovery, various witnesses have described a "quality improvement" committee that meets periodically. **Ex. 32** (Deposotion of Nora Gillespi), p. 32-33. It is unclear what that committee does other than "meet to discuss improvement activities for areas that are identified, including areas that are high risk, problem prone and high volume," (Ex. 32, p. 107), and no documentation from this Committee has yet has been provided.

As a result of the deficiencies documented above, and many others to be developed and discussed during the merits stage of this litigation, the incarcerated population at ACJ receives little if any actual mental health care other than medication.[8]

### B.   Unreasonable Punishment of Individuals with Psychiatric Disabilities

It gets worse.  Not only do Defendants have a constitutionally inadequate mental health system, but they punish class members for requesting mental health treatment or for manifestations of their illnesses.

Defendants do not consider a person's mental health when evaluating the potential use of force or extent of any use of force (Ex. 22, p. 65), and correctional staff "would not know" if someone's conduct is related to their mental health condition.  Ex. 22, p. 32.  In fact, there have been "no discussions" about whether mental health status should be utilized in determining what level of force is reasonable, or the impact of the use of force on those with mental health conditions. Ex. 1, p. 90.  To the contrary, healthcare staff play no role in such decisions.  *Id.,* p. 198.  This is contrary to NCCHC Standards (Ex. 9, MH-A-08), and Defendants' own Policy 2600 (Ex 4).

Nor did Defendants (at least up through the filing of the Complaint) utilize any de-escalation techniques to potentially obviate the need for force or lessen the amount of force needed, except on the acute units.  **Ex. 33** (Policy 207 (4/28/20 revision), AC 2391-2400).  *See also* Ex. 7, at pp. 235-36 (no current policy requiring de-escalation).  This notwithstanding that Title 37 states "only the least amount of force necessary to achieve that purpose is authorized" (37 Pa. Code

---

[8] Even the medication administration system is plagued with problems.  Although not necessary at this stage, Plaintiffs will present evidence of systematic problems with the ordering, tracking and distribution of medication—so much so that patients often go without medication for extended periods of time.

§95.241(2)), and Defendants' own policy allows use of force only ███████████ ████████████████████████████████████████ (Ex. 33, AC 2392), and notwithstanding the recommendations for de-escalation made by Defendants' current Health Services Administrator since 2019.  Ex. 7, pp. 239-40.[9]

As a result of the lack of communication and training regarding mental health, and the decision to not utilize de-escalation techniques, class members have been subjected to repeated uses of force for requesting help or exhibiting symptoms of their mental illness.  Mr. Howard attempted to get the staff's attention by opening his slot or covering his door window, and correctional staff used force against him for doing so.  Complaint, ¶187.  On another occasion, he refused to lock into his cell due to auditory hallucinations and severe paranoia, and correctional staff responded by placing him in a strip cage, spraying him with OC spray, and leaving him a restraint chair.  *Id.,* ¶193-98.  Staff even disciplined him for attempting suicide.  *Id.,* ¶191.  Mr. Porter similarly was tased, head-slammed and placed in a restraint chair for leaving his slot open.  *Id.,* ¶241-42.  And correctional staff threatened to tase Ms. Cohen for attempting suicide.  *Id.,* ¶254.  *See also* Ex. 31, ¶10, 13.   Mr. Goode spent six months in solitary confinement due to "misconducts" stemming from his requests for mental health care or manifestations of his untreated mental illness.  Motion to Substitute, Doc. No. 49, at ¶5.  *See also* **Ex. 34** (Declaration of Brooke Goode), ¶5.  *See also* page 33 *infra* (of a representative sample of 95 incarcerated individuals, ██ had been victims of at least one use of force incident).  All of this despite NCCHC

---

[9] Nor do Defendants even provide meaningful training in de-escalation.  Ex 12, and Exhibit 1 thereto (listing trainings offered); Ex. 22, at 14.  According to Defendants' Training Sergeant, "verbal de-escalation" is now included in Defendants' "interpersonal communications" training (Ex. 19, pp. 75, 152-53), yet while the term "verbal de-escalation" is used in the current training materials, little guidance is actually provided.  Ex. 21.  This is despite clear ACA standards requiring specific training on de-escalation.  Ex. 8, 5-ACI-1D-12, 5-ACI-1D-13, 5-ACI-1D-19.

standards that state that it is unreasonable to punish individuals for seeking care.  Ex. 9, MH-A-101.

According to County data provided by Defendants, ACJ had 585 incidents involving use of force in 2020 and 720 such incidents in 2019.  **Ex. 35**, AC 9002-03.  The next highest county in Pennsylvania each of those years had fewer than half that number of incidents.  The dramatically higher numbers at ACJ very well may be due to Defendants' failure to recognize mental health conditions and refusal to implement de-escalation techniques.

### C.   Overuse of solitary confinement for putative class members

Moreover, the use of solitary confinement or "restricted housing," particular for those with mental health conditions, has been rampant.  The NCCHC itself issued a position statement in April 2016 that says that solitary confinement for anyone for more than 15 consecutive days is "cruel, inhumane, and degrading treatment, and harmful to an individual's health," and further that mentally ill individuals "***should be excluded from solitary confinement of any duration***."  **Ex. 36** (NCCHC position statement (emphasis added)).  For purposes of that statement, solitary confinement was defined to include "restricted housing" or anytime an individual "is deprived of meaningful contact with others." Ex. 36.  The Pennsylvania Department of Corrections stopped placing the most seriously mentally ill individuals in solitary confinement beginning in 2015.  *See* "The Pennsylvania prison system will stop putting mentally ill individuals in solitary," Mark Berman, Washington Post, January 8, 2015, found at: https://www.washingtonpost.com/news/post-nation/wp/2015/01/08/the-pennsylvania-prison-system-will-stop-putting-mentally-ill-inmates-in-solitary/ (last accessed May 14, 2022); "No Safe Harbor, Part II: Prisons cope with mental health," Rich Lord and Joe Smydo, Pittsburgh Post-

17

Gazette, Feb. 7, 2016, found at: https://www.post-gazette.com/news/health/2016/02/07/No-Safe-Harbor-Part-II-Prisons-cope-with-mental-health/stories/201602070031 (last accessed May 14, 2022). As early as 2012, the American Psychiatric Association published a position statement that held: "***Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates***." **Ex. 37** (emphasis added).  As was observed by the Chief Judge for the U.S. District Court for the Middle District of Pennsylvania, "[r]esearchers have observed that 'psychological stressors such as isolation can be as clinically distressing as physical torture.'" *Johnson v. Wetzel*, 209 F.Supp.3d 766, 779 (M.D. Pa. 2016) (*quoting* Jeffrey L. Metzner, M.D., et al., *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics,* 38 J. AM. ACAD. Psychiatry & Law 104, 104 (2010)).

At ACJ, those with serious mental health conditions have been placed in restricted housing despite the above warnings and even though Defendant Williams, Chief Deputy Warden of Healthcare Services, was aware of published articles regarding the impact of solitary confinement on those with serious mental illness.  Ex. 1, p. 64-65. *See also* Ex 7, p. 241, 246.  Mr. Howard was incarcerated at ACJ from June 2017 until January 2021.  He suffers from adjustment disorder, mixed anxiety and depression and PTSD.  Complaint, ¶176, 177.  Over half of his three and a half years at ACJ was spent in solitary confinement.  *Id.,* ¶178.  Mr. Porter was incarcerated at ACJ in August 2019, and again on January 14, 2022, and has spent all but a few days in restricted housing.  *Id.,* ¶228, 232. *See also* Ex. 28, ¶1, 10.  He suffers from severe anxiety, PTSD and depression. Complaint, ¶230. Other mental health patients similarly are routinely kept in segregation.  Ex. 29, ¶11-12; Ex. 34, ¶5-6.  Ex. 7, p. 246.

Defendants do not track how many individuals in restricted housing have mental health conditions.  Ex 22, p. 197.  However, as described more fully below, out of a sample of 95 individuals with diagnosed mental health conditions, at least ▮ had been placed in restricted housing, and not all housing records have been produced.  *See* p. 33, *infra*.  The placement of mental health patients in restricted housing is thus a regular occurrence, and remains so.[10]

### D.   These failures cause significant harm to class members

Due to Defendants' lack of any real mental health care, and Defendants' punishment of individuals who request mental health care or who are manifesting symptoms of their conditions, individuals incarcerated at ACJ suffer dire consequences. Consequences of the failure to provide mental health care include not only decompensation and further suffering, but also an increase in violent incidents and recidivism. Holly Hills, Christine Siegfried, Alan Ickowitz, *Effective Prison Mental Health Services: Guidelines to Expand and Improve Treatment,* U.S. Department of Justice, National Institute of Corrections (2004), at 30-31 (success "in preventing further psychiatric decompensation" among inmates with mental illnesses is dependent on the timely provision of mental health screening, mental health assessments, psychotropic medications, supportive psychotherapy, and crisis stabilization beds).  *See also* E. Fuller Torrey, et al., *More Mentally Ill Persons Are in Jails and Prisons Than Hospitals: A Survey of the States*, Treatment Advocacy Center (2010), at 12 (Individuals who receive outpatient treatment upon release from incarceration are far less likely to be rearrested or re-hospitalized); Terry Kupers, et al., *Beyond*

---

[10] Effective December 2021, solitary confinement was banned at the Allegheny County Jail.  Nevertheless, Defendants claim to have been under a facility wide lockdown since that time, and therefore, at least through April 2022, Defendants have continued to isolate mental health patients (and indeed all incarcerated individuals) since this ban went into effect.

*Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs*, 36 Crim. Just. & Behavior 1037, 1047 (2009) (In a study of individuals with severe mental illnesses housed in a supermax facility, those who went through mental health treatment then back to general population had a "sharp decrease" in violent incidents than those who did not).   *See also* **Ex. 38** (AC 80840-45: "Left untreated, these factors [mental health and substance abuse disorders] contribute to a recidivism rate that is higher than that of the general offender population; in addition, individuals with a serious mental illness return to jail a year sooner than other offenders.").

Consistent with these authorities, each Plaintiff has deteriorated psychologically while in ACJ custody. Complaint, ¶202, 245, 274.  *See also* Ex. 28, ¶10-11; Ex. 29, ¶13; Ex. 34, ¶10.  At the merits stage, Plaintiffs intend to present further evidence of the impact Defendants' practices have on the proposed class.  But at this stage, the impact can be shown clearly through statistics of suicides and suicide attempts.

As early as 2011, ACJ's suicide rate was among the nation's highest.  "Allegheny County Jail's Suicide Rate Among Nation's Highest" (WPXI, July 5, 2011), found at: https://www.wpxi.com/news/allegheny-county-jails-suicide-rate-among-nations-/201418869/. Since that time, the situation has only worsened.  Between 2016 and June 4, 2020, there were nine deaths by suicide at ACJ.  K. Giammarise, "Report cites issues with suicide prevention in Allegheny County Jail" (Pittsburgh Post-Gazette, June 4, 2020), https://www.post-gazette.com/news/crime-courts/2020/06/04/Allegheny-County-Jail-suicide-prevention-issues-report-oversight-board-committee/stories/202006040123.  *See also* **Ex. 39** (Death in Custody

reports, AC 26092-130).   This is approximately *double* the expected rate.   **Ex. 40** (Bureau of Justice Statistics).[11]

And suicide attempts increased each year:   ▇ attempts in 2018, ▇ attempts in 2019, and ▇ attempts in 2020.   **Ex. 41** (ACJ suicide attempts, AC 32782).   Mr. Howard and Ms. Cohen both attempted to kill themselves while in custody, and Mr. Castaphany was placed on suicide watch. Complaint, ¶190, 254, 269; Ex. 29, ¶9; Ex. 31, ¶10.    Former Class Representative (and Class member) James Byrd attempted suicide at least three times while in custody.   Complaint, ¶222. The prevalence of suicide attempts, and the trend of increasing attempts, demonstrates the devastating consequences of Defendants' policies and practices.

## ARGUMENT

Class certification is appropriate to resolve the class claims under the Fourteenth Amendment, the Americans with Disabilities Act and the Rehabilitation Act, and for granting the relief requested in those claims, including declaratory judgment against the Defendants, enjoining the Defendants from continuing their unlawful practices, and compelling Defendants to provide necessary and adequate mental health care to the class.

To obtain class certification, a plaintiff must establish, by a preponderance of the evidence, that the putative class satisfies the prerequisites of Rule 23(a) and complies with Rule 23(b)(2)'s requirement that final injunctive or declaratory relief is appropriate with respect to the class as a

---

[11] According to the Department of Justice, the rate of suicides in local jails has hovered between 30 and 50 suicides per 100,000 inmates.   Ex. 40, Figure 2. Fifty out of 100,000 equates to 1 out of 2,000.   Defendants' population has varied between 1600 and 2300, and as noted above, they have more than two suicides per year.

whole.  *See Shelton v. Bledsoe*, 775 F.3d 554, 563 (3d Cir. 2015).  Under Rule 23(a), a plaintiff

must demonstrate that:

(1)    the class is "so numerous that joinder of all members is impracticable";

(2)    there are "questions of law or fact common to the class";

(3)    "the claims or defenses of the representative parties are typical of the claims or defenses of the class"; and

(4)    the representative parties will "fairly and adequately protect the interests of the class."

Fed. R. Civ. P. 23(a); *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010).  Under Rule

23(b)(2), Plaintiff must show that "the party opposing the class has acted or refused to act on

grounds generally applicable to the class, thereby making appropriate final injunctive relief or

corresponding declaratory relief with respect to the class as a whole."  Fed. R. Civ. P. 23(b)(2);

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 296 (3d Cir. 2011) (en banc).  To make this showing, the

class must demonstrate that "a single injunction or declaratory judgment would provide relief to

each member of the class."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011).

Rule 23(b)(2) was crafted to facilitate cases pursuing injunctive relief on behalf of a group

of individuals against a general course of conduct.  *Baby Neal for & by Kanter v. Casey*, 43 F.3d

48, 59 (3d Cir. 1994) ("In fact, the injunctive class provision was designed specifically for civil

rights cases seeking broad declaratory or injunctive relief for a numerous and often unascertainable

or amorphous class of persons.") (quotations omitted); s*ee also Shelton*, 775 F.3d at 561.  The

"proper role" of a Rule 23(b)(2) class action is to "remedy[] systemic violations of basic rights of

large and often amorphous classes," *Baby Neal*, 43 F.3d at 64, and a (b)(2) class is "an especially

appropriate vehicle for civil rights actions seeking... declaratory relief for prison... reform."

*Hassine v. Jeffes*, 846 F.2d 169, 178 n.5 (3d Cir. 1988) (quoting *Coley v. Clinton*, 635 F.2d 1364,

1378 (8th Cir. 1980)).  Here, the proposed class satisfies the criteria of Rule 23(a) and 23(b)(2).

22

**A.     THE PROPOSED CLASS DEFINITION IS READILY DISCERNIBLE AND CLEAR.**

A 23(b)(2) class seeking only injunctive or declaratory relief, like here, need only be defined by a "readily discernible, clear, and precise statement of the parameters." *Shelton*, 775 F.3d at 563 (quoting *Wachtel ex rel. Jeffe v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 187 (3d Cir. 2006)).

> The proposed class statement is objective, clear, and readily discernible:

> All individuals currently or in the future incarcerated at Allegheny County Jail and who have, or will in the future have, a serious mental health diagnosis, disorder or disability as recognized in the DSM-V, including but not limited to depression, anxiety, post-traumatic stress disorder, schizophrenia, bipolar disorder, or borderline personality disorder.

These parameters are easily verified by reviewing Defendants' own records. *See Shelton*, 775 F.3d at 563. Courts have certified almost identical classes of prisoners with serious mental illness. *See, e.g.*, *Braggs v. Dunn*, 317 F.R.D. 634, 673-74 (M.D. Ala. 2016) (certifying class of "all persons with a serious mental illness who are, or will be, confined within [Alabama Department of Corrections'] facilities"); *Coleman v. Wilson*, 912 F. Supp. 1282, 1293 (E.D. Cal. 1995) (certifying a class consisting of "all inmates with serious mental disorders who are now or who will in the future be confined within the California Department of Corrections"). *See also Rasho v. Walker*, No. 07-1298-MMM, 2016 WL 11514940, at *1, *4 (C.D. Ill. Feb. 8, 2016) (certifying a class of prisoners who "are identified or should have been identified by the [Illinois Department of Correction's] mental health professionals as in need of mental health treatment as defined in the current edition of the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association"); *Parsons v. Ryan*, 289 F.R.D. 513, 515 (D. Ariz. 2013) (class alleging violations in medical care, dental care, mental health care and conditions of confinement), *aff'd*, 754 F.3d 657 (9th Cir. 2014), *reh'g denied*, 784 F.3d 571 (9th Cir. 2015); *Clark v. Lane*, 267

F.R.D. 180 (E.D. Pa. 2010) (certifying class of "all current and future residents of Coleman Hill," a halfway house for individuals released from DOC custody, asserting claims under the Constitution, the Americans with Disabilities Act and the Rehabilitation Act for inadequate medical and mental health care); *Inmates of the Northumberland County Prison v. Reish*, 2009 U.S. Dist. LEXIS 126479 (M.D. Pa. March 17, 2009) (all current and future inmates, pursuing claims associated with the provision of medical and mental health care, among other claims). Courts have also frequently certified classes of prisoners outside the mental health context. *See, e.g.*, *Hassine v. Jeffes*, 846 F.2d 169, 180 (3d Cir. 1988); *Williams v. City of Phila.*, 270 F.R.D. 208, 213–14 (E.D. Pa. 2010).

Despite the fact that courts regularly approve classes defined to include incarcerated individuals with serious mental health conditions or serious mental illness, during discovery, Defendants challenged whether such a class is ascertainable.  In response to that challenge, this Court ruled "Plaintiffs can have a class of persons with serious mental health conditions, however, the scope of that class is subject to debate." Doc. No. 36, Minutes of June 25, 2021 conference. Thus, while the parties may disagree on whether a particular diagnosis or particular individual is sufficiently "serious," this term certainly can be used to help define a class.

Moreover, Defendants themselves use "serious mental illness" as a term for identifying those individuals who "have a higher propensity or likelihood of decompensation when confined [as compared to] other individuals.  So this leads the practitioner to a risk level that would be different or more than a general population individual who does not have a diagnosis of serious mental illness." Ex. 1, p. 151, and Ex. 19 thereto; **Ex. 42** (spreadsheet identifying those individuals at ACJ designated as "SMI" (having a serious mental illness)).  Dr. Brinkman, Allegheny County's current Health Care Administrator at ACJ, acknowledged that serious mental illness is defined by

24

federal resources and is easily ascertainable.  Ex. 7, p. 207-09.  If Defendants can themselves

identify those individuals who they believe qualify as having serious medical illnesses, then surely

a class based on a similar description is ascertainable.  *See also Coleman v. Wilson, supra* ("serious

medical disorder" has a recognized meaning).

Similarly, Defendants know how to define "disability."  **Ex. 43** (ACJ Policy 311, AC 2774-

82).  That policy defines disability as "██████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████."

Similarly, Policy 2100 (Ex. 5, ACJ 2462-68) defines disability as an "██████████████████y

██████████████████████████████████████" and ████████████████████████████████████

████████████

The proposed class includes those who have "a serious mental health diagnosis, disorder

or disability as recognized in the DSM-V."  Defendants themselves use these terms, and the DSM-

V is a recognized tool for diagnosing mental health conditions.  *Rasho, supra* (class defined in part

by DSM).  Given the many other cases that have certified classes based on similar descriptions,

and their use of the same terms, Defendants are hard-pressed to argue that the proposed class is

not reasonably ascertainable.


## B. THE CLASS SATISFIES THE PREREQUISITES OF RULE 23(a)

### i. The proposed class is so numerous that joinder is impracticable.

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is

impracticable."  Fed. R. Civ. P. 23(a)(1). "Impracticability does not mean impossibility, but rather

that the difficulty or inconvenience of joining all members of the class calls for class certification."

*Lerch v. Citizens First Bancorp, Inc.*, 144 F.R.D. 247, 250 (D.N.J. 1992).  "The numerosity

prerequisite is satisfied as long as the class representatives can show impracticability of joinder, even if the exact size of the class is unknown." *Santiago v. City of Phila.,* 72 F.R.D. 619, 624 (E.D. Pa. 1976).

Courts do not rigidly apply the numerosity requirement in civil rights cases seeking injunctive or declaratory relief, as the requested relief would typically extend to the entire class even if the case were brought as an individual suit. *Weiss v. York Hosp.*, 745 F.2d 786, 808 (3d Cir. 1984). A court "may certify a class even if it is composed of as few as 14 members." *Grant v. Sullivan*, 131 F.R.D. 436, 446 (M.D. Pa. 1990) (citing *Manning v. Princeton Consumer Disc. Co.*, 390 F. Supp. 320, 324 (E.D. Pa. 1975) (finding a class of 15 satisfied numerosity)); *see also, e.g.*, *Inmates of the Northumberland Cty. Prison v. Reish*, No. 08-cv-345, 2009 U.S. Dist. LEXIS 126479, at *56 (M.D. Pa. Mar. 17, 2009) ("Even if this problem plagued only 10% of the prison population, 18–21 inmates would be affected, a number which surpasses the threshold for joinder.").

The numerosity prerequisite is satisfied here. Most jails track "mental health caseload," although Defendants do not track that information directly. Ex. 1, p. 212, and Ex. 22 thereto. Nevertheless, if they wanted to track that information, Chief Williams testified that they could look "at both diagnostic reviews as well as those prescribed psychotropic medications to attempt to formulate that list." Ex. 1, p. 212-13.

To assess based on **diagnoses,** Defendants produced a spreadsheet identifying individuals with particular diagnoses at various points in time. **Ex 44**, AC 7961 (series of tabs identifying different categories of diagnoses consistent with DSM-V). The following chart summarizes the number of diagnoses as of certain dates:

| Category of diagnosis | 1/1/20 | 1/1/21 | 8/1/21 |
| --- | --- | --- | --- |

| | | | |
|---|:---:|:---:|:---:|
| Schizophrenia and other psychotic disorders | ■ | ■ | ■ |
| Bipolar and related disorders | ■ | ■ | ■ |
| Depressive disorders | ■ | ■ | ■ |
| Anxiety disorders | ■ | ■ | ■ |
| Trauma and stressor related disorders | ■ | ■ | ■ |
| Neurocognitive disorders | ■ | ■ | ■ |
| Personality disorders | ■ | ■ | ■ |
| Breaks with reality or perceptions of reality | ■ | ■ | ■ |
| TOTAL of above | ■ | ■ | ■ |

Of course, certain individuals may be diagnosed with more than one disorder.  In fact, from a review of a representative sample of incarcerated individuals receiving psychotropic medication, the vast majority of individuals have more than one diagnosis.  Therefore, the total number of individuals with at least one diagnosis is somewhat less than the numbers described above.  Nevertheless, these numbers demonstrate that the number of diagnosed individuals is at least several hundred on any given day.  And the proposed class is defined to include not just those diagnosed on a given day, but those who had a serious mental health condition at any point since the filing of the Complaint and into the future.

To assess the number of individuals prescribed **psychotropic medications**, we could look to a number of different sources.  First, Defendants reported to the State that the number of individuals on psychotropic medication as of January 31, 2021 included 1,370 males and 318 females--a total of 1,688 individuals.  Ex 1, and Exhibit 22 thereto.  *See also* Ex. 7, p. 158, 205 (those numbers appear adequate); **Ex. 45** (data reported to state, Exhibit 22 to depositions).  This by itself demonstrates that the numerosity element is satisfied.

Similarly, Defendants produced documentation showing that there were ██ 13 active prescriptions for mental health medication as of August 1, 2021. Ex. 1, p. 136-37, and Exhibit 13 thereto, also attached as **Ex. 46** (spreadsheet of prescriptions). *See also* Ex. 7, p. 159 (between ████████ prescriptions at any given time). If we assume an average of 2 medications per individual, that would equate to ████ individuals; if we assume an average of 3 medications per individual, that would equate to ███ individuals. Either way, well over 1,000 individuals qualify.

Separately, Defendant Williams testified that, on average, 41 percent of those incarcerated at ACJ are prescribed at least one psychotropic medication, and Dr. Brinkman testified the number was approximately 75%. Ex. 1, p. 213; Ex. 7, p. 158, 205. According to Defendants' records (**Ex. 47**, 2021 County Statistics, AC 8997), ACJ's average population during 2020 was 2,056 individuals. Based on Chief Williams' stated percentage, the number of individuals with prescriptions for psychotropic medication at any given time would be 41% of 2,056, or 843 individuals. Based on Dr. Brinkman's percentage, the number is even higher.[12]

No matter how this question is approached, using psychotropic medications as a marker, the class includes at least hundreds of individuals, even when we consider only those receiving medications on a particular day. Yet this class includes those individuals who were incarcerated

---

[12] Other estimates are roughly consistent with these estimates. An estimated 64% of people in jail have a mental health condition. Kim, Cohen & Serakos, *The Processing and Treatment of Mentally Ill Persons in the Criminal Justice System: A Scan of Practice and Background Analysis* (Urban Institute, March 2015). According to a 2017 report from the Bureau of Justice Statistics of the U.S. Department of Justice, 44% of people in jail had been told by a mental health professional that they had a mental health disorder, and 26% "met the threshold for serious psychological distress". Bronson, J, Berzofsky, M, *Indicators of Mental Health Problems Reported by Prisoners and Jail Inmates, 2011-2012* (Bureau of Justice Statistics, June 22, 2017, NCJ 250612).

as of the filing date (September 15, 2020) and who were subsequently released, and includes those who will in the future be incarcerated.

As noted above, Defendants themselves also "flag" certain individuals as having "**serious mental illness**."   Using their own definition, Defendants produced a spreadsheet outlining individuals with this designation, and that spreadsheet identifies ▮▮▮ individuals who would be part of the class.  Ex. 42, AC 7961.  Given the diagnostic and intake problems discussed above, this number certainly understates the number of individuals who qualify.

Thus, whether considering those with diagnoses, those prescribed psychotropic medications, or those designated by Defendants themselves as having a serious mental illness, the proposed class easily includes hundreds if not thousands of individuals.  In addition to the number of incarcerated individuals, the fluidity of prison populations also weighs in favor of finding numerosity.  *Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1987); *Dean v. Coughlin*, 107 F.R.D. 331, 332-33 (S.D.N.Y. 1985).  Defendants cannot reasonably dispute that the proposed class satisfies Rule 23(a)(1).

### ii.   The constitutional challenges to Defendants' patterns, practices, or policies present common questions of law and fact.

Commonality is easily satisfied in civil rights challenges to government policies or practices as the opposing party "has acted or refused to act on grounds that apply *generally* to the class."  *See Baby Neal*, 43 F.3d at 57 (emphasis added) ("Indeed, (b)(2) classes have been certified in a legion of civil rights cases where commonality findings were based primarily on the fact that defendant's conduct is central to the claims of all class members irrespective of their individual circumstances and the disparate effects of the conduct.").

Actions seeking an injunction against a common policy or practice imposed on incarcerated individuals raise common questions in this Circuit.  *See, e.g.*, *Hagan v. Rogers*, 570 F.3d 146, 158

29

(3d Cir. 2009) (reversing district court's denial of class certification for a class for lack of commonality and typicality, when plaintiff alleged common threat of injury to incarcerated population); *Clarke v. Lane*, 267 F.R.D. 180, 196–97 (E.D. Pa. 2010) (holding the commonality requirement was satisfied for a putative class of all current and future residents of an institution challenging inadequate medical care despite numerous factual differences); *Inmates of the Northumberland Cty. Prison,* 2009 U.S. Dist. LEXIS 126479, at *65 (holding that commonality was met for a class of pre-trial detainees and convicted inmates as similarly situated plaintiffs were subjected to the same policies, shared a common question of law and posited the same constitutional argument challenging their conditions).

Commonality is established in this case. The proposed class members are all individuals who are currently incarcerated or will be incarcerated in the future at ACJ and who suffer from a serious mental health condition. They are all subject to the patterns, practices, or policies at ACJ and the unconstitutional conditions they create. They are also subject to the same threat of harm[13] as a result of these patterns, practices, or policies, namely, the risk of increased psychological and/or physical harm as a consequence of receiving constitutionally inadequate mental health care.

More specifically, the following are questions of fact or law common to the class:

1.  Whether, by virtue of the lack of an adequate mental health care system and inappropriate use of punitive measures against mental health patients, Defendants acted with objective unreasonableness or deliberate indifference to the Class Members' serious medical needs;

2.  Whether there are such systemic and gross deficiencies in staffing, facilities or procedures that Class Members are effectively denied access to adequate mental health care;

---

[13] As the *Baby Neal* court wrote, "class members can assert such a single common complaint even if they have not all suffered actual injury; demonstrating that all class members are *subject* to the same harm will suffice." 43 F.3d at 56 (emphasis in original).

30

3.      Whether Defendants' failure to adequately train staff denies Class Members their rights under the Fourteenth Amendment, the American with Disabilities Act and the Rehabilitation Act;

4.      Whether Defendants fail to provide any therapeutic counseling, or fail to provide therapeutic counseling at clinically-indicated levels, and thus fail to meet relevant standards of care;

5.      Whether Defendants fail to provide any substantive treatment other than medication, and thus fail to meet relevant standards of care;

6.       Whether Defendants have placed barriers to appropriate mental health care, including the lack of confidential spaces for treatment, the lack of methods for identifying those with mental health conditions, and the insufficient documentation of problems and treatment plans;

7.      Whether Defendants' policies and practices allow for use of punitive measures greater than necessary, or on mental health patients who are unable to comply with directives because of their mental illness, and thus violate the Class Members' rights under the Fourteenth Amendment, the American with Disabilities Act and the Rehabilitation Act;

8.      Whether Defendants violated their own written policies and procedures in the provision of mental health care and the use of punitive measures against those with serious mental health conditions;

9.      Whether Defendants' policies and practices of permitting the placement of Class Members in solitary confinement violate rights under the Fourteenth Amendment, the Americans with Disabilities Act and the Rehabilitation Act;

10.     Whether Defendants' policy of placing pretrial detainees in solitary confinement without a hearing for up to 10 business days violates rights under the Fourteenth Amendment, the American with Disabilities Act and the Rehabilitation Act;

11.     Whether Class Members are subject to harm as a result of Defendants' systematic failure to provide adequate treatment and the use of unnecessary punitive measures against them.

Any one of these factual or legal issues is sufficient to meet Rule 23(a)(2)'s commonality requirement.  *See Wal-Mart Stores*, 564 U.S. at 359 (stating that all that is required is a single common question of law or fact that is of central importance to the case); *Baby Neal*, at 56 ("The

commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class").

None of Defendants' policies and practices are diagnosis-specific, or individual-specific. Rather, they apply on their face to all mental health patients, or alternatively, to all individuals incarcerated at the jail.  Although the acute units have some additional practices and procedures applicable to them, most of the policies and procedures apply to these acute units in the same way they apply to other housing units.

Further, as implemented, Defendants clearly use the same practices and procedures, regardless of diagnosis or individual circumstances.  Class representatives suffer from a variety of conditions: Mr. Howard is diagnosed with adjustment disorder, mixed anxiety and depression; Mr. Porter, with anxiety, depression, and PTSD; Ms. Cohen with schizoaffective disorder, manic depressive disorder, anxiety, depression, and PTSD; Mr. Castaphany with anxiety, depression, and PTSD; and Mr. Goode with bipolar disorder, PTSD, depression and anxiety.  Yet each has been subjected to the same lack of treatment, the same solitary confinement and the same excessive use of force.

Despite different diagnoses and personal histories, Defendants ignored requests for mental health care from Mr. Howard (Complaint, ¶181, 190, 194, 198), Mr. Porter (¶234, 236, 238), Ms. Cohen (¶251), Mr. Castaphany (¶261, 268) and Mr. Goode (Motion to Substitute Party, at ¶8). They denied counseling or therapy to all, regardless of diagnosis or individual.  Complaint, ¶182-83; 230, 235, 250.  Defendants have placed each of them in solitary confinement and Defendants have used excessive force against Mr. Howard (Complaint, ¶187, 194, 196-98, 200), Mr. Porter, (¶241-42), Mr. Castaphany (¶263-68) and Mr. Goode (Motion to Substitute Party, ¶7).

32

Pursuant to a protective order, Defendants produced to Plaintiffs records for a representative sample of 99 individuals so that Plaintiffs could assess whether the class as a whole had the same diagnoses as the class representatives, and the same experiences, such as use of force incidents, restricted housing and placement on suicide watch.  This review demonstrates that, regardless of diagnosis and regardless of individual circumstances, a substantial number of class members are placed in restricted housing, are the victims of uses of force, and are placed on suicide watch.  Of the 95 individuals whose records identified a mental health diagnosis, there was at least one use of force incident with respect to █ of them (over █ of the population), █ of them had been placed in restricted housing at some point (over █ of the population), and █ of them had been placed on suicide watch at some point (over █ of the population).  **Ex. 48**, Affidavit of Jaclyn Kurin.  This impact is shown across various diagnoses, as shown in the below chart:

| CLASS SAMPLE | | | | |
|---|---|---|---|---|
| Category of Diagnosis | Total Individuals w/ Diagnoses | Total Individuals w/Diagnoses & Suicide Watch | Total Individuals w/Diagnoses & RHU/DHU | Total Individual w/Diagnoses & Victim of UOF |
| Total Unique Individuals in Class Sample: 99 | █ | █ | █ | █ |
| Schizophrenia & Other Psychotic Disorders | █ | █ | █ | █ |
| Bipolar & Related Disorders | █ | █ | █ | █ |
| Depressive Disorders | █ | | | |
| Anxiety Disorders | | | | |
| Trauma & Stressor Related Disorders | | | | |
| Personality Disorders | █ | █ | █ | █ |
| Neurodevelopmental Disorders | █ | █ | █ | █ |

Ex. 48.  Plaintiffs note that Defendants' production did not include complete housing information, and therefore, the above numbers for placement in restricted housing likely are under-representative.  Ex. 48.

Even if each class member had a different diagnosis or suffered different symptoms as a result of this common course of conduct, different injuries do not defeat commonality.  *Baby Neal*, at 56 (there can be commonality "even if they have not all suffered actual injury; demonstrating that all class members are subject to the same harm will suffice").  "[T]he commonality standard of Rule 23(a)(2) is not a high bar; it does not require identical claims or facts among class member[s]."  *In re Chiang*, 385 F.3d 256, 265 (3d Cir. 2004).  Any factual differences between Plaintiffs' circumstances and those of the rest of the class (such as the specific condition from which the individual is suffering, the severity of the condition, the specific punitive measures employed against them, etc.) do not preclude a finding of commonality.  Plaintiffs are seeking injunctive relief with respect to patterns, practices, or policies that all class members must face by virtue of incarceration at ACJ.  In such cases, as the Third Circuit has noted, it is unlikely that differences in the factual background of each claim will affect the outcome of the legal issue:

> This is especially true where plaintiffs request declaratory and injunctive relief against a defendant engaging in a common course of conduct toward them, and there is therefore no need for individualized determinations of the propriety of injunctive relief.

*Baby Neal*, 43 F.3d at 57 (citation and emphasis omitted).  In this case, all class members are currently, or will in the future be, subject to Defendants' patterns, practices, or policies regarding the care and treatment of mentally ill individuals.  Any factual differences among the class members cannot defeat certification.

### iii.    Plaintiffs' claims are typical of the class.

Plaintiffs' claims are typical of the class they seek to represent because they are caused by the same pattern, practice, or policy that gives rise to the claims of other class members and rely on the same legal theories.  *See Stewart v. Abraham*, 275 F.3d 220, 227–28 (3d Cir. 2001); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183–84 (3d Cir. 2001).   The typicality requirement asks "whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class."  *Baby Neal*, 43 F.3d at 55; *see also Clarke v. Lane*, 267 F.R.D. at 197 (quoting *Beck v. Maximus, Inc.*, 457 F.3d 291, 295–96 (3d. Cir. 2006) (finding typicality met when all putative class members suffered "constitutional violations under a uniform system")).   Typicality is established when "the claims of the named plaintiffs and putative class members involve the same conduct by the defendant... regardless of factual differences."  *Newton*, 259 F.3d at 183–84.

Here, the injuries sustained by Plaintiffs arise from the same patterns, practices, or policies to which the entire class is subjected.  Central to their claims are the systematic patterns, practices, or policies of failing to adequately screen individuals for mental illness; failing to provide minimally adequate psychiatric and psychological services to individuals with mental illness; and punishing individuals for conduct linked to their untreated mental illness, including attempted suicide.  "Actions requesting declaratory and injunctive relief to remedy conduct directed at the class clearly fit this mold."  *Baby Neal,* at 58.

Class representatives suffer from a variety of conditions that are representative of the class as a whole.  As noted above, the class representatives suffer from different combinations of depression, anxiety, post-traumatic stress disorder ("PTSD"), bipolar disorder, schizoaffective disorder and adjustment disorder.  Also, as explained above, the parties agreed to examine a

representative sample of potential class members to evaluate whether the proposed class has the same types of mental health conditions as the class representatives.  Of the 95 individuals within that representative sample whose records reflected mental health diagnoses (and categorizing disorders consistent with the Diagnostic and Statistical manual of Mental Disorders Fifth Edition), █ were diagnosed with depressive disorders, █ were diagnosed with anxiety disorders, █ were diagnosed with bipolar and related disorders, █ were diagnosed with trauma and stressor-related disorders, █ were diagnosed with neurodevelopmental disorders, █ were diagnosed with schizophrenia and other psychotic disorders, and █ were diagnosed with personality disorders. Ex. 48.   Moreover, many of the individuals had multiple diagnoses, similar to the class representatives.  Ex. 48.  Thus, the diagnoses of the class as a whole mimic the diagnoses of the class representatives.

Further, each of the class representatives have been placed in solitary confinement, four of five have been the victims of excessive use of force, all have been subject to the same inadequate mental health program, and all have deteriorated while in the Defendants' custody.  With respect to the representative sample, at least █ had been placed in solitary confinement and █ had been victims of use of force incidents.  These incidents were similar across different diagnoses.  Further, many of the use of force incidents specifically involved interactions with healthcare staff, or the lack thereof.[14]

---

[14]  For example, Individual 1, who was diagnosed with chronic PTSD and antisocial personality disorder, was upset when the medical nurse left the unit without giving him his medication.  Officers responded by tasing him, throwing him to the ground and then placing him in a restraint chair.  He continued to ask for his medication and mental health treatment while in the chair.  He was then placed on disciplinary housing status ("DHU").  **Ex. 49**, AC 77132-157. Individual 2, who was diagnosed with major depressive disorder with psychotic features and PTSD, was upset because he was not receiving his medication at the proper times.  Although he kneeled on the ground in response to an order from correctional staff, he was then tased for

Moreover, all of these individuals were subject to the same mental health program, and the same policies, procedures and practices, as the class representatives.

Although the class members' specific injuries may differ, those injuries—or threats of injury—are all the direct and proximate result of Defendants' patterns, practices, or policies and, therefore, are typical within the meaning of Rule 23(a)(3).

### iv.   The Plaintiffs and their attorneys will fairly and adequately protect the interests of the class.

Plaintiffs and their counsel will fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a)(4). "Adequacy of representation assures that the named plaintiffs' claims are not antagonistic to the class and that the attorneys for the class representatives are experienced and qualified to prosecute the claims on behalf of the entire class." *Baby Neal*, 43 F.3d at 55. Plaintiffs meet both of these factors because (1) there are no conflicts of interests between the Plaintiffs and the unnamed class members; and (2) counsel for the proposed class are experienced and well-qualified to handle the litigation. *See New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007).

As explained in the typicality section, Plaintiffs' interests align with the interests of the proposed class as a whole. Plaintiffs do not have any interests antagonistic to other members of the putative class. First, no "unique defenses" could be asserted against the Plaintiffs that would distract from the class claims or defenses. *See Williams v. City of Phila.*, 270 F.R.D. at 216–20. Plaintiffs' interests coincide with those of the proposed class to seek a declaration that the patterns,

---

allegedly "resisting" and placed on DHU status. Ex. 49 (AC 077458-477). Individual 3, who was diagnosed with schizoaffective disorder, bipolar disorder and PTSD, and identified by Defendants as "SMI," was tased in his back and then in the front of his right leg, and placed in DHU status, for being "disrespectful of medical staff." Ex. 49 (AC-77343-356).

practices, or policies alleged in the Complaint are unconstitutional, as well as a permanent injunction prohibiting Defendants from further implementing such patterns, practices, or policies. *See Inmates of the Northumberland Cty. Prison*, 2009 U.S. Dist.  LEXIS 126479, at *74–75 ("In fact, the interests of the remaining putative representatives are perfectly aligned with those of the putative class; namely, they wish to rectify the conditions at NCP so that current and future inmates are not subjected to deprivations of their constitutional rights while institutionalized at NCP."). The granting of the relief sought by Plaintiffs would benefit the class members and would not impair any future class member's claims.

Further, under Rule 23(a)(4) and Rule 23(g), counsel for Plaintiffs will vigorously represent the class in this litigation.  An order certifying a class action must appoint class counsel under Rule 23(g). Fed. R. Civ. P. 23(c)(1)(B).  In turn, Rule 23(g) requires a court to consider the following non-exhaustive factors:

(i)     the work counsel has done in identifying or investigating potential claims in the action;

(ii)    counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii)   counsel's knowledge of the applicable law; and

(iv)    the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A)–(B).

Counsel for Plaintiffs satisfies all of these factors.  Plaintiffs' attorneys conducted a year-long investigation prior to filing the Complaint, and have been doggedly pursuing discovery since that time.  They are qualified and experienced in conducting class actions, Section 1983 and prisoners' rights litigation, and are familiar with the applicable law.  Plaintiffs' counsel includes lawyers from Schnader Harrison Segal & Lewis LLP, the Pennsylvania Institutional Law Project,

and the Abolitionist Law Center.  Between them, they have extensive experience in prisoners'
rights and class action litigation and have committed to provide the resources necessary to
represent the class.  *See* **Ex. 50** (Declaration of Keith Whitson); **Ex. 51** (Declaration of Alexandra
Morgan-Kurtz); **Ex. 52** (Declaration of Bret Grote).

Plaintiffs' collective counsel is more than qualified to represent the class in this case.  They
will assure the "vigorous prosecution of claims" demanded by Rule 23.

## C.   PLAINTIFFS'   CHALLENGE   TO   DEFENDANTS'   PATTERNS, PRACTICES, OR POLICIES SATISFIES RULE 23(b)(2).

Plaintiffs' claims, which seek declaratory or injunctive relief, also satisfy the requirements
of Rule 23(b)(2) because they seek to define the appropriate "relationship between the defendant(s)
and the world at large" rather than to benefit the individual plaintiffs.  *Baby Neal*, 43 F.3d at 58–
59 (quoting *Weiss*, 745 F.2d at 811).   Accordingly, Rule 23(b)(2) "is almost automatically
satisfied."  *Id*.   Indeed, Rule 23(b)(2) was "designed specifically for civil rights cases seeking
declaratory or injunctive relief for a numerous and often unascertainable or amorphous class of
persons."  *Id*.; *see also Shelton*, 775 F.3d at 562.  As the Supreme Court has explained, the key to
the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the
notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the
class members or as to none of them."  *Wal-Mart Stores*, 564 U.S. at 360 (citation omitted).  Here,
Plaintiffs' claims are so inherently intertwined with that of the class as a result of Defendants'
common patterns, practices, or policies that injunctive and declaratory relief as to any would be
injunctive and declaratory relief as to all.  *See Clarke*, 267 F.R.D. at 198.

Rule 23(b)(2) is "met even if the action or inaction 'has taken effect or is threatened only
as to one or a few members of the class, provided it is based on grounds which have general
application to the class.'" *Santiago*, 72 F.R.D. at 626 (quoting *Advisory Committee's Notes to*

*Proposed Rules of Civil Procedure,* 39 F.R.D. 69, 102 (1966)).  In circumstances similar to those here, where the claim is premised on a class suffering from constitutional injuries due to patterns, practices, or policies applied to all detainees, courts have found Rule 23(b)(2) satisfied.  *See, e.g.*, *Death Row Prisoners of Pa. v. Ridge*, 169 F.R.D. 618, 623 (E.D. Pa. 1996); *Santiago*, 72 F.R.D. at 625–26.  As a result, Plaintiffs' claims meet the requirements of Rule 23(b)(2), and this Court should grant their motion for class certification.


**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court certify the class proposed in this Motion and appoint their counsel as class counsel.


DATED:  June 9, 2022                          Respectfully submitted,

                                              */s/ Keith E. Whitson*
                                              Keith E. Whitson
                                              Pa. I.D. No. 69656

                                              **SCHNADER HARRISON SEGAL & LEWIS
                                              LLP**
                                              2700 Fifth Avenue Place
                                              120 Fifth Avenue
                                              Pittsburgh, PA  15222
                                              Telephone: (412) 577-5220
                                              Facsimile: (412) 577-5190
                                              kwhitson@schnader.com

                                              */s/ Alexandra Morgan-Kurtz*
                                              Alexandra Morgan-Kurtz, Esq.
                                              PA ID No. 312631
                                              **Pennsylvania Institutional Law Project**
                                              247 Fort Pitt Blvd., 4th Floor
                                              Pittsburgh, Pa 15222
                                              Tel: (412) 434-6175
                                              amorgan-kurtz@pailp.org

                                              */s/ Bret Grote*
                                              Bret Grote, Esq.

PA ID No. 317273
*s/ Jaclyn Kurin*
Jaclyn Kurin
D.C. Bar ID No. 1600719
Pro Hac Vice Application To Be Filed
*/s/ Swain Uber*
Swain Uber, Esq.
PA I.D. No. 323477
*/s/ Quinn Cozzens*
Quinn Cozzens, Esq.
PA ID No. 323353

**Abolitionist Law Center**
P.O. Box 8654
Pittsburgh, PA  15221
Tel:  (412) 654-9070
bretgrote@abolitionistlawcenter.org
jkurin@alcenter.org
swain.uber@gmail.com
qcozzens@alcenter.org

*Counsel for Plaintiffs and Proposed Interim Class Counsel*