# Expert Report of Terry A. Kupers, M.D., M.S.P.

*Re: Howard v. Laura Williams, Case No. 2:20-cv-1389*

## Table of Contents

I.    Background and Qualifications

II.   Preparation

III.  Basis for Opinions

    A. Background About Allegheny County Jail

        1. A large proportion of individuals incarcerated in the ACJ have mental health conditions.

        2. NCCHC assessment and lack of appropriate response

        3. Changes Instigated by the Allegheny County community

    B. July 25, 2022 Tour, with Commentary

    C. Findings

      1. Standards in the Field

      2. Staffing at Allegheny County Jail is Grossly Inadequate

      3. Lack of Adequate Training

      4. Ineffective Intake

      5. Lack of Privacy and Confidentiality

      6. Absent or Inadequate Treatment Planning

      7. There is Little or No Ongoing Counseling nor Individual or Group Psychotherapy, and Very Little Effective Case Management

      8. Problems with Medication Management

      9. Lack of Peer Review and Quality Improvement Program

      10. Unreasonable Punishment of Individuals with Psychiatric Disabilities

      11. Overuse of Solitary Confinement for Prisoners with Mental Illness

        a. Background About Solitary Confinement

        b. The RHU and Other Solitary Confinement Settings

      12. Inadequacies of Mental Health Assessment Combined with the Over-utilization of Solitary Confinement Cause Significant Harm to prisoners at ACJ

## IV. CONCLUSIONS

1. Mental Health Treatment at ACJ is shockingly substandard and inadequate.

   a). Staffing at Allegheny County Jail is grossly inadequate.

   b). There is a Lack of Adequate Training of Mental Health Staff.

   c). There is a Lack of Adequate Training for Correctional Staff

   d). The Intake procedure is Inadequate in multiple regards,

   e). Insufficient precautions are taken to ensure privacy and confidentiality.

   f). Treatment Planning is Absent or Inadequate.

   g). There is Little or No Ongoing Counseling nor Individual or Group Psychotherapy, and Very Little Effective Case Management.

   h). There is a singular emphasis on the part of mental health staff on prisoners who are imminently suicidal.

   i). There are large problems in the area of Medication Management,  and the protocol for medication-over-objection must be reviewed and brought up to standards in the field, including consideration of due process.

   j.) There is a Lack of Quality Improvement Programs at ACJ.

2. There is widespread harsh and unreasonable punishment of Individuals with psychiatric disabilities, including excessive force directed selectively at prisoners seeking mental health services.

3. Attempts at "de-escalation" are essentially non existent at ACJ.

4. Solitary Confinement is over-utilized, especially with Prisoners suffering from Mental Illness, and time in solitary confinement is well-known to exacerbate mental illness and worsen disabilities, prognoses and recidivism rates.

5. Many individuals incarcerated at ACJ have serious mental health needs.

6. The conditions prisoners with mental illness in the ACJ qualify as disabilities under both ACJ Policy (#311) and community standards.

7. As described above and throughout this report, there are systemic and gross deficiencies in ACJ's mental health care system, evidenced by repeated and widespread occurrences of failure to provide adequate and appropriate care as well as the

meting of punishments in place of treatment for serious mental health conditions.

8. Inadequacies in the Mental Health Treatment program, overly harsh punishment and over-utilization of Solitary Confinement cause significant harm to prisoners at ACJ.

9. The care being provided at ACJ is unreasonable by any measure, given the seriousness of the risks, ACJ's knowledge of the appropriate standards, and their failure to meet those standards.

## V. RECOMMENDATIONS

1. Mental Health Services in General
2. The Option of Downsizing the Population in ACJ
3. A robust effort to recruit staff applications
4. Increase the number of funded staff positions
5. Hiring, training and supervising are a package
6. Much more rigorous training for all staff at ACJ
7. Staff Collaboration
8. Intake
9. Enhance and Upgrade Treatment Interventions.
10. Privacy and Confidentiality
11. Crisis Intervention
12. Rehabilitation and Education Programs
13. Record Keeping
14. Provide Follow-Up as Clinically Indicated
15. Revamp and expand peer review and quality assurance
16. Increase the number of psychiatrists at the jail
17. Revamp Medication Management
18. Reduce the Waiting Period to be seen by Mental Health staff
19. Decrease Use of Force with all prisoners, but especially prisoners suffering from mental illness
20. Develop very robust De-escalation Procedures
21. Improve the grievance procedure.
22. Assign dedicated custody staff in units with a significant number of prisoners with mental illness.
23. End Solitary Confinement at the Allegheny County Jail and meet the Requirements of the "Prohibit Solitary Confinement Initiative" as well as ACJ Policy #311 regarding accommodations for individuals with psychiatric disabilities

4

24. There must be an end to the culture of punishment that currently prevails at ACJ

## I. Background and Qualifications

I am a board-certified psychiatrist, Institute Professor Emeritus at the Wright Institute, Distinguished Life Fellow of the American Psychiatric Association, and an expert on the psychiatric effects of prison conditions and correctional mental health issues.  I have testified more than thirty times in state and federal courts about the psychiatric effects of jail and prison conditions, the quality of correctional management and mental health treatment, and prison sexual assaults.  I have served as a consultant to the U.S. Department of Justice, Disability Rights California, and Human Rights Watch.  I am author of Solitary: The Inside Story of Supermax Isolation and How We Can Abolish It (University of California Press, 2017) and Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It (Jossey-Bass/Wiley, 1998), co-editor of Prison Masculinities (Temple University Press, 2001), and a Contributing Editor of Correctional Mental Health Report.  I have authored and co-authored dozens of professional articles and book chapters, including "Posttraumatic Stress Disorder (PTSD) in Prisoners" & "Schizophrenia, its Treatment and Prison Adjustment," both articles in Managing Special Populations in Jails and Prisons, ed. Stan Stojkovic, Kingston, NJ: Civic Research Institute, 2005; "Prison and the Decimation of Pro-Social Life Skills," in The Trauma of Psychological Torture, Editor Almerindo E. Ojeda, Vol 5 of Disaster and Trauma Psychology Series, Westport, Connecticut: Praeger, 2008; "Violence in Prisons, Revisited," (with Hans Toch), Journal of Offender Rehabilitation, 45,3/4, 49-54, 2007; "A Community Mental Health Model in Corrections," Stanford Law & Policy Review, 26, 119-158, Spring, 2015; and

two entries, "Posttraumatic Stress Disorder in Incarcerated Offenders" and "Imprisonment and Stress," in the *Sage Encyclopedia of Criminal Psychology*, Sage Publications, 2019.

I served as consultant to the Connections Program in San Francisco, California, a collaboration between San Francisco Court Case Managers, San Francisco Jail Mental Health Services and Community Mental Health agencies designed to provide alternatives to jail for mentally ill and substance-abusing offenders.  I was a member of the California Department of Health Task Force to write "Health Standards for Local Detention Facilities" in 1976-77.  I served as monitor of the *Presley v. Epps* consent decree in Mississippi, involving prisoners with mental illness in isolated confinement at Mississippi State Penitentiary.[1]  I was the recipient of the 2005 Exemplary Psychiatrist Award and the 2020 Gloria Huntley Award from the National Alliance on Mental Illness (NAMI), and the William Rossiter Award for "global contributions made to the field of forensic mental health" at the 2009 Annual Meeting of the Forensic Mental Health Association of California.  My *curriculum vitae* and a list of cases in which I have served as an expert in the past four years are attached to this report as Exhibits A & B.

I have been retained by plaintiff's counsel to offer opinions about the mental health services provided at Allegheny County Jail, the conditions of confinement (including programs, solitary confinement, and so forth) and related issues.  My fees are $350/hour for all work and travel time except testimony, and $500/hour for testimony at deposition and trial.

## II.  Preparation

---

[1] No. 4:05CV148-JAD (N.D. Mississippi, 2005 & 2007).

I have reviewed the following documents:

1) Complaint in this matter

2) Plaintiff's Brief in Support of Motion for Class Certification in this matter along with 52 Exhibits attached to Brief

3) Deposition of Dr. Ashley Brinkman (as well as all exhibits to Dr. Brinkman's Deposition)

4) Deposition of Warden Harper

5) Deposition of Chief Deputy Laura Williams

6) Deposition of Nora Gillespie

7) Deposition of Chief Deputy Warden Jason Beasom

8) Deposition of Robyn Smith

9) Deposition of Sgt. Randy Justice

10)     Declaration of Jason Porter

11)     Declaration of Albert Castaphany

12)     Declaration of Brooke Goode

13)     Declaration of Keisha Cohen

14)     Deposition of Dr. Michael Barfield

15)     Deposition of Stephani Frank

16)     Declaration of Jaclyn Kurin

17)     The Stipulated Confidentiality and Stipulated Order in this matter

18) November 3, 2021 Report of the Office of County Inspections and Services PA Title 37, Chapter 95 Inspection of Allegheny County Jail

19) June 2021 Report to the Jail Oversight Board Pursuant to Allegheny County Code

20) October 2019 Suicide Program Assessment of Allegheny County Bureau of Corrections by the National Commission on Correctional Health Care (NCCHC) - AC_007857 - AC_007894

21) Minutes of several "NCCHC-ACA Prep Meetings"

22) List of psychotropic medications prescribed in the Allegheny County Jail (ACJ)

23)   Numerous policies at the ACJ including Suicide protocol, Intake Assessment and Mental Health Evaluation, Treatment Plans, Use of force, Solitary Confinement and so forth

24)   Medical charts, complaints and housing assignments for ten Inmates at the ACJ

25)   The Allegheny County Jail Survey: Responses from Individuals who were incarcerated, fall, 2021

26)   Title 37 Standards.PDF

27)   ACA Standards

28)   NCCHC Standards

29)   Healthcare Services Orientation.PDF AC_007587 - AC_007605

30)   Policy#609.pdf

31)   Patients with Chronic Disease and Other Special Needs Pdf - AC_002504 - AC_002530

32)   Access to Care.PDF - AC_002462 - AC_002468

33)   ACJ Healthcare Staff Vacancies (Auditor_s office) 7.PDF 14d - AC_007619 -  AC_7621

34)   Deaths in Custody-Suicide (REDACTED).pdf, Exh. 39 Brief for Class Cert

35)   NCCHC Position Statement on Solitary Confinement, Exh 36 to Brief for Class Cert

36)     American Psychiatric Association - Position Statement on Segregation of Prisoners with Mental Illness. PDF, Exh 37 to Brief for Class Cert

37)     Behavioral Health Service Jail.pdf, Exh. 38 to Brief for Class Cert

38)     U.S. Bureau of Justice Statistics, suicide statistics.pdf, Exh. 40 to Brief for Class Cert

The following exhibits to Brief for Class Cert:

39)     Ex 35a - 2019 County data (AC 9002).pdfEx 44f - AC_007961 - AC_007961 - F30-F39 - bipolar - 8-1-21_Redacted.pdf

40)     Ex 44g - AC_007961 - AC_007961 - F40-F48 - anxiety - 1-1-20_Redacted.pdf

41)     Ex 44h - AC_007961 - AC_007961 - F40-F48 - anxiety - 1-1-21_Redacted.pdf

42)     Ex 44i - AC_007961 - AC_007961 - F40-F48 - anxiety - 8-1-21_Redacted.pdf

43)     Ex 44j - AC_007961 - AC_007961 - F50-F59 - adjust - 1-1-20_Redacted.pdf

44)     Ex 44k - AC_007961 - AC_007961 - F50-F59 - adjust - 1-1-21_Redacted.pdf

45)     Ex 44l - AC_007961 - AC_007961 - F50-F59 - adjust - 8-1-21_Redacted.pdf

46)     Ex 44m - AC_007961 - AC_007961 - F60-F69 - person - 1-1-20_Redacted.pdf

47)     Ex 44n - AC_007961 - AC_007961 - F60-F69 - person - 1-1-21_Redacted.pdf

48)     Ex 44o - AC_007961 - AC_007961 - F60-F69 - person - 8-1-21_Redacted.pdf

49)     Ex 46 - list of prescriptions of psychotropic medication (Ex 13 to depositions)_

50)     Ex 49 - sample UOF reports (AC_77132-157; AC_077458-477; AC_077343-3

51)     Ex 41 - AC_032782 -AC_032783 - ACJ Suicide Attempts_Redacted.pdf

52)     Ex 42 - AC_007961 - AC_007961 - SMI_Redacted_Redacted.pdf

53)     Ex 43 - Policy 311 (AC 2774-82).pdf

54)     Ex 44a - AC_007961 - AC_007961 - F20-F29 - schiz - 1-1-20_Redacted.pdf

55)     Ex 44b - AC_007961 - AC_007961 - F20-F29 - schiz - 1-1-21_Redacted.pdf

56)     Ex 44c - AC_007961 - AC_007961 - F20-F29 - schiz - 8-1-21_Redacted.pdf

57)     Ex 44d - AC_007961 - AC_007961 - F30-39 - bipolar - 1-1-20_Redacted.pdf

58)     Ex 44e - AC_007961 - AC_007961 - F30-F39 - bipolar - 1-1-21_Redacted.pdf

59)     Ex 47 - 2021 County data (AC 8997) - population.pdf

60)     Ex 50 - KEW Declaration.pdf

61)     Ex 51 - Declaration of Alexandra Morgan-Kurtz.pdf

62)     Ex 52 - Declaration of Bret Grote.pdf

63)     Ex 45 - 2021 County data (AC 8997) - MH statistics.pdf

64)     Policy #311, Reasonable Accommodations for Inmates with Qualified Disabilities

I was also provided the following documents:

| | |
|---|---|
| Defendants' responses to First Set of Interrogatories and Requests for Production | AC 33570 AC 33572 AC 33573 |
| Defendants' responses to Second Set of Interrogatories and Requests for Production | AC 33575 AC 33576 AC 33764-34280 |
| Supplemental Answers to Interrogatories | AC 49539-49545 AC 49869-50445 |
| "Major incident report" | AC 54316-54463 |
| "Income complaint meds" | AC 55074-55193 |
| Contract with AHN | AC 57206-57302 |
| 2021-06-10 letter from KW to JB | AC 62375-62682 |
| 2021-06-18 letter from JB to KW | AC 67412-67636 |
| 2022-02-03 letter from KW to JB | AC 76684-76687 |

| | |
|---|---|
| AC 22-24 | AC 76691-76698 |
| AC 31-34 | AC 76708-76737 |
| AC 73-865 | AC 76742-76772 |
| AC 866-1013 | AC 77244-77289 |
| AC 1168-2390 | AC 77572-77616 |
| AC 2414-2432 | AC 77708-77718 |
| AC 7587-7605 | AC 77719-77805 |
| AC 7606-7612 | AC 77822-77857 |
| AC 7613-7621 | AC 77858-77921 |
| AC 7657-7717 | AC 77922-77924 |
| AC 7718-7776 | AC 78834 |
| AC 7777 | AC 78835 |
| AC 7829-7856 | AC 79924-79926 |
| AC 7949 | AC 79927-79929 |
| AC 7955-7956 | AC 79941-79948 |
| AC 7957 | AC 79953-79970 |
| AC 7958-7960 | AC 80040-80081 |
| AC 7961 | AC 80125-80240 |
| AC 8117-8123 | AC 80282-80300 |
| AC 8232-8346 | AC 80301-80306 |
| AC 8347-8379 | AC 80364-80366 |
| AC 8380-8410 | AC 80383-80386 |
| AC 8411-8583 | AC 80404-80405 |
| AC 9004 | AC 80438-80440 |
| AC 26092-26130 | AC 80459-80471 |
| AC 32782-32783 | AC 80697-80710 |
| AC 32784-32789 | AC 80986-80990 |
| AC 32792-32795 | AC 80999-81002 |
| AC 32804-32817 | AC 81027-81035 |
| AC 32826-32832 | AC 84055-84090 |
| AC 32833-32851 | AC 84091-84515 |
| AC 32878-32881 | AC 84552 |
| AC 32882-32891 | AC 87585-87629 |
| AC 32892-32898 | AC 87637-87646 |
| AC 33007-33104 | |
| AC 33164-33166 | |
| AC 33204-33206 | |

On July 25, 2022, I toured Allegheny County Jail for 2½ hours in the company of plaintiff's experts, Dr. Walter Rhinehart and Mr. Brad Hansen, and counsel for both parties in this matter.  Major Edwards led the tour.  Maj. Edwards kindly permitted us to take photographs, and all the photos in this

report were taken by me during our July 25 tour.  On that same day I interviewed six prisoners at the jail for approximately 30 minutes each, and I interviewed for over thirty minutes an additional four prisoners virtually on November 16, 2022.

# I. Basis for Opinions

## A. Background About Allegheny County Jail

The Allegheny County Jail (ACJ) was built in 1995.  It is a high-rise building with direct supervision pods on multiple floors. The population of the jail prior to the pandemic was approximately 2,300 to 2,400.  As of July, 2022, the population was approximately 1,600 or 1,700. As of January 26, 2023, the total population at ACJ was 1,484.

Reduction of population has resulted from attempts on the part of various agencies and organizations to provide services in alternative, non-carceral settings and efforts to alleviate overcrowding due to the pandemic. Health services are provided by Allegheny County, with some providers contracted through Allegheny Health Network (AHN), and others employed directly by Allegheny County.

### 1. A large proportion of individuals incarcerated in the ACJ have mental health conditions.

Defendant Williams testified that, on average, 41 percent of those incarcerated at ACJ are prescribed at least one psychotropic medication, and Dr. Brinkman testified the number was approximately 75% (Ex. 1, p. 213; Ex. 7, p. 158, 205).  According to Defendants' records, ACJ's average population during 2020 was 2,056 individuals (AC 8997).

Based on Chief Williams' stated percentage, the number of individuals with prescriptions for psychotropic medication at any given time during that year would be ███ of 2,056, or ███ individuals.  Based on Dr. Brinkman's percentage, the number is significantly higher.  Both numbers are within the range discussed in the literature.

Defendants also produced a spreadsheet identifying individuals with particular diagnoses at various points in time.[2]  The following chart summarizes the number of diagnoses as of specific dates:

|  | 1/1/ 20 | 1/1/ 21 | 8/1/ 21 |
|---|---|---|---|
| Schizophrenia and other psychotic disorders | ███ | ███ | ███ |
| Bipolar and related disorders | ███ | ███ | ███ |
| Depressive disorders | ███ | ███ | ███ |
| Anxiety disorders | ███ | ███ | ███ |
| Trauma and stressor related disorders | ███ | ███ | ███ |
| Neurocognitive disorders | ██ | ██ | ██ |
| Personality disorders | ██ | ██ | ███ |

---

[2] AC 7961 contains a series of tabs identifying different categories of diagnoses consistent with DSM-V.

| Breaks with reality or perceptions of reality | ■ | | ■ | | | ■ |
|---|---|---|---|---|---|---|
| TOTAL of above | ■ | | ■ | | | ■ |

Defendants themselves also "flag" certain individuals as having "serious mental illness."  Using their own definition, Defendants produced a spreadsheet outlining individuals with this designation, and that spreadsheet identifies ■■■ individuals who would be part of the class (AC 7961).  No matter how you define it, there is a significant mental health population at Allegheny County Jail.

The mental health population includes individuals with a wide variety of conditions that are inherently serious in nature, including bipolar disorder, schizoaffective disorders, major depressive disorder, borderline personality disorders, PTSD, and other personality and mood disorders.  Individuals with these conditions by definition have serious medical needs. Other conditions, such as anxiety disorders, persistent depressive disorder and the like are also present, and my review demonstrates that at least some of the population with these conditions also have serious medical needs.

A large majority of the jail population is pre-trial.  A disproportionate number of jail prisoners are Black compared to their proportion in the community, in fact 67% of ACJ jail population is Black while Blacks make up 13% of the population in the community.

## 2. NCCHC assessment and lack of appropriate response

The rate of suicide in the jail is much higher than the national average for jails, and because of that the National Commission on Correctional Healthcare (N.C.C.H.C.) was asked in 2019 to assess the

ACJ suicide prevention program.  After completing their assessment of suicide prevention at ACJ, the N.C.C.H.C. team made the following points:

1. *Visibility of cells and areas a problem vis a vis suicide prevention*
2. *Officers assist with med administration, causing them to turn back on cells they are monitoring.*
3. *"Lack of privacy and interview space conducive to effective health screening is a concern throughout the facility, especially at intake."*
4. *Rounds are done, but need more communication with inmates.*
5. *No cells are suicide-resistant.*
6. *"Increase medical leadership and safe housing for" inmates in withdrawal.*
7. *Enhanced policies needed with regard to staff orientation, mental health services, mental health programs and residential units, and infirmary level care is under review.*
8. *Problem lists are not being utilized by staff to aide therapy and safety.*
9. *Staffing levels a problem. Need better integration of mh with primary care to identify those potentially suicidal, and use of outside records.*
10. *Need greater integration of behavioral care with primary care.*
11. *"Therapeutic programming on mental health residential units is limited. It needs to support a therapeutic environment that lends itself to treatment and recovery."*
12. *Treatment plans incomplete and do not reach NCCHC standards*
13. *Training of nurses and others re suicide not adequate.*[3]

In response to the Report from the N.C.C.H.C., meetings were held and a number of changes were made at the jail.  A "rubber room" or relatively safe cell was constructed in the Intake area, where admittees

---

[3] See October 2019 NCCHC Suicide Assessment (AC 7857-7894).

who are believed to pose a high risk of suicide can be confined until they can be admitted to the acute mental health unit, 5C.  Intake Mental Health Assessments are no longer conducted in the large waiting area but rather in a separate area with multiple desks, and small plexiglass panels have been placed between the desks/stations where mental health Intake evaluations are conducted.  In a document entitled "The Warden's Report on NCCHC Suicide Study, August 2021" (AC_032882-),[4] Warden Harper claims that the County has successfully completed fixes for 9 of the 13 problems the NCCHC had identified in October 2019.  But he averred that it was only the Warden's staff themselves who had decided their fix for the problems was satisfactory, and no return visit from the NCCHC has been scheduled to assess completion of the required changes.  In fact, as of the summer of 2022 when I visited the jail, most of the issues the Warden identified as "completed" actually remain quite problematic.  For example, regarding the NCCHC's "Recommendation #9: Current assigned health staffing must be assessed in line with the population medical and mental health care needs," the Warden claims that measures have been taken such as posting job announcements on the county website and at the relevant graduate schools in the vicinity.  But there is no evidence that these measures were, or are likely to be successful in filling the many empty positions.  With all due respect, the Warden's response seems facile and inadequate considering Dr. Brinkman's April 2022 deposition testimony (8 months after Warden Harper's testimony and discussed further below) about the large number of positions in the mental health

---

[4] See also "Suicide Prevention Program Assessment Recommendations: NCCHC Resource Team Recommendation Completion Summary," 7/27/2021, (AC_033570)

program, including on-site psychiatrists and psychologists, remaining unfilled.  Or, consider Recommendation #3: "Lack of privacy and interview space conducive to the effective health screening is a concern throughout the facility."  Warden Harper lists a few minor alterations that have been put in place, and that is a positive development, but he does not address the fact that most mental health staff interactions with prisoners, even contact with psychiatrists, occur at cell-front, where there is no privacy at all.  If there are sufficient interview spaces, why are so many contacts with mental health staff still conducted at cell-front?  In fact, as I will detail throughout this report, just about all of the concerns raised by the N.C.C.H.C. team that assessed the jail's suicide prevention program in 2019 are still very much concerns today. It is a positive development that there have been multiple staff meetings and some minor changes in response to the N.C.C.H.C. assessment, but for the most part little has changed at the jail.

3.  **Changes Instigated by the Allegheny County community**

        The voters of Allegheny County voted in favor of a referendum that became effective in December 2021.  According to that referendum (AC 7908), solitary confinement is prohibited at ACJ except in emergencies, and the "restraint chair," chemical agents and leg shackles may no longer be used on those in ACJ's custody.  The "restraint chair," a device designed to immobilize disruptive prisoners, is quite controversial.  There have been many deaths in jails around the country involving the use of restraint chairs.  The elimination of the restraint chair at ACJ occurred very recently, so quite a few prisoners I interviewed had been placed in restraint chairs prior to the recent

discontinuation of the practice.  In addition, while use of the restraint chair was recently discontinued, long guns that loudly shoot rubber or wooden blocks are now being used by officers on the units, and their use terrifies prisoners with mental illness and has other harmful effects. So while they may have complied with the express prohibition on the use of the restraint chair, they have replaced it with another practice designed to intimidate.

The referendum also prohibited the use of solitary confinement (defined as isolated confinement for greater than 20 hours per day).  As discussed further below, in my view, ACJ has not complied with this aspect of the referendum.  Instead, they have created entirely unattractive "cages" where prisoners can choose to spend four hours out-of-cell, and because of the design very few choose to do so; or there are extended lockdowns during which prisoners are in de facto solitary confinement; or areas of the jail other than the RHU constitute another form of isolated confinement.

## B.        July 25, 2022 Tour, with Commentary

Major Edwards met us at the entry to the jail and conducted a 2 ½ hour tour.  We were able to talk to him, to staff and to prisoners in each location we toured.  Major Edwards and all staff were amiable, helpful in explaining procedures, and generally very professional.  In Intake we learned how individuals being admitted to the jail are searched, examined, seen by a judge over video in the pre-arraignment office, given jail garb and so forth.  There is a "rubber room" or seclusion cell near the counter where officers sit, and this presumably "suicide-proof" room was constructed recently in response to the

2019 NCCHC Suicide Program Assessment of Allegheny County Bureau of Corrections.

Also remarkable was the absence of restraint chairs, another recent change in response to the "Prohibit Solitary Confinement Initiative," as well as complaints from prisoners, attorneys and human rights groups about restraint chairs being utilized excessively at ACJ and constituting unacceptably cruel and unusual punishment.  Although no longer in use, the restraint chair was used prior to and for a period of time after the Complaint was filed initiating this litigation, and therefore, I include a discussion of it in this report.

Noteworthy were the sites of admission medical and mental health screening.  The screeners are medical/mental health clinicians, a nurse and a social worker respectively.  It is commendable that the initial mental health screening, for all individuals entering the jail, is conducted by an LSW social worker or other mental health clinician rather than a non-clinician such as a custody officer, and that it occurs during Intake.  But the site of initial medical examination is not private and therefore not confidential (see photo, below). The site of the mental health Intake screening is an office with multiple staff and prisoners present (see photo, below).  There are small lexsan panels separating the chairs where the individuals being assessed sit, but still there is no real privacy, and the fact that staff and other prisoners nearby can overhear the interview undoubtedly makes individuals being screened reluctant to share personal information such as suicide ideation or hallucinated voices with the clinician conducting the screening.  The social worker conducting the mental health assessment on the day of our tour reports that she does not have computer access to the admittee's prior medical records from outside of the jail, for example from the Department of Health Services and the state

psychiatric hospital – she can send a request for those records – but she is able to access prior ACJ medical and mental health records.



*Site of Initial Medical Screening*



We toured Unit 5C, the mental health unit designated for the most acutely disturbed and most suicidal prisoners.  We saw no prisoners in the common area/dayroom of the unit, they were all locked in their single cells at the time of our tour and the dayroom was empty.  There was a nursing station and metal tables with benches fixed to the floor (see photo below).  We were told that meetings with counselors and mental health clinicians occur at cell-front or in the dayroom, i.e. the prisoner is not transferred to a private office but rather the counselor stands in front of the solid metal door to talk to the prisoner or they talk in the common area.  I tried to speak to a couple of prisoners through the metal and glass door and had great difficulty hearing them and having a meaningful conversation.



*Unit 5C, the mental health unit for the acutely disturbed*

There were several suicide observation cells (see photo below, but note: in this photo the prisoner is in jail garb because he is not on observation status. If he were on suicide observation status he would be naked except for a "Ferguson Gown" made of material that cannot be torn, and would have no possessions in the cell.)



*Suicide Observation Cell on 5C*

We visited Unit 2B, a unit for sentenced individuals serving their term.  It is a minimum security general population unit.  There were eight prisoners sitting in the dayroom, we were told they are all trustees who have jobs in the jail. All of the other prisoners were confined to their cells.  The physical structure of 2B is similar to that on 5C, but unlike on 5C where prisoners are in a cell by themselves, on 2B they are double-celled, with some exceptions.  Also, there is a recreation area containing a small basketball court.  We are told that visiting is by video only, and prisoners on 2B have tablets which they can use to

access entertainment and educational stations, and are allotted much more out-of-cell time than prisoners on 5C.

I requested a visit to Unit 4F, one of the locations where prisoners in Protective Custody are housed.  Prisoners on Protective Custody are also housed in the RHU "for their protection," but that means they suffer the conditions of solitary confinement, and not because they are charged with a rule-violation, but rather because they are seeking or need protection. Unfortunately there was not enough time left on the tour and I was unable to visit Unit 4F.

We toured the Restricted Housing Unit (RHU) on the Eighth Floor of the jail.  I will describe that Unit, below (Section C, 11, b.) as part of the discussion about solitary confinement.

## C.  FINDINGS

### 1. Standards in the Field

Based on my experience described above (Sect. # I), I am familiar with the appropriate standards for mental health care in jails and prisons.  One source on which I rely are the published standards of the National Commission of Correctional Health Care ("NCCHC").  In particular, the NCCHC published "Standards for Mental Health Services in Correctional Facilities" in 2015. Another source is the American Correctional Association's "Performance-Based Standards for Adult Local Detention Facilities," now in its Fifth Edition. Although the ACA standards apply to jail operations broadly, they have a section addressing healthcare services, including several "expected practices" relating to mental health services.

Defendants claim they follow ACA and NCCHC standards.  AC 2504-2530, AC 2462-68, AC 7587-7605, at 7599 and 7601. According to Chief Williams "We model our [healthcare] policies on NCCHC ....  We are not accredited, but we strive to be and model the policies on those standards" (Williams Deposition, 17:6-10).  Dr. Ashley Brinkman, Allegheny County's current Health Services Administrator, testified at Deposition:

> Question       So as a whole, do NCCHC mental health standards represent what, in your view, would be minimally required?  Or is that more of your goal?
> MR. BACHARACH:  Object to form.  You can answer.
>  Answer        It's the facility's goal to be able to  reach that accreditation. I think the difference between it being minimum and goal is mostly we haven't  reached it yet.  So I suppose it is both.  I'm not sure how to be more specific.  (Brinkman transcript, p. 99).

Another source of the applicable standards is the standard of care in the community, albeit recognizing that jail security interests may impact how those standards are met.  In its Inmate Handbook, ACJ announces that they comply with these standards: ██████████████████████████ ████████████████████████████████████████ ████████████████ (AC_54).  In addition, Title 37, Chapter 95 of the Pennsylvania Code applies to county jails and establishes "minimum requirements" that are "deemed to be essential to the safety and security of the county prison, prison staff, inmates and the public" (37 Pa. Code §95.220b).  Finally, my acumen in psychiatry and corrections, along with practices at other facilities I have visited, inform my opinions on the appropriate standards that are applicable here.

ACJ promulgates internal policies.  Sometimes these written policies on their face are inconsistent with the above standards.  On other occasions, the policies as written comply with the appropriate standards, but ACJ nevertheless fails to comply with their own policies in practice. Overall, as discussed in detail below, Defendants systemically fail to satisfy the required standards and fall well below what is reasonably required to care for those in their custody.

## 2. Staffing at Allegheny County Jail is Grossly inadequate

Dr. Brinkman testified that the ACA and NCCHC standards do not specify a certain number of psychiatrists, psychologists and so forth; rather, the adequacy of staffing is determined by assessing the ability to complete the services required by the standards, and when services are inadequate one assumes staffing is inadequate.[5]  Clearly the unfilled mental health job slots and the long waits to see a mental health clinician (described below) are causally related: the more understaffed the mental health program, the longer the waits, the less consistent the follow-up, the shorter the contacts, on average – and all of these deficiencies in services point to very serious mental health staffing shortages.

Dr. Brinkman's testimony is consistent with recommendations made by The American Psychiatric Association (APA) in *Psychiatric Services in Correctional Facilities, 3rd Edition, 2016*.  The APA includes this discussion of

---

[5] Dr. Brinkman Deposition, p. 80:
"Question: Do either the ACA or the NCCHC standards
specify a particular number of staff per population?
Answer: No.
Q: So how do you determine whether you are meeting those standards?
A: The ability to complete the services required by those standards.

staffing levels: "Adequate numbers of appropriately trained mental health professionals, performing duties for which they are trained and authorized, must be present in every correctional facility.  Staffing must be adequate to ensure that every inmate with SMI[6] or in psychiatric or emotional crisis has timely access to evaluation by a competent mental health professional."  Regarding psychiatrist staffing levels in particular, there is this recommendation: "Although it is very difficult to establish exact psychiatrist-to-patient ratios, the amount of psychiatric time must be sufficient to ensure that there is no unreasonable delay in patients receiving necessary care, and all relevant and necessary psychiatric functions must be met…. The following are recommended basic guidelines regarding psychiatric staffing requirements:…Jails:  For general population needs: one full-time equivalent (FTE) psychiatrist for every 75-100 SMI patients receiving psychotropic medication prescribed for a mental health

---

[6] Serious Mental Illness (SMI) is a term of art.  There are mental illnesses that do not meet the criteria for SMI, and SMI implies relatively serious mental illness, compared with everyday anxiety for example.  But everyday anxiety can be an SMI if, for instance, it is extreme, or if the individual with an anxiety disorder is driven by the stress of solitary confinement to attempt suicide or self-harm. The Bureau of Justice Statistics of the U.S. Department of Justice reported in 2017 that 44% of people in jail have been told by a mental health professional that they have a mental health disorder, and 26% "met the threshold for serious psychological distress." (Bronson, J, Berzofsky, M, Indicators of Mental Health Problems Reported by Prisoners and Jail Inmates, 2011-2012, Bureau of Justice Statistics, June 22, 2017, NCJ 250612).  The American Psychiatric Association references SMI, or serious mental illness. Dr. Brinkman estimates that as many as 75% of prisoners in the ACJ suffer from a mental illness, are on the mental health caseload and are prescribed psychotropic medications.  But not all of those 75% technically qualify for the SMI label.  Most do, but ACJ witnesses have been inconsistent in how they use the SMI flag, if at all.  The Bureau of Justice Statistics, in other reports, uses the category "significant mental illness," meaning a mental disorder that requires treatment, and estimates that 56% of prisoners in jail fit that description.  Of course, there is overlap between SMI and significant mental illness.  With different parties offering different estimates of the prevalence of mental illness at ACJ, I adopt a range from 50% to 75% as the best estimate of the prevalence of mental illness in the ACJ jail population.  That means that mental health services need to be provided to well over half the jail population at any time.

diagnosis" (APA, pp. 8 – 9). This recommendation by the APA provides perspective on the facts that up to 800 or 900 detainees at ACJ require psychotropic medications, and Dr. Brinkman reports that there are often no psychiatrists available at the jail (there is one available by telehealth/video) because psychiatrist positions remain unfilled.

ACJ has only created positions for █ FTE psychiatrists, █ FTE psychologists, and █ FTE nurse practitioners for mental health needs (AC 2648-2665). Separately, to assist these professionals, in 2019 and 2020, ACJ budgeted for █ FTE mental health registered nurses, █ FTE mental health specialists and █ FTE psychiatric aides (AC 119195-96). Even if ACJ had all these positions filled, this would be insufficient given the ACJ population.

But those positions are not filled and have not been filled for a long time. As of August 6, 2020, there were █ vacancies in mental health staff positions, representing an astounding 40% of the healthcare staff (Defendants' Answer, Doc. No. 24, ¶58). The problem has grown worse over time—there were █ vacancies on October 29, 2018, █ vacancies on January 28, 2019, █ vacancies on June 1, 2019, and █ vacancies on June 3, 2020 (AC 7613-7621). According to a Mental Health Staff Roster, in 2019, ACJ added 6 staff members and lost 7, in 2020, added 6 staff members and lost 10, and in 2021, added 4 and lost 6 (AC 9004). According to a November 3, 2021 Allegheny County Jail Inspection Report, two years after the NCCHC report identified above, only 44 of 92 full time treatment positions were filled, only 9 of 19 part-time treatment positions were filled, and only 9 of 18 treatment supervisor positions were filled—a vacancy rate of at least 50% across all levels. (See also Brinkman Deposition, p. 79). Moreover, this staffing shortage includes the most senior members of the healthcare staff—recently, ACJ has had no Director of

Mental Health, no psychiatrists and no psychologists (Brinkman, pp. 51-55, 75-76).

Prisoners at ACJ universally report long waits to see mental health clinicians, even longer to see a psychiatrist. They also report meetings with mental health staff, even the psychiatrist, occur at cell-front or in the common area, and not in an office, there is no privacy or confidentiality, and the meetings usually last only a few minutes.  See later portions of this report. Hearing this one immediately is led to the obvious conclusion there are insufficient mental health staff by far to supply prisoners at ACJ who suffer from mental illness with adequate mental health services, especially considering the fact that up to 75% of the prisoners suffer from mental illness and take psychotropic medications.  These are the obvious consequences of understaffing.  Findings of the Fall 2021 "Allegheny County Jail Survey: Responses from Individuals Who Were Incarcerated" are consistent with prisoners' universal reports to me of long waiting times to be seen by mental health clinicians.  The 2021 Survey covers all medical services including mental health, and reflects "Overall, 66% (of prisoners in the ACJ) reported dissatisfaction…. With medical care in the jail."  Some of the open-ended responses were: "You have to wait forever for medical then they just want to give you medication instead of trying to work on the issues"; "It takes medical weeks to see you even when they know you have severe conditions"; and "My social worker emailed the jail [4 months ago] to have me seen by mental health. I still haven't been seen.  I am bipolar and unmedicated."

And the total number of hours spent by psychiatrists, psychologists and advanced practitioners has diminished dramatically.  For example, according to ACJ records, in calendar year 2018, psychiatrists recorded a total of ████ hours.  In 2019, the total hours recorded was █████ and in 2020, the total was

████.  See also section C(6) of this Report documenting delays in patients being seen by mental health staff.  And all this while the mental health needs of jail populations across the country have increased.

It is brutally clear that there is a massive staff shortage in the mental health services division of ACJ, getting worse all the time, and this is one important proximal cause of the long waits to see mental health staff, of the even longer wait to see a psychiatrist, of the short time prisoners get to spend talking with a clinician, of the near-total absence of counseling or "talking therapy" for prisoners with mental illness, and of the resulting overreliance on psychotropic medications (the only treatment modality available).  The other evidence I cite and opinions I express in this report about the insufficient care received by patients at ACJ further demonstrates the inadequacy of ACJ's staffing.

There are standards applicable to staffing.  For example, Title 37 requires an annual, documented staffing analysis (37 Pa. Code §95.241,1, ii); ████ ████████████████████████.  The NCCHC requires a staffing plan and identifies as unreasonable "having an understaffed, underfunded or poorly organized system with the result that it is not able to deliver appropriate and timely care" (NCCHC standards J-A-01, J-C-07, MH-A-01, and MH-C-07).  The ACA also requires a staffing analysis "on an ongoing basis" (5-ACI-1C-03; 4-4050), and specifically states: "The warden/superintendent can document that the overall vacancy rate among the staff positions authorized for working directly with inmates does not exceed 10 percent for any 18 month period" (5-ACI-1C-05; 4-4052).

Contrary to all of these standards, ACJ, continues to use a staffing analysis that was designed prior to 2015 by Corizon, the private company that was running the jail's medical care at the time (Answers to Interrogatories and

Requests for Production, No. 13).  In particular, the number of psychologist and psychiatrist positions at ACJ has been determined solely by the County's contract with Allegheny Health Network ("AHN"), which was entered into in 2015 (Williams Deposition, p. 103-04; AHN Contract, AC 2648-65), and there has been no discussions about changing those numbers.  (Williams Deposition, p. 110). Thus, notwithstanding state regulations, the standards of the NCCHC and American Correctional Association, and ACJ policy, there has been no new staffing analysis for ACJ for seven years.  And ACJ has exceeded a 10 percent vacancy rate by many multiples for well over 18 months. The NCCHC conducted a "suicide prevention program assessment" of ACJ, at the request of ACJ administration, in October 2019 (AC 7857-94), and one of its "key findings and recommendations" was that: "Current assigned health staffing must be reassessed in line with the population's medical and mental health care needs. Staffing challenges were reported in medical nursing as well as screening and treatment services by mental health specialists" (AC 7860).  The report also noted shortages in mental health specialists and nurses in the acute mental health units and stated: "We were also concerned with the availability of mental health specialists to provide individual and group counseling consistent with effective methodologies, psychosocial/psychoeducational program services, intake MH screening on days/evenings when there is an influx of arrests, and follow-up on inmates in the other housing areas" (AC 7884). Stunningly, notwithstanding these explicit statements from NCCHC in 2019, there has not been a new staffing assessment and the facility remains grossly understaffed. This alone is objectively unreasonable, in violation of all applicable standards, and poses a substantial risk of harm to the ACJ population.

## 3. Lack of Adequate Training

Compounding the staff shortages, there is entirely inadequate training for both custody and mental health staff at ACJ, and the combined deficiencies in staffing and training underlie the gross inadequacy of mental health care in the facility.  There are two basic approaches to assessing the level of staff training in a correctional setting:

1. Establish standards for adequate training, for example 40 hours of training for custody staff in the academy plus an additional 40 hours of training on specified mental health topics such as suicide each successive year; and work-place orientation of mental staff on mental health issues, jail policies, and working with custody staff in the jail.

2. Begin by assessing the quality of work staff are performing, and where the work is unacceptable institute further training to correct the problem.

I choose the latter approach in assessing the training programs at ACJ. Training is ineffective to the extent mental health staff fail to provide treatment plans and follow up with prisoners they have reason to be concerned will commit suicide or will descend into psychosis when consigned to solitary confinement.  Training is inadequate to the extent the correctional staff do not know how to identify those with mental health conditions, when to refer them to mental health, or how to de-escalate situations involving mental health patients.  If correctional staff do not appreciate the dangers involved in subjecting prisoners with mental illness to restraint chairs and solitary confinement, their training is inadequate.  If custody staff are not able to form positive rapport with prisoners suffering from serious mental illness, and if they

too quickly resort to severe force or leave prisoners in restraint chairs for unacceptably long periods with no access to the bathroom, their training regarding use of force and working with prisoners with mental illness is entirely inadequate.

Utilizing this general approach, and as demonstrated throughout this report, it is quite clear that staff training at ACJ is very inadequate, and objectively unreasonable, and much more robust and effective training about mental illness and its treatment are needed at ACJ for both custody and mental health staff, as well as training on de-escalation and the indications for and proper conduct of each variety of use of force as well as all forms of solitary confinement.

In addition, there are standards that identify an adequate level and kind of training. The NCCHC standards require specific training for mental health staff "on delivery of mental health services in the correctional setting." (J-C-01, J-C-03, MH-C-03).  Defendants do not comply with this standard.  For example, in her deposition, healthcare staff educator Robyn Smith testified: "The ACJ provides pre-service orientation to Mental Health Staff, but that training relates to ACJ procedures, such as safety, security, use of and accounting for sharps, and other such non-medical training.  The ACJ does not provide professional training to licensed medical staff" (Smith Deposition, pp. 101-102; See also Defendants' responses to First Set of Discovery, Interrogatories Nos. 3 and 4). Defendants still to this day do not provide any annual in-service training relating to the provision of healthcare (Smith Deposition, p. 68-69), and did not even provide a basic healthcare orientation until May 2020 (Smith Deposition, p. 19, 43-44, 47, 50-51).  Since May 2020, that orientation has been provided only to new hires (Smith Deposition, p. 142), and in any event, does not include discussion of the ACA or NCCHC standards other than simply making general

reference to the fact that some standards exist (Smith Deposition, p. 64-65). The 2019 NCCHC review noted that "enhanced policies are needed" with respect to healthcare staff training, and additionally recommended advanced training for those working on the acute units (AC_7860).

Dr. Brinkman testified that mental health specialists, those who were not grandfathered in, must have a Masters degree in a field related to behavioral health such as social work, counseling, substance abuse or criminology.  It appears that a license in a clinical field such as social work or psychology is not uniformly required, i.e. an individual with a Masters degree in criminology would not be qualified for licensing as a mental health clinician.  According to AC 032794, at least as of 2021, applicants must have a masters' degree and "proof of a current CPR/BLS certification" prior to appointment. Licensure in a mental health field does not seem to be required.  Considering the fact that mental health specialists do not need to have very extensive clinical training prior to their employment at ACJ, and do not need to be independently licensed, the training for ACJ mental health staff is far too thin.  Further, considering the fact that suicide risk assessments at intake are uneven and too often do not lead to the identification of prisoners at high risk of suicide, and considering that very few if any staff at ACJ conduct individual or group psychotherapy sessions, the lack of required training of mental health staff in clinical matters is unacceptable.  Either the professional qualifications of mental health counselors must be upgraded – for example, an independent license as a mental health practitioner needs to be a prerequisite for work in mental health at ACJ -- and that would constitute an upgrade of the clinical training of mental health specialists -- or much more on-the-job training in clinical matters must be required for mental health workers.

Of still greater concern is a lack of mental health training for correctional staff. The NCCHC requires, at a minimum, annual training for correctional staff on (1) how to recognize signs and symptoms of mental illness, (2) communicating with incarcerated individuals who have positive signs of mental illness, and (3) procedures for appropriate referral of incarcerated individuals with mental health complaints (J-C-04, MH-C-04).  The same standards require additional training for correctional staff working on acute units. (*Id*; *See also* 5-ACI-1D-10).  ACJ policy requires ██████████████████████████████ ████████████████████████████████████████████ ████████████████████████████ Policy 2303, AC 2475-78). The same policy requires ████████████████████████████████████ ████████████████ (Ibid).  Despite these standards, custody staff receive training only on suicide prevention and "interpersonal communications." (Williams Deposition, p. 55-57; See also Supplemental IR answers reflecting there is no mental health training aside from training received through the training department).[7]  The interpersonal communications training is not required training (Justice Deposition, p. 90).  And neither the interpersonal communications training nor the suicide prevention training discuss (1) the signs and symptoms of mental illness, (2) communicating with people with such conditions, or (3) referrals to mental health staff, as required by the above-referenced standards and policies.  (For training on suicide, see training curriculum, Exh. 20 to Brief for Class Certification; For training on interpersonal communication see Ex. 21 of Brief for Class Certification, AC 77244-89; see also, current Interpersonal Communications training, AC 77244-89).  The Chief

---

[7] I understand some additional training programs have been developed since the initiation of this litigation, but again, the deficiencies in the current mental health treatment program reflect that training remains vastly inadequate.

Deputy Warden of Operations, Jason Beasom, and the Sergeant in Charge of the
Training Department, Sergeant Randy Justice, acknowledged that they would
have no way of determining whether someone at the jail was being treated for a
mental illness (Justice Deposition, p. 77; Beasom Deposition, p. 32).  Chief
Deputy Beasom testified:

> Question:    How do you determine whether conduct  is
> related to someone's mental health condition
> Answer:    I don't determine that.
>  Q:    Have you received any training how to identify the
> signs and symptoms of mental illness?
>  A:    Past somebody verbalizing suicide ideations or
> saying, you know, I'm seeing things that aren't there -- I
> mean, just obvious things that would prompt me to think
> somebody was experiencing a mental health condition, I
> can't think of any (Beasom Deposition, p. 32).

This in spite of the fact that ACJ Policy 2702 (AC 2540-42) requires, █

███████████████████████████████████████████████████████████

██████.  As a result of this lack of training, correctional staff do not know when
someone is displaying symptoms of a mental health condition, or may
legitimately need treatment.  Similarly, Defendants do not provide any
additional training for correctional staff who serve on the acute mental health
units, contrary to the above-referenced standards (Justice, p. 72, 113).

Moreover, there is no meaningful training in de-escalation for custody
staff at ACJ (Brief in Support of Class Cert, Exhibit 12, and Exhibit 1 thereto,
listing trainings offered, Brief in support of Class Cert, Exh. 22, at 14).
According to Defendants' Training Sergeant, "verbal de-escalation" is now
included in Defendants' "interpersonal communications" training (Ex. 19, pp. 75,
152-53), yet while the term "verbal de-escalation" is used in the current

training materials, little guidance is actually provided (Brief on Class Cert, Exh. 21). This is despite clear ACA standards requiring specific training on de-escalation (Brief on Class Cert, Exh. 8, 5-ACI-1D-12, 5-ACI-1D-13, 5-ACI-1D-19). Warden Harper acknowledged the lack of such training:

> Harper Warden 05.11.22, (Page 57:9 to 57:17)
>
> 57
>
> 9   Q   Does Allegheny County jail offer or provide
>
> 10   deescalation training?
>
> 11   A   We are in the process of providing
>
> 12   deescalation training hopefully in the next couple of
>
> 13   months.
>
> 14   Q   Up through today, Allegheny County jail has
>
> 15   not provided any de-escalation training; is that
>
> 16   correct?
>
> 17   A   Not official de-escalation training.

This is despite the fact that Dr. Brinkman has been advocating for de-escalation training for many years to no avail (Brinkman deposition, p. 239-240). Another problem with training at ACJ is that much of the training is conducted on the web or by self-study. This does not constitute adequate training in a large urban jail where up to 75% of the incarcerated population may suffer from mental illness, are on the caseload and are prescribed psychotropic medications. There need to be classroom hours where trainer/teachers can assess the capacity of trainees to form therapeutic relationships with their patients or to care enough about their patients to make certain they receive follow-up treatment or are barred from solitary confinement if solitary confinement would likely cause psychological harm.

This failure to train has devastating consequences.  Because correctional staff do not know when someone is manifesting symptoms or is unable to comply with directives due to their mental illness, they punish individuals rather than referring them for treatment or accommodating their illnesses, as described more fully below.  Because they do not deescalate, individuals receive much greater punishment than necessary.  And because mental health staff do not receive training on care in a correctional setting, care is compromised.

I want to be very clear that I am not blaming the mental health staff for the many deficiencies in the mental health treatment program at ACJ.  Mental health staff who care about their patients and are very motivated to provide the best treatment under the circumstances – and I would hope this description fits the majority of mental health staff at ACJ -- are stymied by severe staff shortages in terms of mental health personnel, the inadequate training for them as well as for custody staff, the lack of programs where they can refer their patients to receive the treatment and rehabilitation services they would need were they to be effectively treated for their disability, and the very harsh punitive practices of custody staff at ACJ.  These are "structural obstacles" to the provision of quality mental health care.  Rather than blaming the mental health staff for inadequate and substandard services at ACJ, I want to praise them for remaining on staff at the jail and trying to help their patients while being faced with such daunting structural barriers to care.  The shortfalls of the mental health delivery system at ACJ are not primarily the fault of the mental health staff.  I do fault mental health staff for not speaking out vociferously and complaining about the required cell-front interviews, about the brevity of contact with patients, about the lack of programs, and about the consignment of patients with mental illness to solitary confinement.

Better training is needed at ACJ, but better training does not by itself prevent inappropriate staff attitudes and mishandling of prisoners. Staff must be, on account of their character and career aspirations, predisposed to forming healing relationships with individuals suffering from mental illness, and they have to be amenable to the training. I will discuss below my strong recommendation that "dedicated custody staff" be assigned on Units designed for prisoners with serious mental illness. In other words, officers who bid for and are selected to work on those Units must exhibit the qualities of empathy and sensitivity to people with psychiatric disabilities, receive extra training on mental health issues, and be recognized as trained on mental health issues.

## 4. Ineffective Intake Procedures

Policy #2506, "Mental Health Screening and Evaluation," is a comprehensive outline of mental health screening and the topics that must be addressed during a mental health evaluation by a qualified mental health professional. However, the practices of staff I have had an opportunity to assess fall far short of what is outlined in Policy #2506. The list of questions in the policy is much longer than the list of questions that are actually ticked in practice with the evaluation form, and then many of the medical charts I reviewed contained Intake screening evaluations where even the limited number of questions on the form are not ticked. Then there are the cases, identified elsewhere in this report, where the evaluation is completed incorrectly and a history of mental health treatment, prior suicides, prior psychiatric hospitalizations and psychotropic medications are not properly noted on the Intake evaluation. There are questions on the Intake form that are not ticked, or they are ticked incorrectly, meaning that individuals with mental illness,

needing psychotropic medications, or at high risk of suicide are simply not identified and are not referred for needed mental health treatment.  Policy #2506 also ███████████████████████████████████████████████, and in many of the cases I examined there is no treatment planning and no follow-up, or the follow-up is not adequate considering the risk of suicide or psychiatric decompensation.  In other words, in all too many cases the practice at ACJ fails to satisfy the requirements of Policy #2506.

Describing the intake process, the 2019 NCCHC assessment of suicide protocol states: "The questions were asked quickly, loudly, and robotically, with the officer looking at the computer screen rather than observing the inmate for affect or critical red flag behaviors.  The series of questions takes about half a minute" (p. 5, AC 7863) and "It seemed like the purpose of the questions was being overlooked" (*Id*).  Similarly, "Privacy was inadequate due to the sensitive nature of the series of questions being asked" (*Id).*  Finally, the NCCHC reported: "Staff interviewed reported that due to the busy intake process they encounter times when they do not have enough time for gathering sufficient information on inmate health" (2019 NCCHC Report, p. 4, AC 7862).

The NCCHC Assessment Report notes that: "Applying the BJS prevalence estimates to the above data suggests that a large number of inmates with mental illness may not be identified in intake."  In particular, the report noted that in 2018, 14% of those screened were referred to mental health, compared with 26%, which was the expected number based on the Bureau of Justice, and based on the fact that "the prevailing view now is that the prevalence is closer to 30% of the jail population."  The figures cited by the NCCHC are actually significantly lower than the actual prevalence of significant mental illness in ACJ as reported by Dr. Brinkman.  There are many possible reasons for the discrepancy, one being that the proportion of individuals with mental illness in

ACJ is higher than the national average, and another being that different definitions of mental illness are being utilized.  But the fact remains that deficiencies in the Intake Assessment process at ACJ means that many cases of mental illness are being missed, and thus the number of individuals on the mental health caseload is significantly smaller than the number with mental health needs.  Consistent with that concern, according to the "Warden's Report" published by the Jail Oversight Board in late 2021, only about 5 percent of new admittees were referred for mental health services.[8]  This is an extraordinary under-identification of cases of mental illness, given that Dr. Brinkman testifies 75% of detainees at ACJ have a mental illness and require treatment.  As a result, many who have legitimate mental health conditions will never be identified as such, and never receive any type of care.

Other figures similarly suggest that the expected number of individuals who should be referred for evaluation and treatment is much higher than 30% at ACJ.  Defendants' failure to ensure privacy during the intake process (as noted by the NCCHC and in my description of my tour of the facility, above) unquestionably interferes with the effectiveness of this process as many will feel that they cannot be forthright about their sensitive psychological history in this setting.  ACJ did not provide any training or orientation on intake procedures until Ms. Smith developed her overall orientation in 2020, and even that orientation does not include "how to do a screening" (Smith Deposition, p. 72, 81-82).  The NCCHC standard requires such training (J-E-05), and the 2019 NCCHC Assessment Team explicitly recommended such training to ACJ (NCCHC,

---

[8] According to this report (page 9), for the period 7/16/21 to 8/15/21, there were 78 referrals out of 1,456 "pre-screens," which represents 5.4%.  For 8/16/21 to 9/15/21, there were 70 referrals out of 1,484 pre-screens, representing 4.7%.  For 9/16/21 to 10/15/21, there were 66 referrals out of 1,367 pre-screens representing 4.8%.

p. 20-21).  Given the lack of training and lack of privacy for screenings, the low number of referrals to mental health is perhaps not surprising.  ACJ's intake procedures and practices are insufficient and fail to meet the required standard of care.

During my tour of the jail on July 25, 2022, I observed a social worker conducting a thorough mock mental health screening as part of the Intake process. I noted that the screening was timely, and was conducted by mental health staff.  One problem is a continuing lack of a private space for the screening, where confidentiality would be possible.  There are problems with consistency of the screenings, and with follow-up. I uncovered many screening assessments where not all questions were ticked, or were ticked incorrectly. Many individuals with serious emotional problems are not identified and are not diagnosed during the screening process, and others with identified emotional problems are admitted to the jail and tagged for follow-up mental health assessment and treatment, but the follow-up does not occur or does not occur timely.

## 5. Lack of Privacy and Confidentiality

Privacy and Confidentiality are bedrock requirements for mental health assessment and treatment.  There is really no place in the Intake area where a prisoner can be seen for an intake screening and feel confident that nobody overhears the conversation.  It was a positive step when the mental health Intake screening was moved from the waiting room area to a separate area with multiple desks and a small lexsan shield between seats occupied by prisoners for their intake interviews, but still prisoners can overhear the interviews with other prisoners and that does not give them reason for confidence that their mental

health issues are discussed in a private and confidential manner.  Sadly, the result in all too many cases is that the prisoner fears that others will overhear his reporting of "voices" or "suicidal inclinations" and stereotype him as a "ding," a "wingnut," or simply consider him weak on account of his psychiatric disability – a stigmatization that all too often leads to violent victimization. Because of such privacy concerns, he or she is much less likely to disclose mental health issues to the screener.

The same problem occurs on the units, where mental health staff see prisoners only cell-side, i.e. they speak to them through the food port of their cell door or the cracks around the door, and again prisoners in that situation tell me they do not say much to the mental health staffer because they are afraid they will be overheard.  The NCCHC Assessment Team expressed concern about this issue.

One woman prisoner's report during our November 16, 2022 video interview is typical of several prisoners I talked to:

> Prisoner #7, a 44 year old Black woman with short hair wears red prison clothing when interviewed by video from the general population Unit 1A.  She tells me there was no real intake assessment when she was admitted to the jail in August, 2022. Someone asked her if she was suicidal.  She is prescribed Remeron and Vistaril, which were prescribed a month prior to our interview by the psychiatrist in the jail, but she has not seen the psychiatrist since then.  She believes there is only one psychiatrist in the jail, with a large caseload.  She spoke to him briefly at a table in the dayroom of the pod before he ordered her medications.  She is depressed and has been thinking about committing suicide, but she does not make much use of mental health services in the jail because the only contact that is possible with mental health staff would be in the dayroom of her pod, where there is no privacy and others can overhear the conversation.

Lack of privacy impacts mental health care in very important ways.  For example, I mentioned that the prisoners doubt that the conversation with a mental health staffer is private and confidential leads the prisoner to clam up and not tell the mental health staffer about suicidal thoughts, crying jags, or hallucinated voices.  A lack of privacy also makes the prisoner unlikely to develop a trusting relationship with mental health staff, after all, if the prisoner cannot trust the clinician to provide a confidential interview situation, how can staff be trusted?  Then, besides the fact that mental health staff miss important symptoms during intake interviews and do not spend enough time with each prisoner on the unit who wants to talk about emotional problems, it is very difficult when contacts are not private and confidential, for clinician and prisoner to form the kind of trusting therapeutic relationship that is a requirement if mental health treatment is to be effective.

It is also contrary to established standards of care.  The NCCHC standard is that "discussion of patient information and clinical encounters are conducted in private and carried out in a manner designed to encourage the patient's subsequent use of mental health services" (MH-A-09).  Compliance indicators for this standard include "clinical encounters occur in private, without being observed or overheard."  ACJ Policy 2508 requires that "█████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████ (AC 76699-76707).  In segregated areas, the Policy explicitly requires ████████████████████████████████████████████ ████████████████████████████████████████ Based on my patient interviews, tour of the jail and review of records, ACJ's practices fail to protect patient privacy and do not satisfy the required standard of care.

## 6. Absent or Inadequate Treatment Planning

Policy #2600, "Patients with Chronic Disease and Other Special Needs,"

includes  But in a large majority of clinical charts I have reviewed,

there are no treatment plans and there are many failures to follow-up the

contact with prisoners identified as requiring mental health follow-up.  Dr.

Barfield testified that treatment plans are not required for prisoners who are in

general population and are not on the mental health Units, but his testimony is

staunchly contradicted by Policy #2506 and Policy #2600.  And Policy #2604,

"Treatment Plans," requires  In other words,

and again, the practice at ACJ is significantly beneath the level required by ACJ

policy in terms of assessment, treatment plan and continuity of care.

When asked about treatment plans, Dr. Barfield testified that there are

supposed to be treatment plans in the medical charts for prisoners on the

mental health units, but prisoners in general population do not have treatment

plans (Barfield Deposition. P. 111).

> Question: Now, I understand that there is a form called a treatment
> plan; correct?
> Answer: Yes.
> Q: And I understand that's only used on the acute units?
> A. Yes.

> Q. So why is that form only used on the acute units?
> A. It's not -- they're not a residential program, they're not required, by residential standards, to do treatment plans because they're not, they're not licensed. As a licensed facility you need to have treatment plans throughout, you know, but this isn't -- they don't have -- it's not a licensed facility so it's going to be totally different. It was done as a mode to provide some level of treatment, but it's definitely not the same as a Western Psych would do with a treatment plan because their license dictates that. (Barfield Deposition, pp. 111-112).

My own conclusion, from review of medical/mental health charts, is that often there is no treatment plan in the charts, even when prisoners have been on the mental health units.  But more important, and with all due respect, Dr. Barfield is simply wrong about there being no requirement for treatment plans at ACJ because it is not a licensed mental health facility.  In fact, the N.C.C.H.C. *Standards for Mental Health Services in Correctional Facilities,* (NCCHC, 2008 & 2015) require: "Treatment Plans, Standard: Mental health services are provided according to individual treatment plans....  Compliance Indicators: 1. An individual treatment plan directs the mental health services needed for every patient on the mental health caseload and includes the treatment goals and objectives...."  And Allegheny County Bureau of Corrections, Policy #2513, "Continuity, Coordination, and Quality of Care During Incarceration," specifically requires ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████  (AC_032893)

Contrary to the above standards, Defendants merely rely on progress notes as the required "treatment plan." Williams, p. 214-15; Defendants' Answer, ¶239 ("progress notes are a treatment plan").   The NCCHC found Defendants'

treatment plans to be "incomplete or not well documented." (AC 7881).  This conclusion is unsurprising; progress notes are often times very cursory, and do not include the requisite elements of a treatment plan, such as treatment objectives and goals, and the steps to achieve those goals.  Rather, these "treatment plans" typically include nothing more than medication adjustments (see for example AC 17469-78; 23348-52; 23399-403; 24831-41; 27105-13; 27170-74).  Sometimes they add the following standard language each time:



 (AC 32651-55, 32661-75).  This added boilerplate language, even when it is included, does not qualify as a treatment plan as described by the standards--it does not even identify treatment goals and objectives, or discuss how to reach such goals and objectives.

The treatment plan is what guides management of the patient's condition and is an important component to any type of treatment.  Meeting minutes document ACJ's knowledge of the insufficiency of their treatment plans, yet changes were never implemented.  Without any real treatment plan, ACJ's care fails at the outset to meet the appropriate standard of care.

## 7. There is Little or No Ongoing Counseling nor Individual or Group Psychotherapy, and Very Little Effective Case Management

All prisoners I interviewed reported that if they were not beaten by officers and consigned to solitary confinement for requesting to see mental health staff -- which many averred happening to them, and others averred

witnessing happen to other prisoners -- it would still take an inordinately long time to see mental health staff, and then their meeting with the mental health staffer would be limited to a very few minutes and most likely occur at cell-front and not in a private office where there could be confidentiality.  Several report they very rarely get to talk to mental health staff, and their requests to see mental health staff go unanswered or they are assaulted by officers or sent to RHU for requesting mental health treatment.  Prisoners universally reported that there is nothing in the way of psychotherapy, neither individual nor group therapy, and that they are only able to see mental staff if they are suicidal, and then only for very short-term crisis intervention with little or no follow-up.   I will briefly present one representative case.

> Prisoner #1, has diagnoses in his chart of Schizoaffective Disorder, Bipolar Type, and Mild Intellectual Disability.  This Caucasian man with short hair and beard and blue eyes evidences flat affect, concreteness and pressured speech consistent with his diagnoses.  He has made multiple suicide attempts at the jail. Officers have used the taser and immobilizing gas on him, and he has spent time in solitary confinement.  In solitary, he reports, the symptoms of his mental illness, especially very high anxiety, agitation, memory deficits and mood swings, were greatly exacerbated.  He recalls being in the RHU for several months a couple of years ago, after he had asked to see the mental health staff and officers responded by hitting him in the head, placing him in the restraint chair and then transferring him to the RHU. He complains that mental health staff frequently subject him to involuntary medication injections at times when he is perfectly willing to accept the medications voluntarily.  He admits that he occasionally gets into fights, but he believes his mental illness is a large factor in his combativeness.  He has been transferred several times to the Torrance facility (Torrance State Hospital)

for adjustment of his medications or evaluation of his competence.  He tells me that in all the time he has been in ACJ, he has been offered no psychotherapy of any kind.  On Units 5C and 5D he spends all day locked in his cell and does not even get four hours out-of-cell recreation.  He summarizes: "Mental health treatment at the jail is horrible, I spend 24 hours a day in my cell and nobody talks to me."  I interviewed him on July 25, 2022, and he reported he had not seen a psychiatrist since May, and then only at cell-front.

This prisoner's report of his treatment is consistent with mental health notes in his medical record. I reviewed his Housing History (AC_033204 through AC_033206), and two large files containing forms and notes from his mental health file (AC_049869 through AC_ 050445; AC_067412 through AC_067636).  I have not been provided any other medical/mental health charting for him.  There are no progress notes included in the materials I reviewed, no treatment plan, and no evidence he ever underwent counseling or psychotherapy at ACJ.  There is a fairly comprehensive packet from Torrance State Hospital Forensic Unit including a 3/30/2021 summary with diagnoses Schizophrenia and Cluster B Personality Disorder,[9] medications including Zyprexa (anti-psychotic agent) and Depacote (mood regulating medication prescribed for Bipolar Disorder), a note that Prisoner #1 often refuses medication and a conclusion that he is competent to stand trial.  Allegheny County Jail Medical and Mental Health records reflect multiple admissions to the jail.  He has been housed on 5C, 5D and General Population, he has been on RHU status and involuntary medications have been ordered.  There are reports of two

---

[9] Cluster B Personality Disorders include antisocial personality disorder, borderline personality disorder, histrionic personality disorder and narcissistic personality disorder. The notation in this chart is ambiguous in that no specific disorder is identified.

psychiatric evaluations by a psychiatrist (10/22/2020 & 8/19/2021).  The psychiatrist went to see Prisoner #1 at cell-front on both occasions, he was lying on his bunk and refused to speak, and the psychiatrist reported his pattern of being aggressive when acutely psychotic and then responding well to anti-psychotic medications, and being in remission between episodes.  The psychiatrist did not include past history in his reports except to mention that Prisoner #1 is known to suffer psychotic episodes, responds well to psychotropic medications and often refuses to take medications.  He was unable to do a mental status examination on both occasions but nevertheless ordered involuntary medications.  There were no problem lists, no treatment plans and no follow-up appointments contained in the documents I reviewed. Medical and Mental Health screening evaluations were very skimpy, contained little information, and "NO" was ticked on the single question about suicide risk and the single question about homicidal risk, i.e. no ideation and no plans of suicide or homicide at the time of the screening, with no mention of prior suicide attempts nor aggressive acting out.  Likewise, the screening mental health assessment for placement on RHU status mentions only that he was not, at the time of the assessment, suicidal or homicidal, and does not reflect the screener looking into past history of suicide attempts – a very dangerous risk factor for suicide in the present -- nor considered the risk of his mental illness deteriorating or being exacerbated by consignment to solitary confinement. The only psychiatric evaluation in the chart, with past history and mental status examination, was done at Torrance State Hospital and entered into the ACJ chart.

Women prisoners tell the same story about the lack of effective screening and the near absence of mental health services.  Prisoner #9's report is typical:

This 22 year old heavy set Black woman currently in the RHU on Unit 1C, wearing hair curlers, tells me she has been in the jail since February 2021.  She tells me she suffers from Bipolar Disorder and periodically "snaps out."  She is prescribed quite a few psychiatric medications, but complains that mental health staff do not respond to requests for an appointment for months, so she handles her emotional difficulties on her own.  She tells me, "I've had a couple of mental disorders since I was very young.  They don't do treatment here (in ACJ), instead, if you complain about emotional problems they send you to 5MD, strip you naked and don't talk to you.  They treat you like a caged animal." She has been on Unit 5MD, and says that on that unit you get out of your cell an hour or so per day.  She has been on RHU status, where they searched her a lot.  She would get food in the commissary, and they would put her in "a cage" for recreation.  She says about the RHU, "Being up there messes with your mind.  4F is the worst, you can't even hear anything from your cell….  The guards have long guns that shoot blocks at people.  They also have a pepper spray gun.  The guards don't know how to handle stressful situations, so they intimidate you rather than trying to help.  They are always quick to use force, and don't do any de-escalation."  She believes that when guards find out a prisoner has emotional problems, they respond with punishments, and they put a lot of people with mental health problems in RHU.  She continues, "In fact most of the women in RHU have mental problems.  If you want to talk to someone from mental health, you have to bang on the wall or the door to get their attention, and even then it takes weeks before you see someone.  You only have a 5 to 10 minute conversation with mental health, and there's no follow-up.  If you want to see mental health again, you have to bang on the walls and door again.  And then there's a long wait and you see a different person (mental health staff)."  She tells me there was no real intake assessment, the only question she was asked was whether or not she was suicidal, and that conversation was not in a private space so there was no confidentiality.  She continues, "They don't treat you with respect, they "toss your cell" (slang for a cell search) including your personal papers, they treat you harshly!"

Title 37 states that written local policy must "require treatment services to include . . . counseling services" (37 Pa. Code §95.243(2). NCCHC's "foundational standard" defines mental health services as "the use of a variety of psychosocial, psychoeducational and pharmacological therapies, either individual or group" (J-F-03, MH-A-01), and describes "individual and group counseling as clinically indicated" to be a "basic" outpatient service to be provided "at a minimum" (MH-G-01; *See also* 5-ACI-5E-09).  But individual counseling and group mental health therapy are not provided to prisoners at ACJ, with very rare exceptions. (Answer, ¶¶25, 26.). Dr. Brinkman testified that one prior psychologist held group sessions on one acute pod, and another psychologist offered individual sessions for a short period of time, but she acknowledged there has been no other therapeutic counseling. (Brinkman Deposition, p. 172).[10]

At ACJ, the interactions between mental health staff and patients are limited to "crisis intervention," brief assessments for medication renewal, and "drive by" cell-door consultations to triage sick call requests from patients. (Brinkman Deposition, pp. 128-29).  Absent some special reason for follow up, the only regularly scheduled appointments with a mental health patient would be to follow up on medication and assess whether dosages are correct.  Dr. Brinkman testifies that the aim of responding to sick call requests is to triage the request, determine if there is a crisis requiring urgent intervention, and provide 'short-term supportive encounters" (Brinkman Deposition,  pp. 31-33, 65-66 & p. 192).

---

[10] In late 2021, ACJ authorized new "therapist" positions to be able to provide counseling.  As of the date of depositions in this matter, only one individual had been hired and was in the process of being trained.

According to mental health grievances I have reviewed, patients routinely complain of not being seen by mental health staff. The file of redacted grievances contains 229 pages of completed grievance forms from 2/13/2016 to 3/31/2021 (Brief in Support of Class Cert, Exhibit 27).  They consistently reflect shortfalls in the mental health program, from difficulty getting to be seen by mental health staff, to medications not being received, to lack of follow-up, to a lack of regular 15 minute checks for a suicidal detainee, and so forth.  One prisoner's grievance includes the statement, "█████████████ ████████████████████████ █████████████████████████████ (1/4/2017); another writes: ████████████████████████████████ ██████████████████████████████████ █████; another writes ████████████████████████ ███████████████████████ (2/1/2017); another writes: █████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████ (7/1/2019); another writes: ████████ ████████████████████████████████ ███████████████; another: █████████████████████ ██████████████████████████████████ ██████████████████████████████ █████████████████████████████ ████████████████████████████ ████████████████████████████████ ██████████████████████████



(3/11/2020); and another:

(3/3/2021); and another:

(1/7/2021).

Again, Dr. Brinkman, the current Health Care Administrator, has acknowledged "delays" with medication renewal assessments and sick call requests (Brinkman Deposition, pp. 134, 137, 149).  The NCCHC Suicide Assessment Team in 2019 expressed concerns regarding these limited mental health encounters on the regular housing pods.  They noted that most such encounters occur cell-side, rather than in a private area, and that this "presents a barrier to the therapeutic relationship" (NCCHC Assessment, p. 23).  This practice is contrary to NCCHC standards, which require consultations to be "in private, without being observed or overheard" (J-A-07, MH-A-09); and contrary to Defendants' own policy.  NCCHC requires consultations to be in an "adequately equipped room" and must "protect confidentiality" (ACJ Policy 2508, AC 2495-2503).  Given significant staffing shortages, these "drive-by cell-side" consultations are cursory and fail to provide any meaningful assessment or treatment.

For the mental health fields, there is a difference between 'psychodynamic (or CBT or DBT) psychotherapy" and "supportive psychotherapy."  There is also "case management." The terms describe various forms of "talking" that can occur between mental health clinician and patient. Psychodynamic psychotherapy requires regular appointments lasting up to 50 minutes each (typically they are shortened to 30 minutes in jails), a great deal of talking, and the therapist offers interpretations and other interventions to help patients resolve their emotional difficulties.  Supportive psychotherapy, also generally termed "counseling" in correctional settings, involves less intensive sessions and fewer interpretations, but also includes regular sessions with significant talk about the patient's problems and what he or she can do about them.  There is individual psychotherapy and group psychotherapy. "Case management" was a new development in community mental health in the 1980s.  The idea is that a "case manager" is assigned to each patient with mental health problems, and the case manager keeps track of the patient's progress over time and repeatedly checks in with each patient to assess their progress and their ongoing treatment needs.  In jails in other localities, case managers are assigned as soon as a detainee with a psychiatric disorder or suicidal crisis is admitted, and then that case manager meets regularly with each person in his or her caseload, no matter where that individual is currently located in the jail, and talks with him or her while tracking his or her progress and remaining mental health problems.  <u>Case management is not a substitute for other forms of psychotherapy!</u>  Rather, it is an additional modality that is designed to monitor each individual's progress in the mental health delivery system, and helps to provide continuity of care.  In combination with psychotherapy and rehabilitation programs, case management helps insure that adequate treatment will be delivered.  Where standards and policies require a

variety of mental health treatment interventions in correctional facilities, they are referring to some combination of psychodynamic psychotherapy, supportive psychotherapy, individual and group psychotherapy, and case management. Each patient is provided one or another treatment modality according to clinical need. The bottom line is that prisoners whose condition requires mental health treatment must be able to rely on mental health staff meeting with them on a regular basis and giving them an opportunity to talk about their emotional difficulties.  The limited mental health encounters at ACJ for medication renewal or responding to sick call requests do not quality for, and are insufficient to constitute, any of these types of treatment.

At ACJ, meaningful mental health treatment is not provided until an individual's symptoms become so acute that they are imminently suicidal.[11] Plaintiff Shaquille Howard's requests for mental health care were largely ignored, and he explicitly was told he could not receive treatment unless he was suicidal (Complaint, ¶181).  At one point, he pretended to be suicidal in order to get help, and still got no help other than placing him alone in a suicide watch cell with no clothes (Complaint, ¶188).  Similarly, Plaintiff Jason Porter's repeated requests for mental health care have been denied, and correctional staff refused to contact the mental health department unless he admitted to being suicidal (Complaint, §234, 236; *See also* Declaration of Jason Porter, ¶5-6). Eventually, in order to get care, Mr. Porter told staff that he was suicidal.  When mental health staff arrived, Mr. Porter explained that he was not really suicidal, and the staff person then walked away without listening to his concerns (Complaint, ¶238, Declaration, ¶7). Correctional staff made the same type of

---

[11] This unfortunate reality is almost inevitable when the only training provided to correctional staff about mental health treatment is suicide prevention.

statements (need to be suicidal before receiving treatment) to Plaintiff Albert Castaphany (Complaint, ¶268;  See also Declaration of Albert Castaphany, ¶9). And very many grievances filed by other incarcerated individuals provide evidence that these statements are made routinely (Brief in Support of Class Cert., Exh. 30).  For example, one Grievance states: "... ███████████

███████████████████████████

████████████████████████████

██████████████████████████

██████████████████████████████

█████████████████████████

████████████████████████████████

███████████████████ (3/1/2020).  Six different grieving prisoners included in this sampling of grievances wrote that they were told by staff they would not be seen by mental health staff unless they said they were suicidal.

Inadequacies in the mental health care delivery system were reflected powerfully in the Fall 2021 Allegheny County Jail Survey, including the following responses to open-ended questions: "Mental health is so slow to see us. There should be programs for people who come in on meds like Adderall, Ritalin ....";  "I get disrespect verbally, I have been assaulted physically, I have been tormented";  "I have been not able to cope or talk to someone who could help me, and I have felt abandoned";  "Need more access to drug and alcohol and mental health... there are a lot of suicide attempts and violence because lack of mental health plus all the locked in cell time";  "The place is very punitive mental torture. They are breeding mental illness";  "I feel this place is designed to break your mental health";  and "I wish we had more support groups." (p. 11).

The prisoners I interviewed while I was at ACJ on July 25, 2022, and subsequently on November 16, 2022 via video, were housed in different areas of ACJ, most did not know each other, and they did not have any opportunity to compare notes prior to my interviews.  They were all diagnosed with significant mental illness and were prescribed psychotropic medications during their tenure at ACJ.  Almost all reported there are long waits to see anyone from mental health, especially a psychiatrist, they are seen by mental health staff only for a few minutes, usually at cell-front or in the common area, and not in an office where privacy might be possible, they report custody staff often use force against individuals who seek mental health care, and they are forced to spend a lot of time in solitary confinement.

**Prisoner #6**, a 39 year old Black man who has been in ACJ for two years pre-trial and is soon to be sentenced to prison, is diagnosed Bipolar Disorder, PTSD, Anxiety Disorder and Manic Depression, and was being treated at a clinic in the community and taking strong psychotropic medications before admission to ACJ.  When he arrived at the jail his medications were discontinued and he was not prescribed psychotropic medications for over a month, a month filled with severe anxiety, hallucinations, anxiety, nightmares and so forth.  Then, he was only able to see a psychiatrist for a few minutes on video, that psychiatrist told him he needs psychotherapy but he has never received any psychotherapy at the jail.  He tells me prescribed medications are late or not administered because of staff shortages.  His current medications are not effective in treating his symptoms, including racing thoughts, hallucinated voices and depression.  He is prescribed the mood stabilizer Depacote, the anti-psychotic Risperdal and the antidepressant Remeron.  His symptoms become much worse when he is consigned to solitary confinement in RHU or on another pod. He has been requesting to see a psychologist for the past two years and to date has not seen one. He has also been requesting to see a mental health counselor, but the last time he saw one was four months ago, and then only for

a few minutes.  All of his requests for individual and group therapy have been denied or ignored.

Review of the medical chart of Prisoner #6 is consistent with his verbal report.  There are medical visits, a long list of medications provided him, and only 3 notes from mental health staff over his entire tenure at ACJ, the first an 9/29/2020 medical screening that does not mention his prior history of mental health treatment and psychotropic medications, the second a 9/4/2020 mental health evaluation that reflects three prior suicide attempts, mental health treatment in the community and psychotropic medications, and the third a cell-front very brief encounter with a psychologist who wrote she would arrange follow-up with a psychologist, but no note to reflect that ever occurred, and no further mental health notes. There is no problem list, no treatment plan, no psychiatrist contact and no other mental health notes.

Correctional staff actively discourage individuals from seeking mental health treatment. Mr. Castpahany was told that the more he makes requests, the longer it will take to be seen (Complaint, ¶6).  Officers sang "O Christmas Tree" to him, mocking his green suicide gown (Complaint, ¶10). Correctional staff discouraged Class Representative Keisha Cohen from requesting treatment by embarrassing her when she did, calling her crazy (Declaration of Keisha Cohen, ¶6-7).  This is the opposite of a therapeutic environment.  Patients are ignored unless they express suicidal ideation, and if they do express such thoughts, they are mocked. And officers are quick to use force against prisoners with mental illness.

There are units dedicated to housing and treating individuals with mental illness, including 5C, 5D, 5F and 5MD.  But there, prisoners spend most of their time alone in their cells. They can come out of their cells only certain hours each day, when they are permitted unstructured congregate activities including

recreation.  Prisoners with acute psychosis or other disorders, and those who are acutely suicidal, are admitted to Unit 5C for acute conditions, 5D for subacute.  For women, there is Unit 5MD, the most intensive mental health treatment unit for women.  There is a stepdown unit, 5F for men, and there are other units where prisoners with mental illness are housed.  One notices immediately the lack of group meetings and psychotherapeutic opportunities.  On 5C, the dayroom is mostly empty, all prisoners are locked in their cells and, besides rounds, staff interact relatively rarely with their patients.  This is warehousing, albeit with the prescription of psychotropic medications, brief individual meetings with a staff member and infrequent contact with the psychiatrist.  This constitutes very inadequate and substandard mental health treatment.

For prisoners not currently housed on the mental health pods, i.e. those in general population and RHU, there is very little or nothing in the way of mental health treatment aside from medications.  There are almost no individual or group therapies, aside from some substance abuse programming, there are no rehabilitation or vocational training programs, and there are no problem lists or treatment plans on the medical charts of most individuals not housed on the mental health units.

In violation of standards in the field including those of the N.C.C.H.C., there are insufficient variety and levels of mental health treatment intervention.  All standards require a jail provide multiple levels and types of mental health intervention: outpatient, crisis intervention (including suicide prevention), intermediate care (often called a stepdown program), outpatient and so forth.  And there must be multiple treatment modalities at each level of care, including assessment, crisis intervention and suicide prevention, psychotropic medications as appropriate, individual and group psychotherapy (this can

include psychodynamic or supportive therapy) as needed, and other forms of therapeutic and rehabilitative programming that foster therapeutic healing and growth.  At ACJ, there is shockingly little in the way of talking between prisoners and mental health clinicians. Dr. Barfield claims that prisoners can request and receive timely mental health treatment and they will get it, while Dr. Brinkman acknowledges delays.  Prisoners universally tell me there are long delays, a lack of follow-up and they can be beaten or tased for even asking to meet with mental health staff.  Lack of counseling and the lack of meaningful regular appointments or case management violates all applicable standards and is objectively unreasonable.  It also creates a substantial risk of serious harm to the affected population.

I will briefly present one ACJ prisoner's report during our interview of his experience seeking mental health treatment in the jail:

Prisoner #2 is a stocky 38 year old white man who is calm, actually subdued as if from medication side effects, with flat affect.  He is diagnosed Paranoid Schizophrenia and Schizoaffective Disorder, Bipolar Type.  He had been taking Wellbutrin, Lithium and Thorazine, prescribed in the community, when he was admitted to ACJ in December, 2021.  He tells me he had been at a psychiatric hospital prior to admission to the ACJ.  He has a substance abuse problem and at various times has been prescribed Narcan, including while in ACJ.  At ACJ some of his previous medications were discontinued. He was housed on 5C for a month, a lot of the time on the suicide prevention protocol, and tells me that officers twice threatened him with use of force if he did not take his medications.  He was confined to his cell all day except three two-hour periods out of his cell each week to watch television or walk around, and only saw mental health staff at cell-front for a minute or two each session. He never had a session where he sat down in an office with a mental health staff member.  He is currently on 5F and reports there is no psychotherapy, no group treatments and no programs.  He sees a

mental health staff member every two weeks, again for only a few minutes.  The voices he hears have become louder and more upsetting since he has been in ACJ and mostly confined to his cell. He reports that if a prisoner refuses to take his medications force is used against him, so he takes his medications so as "not to get beat up."  He repeats he has had no psychotherapy and no programs at ACJ.  He has not been in the RHU.  He was on suicide observation a couple of months ago, basically he was alone in a suicide observation cell 24 hours per day, he walked in circles all day in his cell, on many days no staff member came to see him, and on days they did come by his cell they only talked to him at cell-front and only for a few minutes.  He tells me "Nobody listens to me, the voices get worse being alone in Observation, and you're always watched."  While on a mental health unit, he would see the psychiatrist every two weeks, less than five minutes each time and at cell-front.  He is not prescribed the medications he had before being admitted to the jail and says the medications he is prescribed in the jail do not work very well and cause side effects, but the psychiatrist does not listen to him when he tells him that.  He is certain that being in the jail makes his mental disorder worse, he is more anxious, his thinking is more impaired and he is scared he will be less able to react appropriately in society after he is released from jail.  I reviewed the medical chart for Prisoner #2.  There is nothing in the chart that contradicts Prisoner #2's report of his tenure in the jail. There is a 12/12/2021 Mental Health Screening that fails to note past psychiatric hospitalizations, psychotropic medications and prior mental health treatment at ACJ, but an admission note to the mental health unit a few days later states: "note, the screening was completed as a formality and not considered an accurate depiction of presentation and history."[12]

---

[12] In other words, the Intake screening was filled with errors and misinformation and was misleading.  Luckily a nurse on the mental health unit entered a subsequent note in the chart reflecting the errors in the screening form before any harm was caused, but one

There is a 12/13/2021 Psychiatric evaluation and a 12/16/2021 follow-up progress note, reflecting that mental health staff saw the prisoner at cell-front both times.  A 12/15/2021 Regular Observation Treatment Plan by Vincent O'Reilly mentions the need for "supportive directive therapy," but there are no further progress notes about treatment and there are no other treatment plans.

8. **Medication Management**

There is a very clear pattern at ACJ where prisoners on the mental health caseload are "treated" with inordinate amounts of time in a cell by themselves – whether that be punitive segregation, protective custody, during lockdowns, or merely being locked in a cell, isolated and idle, just about all day.  There is little or no individual psychotherapy or group psychotherapy, and all too little in the way of group education and rehabilitative programs.  The prescription of psychotropic medications alone is not, in itself, adequate mental health treatment at any level of care (outpatient, crisis intervention, inpatient or "stepdown" care). Of course psychotropic medications are very often a part of the needed treatment, but medications do not substitute for staff taking time to talk to prisoners as part of a treatment plan that involves multiple treatment and rehabilitation modalities. That is clearly the standard of care in the community and is reflected in all standards in the field of correctional mental health. For example, the Task Force on Correctional Mental Health Care of the American Psychiatric Association arrived at this formulation: "Mental health

---

wonders how many other inaccurate Intake screenings occur and go undetected, leading to inadequate or harmful treatment or lack of treatment – Cf. Prisoner #6, discussed below, who also had a very faulty and misleading Intake Assessment.

treatment in the correctional setting, like that in any setting, is defined as the use of a variety of mental health therapies, including biological, psychological, and social. In the correctional setting the goal of treatment is to alleviate symptoms of mental disorders that significantly interfere with an inmate's ability to function in the particular criminal justice environment in which the inmate is located.  It is obvious, therefore, that mental health treatment is more than the mere prescribing of psychotropic medication, and psychiatrists should resist being limited to this role."[13]There is remarkable overreliance on psychotropic medications at ACJ.  As of 9/15/2020, there were ███ prescriptions for psychotropic medications (AC 8123).  As of 1/31/2021 there were ███ patients taking psychotropic medications (Brief in support of Class Cert., Exh. 22).  Dr. Brinkman estimates that 75% of those incarcerated at the jail are prescribed psychotropic medications (Brinkman Deposition, pp. 157-158).  And as noted above, there is little else in the way of treatment.

Moreover, problems with medication management are extensive and well-documented.  There are 510 pages of grievances related to the administration of psychotropic medications at ACJ.  In addition, the Fall 2021 "Allegheny County Jail Survey" contains many statements from prisoners about deficiencies in the way medications are prescribed and delivered at ACJ.  Some typical comments are: ████████████████████████████████ ████████████████; ████████████████████████████████

---

[13] see AM. PSYCHIATRIC ASS'N, PSYCHIATRIC SERVICES IN JAILS AND PRISONS, 2d ed., 2000, p. 15-16.  See also NAT'L COMM'N ON CORR. HEALTH CARE, STANDARDS FOR HEALTH SERVICES IN JJAILS (2015); AM. PSYCHIATRIC ASS'N, PSYCHIATRIC SERVICES IN JAILS AND PRISONS (2d ed. 2000); FRED COHEN, PRACTICAL GUIDE TO CORRECTIONAL MENTAL HEALTH AND THE LAW (2011); CORRECTIONAL PSYCHIATRY: PRACTICE GUIDELINES AND STRATEGIES (Ole J. Thienhaus & Melissa Piasecki eds., 2007).

███████████████████████████████████████████████; and

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████" Of course, all of these comments, made with general medical care in mind, apply to the prescription of psychotropic medications. And many individuals I interviewed or spoke with during my tour identified the same problems.

In violation of NCCHC requirements and the standard of care in the community, there seems to be no centralized mechanism to monitor the utilization of medications—at least not an effective one. And there is no training at ACJ regarding the administration of psychotropic medication, as would be required by MH-C-05 (see Brinkman Deposition, pp. 160-161).

Involuntary medication or medication over objection is very problematic at ACJ. Physicians can order involuntary medications on an emergency basis for 24 hours, with proper notation on the medical chart of the emergency necessity. After that, there needs to be a process respecting due process. The Washington v. Harper ruling[14] addresses involuntary medications in prison settings, and sets the standard, especially in a large jail like ACJ where a large proportion of prisoners suffer from mental illness and require mental health treatment. *Washington v. Harper* includes the provision that involuntary medication must be an intervention of last resort after less intrusive interventions have been tried and failed, and then there needs to be a committee that considers the need for the involuntary treatment, a committee that includes several clinicians who are not involved in the treatment of the individual being considered for involuntary medication. It does not appear that

---

[14] *Washington v. Harper*, 494 U.S. 210 (1990)

any such protocol is active at ACJ.  In fact, Prisoner #1 was seen twice by the psychiatrist, very briefly at cell-front, and the psychiatrist was unable to do a complete psychiatric evaluation because Prisoner #1 would not talk to him, but still the psychiatrist ordered involuntary medications on an as-needed basis. From clinical research we know that patients who have a quality trusting relationship with their psychiatrist and psychotherapist are much more likely to adhere to medications voluntarily than are patients who are seen by a different practitioner at each appointment.  The practice whereby a mental health clinician sees a prisoner briefly at cell-front, where there is very little opportunity to form a trusting therapeutic relationship (as in the case of Prisoner #1), does not satisfy the procedural requirement that less intrusive interventions must first be tried and fail.  Prisoner #1 should have been seen on a regular schedule, and should have been taken from his cell to a private office where there would be privacy and he would more likely talk to the psychiatrist, and had that been done it is likely he would have voluntarily adhered to the medication regimen and involuntary medications would not have been necessary.  In any case, the way involuntary medications are prescribed at ACJ does not come anywhere near satisfying due process requirements as spelled out in Washington v. Harper.

For prisoners not currently housed on the mental health pods, i.e. those in general population and RHU, there is little or nothing in the way of mental health treatment aside from medications.  There are almost no individual or group therapies, aside from some substance abuse programming, there are no rehabilitation or vocational training programs, and there are no problem lists or treatment plans on the medical charts of most individuals I am aware of who are not housed on the mental health units.  Prisoners are left to request mental

health treatment as needed, and then there are long waits and very little time to talk to a clinician.

Medications do not suffice as the single mental health treatment modality. There is a large and convincing research literature in psychiatry and psychology that while medications are a useful component of the mental health clinician's armamentarium, if given alone and not in combination with some form of psychotherapy and rehabilitation, the medications do not work or cause harmful side effects. For example, depression and many other psychiatric disorders involve very low energy, lack of initiative and somnolence. At ACJ, without programs for the prisoners to be involved in, they tend to vegetate in their cells. Psychotropic medications have many side effects, including fatigue and somnolence. These side effects result for many prisoners in a lot of daytime sleeping and general lethargy. When a depressed patient is given medications that foster lethargy and somnolence, and is left idle in a cell, the depression is worsened by the lack of energy and meaningful activity. In treatment settings such as an inpatient psychiatric ward, mental health staff work very hard to "mobilize" somnolent and self-isolating patients. We encourage them to come out of their room and take part in group activities on the ward. Not at ACJ. There are almost no programs such as individual or group therapy, and the prisoner diagnosed with a mental illness and prescribed psychotropic medications is likely to spend a lot of time alone in a cell. Either the individual is confined to cell on Unit 5C, or sent to the RHU for misconduct or protection, or there is a lockdown such as the jail-wide 30-day lockdown at ACJ in March, 2021. There are dayrooms in the mental health units. Prisoners on the mental health caseload are permitted some time in the dayroom. But in the dayroom they tend to interact very little with treatment staff and there is

mostly no therapeutic programming.  In all too many cases, especially on the treatment unit for the most acutely and severely disturbed (5C), the patients are essentially held in solitary confinement-like conditions for a large proportion of the time, and prescribed psychotropic medications.  Again, solitary confinement exacerbates mental illness and worsens prognoses, and medications alone do not alleviate the symptoms and disabilities.

## 9.  Lack Quality Improvement Program

It is essential that any health care system implement some form of quality improvement or annual review system to ensure that services are being provided fairly, efficiently and adequately.  Title 37 requires a written report "to demonstrate that adequate health care is being provided to inmates and reviewing findings with prison administrators annually" (37 Pa. Code §95.232,6), and an "annual documented review of the prison's healthcare delivery system" (*Id.* §95.232,7).  NCCHC further recommends a continuous quality improvement program (MH-A-06) and a clinical performance enhancement process (MH-C-02).  Defendants have no such documented reviews or processes (Williams, p. 37-41, 75; response to Interrogatory No. 11, the response being "not applicable" to a request to identify all such reviews or investigations).[15]  As a result, Defendants have failed to correct their grossly deficient mental health care system.

---

[15] During discovery, various witnesses have described a "quality improvement" committee that meets periodically (Deposition of Nora Gillespie, p. 32-33).  It is unclear what that committee does other than "meet to discuss improvement activities for areas that are identified, including areas that are high risk, problem prone and high volume," (Gillespie, p. 107), and only a smattering of documentation relating to this Committee has been provided.

## 10.   Unreasonable   Punishment   of   Individuals   with   Psychiatric   Disabilities

The prisoners I interviewed universally reported that officers use force very quickly, and that causes tense interactions with custody staff to escalate very fast with no attempts made at de-escalation.  They almost all reported that they were either the objects of beatings at the hands of custody staff, of immobilizing gas, or tasering, or of the restraint chair (the last is no longer in use).  The few who had not been the object of use of force by custody staff reported they had seen force used against many other prisoners for no discernible reason, especially if prisoners talk about emotional problems and ask to see mental health staff, and they were terrified that would happen to them.  Several mentioned that is why they do not request mental health services.  Quite a few had been subjected to solitary confinement, either in the RHU or on RHU status on the 5th floor units.  They all knew about, and were frightened of, the use of long guns shooting blocks on the mental health units.

Custody staff and administration do not consider a person's mental health when evaluating the potential use of force or extent of any use of force (Beasom Deposition, p. 65), and correctional staff "would not know" if someone's conduct is related to their mental health condition (Beasom Deposition, p. 32).  In fact, there have been "no discussions" about whether mental health status should be utilized in determining what level of force is reasonable, or the impact of the use of force on those with mental health conditions (Williams Deposition, p. 90, 198).  To the contrary, healthcare staff play no role in such decisions (Williams Deposition, p. 198).  Chief Deputy Warden Jason Beasom discussed this issue in his Deposition:

Question: All right. So then the answer to my question is,
they're (officers) told they have to de-escalate first and that's
how they take into consideration the possibility of mental
illness?
Answer: Correct.
Q. Does the policy of the jail require or encourage officers to
consider whether a use of force might aggravate someone's
mental illness or might cause psychological harm?
A: I don't know if the policy is specific to that point, no.
Q: Does the ACJ policy require or encourage officers to
consider whether an incarcerated individual might be unable to
comply with directives because of his mental illness?
A: I don't believe the policy states that.
Q:  When determining what level of force is reasonable or
necessary, does an incarcerated individual's mental condition
play into that determination in any way?
A: No. (Beasom Deposition, p. 65.)

This lack of consultation with mental health staff about housing and
discipline, and absence of consideration of a prisoner's mental health condition
prior to the use of force, is contrary to NCCHC Standards (MH-A-08), and ACJ's
own Policy 2600 (███████████████████████████████
████████████████████████).  This lack of consultation also
violates ACJ's Policy #311, "Reasonable Accommodations for Inmates with
Qualified Disabilities," which requires ████████████████████████
████████████████████████████████.

Up through the filing of the Complaint in this matter, there was little or no
utilization of de-escalation techniques to potentially obviate the need for force
or lessen the amount of force needed, except perhaps on the acute units (see
Policy 207, 4/28/20 revision; see also AC 2391-2400 and Brinkman
Deposition, pp. 235-36 -- where she testifies there is no current policy requiring

de-escalation).  Title 37 limits use of force: "only the least amount of force necessary to achieve that purpose is authorized" (37 Pa. Code §95.241(2), and ACJ policy allows use of force only "████████████████████████ ████████████████████████████████████████████████" (AC 2392). Dr. Brinkman expressed her frustration trying to institute meaningful de-escalation and training in de-escalation at ACJ:

> Question: And have you had discussions about de-escalation with administration on the correctional side?
> Answer: Yes.
> Q: With whom in particular?
> A: So there is a training commission that I have brought up this as a possibility. I only cited it as an example. But that the broader de-escalation is what was necessary. I have also brought it to what was Chief Deputy Warden Williams and our administrative team in other venues. So when we identified de-escalation as something we need to talk about, I have talked about this being the one I am most familiar with.  And one that I know has an evidence base to it. Obviously, CIT is a very common one in corrections. Because a lot of times there is entire CIT teams in community policing.
> Q: When did you start promoting the idea of training on de-escalation?
> A: I would say at some point in 2019. I just don't recall the specific timeline. It is something I am passionate about myself.
> Q: And at that time, was your idea met with resistance?
> A: Not resistance. More of logistics and how would that work. I can see the value in it. What do we need to do, can I review the information you have shared type of response.
> (Brinkman Deposition, pp. 239-40).[16]

---

[16] Nor is meaningful training in de-escalation in place at ACJ (Brief on Class Cert, Exhibit 12 and Exhibit 1 thereto (listing trainings offered); Brief on Class Cert., Ex. 22, at 14.  According to Defendants' Training Sergeant, "verbal de-escalation" is now included in Defendants' "interpersonal communications" training (Brief on Class Cert, Exh. 19, pp. 75, 152-53), yet while the term "verbal de-escalation" is used in the

As a result of the lack of communication and training regarding mental health, and the practice not to utilize de-escalation techniques, prisoners with mental illness at ACJ are subjected to repeated use of force for requesting help or exhibiting symptoms of their mental illness.  For example, Mr. Shaquille Howard attempted to get the staff's attention by opening his slot or covering his door window, and correctional staff used force against him for doing so (Complaint, ¶187).  On another occasion, he refused to lock into his cell due to auditory hallucinations and severe paranoia, and correctional staff responded by placing him in a strip cage, spraying him with OC spray, and tasing him.  Mr. Jason Porter was tased, head-slammed and placed in a restraint chair for leaving his slot open (see Porter Declaration; see also Complaint, ¶241-42).  And correctional staff threatened to tase Ms. Keisha Cohen for attempting suicide (Cohen Declaration; see also Complaint, ¶254; *See also* Brief in support of Class Certification, Exh. 31, ¶10, 13).  Mr. Brooke Goode spent six months in solitary confinement due to "misconducts" stemming from his requests for mental health care or manifestations of his untreated mental illness (Motion to Substitute, Doc. No. 49, at ¶5; *see also* Declaration of Brooke Goode).  All of this despite NCCHC standards that state that it is unreasonable to punish individuals for seeking mental health treatment, and requiring good faith efforts at de-escalation prior to use of force (MH-A-101).

According to County data provided in Discovery, ACJ had ██ incidents involving use of force in 2020 and ██ such incidents in 2019 (AC 9002-03).  The next highest county in Pennsylvania each of those years had fewer than

---

current training materials, little guidance is actually provided (Brief on Class Cert, Ex. 21).  This is despite clear ACA standards requiring specific training on de-escalation (5-ACI-1D-12, 5-ACI-1D-13, 5-ACI-1D-19).

half that number of incidents.  The dramatically higher numbers at ACJ are due to some extent to custody staff's failure to recognize mental health conditions, and their refusal to implement de-escalation techniques.

ACJ Warden Orlando Harper, when asked during his Deposition whether ACJ offers de-escalation training, testified that they are "in the process of providing de-escalation training, hopefully in the next couple of months."  There followed this exchange with Warden Harper providing answers:

> Question: Up through today, Allegheny County jail has not provided any de-escalation training; is that correct?
> Answer: Not official de-escalation training.
> Q: Has ACJ offered any unofficial de-escalation training?
> A: We do provide -- I will say this, we tell our supervisory staff to try to talk individuals to comply. And as you saw in our policies, and as I testified, we use our mental health specialists to try to de-escalate the situation. And I think that they are trained in de-escalation.
> Q: Who provides the mental health specialists with de-escalation training?
> A: I am not sure. I would think during their nursing certification working with mental health, they would be trained how to de-escalate mental health individuals.
> Q: You are referring to their training outside of the jail?
> A: I am referring to whatever certifications a mental health specialist would have to get.
> (Harper Deposition, p. 57-58).

In other words, there was at the time of Warden Harper's Deposition (May 11, 2022), no de-escalation training for custody or mental health staff at ACJ, the Warden assumed (but does not know for a fact) that clinicians receive training in de-escalation outside the jail, and the only times mental health staff are expected to see the prisoner and attempt de-escalation prior to use of force is when the prisoner is known by custody staff to suffer from mental

illness -- but remember, custody staff have no way of knowing if a particular prisoner suffers from a mental disorder (Beasom Deposition, p. 32).

This lack of emphasis and training on de-escalation and lack of training on de-escalation is a stark violation of all correctional standards and acceptable practices in the field.  For example, the American Correctional Association, in the 5th Edition of the Performance Based Standards, includes a Section on De-escalation, which states unequivocally: "All security and custody personnel are trained in approved methods of self-defense and de-escalation" (5-ACI-ID-19, p. 37). The failure of staff to utilize de-escalation techniques prior to use of force at ACJ violates all standards in correctional management and mental health care.

The restraint chair was utilized relatively frequently until very recently with prisoners in the ACJ, many of whom suffer from serious mental illness, and many of whom were experiencing psychiatric crises at the time they were placed in the restraint chair.  The restraint chair is a chair or chair-like device where a prisoner is strapped, arms, legs and midsection, and is unable to move much.  Subsequent to the voter referendum that took effect in December, 2021, the restraint chair is no longer utilized in the ACJ.  Before then, Allegheny County Jail utilized the restraint chair much more than any other county in Pennsylvania, ██ times in 2019.[17]  And in the acute units alone, and RHU, there were ██ incidents involving the chair between 1/13/19 and 6/19/21 (on pods 1C, 5C, 5D, 5MD and 8E, AC 8124).

---

[17] Pennsylvania Department of Corrections data, cited by Juliette Rihl, "It Always Escalated to the Chair," *PublicSource,* February 4, 2021.
<https://www.publicsource.org/restraint-chair-allegheny-county-jail-mental-health/>

Like several of the class representatives, quite a few of the prisoners I interviewed reported they have been strapped into a restraint chair at ACJ. They universally reported there had been no attempt at de-escalation prior to their being placed in the restraint chair, they had been kept in the chair for many hours or entire shifts (8 or 9 hours), they were not released from the restraint chair to use the bathroom so they had to urinate and defecate in their pants while in the restraint chair, and the entire procedure was extremely painful and humiliating. The actions as described were in violation of national standards, including the standards of the American Correctional Association, that require four-point restraint (all four limbs restrained, on a gurney or a restraint chair) be utilized only as a last resort after all less restrictive and harsh interventions have been attempted and failed, and should be utilized only for the shortest time necessary to restore order.[18]  Of course, all standards that address this issue, and common decency require that occupants of restraint chairs be released as needed for bathroom functions.  There is also a requirement that each limb of a person strapped into a restraint chair be released from restraint at frequent intervals so that circulation will not be cut off.  And there is a strong consensus in corrections, as reflected in very many jail policies nationwide, that there must be strict time limits to the use of restraint chairs, that limit is 2 hours in many vicinities, 4 hours in some others,[19] and that restraint chair placement cannot be used as punishment but rather must be instituted for the shortest time possible to safely control dangerous

---

[18] American Correctional Association, Performance-Based Standards and Expected Practices for Adult Correctional Institutions, A.C.A., March, 2021.

[19] See Disability Rights California, The Cruel and Unusual Use of Restraint Chairs in California Jails: A Call to Action, June 8, 2020.

behavior.[20]  The Use of Force Policy at ACJ, Policy #207,[21] requires that "███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████"   ACJ's practices violate all these standards.

Restraint chairs are not the only problematic custodial intervention with prisoners. The prisoners I interviewed universally reported that officers at ACJ are very quick to initiate punitive measures including tasers (electric shock applied by a gun designed to immobilize prisoners), immobilizing gas (pepper spray), beatings and solitary confinement, without first attempting de-escalation, and quite often in response to very minor rule violations, verbal arguments with prisoners or, in many cases, from the prisoners' perspective, for no reason at all. The notion of excessive force is based on a determination that the use of force is excessive relative to the legitimate aim to which force is being used.  The pattern and universality of prisoners reports to the contrary is striking.  The same reports are provided by prisoners housed in different areas of the jail, who do not know each other.  And these statements are corroborated by ACJ's own records, where ACJ's use of force incident rate is the highest in the state.

---

[20] see  Allegheny County Jail Policy #208, Effective 5/28/2008 and revised 4/28/2020, "Emergency Restraint Chair."  It is noteworthy that the policy of the Allegheny County Jail on Restraint Chairs ████████████████████████████████████████████. The Policy seems to demonstrate that a restraint chair is considered by ACJ staff to be an acceptable approach to a suicidal prisoner, for example one who refuses to answer questions, take his medications or don the suicide gown. Of course, utilizing the restraint chair with suicidal prisoners is a violation of all standards and a cruel and inhumane practice.

[21] Exhibit #10, Deposition of Dr. Brinkman.

I will briefly summarize Prisoner 13's experience with the restraint chair and use of force.  I did not have an opportunity to interview Prisoner #13, so my summary is based on document review, including her medical chart.

> Prisoner #13 has been incarcerated at ACJ at least twice since 2018.  She is diagnosed Schizoaffective Disorder, Psychotic Disorder, Manic Depressive Disorder, Anxiety, Depression and PTSD.  A progress note by a mental health specialist on 9/12/2018 stated: "Earlier in the evening, attempted to talk to new arrestee due to her flooding her cell continuously.  She refused to acknowledge me, and refused to answer any of my questions.  Unable to redirect her.  She appeared to calm down and was behaving appropriately until around 2000 hours, when I received report she was acting out again.  Currently she is standing naked at the door kicking water out of the cell....  She continues to yell, scream and bang on the door and she refuses to answer any questions.  Received report.  Decision was made to bypass processing and admit to 5MD due to inmate refusing to answer any questions and her transfer to 5MD Close Obs (Observation), 'Gown only.'  Impulsiveness, unpredictability.  She will be placed in a gown for her safety."  An LPN posted a progress note 4 minutes later: "New arrest cleared for OC spray. Decontaminated after OC spray.  Also placed in Restraint Chair. Restraints checked and have proper fit.  Will continue to monitor." Thus, this new admittee, who was most likely in the midst of an acute psychotic episode and acting inappropriately due to her mental illness, was stripped naked and placed in a gown, was sprayed with OC (pepper spray) and was almost immediately placed in a Restraint Chair.

The Use of Force Policy at ACJ, Policy # 207, is very clear that " ███████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████."  Prisoner #3, like all the other prisoners I interviewed,

tells me that everyday practices at ACJ are very different than what is required by policy.

Prisoner #3, a Black man with a mustache is very articulate. He tells me he suffers from Depression, Anxiety, ADHD, and Mood instability.  He has a great deal of trouble getting mental health staff to come to see him.  He takes psychotropic medications and suffers side effects, but the time between appointments with a psychiatrist is very long, and sometimes his medication prescription runs out without being refilled. He is prescribed Remeron for depression, and it makes him very sleepy in the middle of the day (Remeron is known to have a strong sedative effect).  The doctor refuses to change the medication to something with less of a sedative effect.  He tells me he was "in the hole" for a while, meaning the RHU on the 8th floor.  Once he told a nurse who came to see him at his cell-front that he didn't want to talk to her, and she had him put on Suicide Observation on 5C. There they took his clothes, his mattress and his blankets. He had to sleep on the metal slab (bed).  Another time he was sentenced to 30 days in the hole (RHU) for a fight.  He claims he was not involved in the fight, but it was another prisoner's word against his.  The other guy went to the mental health unit, he to RHU.  He tells me, "You can get sent to the hole many times.  If you refuse to do anything, they send you to RHU.  If you refuse to take Haldol, they use force to give it to you (this has not been done to him, but he frequently witnesses it being done to other prisoners).  He came to the ACJ (this time, he also had prior stints in the jail) in December, 2021.  Half of the time since then he has been in the RHU.  He tells me, "I want to ask for mental health treatment, but I know that when you ask officers to see mental health they start an argument with you, they say you are refusing an order, and they send you to the hole.  They

take you to the hole for anything, like using a clothesline in your cell." He continues, "There are mental health rounds every few days, and mental health staff walk around, but if you don't have a history of self-harm they don't want to talk to you.... And the COs don't react well if you have emotional problems." Prisoner #3 reports that being alone in a cell with nothing to do makes his anxiety and depression much worse. He tells me, "The staff don't care about you; the Warden likes keeping people locked down." In June or July 2019, he was in the RHU and feeling agitated and anxious – agitation and anxiety mount when he is in solitary confinement -- he admits he got into an argument with a C.O. and called her "Bitch" – and then he was maced (when he already was handcuffed) in the face and strapped in the restraint chair for 9 hours. He pleaded to use the bathroom, which wasn't permitted, and he had to defecate on himself in the restraint chair. He thinks his agitation and anxiety, both worsened by solitary, led to his cursing the officer. I asked about race relations and he said, "there are some good CO's, but others are very prejudiced; they pick on you for your tattoos; but officers have tattoos, too, like the tattoo on one officer's forearm showing a lynching." He tells me, "They have very loud guns now, they fire blocks with a loud flash." He witnessed officers using the gun, not trying to hit anyone, just scaring prisoners with the ricochet and the loud noise.

I asked Prisoner #3 about attempts to de-escalate before mace, tasers and the restraint chair are used. He told me he has never seen the slightest attempt at de-escalation with himself or any prisoner prior to the use of force. Mental health staff are never called to help with de-escalation. All of the other prisoners I interviewed told me the same thing.

ACJ Policy #207 on the Use of Force includes "███████████████ ██████████████████████████████████████████" Section 5

states: "█████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████"

A long gun firing (rubber or wooden) blocks and making a very loud noise seems to be among officers' current arsenal at the jail.  Several prisoners reported to me that officers have been carrying these guns on the jail units, and in at least two occasions reported to me by prisoners from different units, have recently fired the gun toward the floor inside the units, presumably attempting to frighten prisoners.  It does frighten prisoners, quite a lot, and again, with prisoners suffering from serious mental illness this is an entirely brutal and unacceptable practice. It is interesting that I am hearing about the use of this kind of weapon in the period following cessation of use of the restraint chair at the jail, suggesting that custody staff employ severe and/or excessive force and when one form of force (the restraint chair) is discontinued, they find another form of force to intimidate and terrify prisoners.  To the extent this is the case, there is no legitimate penological objective in this kind of bullying use of force, and it is entirely counter-productive and harmful to prisoners, especially prisoners with mental illness.

Prisoner #6, the 39 year old Black man with Bipolar Disorder, who I briefly discussed above (Sect. #6), reported to me that he has been subjected to force, what he considers "excessive force," even though he had not done anything wrong, and he claims officers often use force on him (beatings, taser, immobilizing gas) in response to his exhibiting mental health symptoms. He

tells me, "The guards would rather use physical force rather than talking to you, especially about emotional issues; the CO's want you to be scared of them."  He also told me, "There is racism, certain cops are more brutal than others, one CO is a racist, he has a tattoo of a Black baby hanging from a tree. The racism shows in favoritism."  He is housed on Unit 3E, and spent 23 hours per day in his cell until a month before our interview, supposedly because of COVID measures.  He tells me, "I witness them tase people all the time, they don't even have a reason, they tase you and then take you to the mental health pod (5C)."  He reported there is a new kind of shotgun that shoots blocks, and officers use it, shooting at the ground on the pods.  There is a loud bang when they shoot it, which makes him jump and become very anxious. He was strapped into the restraint chair at the jail in 2019, he was having mental health issues, he wanted to see mental health staff, and he was suicidal. "I got in an argument and spit at them, they put me in the restraint chair for a couple hours in Intake.  I pissed on myself.  Then I got 30 days in RHU."  He has been assigned to isolation in his cell, and he has been sent to RHU for a month at a time. I asked about the indoor recreation cubicles in RHU, and he said, "There are cages in RHU, but who wants to come out of their cell to a cage, it's degrading, so you're an animal now."   He continues, "RHU was hell, you only got recreation every three days.  I got anxious, had racing thoughts, couldn't concentrate, I didn't want to talk to anyone.  My mood and panic attacks were much worse.  I felt increasing anger.  Overall jail has made my illness worse. This is the worst jail I've ever been in."

In a jail where mental health services are substandard, there is a tendency for a significant proportion of the prisoners who suffer from mental illness to get into disciplinary trouble, become the object of use of force, and be sent to solitary confinement.  It might be that their idiosyncratic behaviors anger other

prisoners and they get into fights.  It might be that there is a lot of stigma in jail about mental illness, and people with mental illness are more likely than others to be victimized by other prisoners and punished harshly by custody staff.  And, of course, people with mental illness often have a lot of trouble following strict rules.

In my review, I have seen many instances where individuals are punished in large part due to manifestations of their symptoms or because they merely requested mental health care.  For example, during my July 25, 2022 tour of ACJ I sat down next to a Black prisoner in orange pants and shirt on Unit 2B and asked if he is able to request a visit with mental health staff, and how.  He told me that if he asks to see someone from the mental health department most likely the officer he asks will harass him and "stick me in segregation" on the Restricted Housing Unit.  I do not rely on individual statements unless corroborated by other evidence, but I do believe it is the sincere belief of the prisoner I spoke to.  Then, independently, several other prisoners I spoke to on other units echoed this randomly selected prisoner's sentiment.

Additional corroboration for the fact that custody staff punish prisoners who ask for mental health treatment comes from three named plaintiffs in the Complaint in this matter.  Shaquille Howard, who suffers from anxiety, depression and PTSD, reports he has been sprayed with Oleoresin Capsicum ("OC") in the face while handcuffed and placed in the restraint chair on multiple occasions when he needed and was asking for mental health treatment (Complaint, ¶. 4). Brooke Goode testifies in his Declaration that he suffers from Bipolar Disorder and PTSD, he is frequently not provided his prescribed psychotropic medications at ACJ, he has been denied counseling or mental health treatment and has often gone months without seeing a psychiatrist, and reports, "I have spent around six months total in solitary confinement either as

punishment for making multiple requests to seek mental health care or as punishment for manifestations of my untreated mental illness." And James Byrd, who suffers from Bipolar Disorder, depression, anxiety and PTSD, reports being repeatedly issued misconducts and kept in solitary confinement for seeking mental health or medical care, and he has been repeatedly assaulted with a taser, sprayed with OC spray, and placed in the restraint chair (Complaint, ¶. 5). Prisoners I interviewed who shared concerns about use of force or solitary confinement following requests to see mental health also told me that consequently they were very disinclined to seek mental health counseling or treatment.

These repeated and widespread occurrences demonstrate systemic deficiencies in ACJ's use of force policies, practices, and training.

In addition to these factors, an attitude on the part of officers, a part of their culture, too often includes intense stigma toward prisoners with mental illness. This seems to be a huge problem at ACJ. Based on my findings, many of the officers do not know how to manage prisoners with mental illness and that, combined with the stigma they harbor and the lack of training on managing individuals with mental illness, drive them to punish those prisoners very harshly, including the use of excessive force and overreliance on solitary confinement. Harsh treatment, including the frequent use of immobilizing gas, tasers, beatings and other harsh punishments, is very traumatic, and the trauma worsens psychiatric disorders that pre-exist the trauma, or is very likely to cause psychiatric distress and disorder in individuals who were previously mentally stable. Many of the individuals I interviewed described the impact on them of these uses of force, and as should be obvious, they suffered significant harm as a result.

In addition, at ACJ, prisoners suffering from serious mental illness are not excluded from solitary confinement, in spite of all standards including those of the N.C.C.H.C. requiring they be excluded from solitary.  With adequate mental health treatment, a large proportion of prisoners with mental illness can steer clear of disciplinary trouble.  But with inadequate treatment – and medications plus cell confinement is clearly inadequate treatment – a much larger proportion of prisoners with mental illness wind up in solitary confinement, which is known to greatly exacerbate serious mental illness.

## 11. Overuse of Solitary Confinement for Prisoners with Mental Illness

   a. **Background About Solitary Confinement.**[22]  Solitary confinement causes immense psychological harm.  There has been a substantial amount of research into the harmful effects of solitary or isolated confinement, especially if the prisoner thus confined suffers from a serious mental illness or is vulnerable to mental illness.[23]  Even relatively stable prisoners suffer

---

[22] I employ the terms "solitary confinement" and "isolated confinement" interchangeably. Some correctional officials object to the use of the term solitary confinement because, they claim, individuals in their isolative confinement units have some contact with the officers who pass them their food trays, search them and escort them to appointments. I am not convinced this constitutes adequate human contact, so I continue to employ the two terms synonymously.

[23] Kupers, T. (2013), Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake?," The Routledge Handbook of International Crime and Justice Studies, Eds. Bruce Arrigo & Heather Bersot, Oxford: Routledge, pp. 213-232; Scharff-Smith, P. (2006). 'The effects of solitary confinement on prison inmates: A brief history and review of the literature,' In M. Tonry (Ed.), Crime and justice, Vol. 34, 441-528, Chicago: University of Chicago Press; Kupers, T. (2017), Solitary: The Inside Story of Supermax Isolation and How We Can Abolish It, Berkeley, University of California Press. In their amicus brief in Wilkinson v. Austin, 545 U.S. 209 (2005),

serious psychiatric symptoms and disabilities when kept in a cell much of the time.[24]  Human beings require at least some social interaction and productive activities to establish and sustain a sense of identity and to maintain a grasp on reality. In the absence of social interactions, unrealistic ruminations and beliefs cannot be tested in conversation with others, so they build up inside and are transformed into unfocused and irrational thoughts. Disorganized behaviors emerge. Internal impulses linked with anger, fear and other strong emotions grow to overwhelming proportions. Sensory deprivation is not total in jail isolation settings; there is the intermittent slamming of steel doors and there is yelling (one has to yell in order to be heard), but this kind of noise does not constitute meaningful human communication.  And in many jails the relative crowding leads to double-celling.  Having a cellmate, most often a stranger, is not an improvement over being alone in a cell.  The conditions still constitute solitary confinement, one spends nearly 24 hours in a cell with little in the way of meaningful activities, only with a cellmate.   In fact, celling two prisoners together, especially if either one suffers from serious mental illness, increases the risk of violence as well as anxiety, i.e. fear the cellmate

---

leading mental health experts summarize the clinical and research literature about the effects of prolonged isolated confinement and conclude: "No study of the effects of solitary or supermax-like confinement that lasted longer than 60 days failed to find evidence of negative psychological effects" (p. 4).

[24] Craig Haney, Mental Health Issues in Long-Term Solitary and "Supermax" Confinement, CRIME & DELINQUENCY, 49(2), 124-156 (2003); Stuart Grassian & Nancy Friedman, Effects of Sensory Deprivation in Psychiatric Seclusion and Solitary Confinement, INT'L J. OF LAW & PSYCHIATRY, 8(1), 49-65 (1986); Terry Kupers. (1999).  Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It.  New York: Free Press.

will assault one when asleep.  Prisoners in this kind of segregation do what they can to cope. Many pace relentlessly, as if this nonproductive action will relieve the emotional tension.  Those who can read books and write letters do so.

The tendency to suffer psychiatric breakdown and become suicidal is made even worse by sleep deprivation, which is a frequent occurrence among prisoners in isolated confinement. Loss of sleep intensifies psychiatric symptoms by interfering with the normal diurnal rhythm (the steady alternation of day and night that provides human beings with orientation as to time), and the resulting sleep loss creates fatigue and magnifies cognitive problems, memory deficits, confusion, anxiety, and sluggishness.  It is under these extreme conditions that psychiatric symptoms begin to emerge in previously healthy prisoners. Of course, in less healthy ones, there is psychosis, mania or compulsive acts of self-abuse or suicide.  A stunning statistic, born out in research around the country, is that fully 50% of all successful jail and prison suicides (not attempts) occur among the 3% to 7% of prisoners who are in isolated confinement (segregation).[25]

Regarding the length of time it takes for the harmful effects of jail isolation to surface, there is no single length of time that accurately fits the situation of all affected individuals.  I have observed some relatively stable-appearing prisoners break down and become psychotic or seriously suicidal

---

[25] Mears, D.P. & Watson, J. (2006). "Towards a fair and balanced assessment of supermax prisons," Justice Quarterly, 23,2, 232-270.; Way, B., Miraglia, R., Sawyer, D., Beer, R., & Eddy, J. (2005).  "Factors related to suicide in New York state prisons," International Journal of Law and Psychiatry, 28,3, 207-221.; and Patterson, R.F. & Hughes, K. (2008). "Review of completed suicides in the California Department of Corrections and Rehabilitation, 1999 to 2004," Psychiatric Services, 59, 6, 676-682.

after being in solitary confinement for only a few days.

Prisoners suffering from serious mental illness typically suffer exacerbation of the mental illness, more severe acute episodes, longer course of each episode, less capacity to move on to remission and stability, a poorer prognosis (compared to individuals with equivalent diagnoses who are not consigned to solitary confinement), and there is some evidence of worse recidivism rates for individuals who were formerly consigned to solitary confinement in prison.[26]

There is also research demonstrating that the psychological effects of trauma are accompanied by physical changes in the brain.[27]  A body of research is accumulating that shows the harmful effects of solitary confinement on the brain.[28]

Haney, Weill, Bakshay and Lockett point out that isolation is used more in jails than in prisons, that prisoners with serious mental illness in jail are very likely to spend time in punitive segregation, and that the isolation

[26] Mears, D. P., & Bales, W. D. (2009). Supermax incarceration and recidivism. Criminology, 47, 1131-1166; Lovell, D., Johnson, L. C., & Cain, K. C. (2007). Recidivism of supermax prisoners in Washington state. Crime & Delinquency, 53, 633-656.

[27]  See Taber, K. H., & Hurley, R. A., PTSD and combat-related injuries: Functional neuroanatomy, The Journal of Neuropsychiatry & Clinical Neurosciences, 21, pp. 1-4, 2009;  Vaishnavi, S., Rao, V., & Fann, J. R., Neuropsychiatric problems after traumatic brain injury: Unraveling the silent epidemic. Psychosomatics 50, pp. 198-205, 2009; Taber, K. H., & Hurley, R. A., "PTSD and combat-related injuries: Functional neuroanatomy," The Journal of Neuropsychiatry & Clinical Neurosciences, 21, pp.1-4, 2009.

[28] Carol Schaeffer, "Isolation Devastates the Brain": The Neuroscience of Solitary Confinement, SOLITARY WATCH (May 11, 2016);

causes great harm.[29]  After reviewing the recent history of widespread solitary confinement at Rikers Island, the jail for New York City, they conclude: "This is precisely why the long-ignored and largely overlooked practice of jail isolation needs to be more carefully studied, independently monitored, effectively regulated, and legally controlled in local jails across the country.

But punitive segregation is not the only form of solitary confinement in jail.  There is a great amount of *de facto* solitary confinement for jail prisoners with serious mental illness even if that is not the intention of staff.  The harm of solitary confinement, including exacerbation of serious mental illness, is the same whether confinement is in a punitive segregation unit such as RHU at ACJ, or is a *de facto* form of solitary such as a jail lockdown.  Because of crowding and/or staff and program shortages, prisoners in jail are often restricted to their cells for most of the day, and there is relatively little in the way of meaningful programming, jobs, even recreation.  If prisoners are confined to their single- or double-cells twenty-two or more hours per day with little opportunity to engage in productive activities, this is *de facto* solitary confinement and causes the same human damage that punitive solitary confinement causes, especially with prisoners who suffer from serious mental illness.

The 22-hour requirement typically attached to the definition of solitary confinement must not be construed as a rigid time frame.  In some jails, prisoners may be confined to their cells for slightly less than 22 per hours per day, but because of the totality of conditions, including very little

---

[29] Haney, C, J. Weill, S. Bakhshay & T. Lockett.  (2015).  Examining Jail Isolation: What We Don't Know Can Be Profoundly Harmful.  *The Prison Journal*,1-26.

opportunity for social interaction and very little in the way of meaningful activities, the conditions still constitute solitary confinement.  Craig Haney offers the following clarification: "From a psychological perspective, solitary confinement is defined less by the purpose for which it is imposed, or the exact amount of time during which prisoners are confined to their cells, than by the degree to which they are deprived of normal, direct, meaningful social contact and denied access to positive environmental stimulation and activity. Thus, even a regime incorporating a few daily hours of out-of-cell time during which a prisoner is simultaneously prohibited from engaging in normal, direct, meaningful social contact and positive stimulation or programming would still constitute a painful and potentially damaging form of solitary confinement. Especially in a prison context, the terms "normal" and 'direct' mean that the contact itself is not mediated or obstructed by bars, restraints, security glass or screens, or the like. "Meaningful" refers to voluntary contact that permits purposeful activities of common interest or consequence that takes place in the course of genuine social interaction and engagement with others."[30]

The "lockdown" is another form of *de facto* isolation."  When there is violence in the jail or evidence of an escape attempt, and deputies do not know who is responsible for the violence, all of the prisoners are locked into their cells and dormitories and are not free to go to the dayroom or participate in programs.  The lockdown can last for weeks. Besides the jail housing situations that obviously constitute solitary confinement, there is a tendency for jails that are crowded and relatively thinly staffed to keep prisoners in their cells or dormitories for most of each day simply to make

---

[30] Quoting Craig Haney, 2023, personal communication.

management of the facility easier.  Thus, even in general population housing situations, the prisoners remain in their cells or dorms all but one or two hours each day.  This is why, when one tours a jail during the daytime, one sees hallways, dayrooms and yards with no prisoners occupying them, and sees prisoners sleeping or laying on their beds in the middle of the day.  I found the empty halls, dayrooms and yards quite stunning during my July 25, 2022 tour of ACJ.

There is a strong and growing consensus among correctional mental health professionals, state legislators and international bodies including the United Nations that solitary confinement causes immense human damage without providing any real help in reducing prison violence, and that the use of solitary confinement in corrections must be greatly reduced or ended. This is why the N.C.C.H.C., the A.C.A. and the American Psychiatric Association recommend against consigning prisoners with serious mental illness to solitary, and placing short and strict time limits for everyone in solitary.  Thus, United Nations Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Juan Mendez, declared that solitary confinement lasting longer than 15 days constitutes a human rights abuse or torture.[31]

The National Commission on Correctional Health Care (NCCHC) published in 2016 a "New Position Statement on Solitary Confinement" that begins with the statement: "Prolonged (greater than 15 consecutive days)

---

[31] <https://www.prisonlegalnews.org/media/publications/International%20Human%20Rights%20Law%20on%20Solitary%20Confinement%2C%20HRF%2C%202015.pdf>. The 2015 United Nations Minimum Rules on the Treatment of Prisoners, known as the "Mandela Rules," prohibit the use of solitary confinement lasting longer than 15 days except in very rare cases, and then only with very rigorous review by a higher authority <http://solitaryconfinement.org/mandela-rules>.

solitary confinement is cruel, inhuman and degrading treatment, and harmful to an individual's health," and that mentally ill individuals "**should be excluded from solitary confinement of any duration.**"[32] Many state legislatures have passed laws limiting and monitoring the use  of solitary confinement in corrections. New Jersey and New York last year passed laws banning the utilization of solitary confinement for longer than a few weeks for any prisoner.[33]

## b. Solitary Confinement at ACJ: The RHU and other Settings.

We toured the RHU on the Eighth floor of ACJ (Pod 8E) on July 25, 2020.  Major Edwards explains that there are ▉ cells in the RHU, ▉ are double-celled (contain two prisoners) and ▉ contain a single prisoner.  Thus there were approximately ▉ prisoners in the RHU at the time of our tour.  But again, there are many other sites of solitary confinement in the ACJ, including solitary confinement cells on the 5th floor mental health units, and lockdowns at ACJ are frequent and can last a month at a time.  The first issue of the Jail Oversight Board Segregation Report for the Month of July, 2021, reflects that there had been nearly 300 people in solitary confinement at ACJ in March of that year (this was prior to the referendum on solitary confinement[34]).  The 300 figure includes all individuals who were

---

[32] Available at <https://www.ncchc.org/solitary-confinement-position-statement>.

[33] See <https://www.vox.com/policy-and-politics/2019/7/10/20681343/solitary-confinement-new-jersey>; <https://www.nytimes.com/2021/04/01/nyregion/solitary-confinement-restricted.html>

[34] "275 Allegheny County Jail Inmates Were Held in Solitary Confinement Last Month, Officials Say," WESA, BBC World Service, July 12, 2021 <https://www.wesa.fm/courts-

in solitary confinement at any time during the month, and not the number who were in solitary confinement at any one point in time.

In Pod 8E,  . The cells are not at all "suicide-proof," and there are many places in the cells where a noose can be strung.  See photo below.

justice/2021-07-12/275-allegheny-county-jail-inmates-were-held-in-solitary-confinement-last-month-officials-say>



*Restricted Housing Unit (RHU)*



*Inside of a cell in RHU*

During our tour, I requested to tour unit 1C, which contains eight segregation cells for women.  There was insufficient time on the tour to do so, but we were told the physical lay-out of the cells and the daily routine are equivalent to those for male prisoners.

There are many prisoners suffering from significant or serious mental illness in the RHU, and in many of the segregation cells outside the RHU, for example those located on the 5th floor of the jail, the site of the acute (5C), subacute (5D) and stepdown (5F) mental health units, as well as 5MD for women.  As I mentioned above, individuals with mental illness experience exacerbation of their mental illness and resulting disability when consigned to solitary confinement. Prisoners who are sometimes somewhat suicidal become more seriously suicidal, the length of time between their suicidal crises shrinks, and too many succeed in their suicide attempts (remember, 50% of suicides ending in death occur among the much smaller proportion of prisoners in jails and prisons).  Those suffering from Schizophrenia or Bipolar Disorder experience more hallucinations and bizarre thoughts or more severe mood

swings and psychotic symptoms.  Treatment that consists almost entirely of psychotropic medications cannot ameliorate the symptoms and psychiatric damage that comes with jail incarceration and especially solitary confinement. Mental health crises are made much worse by solitary confinement, and as a result prognoses and disabilities worsen. This is why the N.C.C.H.C., the American Psychiatric Association, the United Nations and the American Correctional Association, among others, all issue standards that prohibit or greatly restrict the consignment of prisoners with serious mental illness to solitary confinement.

Allegheny County Jail is an outlier in the use of solitary confinement.  Not only are a relatively large proportion of the jail population consigned to solitary confinement, but in addition prisoners with serious mental illness are not barred, by policy or practice, from solitary confinement, as contemporary standards, courts, and laws in many states would require.

At ACJ, many detainees with serious mental health conditions have been placed in restricted housing despite the above warnings and even though Defendant Williams, Chief Deputy Warden of Healthcare Services, is aware of published articles regarding the impact of solitary confinement on those with serious mental illness (Williams Deposition, p. 64-65. *See also* Brinkman Deposition, p. 241, 246).  Mr. Howard was incarcerated at ACJ from June 2017 until January 2021. (Complaint, ¶176, 177).  Over half of his three and a half years at ACJ was spent in solitary confinement (Complaint*., ¶178).  Mr. Porter was incarcerated at ACJ in August 2019, and again on January 14, 2022, and has spent all but a few days in restricted housing (Complaint , ¶228, 232; *See also* Brief in support of Class Cert, Exh. 28, ¶1, 10).  Many other mental health patients similarly are routinely kept in segregation (Brief in

Support of Class Cert., Exh. 29, ¶11-12; Exh. 34, ¶5-6; see also Brinkman
Deposition, p. 246).

The "Medical and Mental Health Segregation Clearance Placement Form,"
copies of which appear in prisoners' medical charts (see, for example, AC-
007777 or AC_001168), and as Exhibit 9 to Dr. Brinkman's Deposition,
contains a number of questions that can be ticked 'yes' or 'no.'  The questions
include Injuries?, medical restrictions?, detox protocols?, pregnant?  Under the
heading "mental health": "Is inmate suicidal or self-injurious at this time?" "Is
inmate demonstrating psychotic behavior at this time?,"  "Does inmate need
admission to acute mental health unit at this time?"  Below this list of
questions is the instruction: "If all answers are 'NO,' then housing placement to
be determined by custody (In other words, consignment to solitary
confinement is approved).  Any 'Yes' answers, inmate will be admitted to acute
mental health unit for further assessment."

This Clearance Placement Form, like the deposition testimony of Dr.
Brinkman and Chief Deputy Williams, entirely misses the purpose of mental
health screening for placement in segregation.  By asking only about "at the
present time" for suicide risk, psychosis and the need for inpatient admission,
the clearance procedure leaves out the critical issue of risk. For example,
suicide risk assessment is based on much more than a current suicide plan or
psychosis.  It includes past suicidal behavior, the inmate's previous experience
in segregation and whether he/she suffered a suicidal crisis or psychotic
episode in segregation in the past, his/her diagnosis and any psychotropic
medications prescribed, etc.  In other words, individuals at high risk of suicide
or psychosis, based on more than simply their current statements or
appearance, must not be placed in segregation. The most important risk factor

for suicide in a solitary confinement setting is prior attempt(s) at suicide, especially during a prior jail stint or prior term in solitary confinement, and this absolutely critical consideration is not reflected in the ACJ Clearance Placement Form.  The clearance procedure and form fail to address most of the risk factors for suicide and the risk factors for psychotic decompensation and worsening depression.

Defendants do not track how many individuals in restricted housing have mental health conditions.  Ex 22, p. 197.  However, based on an analysis of a representative sample of 95 individuals with diagnosed mental health conditions, more than a third had been placed in restricted housing, and not all housing records have been produced.  The placement of mental health patients in restricted housing is thus a regular occurrence.  Further, there is a frightening number of individuals who are moved directly from restricted housing to the acute mental units, as a result of decompensation during the period of isolated confinement or manifestation of symptoms while in isolated confinement.  AC 084647 documents almost ███ such transfers.  This alone demonstrates the severe impact of such isolation.

While in isolation, "rounds" are conducted by medical nursing and mental health staff, but all contacts with prisoners take place while the prisoner is in his cell and the interviewer stands outside.  This is a "cell-front interview."[35]  Of course there is no privacy nor confidentiality because officers nearby and prisoners in neighboring cells can overhear the conversation.  Prisoners tell me they are very reluctant to share much information of consequence during these "cell-front interviews" because there is great stigma among the incarcerated

---

[35] See my explanation of the problems with "cell-front interviews," "The Cell-front Interview," *Correctional Mental Health Report,* 24, 4, Spring, 2022.

population toward prisoners with emotional problems.  Thus the fact that interviews with medical and mental health staff occur only or mainly at cell-front means that prisoners who are suicidal or psychotic may not share with the staff making rounds that they are in crisis or suicidal. Most of the prisoners in the unit are there because of disciplinary trouble related to misconduct, i.e. they are in punitive segregation.  Others are on administrative segregation for a variety of reasons, or are in protective custody.  The RHU is far from the only site of solitary confinement and punitive segregation at ACJ.  For example, according to the Jail Oversight Board Segregation Report for the Month of March, 2022, the entire jail was in lockdown for the month of March, 2022, from March 1 to March 31, meaning all of the more than 1,600 prisoners were confined to cell for a month with very limited time out of their cells.[36]

The safe alternative to solitary confinement for difficult prisoners must include psychotherapy and rehabilitative programming, which would improve rather than exacerbate their psychiatric condition.  But there is little or none of either at ACJ.

The fact that so many prisoners are in solitary confinement (300 at some time during the month of March, 2021, or over 1,600 during a month-long lockdown) must mean that one can be sent to the RHU or some form of segregation for a relatively minor rule infraction, or for no infraction at all.  The numbers point to that conclusion.  And in fact, the prisoners I interviewed universally told me that they had been consigned to segregation for relatively

---

[36] Report of the Jail Oversight Board Pursuant to Allegheny County Code Chatp. Sect. 205-30 for the Month of March, 2022, available at </www.alleghenycounty.us/uploadedFiles/Allegheny_Home/Dept-Content/Jail/Docs/Reports/JOB%20Segregated%20Housing%20Report%20March%202022.pdf>

minor rule infractions or for no infraction at all, and many of them complained of the excessively harsh punishment and unfairness of their treatment.

Allegheny County voters passed in May, 2022, with 70% of voters' approval, a referendum, the "Prohibit Solitary Confinement Initiative," banning solitary confinement or confinement at ACJ in a cell for more than 20 hours per day.[37]  The referendum was written into the County Code and became effective in December, 2021.  Around that time, indoor cubicles were constructed in the center of the Restricted Housing Unit, where prisoners in the RHU are permitted four hours per day of out-of-cell time.

---

[37] <chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://apa-pgh.org/wp-content/uploads/2021/01/solitary.pdf>



*The Indoor Recreation Area within the Restricted Housing Unit (RHU)*

In these four approximately 9½ foot X 9½ foot, 7 foot high caged spaces, there is no furniture, no place to sit, no toilet, no athletic equipment, nothing but a floor with a linked fence perimeter and ceiling.  During our tour in the middle of the day, the 4 enclosures were empty except for one prisoner wandering aimlessly in one of the four enclosures. Since the population of the Restrictive Housing Unit is approximately ▮ prisoners, it is clear that if all prisoners in segregation were truly provided 4 hours out of cell per day, the four enclosed recreation spaces in the RHU (plus similar spaces outdoors) would have to be full all hours of the day and into the night, and still there would not be sufficient time and space to accommodate all ▮ prisoners being released from their cells four hours per day.

But the recreation spaces were mostly empty when we toured the RHU in the late morning.  I walked up to several cells and asked prisoners why they were not utilizing their opportunity for out-of-cell "recreation," and every single one of them told me that if you opt to go to the recreation area in order to get out of your cell, there is nothing to do, nowhere to sit, and no equipment to do anything.  So, one prisoner asked me, "why would any sane person opt to go spend 4 hours in a cage with nothing to do and nowhere to sit?"  In other words, the large majority of residents of the RHU refuse the allotted daily recreation time in the cage-like enclosures, and for good reason.  This is a disingenuous, even cynical response on the part of staff and administration of ACJ to the requirement there be four hours of out-of-cell time per day, as mandated by the "Prohibit Solitary Confinement Initiative."  If the custody officers and jail administration are unable to figure out that an empty cage in the middle of the RHU would not attract many takers, then the fact that the enclosures remain empty much of the time should be sufficient empirical evidence to convince staff and administration that it is not a workable plan.

Solitary confinement is about severe social isolation, it is also about idleness and a lack of meaningful and productive activity.  Human beings, especially those suffering from mental illness, require social connection as well as meaningful productive activities to sustain mental health and functioning, that is why group sessions and rehabilitation programs must, according to all standards, be a part and parcel of any jail mental health program.  If the four hours out-of-cell in the RHU is to have any positive effect, there must be group events, rehabilitation programs and so forth for the prisoners who are released from their cells.

The four enclosures for recreation in the RHU do not provide any counter to the harmful isolation and idleness of solitary confinement. It seems like they were designed to fail, as if the staff and administration were saying, "OK, the voters insist we provide prisoners in segregation four hours per day of out-of-cell time, we will permit them to be in an entirely unattractive space that they will find no better than isolation in their solitary cell, and then not many of them will choose to leave their cells and make use of the recreation enclosures, but we can claim we have fulfilled the requirement that they be permitted four hours out-of-cell."

Pod 8E is far from the only site of solitary confinement and punitive segregation at ACJ.  And in any event, ACJ has managed to keep the population isolated by using jail-wide lockdowns.  According to Warden Harper, the entire jail was on lockdown from the time the prohibition on solitary confinement went into effect until May of 2022—a period of almost six months (Harper deposition, 175-77, 189-90).

Harper Warden 05.11.22, (Page 191:4 to 191:10)
                    191
    4      Q    So fair to say that since the adoption --
    5    since the effective date of the referendum, the

```
 6   facility has been on lockdown consistently until last
 7   week?
 8      A    It's fair to say that to ensure the safety
 9   of the facility, the jail was on lockdown until May
10   2nd.
```

The justification reported to the Jail Oversight Board for this 6 month lockdown was "COVID," but Warden Harper did not create any documentation to support or justify the decision to keep the entire population isolated for this extended period (p. 188-89).

Due both to the cynical use of "cages" to allow for "recreation," and the overuse of lockdowns without documentation, ACJ still uses solitary confinement, in violation of the referendum.  And it continues to cause harm to those incarcerated as described above.

Quite a few individuals on protective custody status are consigned to solitary confinement/RHU.  There is an area allocated for prisoners on protective status on Unit 4F, but for some reason, probably oversubscription for the beds on 4F, a significant number of individuals requiring protective custody are housed in the RHU and other solitary confinement settings.  This is an unacceptable practice.  Individuals requiring protective custody have not broken rules and are not being punished, therefore they are entitled to all the amenities and activities their security level permits, though they must be separated from potential enemies in the interest of safety.[38]

---

[38] See American Correctional Association Standards, 3-4237 (Ref.2-4214), at p. 38: "Inmates in protective custody should be allowed to participate in as many as possible of the programs afforded the general population, providing such participation does not threaten institutional security." The National Institute of Corrections (U.S. Dept. of Justice) publication, Protective Custody Management in Adult Correctional Facilities, 1990, notes that: "The courts generally require that protective custody facilities and

12.     **Inadequacies of Mental Health Assessment Combined with the Over-utilization of Solitary Confinement Cause Significant Harm to prisoners at ACJ**

Prisoners suffering from serious mental illness, when consigned to solitary confinement, typically suffer exacerbation of the mental illness, more severe acute episodes, longer course of each episode, less capacity to move on to remission and stability, a poorer prognosis (compared to individuals with equivalent diagnoses who are not consigned to solitary confinement), and worse recidivism rates.[39]

---

services be as comparable as possible to the facilities and services provided to the general population" (p. 19), available at

<https://www.ncjrs.gov/pdffiles1/Digitization/134060NCJRS.pdf>.

[39] Holly Hills, Christine Siegfried, Alan Ickowitz, *Effective Prison Mental Health Services: Guidelines to Expand and Improve Treatment,* U.S. Department of Justice, National Institute of Corrections (2004), at 30-31 (success "in preventing further psychiatric decompensation" among inmates with mental illnesses is dependent on the timely provision of mental health screening, mental health assessments, psychotropic medications, supportive psychotherapy, and crisis stabilization beds). *See also* E. Fuller Torrey, et al., *More Mentally Ill Persons Are in Jails and Prisons Than Hospitals: A Survey of the States*, Treatment Advocacy Center (2010), at 12 (Individuals who receive outpatient treatment upon release from incarceration are far less likely to be rearrested or re-hospitalized); Terry Kupers, et al., *Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs*, 36 Crim. Just. & Behavior 1037, 1047 (2009) (In a study of individuals with severe mental illnesses housed in a supermax facility, those who went through mental health treatment then back to general population had a "sharp decrease" in violent incidents than those who did not).   *See also* **Ex. 38** (AC 80840-45: "Left untreated, these factors [mental health and substance abuse disorders] contribute to a recidivism rate that is higher than that of the general offender population; in addition, individuals with a serious mental illness return to jail a year sooner than other offenders.").

Research in the field of psychiatry clearly reflects that the longer an individual suffering from serious mental illness remains acutely disturbed and untreated during an episode of decompensation, the more severe the episode and the greater the damaging effects in terms of ongoing mental health status, disability and prognosis.  If an individual experiencing an acute crisis – a psychotic episode or an episode of severe mood disorder -- is not intensively treated and remains acutely psychotic for an extended period, especially if the individual is left to suffer very stressful conditions of confinement such as solitary confinement in RHU, it is predictable that, on average, the mental illness will be worse in the future (subsequent episodes of psychosis or mood disorder will be more frequent, more severe and more disabling), and the prognosis will be more dire.  By contrast, if the individual is provided emergency anti-psychotic medications as well as other indicated treatment interventions as soon as evidence surfaces of an evolving decompensation or acute psychotic episode, and is provided decent housing and programming in a congregate setting (in the community or in general population in prison), then the episode will be relatively less severe, as will the individual's disability and prognosis. The patient's subsequent mental state will also be relatively less damaged.[40] This is why there is a concerted effort in psychiatry today to identify episodes of acute decompensation early and intervene aggressively.  To a reasonable degree of medical certainty, considering what I observed at the jail, all the interviews I conducted and the documents I reviewed, the combined effect of inadequate

---

[40] Penttilä M, Jääskeläinen E, Hirvonen N, et al. (2014), Duration of untreated psychosis as predictor of long-term outcome in schizophrenia: systematic review and meta-analysis. *Br J Psychiatry*, 205: 88–94; Jonas KG, Fochtmann LJ, Perlman G, et al. (2020) Lead-time bias confounds association between duration of untreated psychosis and illness course in schizophrenia. *Am J Psychiatry*, 177: 327–334.

mental health treatment and harsh punishments including solitary confinement cause great psychiatric damage to prisoners. The overall effect is to worsen the mental illness of prisoners and make their disabilities greater and their prognoses more dire.

This is also reflected in the ultimate type of harm – death. As early as 2011, ACJ's suicide rate was among the nation's highest.[41]  Since that time, the situation has only worsened. Between 2016 and June 4, 2020, there were nine deaths by suicide at ACJ.[42]  This is approximately double the expected rate.[43] And suicide attempts in ACJ increased each year:  there were ██ attempts in 2018, ██ attempts in 2019, and ██ attempts in 2020.[44]  Indeed, each named Plaintiff in this matter has deteriorated psychologically while in ACJ custody.[45] Mr. Howard and Ms. Cohen both attempted to kill themselves while in custody, and Mr. Castaphany was placed on suicide watch.[46]  Former Class Representative

---

[41] "Allegheny County Jail's Suicide Rate Among Nation's Highest" (WPXI, July 5, 2011), found at:  https://www.wpxi.com/news/allegheny-county-jails-suicide-rate-among-nations-/201418869/

[42] K. Giammarise, "Report cites issues with suicide prevention in Allegheny County Jail" (Pittsburgh Post-Gazette, June 4, 2020), https://www.post-gazette.com/news/crime-courts/2020/06/04/Allegheny-County-Jail-suicide-prevention-issues-report-oversight-board-committee/stories/202006040123.  *See also* **Ex. 39** (Death in Custody reports, AC 26092-130).  See also Complaint, ¶202, 245, 274;  *See also* Brief in Support of Class Cert., Exh. 28, ¶10-11; Exh. 29, ¶13; Exh. 34, ¶10).

[43] According to the Department of Justice, the rate of suicides in local jails has hovered between 30 and 50 suicides per 100,000 inmates. Ex. 40, Figure 2. Fifty out of 100,000 equates to 1 out of 2,000.  Defendants' population has varied between 1600 and 2300, and as noted above, they have more than two suicides per year (Complaint, ¶202, 245, 274;  *See also* Brief in Support of Class Cert, Exh. 28, ¶10-11; Exh. 29, ¶13; Exh. 34, ¶10).

[44] Brief in Support of Class Cert, Exh. 41 (ACJ suicide attempts, AC 32782).

[45] Complaint, ¶202, 245, 274;  *See also* Ex. 28, ¶10-11; Ex. 29, ¶13; Ex. 34, ¶10).

[46] Complaint, ¶190, 254, 269; Brief in Support of Summ. Jdgment, Exh. 29, ¶9; Exh. 31, ¶10.

(and Class member) James Byrd attempted suicide at least three times while in custody.[47]  Of the representative sample of ■ individuals described above, ■ had been placed on suicide watch or attempted suicide; of the ■ individuals diagnosed with Schizophrenia, ■ had been placed on suicide watch or attempted suicide, and of the ■ individuals suffering from Depression, ■ had been on suicide watch or attempted suicide.[48] The prevalence of suicide attempts, and the trend of increasing attempts, demonstrates the devastating consequences of policies and practices at ACJ.

I had the opportunity to review several files involving prisoners at ACJ who have succeeded at taking their lives while in the jail.  One was the file of Prisoner #12 (AC_087609 – AC_087622).  The file contains a "Root Cause Analysis" of the male prisoner's suicide on April 7, 2019.  The prisoner's chart, which includes an unremarkable Intake screening without indication of suicidal crisis, reflects he was housed on the medical unit for treatment of physical injuries.  He was eventually transferred to Unit 8D, a maximum security unit.  A mental health referral was made in January, 2019 after medical staff noted his depressed mood as well as the death of both of his parents within a short time, his mother passing away while he was incarcerated at ACJ.  The mental health assessment reflected his depression and recent losses, but concluded he was not suicidal and no further treatment was indicated.  Then, on April 7, 2019 he was found hanging in his cell.  The post-mortem reviewer correctly points out that there were several important risk factors for suicide, including depression, the fact that this was his first time in jail, and the recent loss of both parents. The reviewer also concludes that the mental health staffer who did the original

---

[47] Complaint, ¶222

[48] Jaclyn Kurin Declaration, Exh. 48 to Brief in Support of Class Cert.

screen for suicide was not sufficiently knowledgeable about risk factors for suicide and more training was indicated.  This is an adequate Root Cause Analysis, and the reviewer's conclusion is correct, Prisoner # 12 should have come to the attention of mental health staff as a significant risk of suicide and should have been treated accordingly.  It is important to note that the case reflects insufficient training and possibly inadequate professional education on the part of the individual doing the Intake mental health screen, as well as the individual doing the evaluation in January, and that more rigorous mental health follow-up would have likely prevented the suicide.

I will mention another case where I reviewed the clinical file.

> The file of Prisoner # 11, who hung herself in her cell utilizing jail issue pants tied to the bed frame on 4/28/2018, is instructive (AC_033764 – AC_033899). She was admitted to the jail on 4/13/2018, charged with a relatively minor robbery by her children, and received intake medical and mental health screening as well as a mental health evaluation on 4/14/2018.  She was known to have a history of depression, alcohol abuse, two psychiatric hospital admissions in recent years and a prior suicide attempt by overdose on Neurontin.  Nevertheless, upon screening in Intake she denied current suicide ideation or plans and was admitted to general population on the 4th floor of ACJ.  She submitted several sick call slips requesting an appointment with mental health and expressed some urgency.  It is noted she was given an appointment with mental health for 4/27/2018. Meanwhile members of her family called ACJ, her son made 6 phone calls to the jail about his mother, and a transcript of one of her son's phone calls includes: "I really want to get her help but am afraid to just bail her out and have her do it (note by TK: was he concerned about self-harm?, that is the most likely meaning) in her home.  Is there anyone we can talk to about getting this evaluation done?"  She

was scheduled to see the psychiatrist on an unspecified date.  No visit with mental health staff occurred on 4/27/2018 even though the prior note on the chart referenced an appointment for 4/27.  At 9:34 PM the evening of 4/27 there was an emergency medical response to her cell on 4E, she was found hanging in her cell, emergency measures were initiated, but she was pronounced dead at 10:14 PM at the jail.  An Officer includes in a subsequent incident report, "After speaking with her son on 4/26/18 and learning that she will be forced to comply with an inpatient treatment program before charges would be dismissed, Prisoner #11's anxiety seemed to intensify as she told her son that she would go away and that he would never see her again.  This was the last contact Prisoner #11 made on the inmate phone system."

Subsequent to this woman's death, it was discovered she had been on "Suicide Watch" at the Butler County Jail prior to transfer to ACJ on 4/13/2018....  A Deputy explained that "a one-page medical form containing mental health information was sent with the deputy sheriffs who transported the victim to the ACJ.  The Deputy provided me a copy of that form...."  The Warden stated that the ACJ admitted the victim without receiving any medical or mental health paperwork from the Butler Co. Jail."

There are two lessons to be learned from the jail suicide of Prisoner #11.  The first is that communication between agencies and staff of multiple disciplines is a very important component of any effective suicide prevention effort.  Lindsay Hayes, the foremost national expert on suicide behind bars, identifies collaboration between all disciplines and groups of staff as a key prerequisite for any successful suicide prevention program.[49]  The failure of

---

[49] Hayes, L.  (2010).  National Study of Jail Suicides: 20 Years Later, National Center on Institutions and Alternatives.

communication about this woman being previously placed on "Suicide Watch" at the Butler Jail contributed to her eventual demise.  Further, the fact that she did not tell the clinicians conducting the screening and the mental health evaluation at Intake about her recent suicide crisis means she was lying to them, and lying on Intake screening is one more serious risk factor for suicide (in part because a prisoner who lies during Intake cannot be trusted to truthfully say whether she is going to kill herself).

The second lesson is that, while a mental health clinician did a timely mental health evaluation in Intake and decided it was safe for her to be in general population, there was no treatment plan indicating a follow-up appointment to determine how this woman with several serious risk factors for suicide (depression, previous suicide attempt, hospitalizations for mental health issues as well as detox – all very serious risk factors for suicide, as is lying to the clinician doing the screening) was adjusting to being in jail.  No matter how complete or accurate an Intake Assessment is, if there is no follow-up arrangement (typically documented in a Treatment Plan), the assessment is not helpful in preventing suicide.  She was in ACJ for two weeks, wrote several requests for a mental health appointment, and the jail received more than a half dozen phone calls from her children asking that she be seen by mental health on an urgent basis.  She was not seen by mental health again -- in spite of being scheduled to be seen on 4/27, but then not being seen on that date -- before she committed suicide late in the evening of 4/27/2018 or early morning of 4/28.  I am not asked to conduct a psychological autopsy or postmortem review in this case, but the issue that is pertinent to my investigation is that there was a failure on the part of mental health staff to see her for follow-up after Intake assessment, and there was no treatment plan.  Had she been seen by mental health between 4/14 and 4/27/2018, the clinician seeing her could

have registered her mounting anxiety, and the information from her previous hospitalizations and "Suicide Watch" at Butler County could have reached her chart.  If proper procedures had been followed, the clinician conducting the follow-up examination would have taken note that she was lying to the clinician who did the Intake evaluation, she would have been transferred to an acute mental health setting and suicide observation, and her suicide would very likely have been prevented. To my knowledge, there was no effective postmortem review and no changes of policies and practices at ACJ were effected following the tragic death of Prisoner #11.

I requested documentation of postmortem reviews (or psychological autopsies) on all successful suicides at ACJ in recent years, and only two very incomplete files were produced.  This greatly limits my ability to review suicide prevention and crisis intervention practices at ACJ.  But more importantly, it seems to reflect that adequate suicide postmortem reviews are not consistently conducted at ACJ, and therefore the mental health staff and jail administration are not able to discover what may have gone wrong in the treatment and management of individuals who eventually took their own lives, and the opportunity to change policies and practices in the interest of preventing future suicides is lost.  This is very unfortunate, and also reflects a failure to comply with standards in the field requiring postmortem reviews of psychological autopsies that include recommendations on improving suicide prevention and crisis intervention.

ACJ administrators acknowledge they know about standards in the field and know that they are not meeting them.  They know about the large number of prisoners with mental health issues, and they know the number of prescriptions and dosages prescribed at the jail.  They know how many prisoners are placed on suicide watch. They know of the literature regarding solitary

confinement.  And they know they are not meeting the NCCHC standards regarding mental health treatment as well as the use of force and consigning prisoners with mental illness to solitary confinement.

## IV.  CONCLUSIONS

1. Mental Health Treatment at ACJ is shockingly substandard and inadequate.

   a) Staffing at Allegheny County Jail is grossly inadequate, with up to 50% of funded positions in mental health remaining unfilled.  For long periods there are no psychiatrists or psychologists present at the facility.  The number of funded positions for all types of mental health professionals is inadequate, but then the problem is compounded by the large number of unfilled positions.  This is extremely inadequate staffing.  Immediate results of the gross staffing shortage are long waits to see mental health staff, especially a psychiatrist; visits with mental health staff do not occur in a private and confidential setting, but often at cell-front where they can be overheard by other prisoners and custody staff; visits with mental health staff are unacceptably short, typically 5 minutes; there is a lack of follow-up and so forth.

   b) There is a Lack of Adequate Training of Mental Health Staff.  Mental health staff are not trained on mental health topics beyond suicide prevention.  The lack of adequate training leads to mental health staff meeting prisoners without due consideration of confidentiality protection, seeing prisoners too briefly and without adequate follow-up, failing to write proper progress notes and enter treatment plans and upgrades in the medical charts, failing to adequately assess prisoners entering the RHU to see if they can tolerate solitary confinement without decompensating or attempting self-harm or suicide, and failing to provide de-escalation intervention as needed as well as training custody staff on methods of de-escalation.  Training is needed to remedy these and other shortcomings in mental health services at ACJ, as discussed throughout this report.

c) <u>There is a Lack of Adequate Training for Correctional Staff.</u>
Correctional staff have not received any, and still do not receive
sufficient, training to help them identify those with mental health
conditions, how to communicate and interact with those with mental
health conditions, and when or how to refer individuals to mental
health.  Correctional staff also do not receive actual de-escalation
training.  As a result, individuals are inadequately treated or not
treated at all, and instead are punished for requesting mental health
care or for the manifestations of the symptoms of their conditions.

d) <u>The Intake procedure is Inadequate in multiple regards,</u> including
gross variation in the completeness and adequacy of intake
assessments, a lack of adequate follow-up when mental health
problems are uncovered, and a hit-and-miss approach whereby very
many prisoners receive no mental health screening upon admission
to ACJ.

e) <u>Insufficient precautions are taken to ensure privacy and
confidentiality.</u>  Most mental health encounters are conducted at the
cell door, where others can easily overhear conversations.  And
screenings are done in an area where statements also can be easily
overheard.  The lack of privacy and confidentiality impedes care.

f) <u>Absent or Inadequate Treatment Planning.</u>  According to all
standards governing correctional mental health care there must be a
treatment plan on the medical chart for every prisoner receiving
mental health treatment, and treatment plans must be updated
frequently.  There is a hit-and-miss attempt to enter treatment
plans on the charts of prisoners in the units dedicated to mental
health treatment, but for most of the prisoners receiving outpatient
mental health care throughout the jail, especially in the RHUs, there
is very often no treatment plan at all, and no other effective
planning or case management

g) <u>There is Little or No Ongoing Counseling nor Individual or Group
Psychotherapy, and Very Little Effective Case Management</u>.
Standards in Correctional Mental Health require the availability in a
jail of a variety of treatment modalities. Medication prescription
alone without other modalities is inadequate treatment, and there
need to be an array of mental health settings including access to

inpatient psychiatry as needed, stepdown programs, outpatient treatment and so forth.

h) <u>There is a singular emphasis on the part of mental health staff on prisoners who are imminently suicidal.</u>  The little training that is provided to mental health and custody staff is often limited to the recognition of suicide risk.  This means that often, if a prisoner wishes to be seen by mental health staff, he or she must aver imminent suicidality, and this creates tensions between mental health staff and prisoners, for example staff conclude that the prisoner who falsely claims to be suicidal is malingering or manipulating, and then the mental health issue that cries out for attention is not attended to and a lot of prisoners with mental illness are punished.

i) <u>There are large problems in the area of Medication Management.</u>  The prescription of psychotropic medications is, in most cases, not adequate mental health treatment.  There must be psychotherapeutic sessions and rehabilitative programs available for prisoners who require those forms of treatment and rehabilitation.  There is a nearly total absence of such programs at ACJ, and the result is that prisoners with mental illness are prescribed medications and that constitutes the only treatment they receive.  This violates all standards in correctional mental health, which require an array of therapeutic interventions that permit clinicians to create an adequate treatment plan for the various psychiatric problems they uncover in the prisoner population.  Then, there are excessively long waits to see a psychiatrist, encounters with psychiatrists are very brief, often occur at cell-front with no privacy nor confidentiality, and there is inadequate follow-up.  These lacks foster non-adherence on the part of prisoners who really need mental health treatment, but they tell me that mental health staff do not care about them, the medications cause side effects and it takes too long to see a prescriber to adjust the dose or change the regimen, and consequently they have no trust in mental health staff.  Trust in mental health staff, and the evolution of a safe and trusting therapeutic relationship, is the key to fostering adherence to treatment plans in a jail population.  Moreover, there are regular and repeated instances of mismanagement of medication, and no effective system for managing medication and ensuring a consistent

supply and consistent delivery.  The protocol for medication-over-objection must be reviewed and brought up to standards in the field, including consideration of due process.

j.) There is a Lack of Quality Improvement Programs at ACJ.  There are a few committees that presumably attempt to accomplish these functions, but either they have too limited authority (e.g. to enrich staffing or accomplish treatment plans in all medical charts), or there is too little will at ACJ to put in place an adequate mental health treatment program.  The failure of ACJ to ameliorate the issues that were pointed out by the visiting team from the National Commission on Correctional Health Care in 2019 illustrates the problem.  If ACJ cannot effect the remedies strongly recommended by N.C.C.H.C to reduce suicides at the jail, what hope is there for staff that the work they do in peer review and quality assurance will have any effect?  Consequently staff simply stop trying to accomplish meaningful peer review.

2. There is widespread harsh and unreasonable punishment of Individuals with psychiatric disabilities, including excessive force directed selectively at prisoners seeking mental health services.  Brutal "takedowns," tasers, unreasonable restraint and guns that fire blocks (riot guns) are utilized by custody staff to intimidate and harshly punish prisoners with mental illness.  In the absence of adequate mental health treatment, along with severe understaffing and inadequate training, a culture of punishment proliferates and prisoners with SMI are punished harshly with pepper spray, physical restraint and threats of gun fire. Officers are too quick to employ use of force, and too often employ excessive force against prisoners with serious mental illness.  It is as if custody staff, who on average do not know how to manage individuals with mental illness and resulting disabilities, resort to what they do know how to do, and that is to punish harshly for perceived rule infractions.

3. Attempts at "de-escalation" are essentially non existent at ACJ, and although administrators claim they include de-escalation techniques for custody staff in the section of their training on relationships with prisoners, in practice the attempt entirely fails as prisoners universally report they are beaten or tased with no attempt at de-escalation.  There is a recent change in policy whereby, when custody staff encounter a rule-breaking and recalcitrant prisoner who suffers from mental illness

(and 50% to 75% of prisoners at ACJ have a mental health problem), they call in mental health staff to intervene and perform de-escalation. But training materials have not shown evidence of meaningful de-escalation techniques, nor has ACJ leadership shown that it understands that de-escalation is different from and more than merely seeking compliance via oral commands prior to engaging in physical force.  In multiple depositions ACJ staff and leadership have attested that they believe that beginning the use of force continuum with oral commands prior to moving to physical force is de-escalation, when in fact that is literally the definition and trajectory of escalation.  The problem is that officers do not know how to identify rule-breaking that is connected with a prisoner's mental illness, do not know which prisoners have a mental health problem, and are too quick to simply punish the prisoners harshly without attemptin de-escalation or asking mental health staff to help with de-escalation, resulting in all too many instances of excessive force.

4. <u>Solitary Confinement is over-utilized, especially with Prisoners suffering from Mental Illness, and time in solitary confinement is well-known to exacerbate mental illness and worsen disabilities, prognoses and recidivism rates.</u>  Solitary confinement takes many forms including the Restrictive Housing Units, but also includes frequent lockdowns where prisoners are restricted to their cells nearly 24 hours per day. It is quite shocking how much solitary confinement occurs at ACJ, in contravention of Policy #311 which requires ███████████████████████████ ███████████████████████████████, and in contravention of the voter-approved referendum (AC 7908) that was written into the County Code and became effective in December, 2021.  According to that referendum solitary confinement is prohibited at ACJ except in emergencies, and the "restraint chair," chemical agents and leg shackles may no longer be used on those in ACJ's custody. that.

5. <u>Many individuals incarcerated at ACJ have serious mental health needs.</u> These include those diagnosed with schizoaffective disorders, bipolar disorders, various severe personality disorders, major depressive disorder, other mood disorders and a longer list of psychiatric disorders.  In some patients, PTSD and anxiety create serious mental health needs as well. Patients with these needs and conditions face a substantial risk of serious harm if these conditions go untreated.  This harm includes worsening of their conditions or extended duration of their conditions, poorer prognoses, increased risk of being subjected to punishment while at ACJ,

more difficulty adjusting after release from ACJ, increased recidivism rates and a higher incidence of suicide attempts and suicide.

6. <u>The conditions listed in #5., above, qualify as disabilities under both ACJ Policy and community standards</u>.  These conditions involve symptoms that substantially limit major life activities, if not treated.  Without treatment, these individuals are effectively precluded from meaningful participation in ACJ programs and services.  This is especially so when these individuals are punished for requesting help or for manifestation of their psychiatric symptoms.

7. <u>As described above and throughout this report, there are systemic and gross deficiencies in ACJ's mental health care system, evidenced by repeated and widespread occurrences of failure to provide adequate and appropriate care as well as the meting of punishments in place of treatment for serious mental health conditions.</u>  These deficiencies, individually and collectively, effectively deny mental health patients access to the care their conditions require, and fail to provide accommodation for those conditions.

8. <u>Inadequacies in the Mental Health Treatment program, overly harsh punishment and over-utilization of Solitary Confinement cause significant harm to prisoners at ACJ,</u> including exacerbated mental illness, increased disability, an increased incidence of suicide and self-harm, permanent psychiatric injury, and prognoses and recidivism rates much more dire than they would be if adequate mental health treatment were provided at ACJ.

9. <u>The care being provided at ACJ is unreasonable by any measure, given the seriousness of the risks, ACJ's knowledge of the appropriate standards, and their failure to meet those standards.</u>  The unreasonableness and inadequacy of care is obvious.  At the level of staffing that ACJ has maintained for the last several years, adequate care is all but impossible.  The lack of psychotherapy, the delays in seeing patients and the cursory nature of the mental health encounters are all obvious (or at least should be obvious) to jail administration. The numbers of people placed in restricted housing, and the use of force incident rates are tracked, so ACJ must know that it is an outlier.  And Warden Harper testified that he reviews and approves all trainings.

## V. RECOMMENDATIONS

1. <u>Mental Health Services in general</u>.  Comprehensive mental health services must be provided to all prisoners in need at ACJ.  Adequate mental health treatment requires the availability of a trained clinician to develop a trusting relationship with a patient in a setting that permits privacy, where confidentiality is respected so that very personal themes can be explored and worked through.  Adequate mental health treatment requires a variety of treatment modalities, including but not limited to crisis intervention; psychotropic medications as needed; the availability of a certain number of group activities such as group therapy, psycho-educational groups, facilitated socialization or recreational activities, and psychiatric rehabilitation groups that involve psycho-educational programs, training in the skills of daily living and medication compliance; admission to an acute psychiatric hospital as needed; social work outreach to family members as needed; and after-care planning so that the disturbed individual is not returned to the environment that caused a breakdown but rather is provided with the ongoing care and social supports needed to sustain his or her mental health.  Not all of these modalities need to be available in any particular setting, and not all of them need to be utilized with any particular prisoner.  But they need to be available and accessible so that mental health clinicians can create a treatment plan specific to each patient's needs.  There must be more programs and out-of-cell activities for prisoners with serious mental illness, wherever they are housed.  And there must be more congregate activities, sufficiently supervised to insure safety. The NCCHC standards are widely accepted and ACJ should be compelled to adhere to those standards. Sufficient number of qualified staff must be made available to conduct this programming, as to render effective treatment.

2. <u>The option of downsizing the population in ACJ.</u>  Prior to making concrete recommendations for the mental health component of the long list of issues I have raised in this report, I recommend serious consideration of the option of significantly downsizing the jail population. There are many very safe ways to downsize a large urban jail.  Two facts warrant consideration: 1.  The large majority of prisoners have mental health problems, and 2. Approximately the same proportion – 75% - are pre-trial.  These two facts suggest first steps in downsizing an urban jail: 1). Fund community treatment programs as alternatives to jail for a large proportion of arrestees with mental illness or substance abuse problems.  Diversion typically involves transfer of pre-trial

and even sentenced jail prisoners to treatment and recovery programs in the community.  Diversion of individuals with mental illness and substance abuse problems has proven an effective and safe alternative to incarceration in jail. Behavioral Health Courts, or a division within the Sheriff's Department, can facilitate the transfers and administer the diversion.  2). Change the bail arrangements so that a large proportion of the pre-trial individuals in the jail can be released pending trial.  I will not pursue this option further here, but I strongly recommend considering it.  It is far from an "overly-optimistic" scheme to fix what ails an urban jail.  It is actually being tried in Los Angeles County right now. After voting not to build a "mental health jail" when L.A. Men's Central Jail is demolished, the Los Angeles County Board of Supervisors established an Alternatives To Incarceration (ATI) Task Force and are right now strategizing how to convert what were jail-based mental health services to sites in the community outside the jail.[50]  Downsizing the Allegheny County Jail should be one of the options explored in the remedy phase of this matter. In other words, if the population of prisoners were much smaller, and the level of staffing remained the same, then each mental health clinician, on average, would have a smaller caseload and could provide better services – including shorter waiting times, better follow-up, and longer psychotherapy sessions – and the outcomes would be much improved.

3. A robust effort to recruit staff applications, especially in mental health, must occur.  The currently funded staff positions are not adequate to the task of delivering quality mental health treatment at the jail, but then nearly 50% of the currently funding staff positions have gone un-filled over several years. Perhaps increased salaries are needed, perhaps a more energetic recruiting campaign.  Whatever it takes, the current plan of advertising for mental health positions at the jail has not been successful and a much more robust effort must be made.  There must be a plan to understand and prevent the high rate of staff turnover that currently prevails. Under-staffing is not limited to the problem of not hiring enough staff, it also occurs when the number of staff hired do not eclipse the attrition rate.  Former employees have spoken out on reasons for a high attrition rate.[51]  Part of the problem is that qualified and caring mental health professionals, on average, would have little incentive to work in a jail where their contact with patients is limited to cell-front

---

[50] Alternatives to Incarceration (ATI), Los Angeles County
<https://ceo.lacounty.gov/ati/>
[51] <https://www.publicsource.org/former-allegheny-county-jail-medical-mental-health-employees-speak-out/>

interviews, where there are long waits to see a psychiatrist, and where custody staff intimidate and punish prisoners with mental health problems who seek mental health care.  Thus, successful remedies for the many problems identified in this report would have the additional beneficial effect of making mental health staff positions more attractive to able clinicians, and the problem of unfilled positions would be greatly improved.  I would require ACJ to fill at least 90% of positions at all levels, and take whatever steps are necessary to ensure staffing of over 90% of positions, both pre-existing positions and the additional positions described below.

4. Increase the number of funded staff positions.  Currently funded staff positions are insufficient to provide adequate mental health treatment to the large proportion of the population that need mental health treatment.  Besides filling the currently funded positions, especially psychiatrists and independently licensed (Ph.D., M.S.W., Masters in Psychology), there need to be a significantly increased number of funded positions.  I recommend first selecting a percentage of current funded positions, perhaps 25%; expanding the budget for mental health staffing by 25%; putting in place needed remedies to problems like long waiting times to see a mental health clinician or psychiatrist, too brief encounters in settings that do not permit privacy and confidentiality, a lack of individual and group psychotherapy, and too little follow-up; and then re-assessing whether the 25% increase in funded staff positions satisfies the needs, as measured by significantly reduced wait times, more privacy, more individual and group psychotherapies, sessions that are long enough to get the job done, more consistent follow-up, and so forth.

5. Hiring, training and supervising are a package.  The only way to defeat custody and mental health staff insensitivity or cruelty toward prisoners with emotional problems is to hire officers and clinicians who exhibit sensitivity and empathy toward this population (or, inversely, do not hire officers who have a past history of, or proclivity toward, abuse or violence, a first step being a thorough background check to disqualify job candidates with a history of domestic violence, prior abuse of prisoners, etc.), train them adequately about mental illness, suicide, de-escalation, etc., and then supervise them to make certain they do treat prisoners with emotional problems with respect and always try their best to help them with their problems and their treatment.

6. Much more rigorous training for all staff at ACJ is urgently needed, on mental health issues, on use of force and other custody practices with prisoners suffering from mental illness, on de-escalation, and for mental health staff, on

suicide risk and prevention, on the harms of solitary confinement and on the proper conduct of individual and group psychotherapy.  But again, training alone is not an adequate remedy for negligent or bad behavior on the part of jail staff.  Improved training must be combined with improved hiring practices, with an eye toward recruits who are sensitive to the needs of prisoners and invested in helping them stay sane and grow.  And adequate supervision on the job is urgently needed, with zero tolerance for excessive force, stigmatizing prisoners with mental illness, sexual abuse and other abuses. Mental health staff need more training about gender and cultural issues, and treatment for individuals who have experienced trauma.  Sensitivity regarding gender, race, culture and disabilities needs to be enhanced through rigorous training.  Moreover, training about security for mental health staff needs to be upgraded.  In other words, "cross-training" must be expanded, and topics such as cultural competence, stigma towards people suffering from serious mental illness, race relations, childhood trauma, gender relations and so forth should be included in the enhanced training for both mental health staff and security staff.

7. Staff collaboration.  More collaboration is needed between mental health and security staff, so that mental health staff does not simply accept security staff's decisions about discipline, housing, etc., but rather is involved in discussions and these issues are resolved in collaborative fashion.  In this collaborative process, significant weight needs to be given to the prisoner's mental health needs so that the resolution is not simply punitive.

8. Intake.  The Intake mental health screening procedure needs to be improved. There needs to be a mechanism for monitoring how often the Intake screening is adequately accomplished, how well follow-up treatments and actions are accomplished, and how failures of Intake screening – for example suicides occur among prisoners whose mental health needs were missed at intake – are tracked and relevant changes in procedures are instituted to decrease the risk of repeating mistakes.

9. Enhance and Upgrade Treatment Interventions. There is an urgent need to provide more robust treatment at every level of clinical intervention: inpatient, stepdown, and outpatient care.  Multiple modalities of treatment, including individual and group psychotherapy, crisis intervention, case management and so forth must be available so that clinicians who uncover a treatment need in particular patients can recommend the needed treatment and be confident the treatment will be provided.  Treatment must not be limited to

psychotropic medications. There must be psychoeducational programs regarding living with depression or preparing for work readiness after release, and there must be an array of meaningful structured and supervised congregate activities to best prepare prisoners with (and without) mental illness for success upon their release from jail.

10.    Privacy and Confidentiality.   Currently, at ACJ, an unacceptably high proportion of contacts between mental health staff and prisoners occur at cell-front or in a large room occupied by many prisoners and staff, and not in a private office space conducive to privacy and confidentiality.  This represents a violation of professional ethics and the standard of care in the community. It also dissuades prisoners from sharing with mental health staff their emotional difficulties such as thoughts of suicide, and when prisoners do not trust staff sufficiently to share their plans of self-destruction, preventable suicides occur.

11.    Crisis Intervention.  Regarding suicide prevention and treatment, detection and prevention need to begin with prisoners' admission to the jail, and this is not merely a matter of more consistent and thorough Intake Assessment as spelled out in # 8, above.  Early warning signs of suicide risk need to be heeded, and past psychiatry history of self-harm needs to be taken as a serious predictor of future crises.  This means prior mental health records must be sought on an urgent basis whenever a new admittee presents a risk of suicide.  By beginning early to think about which prisoners are likely to pose a risk of suicide in the future, staff can work to alleviate some of the stresses that would make suicide more likely.  For example, with a male prisoner who has attempted suicide in the past when he felt in danger in jail, staff can make efforts to make certain he feels safe and therefore does not need to resort to self-destructive behaviors.  Prisoners at significant risk of suicide and self-harm must not be consigned to solitary confinement (RHU), where the rate of suicide attempts is very high. The conditions of confinement in Observation cells must be improved so that observation is not punitive, mental health staff should have much more input into decisions about searching entering prisoners and the amenities they will be permitted, prisoners who qualify on a security basis must be provided greater amenities and comforts while going through a suicidal crisis, and if a prisoner is in observation for longer than 24 hours (or 48 hours over a weekend), then he or she must be transferred to an inpatient psychiatric ward where more thorough assessment and more intensive mental health services can be provided. Confinement in an observation cell should not include deprivation of recreation and out-of-cell

activities.  In fact, to the extent possible, out-of-cell programming and activities should be encouraged and supported.  Admissions to observation should be tracked and reviewed, both as a measure to identify prisoners at risk and as a quality assurance mechanism.  Any prisoner who is admitted to observation on multiple occasions should be suspected of suffering from a more serious mental illness than was previously assumed, and should be examined more intensively.

12.    Rehabilitation and Education Programs.  Vocational, Educational and other general rehabilitation programs need to be upgraded and maintained so that prisoners with mental illness will have appropriate health-supporting activities and programs available to them as they engage in mental health treatment.  Social interaction is a critical component of mental health treatment, and the availability of general rehabilitation and educational programs in a jail is the best way to provide the types of constructive social interactions that individuals suffering from serious mental illness need.

13.    Record Keeping.  Clinical charts must be upgraded significantly.  Treatment plans and rationales for all interventions should be clearly stated in the clinical chart.  Past records should be requested and entered in the chart.  Medical history and significant medical intervention, including non-psychiatric medications being prescribed, should be reflected in the mental health chart.  History of past traumas should be reflected in the chart.  Psychiatric medications and dosages should be clearly listed in the Progress Notes, and all prescribing and changes of medications should be noted and a clear rationale for same be inserted in the chart.  Clinicians should consistently use Problem Lists.  Clinicians who examine prisoners on an emergency or elective basis should have access to the clinical chart, including past history and treatment regimens, and should rely on same in doing their assessment.  There should be more consistency in the clinical record, for example when a prisoner is discharged from Observation, and recommendations are made as to follow-up treatment, there should be tracking to see if the recommended follow-up treatment has occurred.

14.    Provide Follow-Up as Clinically Indicated.  Treatment plans in every prisoners' chart must outline follow-up needs, and then there must be a mechanism for monitoring whether or not the follow-up that is part of the treatment actually occurs.

15.    Revamp and expand peer review and quality assurance.  This must involve development of performance-based methods for ongoing assessment of each

staff member's performance on such things as treatment plans in charts, timely follow-up and so forth.  Staff reviews (psychological postmortem or suicide review) of suicides should be thoroughly documented and each staff review should include suggestions on revisions of policy and practice designed to minimize repetition of mistakes or ill-conceived clinical interventions that were part of the etiology of the suicide.

16.     Increase the number of psychiatrists at the jail.  There must be sufficient psychiatrists to permit prisoners to see a psychiatrist in timely manner, to have enough time with the psychiatrist to adequately review medication needs and side effects of prescribed medications, and as much as possible prisoners should see the same psychiatrist for follow-up visits.  Psychiatrists play more of a role in mental health treatment in jail than merely prescribing medications. They are the senior clinician on account of their discipline, and should have input into suicide risk assessment, peer review, supervision of and consultation to other mental health professionals, and the development of policies related to mental health treatment.

17.     Revamp Medication Management.  Continuity of medication regimens is extraordinarily important.  This includes provisions that must be made for "Bridge Medications," i.e. when a prisoner entering ACJ reports taking psychotropic medications, those medications must be continued without interruption.  This is typically accomplished by having the individual performing the Intake Mental Health Assessment contact the individual's psychiatrist or the pharmacy in the community to document the ongoing prescription. Involuntary psychiatric medications, or "medication-over-objection" must be guided by well-thought-out policies that provide for adequate procedural mechanisms and due process.   "As needed" or "p.r.n." orders for involuntary medications are not permissible.

18.     Reduce the Waiting Period to be seen by Mental Health staff.  This requirement is related to staffing levels, peer review and other considerations already addressed.  Every effort must be made to guarantee timely access to mental health clinicians including psychiatrists, timely and completed follow-up appointments and so forth.  Performance-based monitoring of wait periods must be performed such that if the wait time to see the psychiatrist or other mental health professionals becomes unacceptably long, mental health administration will learn of the problem and be in a position to remedy it.

19.     <u>Decrease Use of Force with all prisoners, but especially prisoners suffering from mental illness.</u>  There should be no punishment for behaviors that are clearly driven by psychiatric illness, for example, actions taken by prisoners at the behest of command hallucinations, or self-destructive acts (whether they be suicidal in intent or serve some other emotional purpose such as the relief of anxiety) on the part of depressed and suicidal prisoners.  All incidents of use of force involving prisoners with mental illness must be reviewed by mental health staff as soon as possible.  Where possible, mental health staff should be contacted prior to planned use of force on prisoners with mental illness, and should intervene pre-emptively for the purpose of de-escalation and to see if they can help the prisoner change his or her behavior so that use of force will not be necessary.

20.     <u>Develop very robust De-escalation Procedures that Reduce the Need for Use of Force,</u> and closely monitor and supervise use of force on the part of custody staff.  Training on de-escalation for custody and mental health staff must be part of this effort.  The training must be conducted by a consulting recognized expert on de-escalation.

21.     <u>Improve the grievance procedure.</u>  Grievance forms must be readily available to prisoners and they must have reason to be confident their grievances will be honored and considered objectively.  There must by an independent official who considers grievances, and usually this involves a confidential box in each unit of the jail where prisoners can deposit grievances and custody staff will not see the grievance, and an ombudsman or other official who does not play a custodial role at the jail considers the grievance, conducts hearings and so forth.

22.     <u>Assign Dedicated custody staff to units with a significant number of prisoners with mental illness.</u>  To the extent possible, all custody staff should be trained to interact with prisoners who suffer from mental illness.  But in a jail like ACJ, where 75% of prisoners suffer from mental illness and entire units are designated as mental health treatment units, including 5C, 5D, and 5MD, custody staff working on the mental health treatment units should be "dedicated," in the sense that they bid for jobs on those units, receive special training on working with prisoners with mental illness, and are recognized among the custody staff as being authorized to work on mental health treatment units.

23.    <u>End Solitary Confinement at the Allegheny County Jail.</u>  Consignment to solitary confinement must be discontinued for all prisoners, as required by the "Prohibit Solitary Confinement Initiative" that voters passed, banning solitary confinement or confinement in a cell for more than 20 hours per day. Creating in the RHU a very unattractive recreation enclosure with no recreation equipment and nowhere to sit is not an acceptable response to the passage of the referendum and the resulting changes in the County Code. Overreliance on lockdowns must also end, since lockdowns constitute *de facto* solitary confinement.  At least four hours of meaningful and productive congregate activities must be provided for all prisoners, including those who would have been subjected to solitary confinement prior to passage of the referendum.  The prohibition of solitary confinement for prisoners with serious mental illness, with a few rare and time-limited exceptions where there is an imminent and serious security risk, was already included in Policy #311, "Reasonable Accommodations for Inmates with Qualified Disabilities," prior to the passage of the referendum barring solitary confinement for all prisoners. Policy #311 requires the provision of reasonable accommodations, including housing arrangements, for prisoners at ACJ with "a physical or mental impairment that substantially limits one or more of an individual's life activities." Clearly Policy #311 should cover prisoners in ACJ with significant psychiatric disability.  Therefore, the exclusion of prisoners with serious mental illness from solitary confinement, including but not limited to consignment to RHU, qualified as a required accommodation for their disability under Policy #311.

Cook County (Illinois) Jail and Rikers Island (NYC) have ended the practice of solitary confinement in jail, and the Colorado Dept. of Corrections has ended the use of solitary confinement throughout the state prison system.  Rick Raemisch, the retired Exec. Dir. Of the Colorado Department of Corrections, who designed and administered the ending of solitary confinement in Colorado's prisons, is available as a consultant through Falcon, Inc., a consultation and management firm, to correctional facilities desiring to reduce or end the use of solitary confinement <https://www.falconinc.com/leadership/rick-raemisch/>, and I recommend consulting him about what it would take to reduce or end the use of solitary confinement at ACJ.  Meaningful structured (staff-facilitated) and unstructured (including recreation, free time in the common area, etc.) for four or more hours per day must be effected immediately.  In order to greatly reduce or end the practice of solitary confinement, alternative programs need to be established to help prisoners spend their time in jail peacefully, without

running afoul of rules, and accrue skills that will help them succeed in the community once they are released. The programs that provide a successful alternative to solitary confinement are, to a significant extent, the same programs that are needed to improve the quality of mental health treatment at ACJ, including individual and group counseling/psychotherapy and rehabilitation programs that teach work and human relationship skills.

24.  There must be an end to the culture of punishment that currently prevails at ACJ. There must be a culture change such that the custody staff breaks free of an overly punitive culture of punishment. This requires attention to hiring practices, training and supervision of custody staff, and significantly, leadership.

**The Mission of the Allegheny Bureau of Corrections is "To protect the citizens of Allegheny County from criminal offenders through a collaborative system of incarceration, which securely segregates offenders from society, assures offenders of their constitutional rights, and maintains diagnostic, rehabilitative treatment program to enhance the success of offenders' reintegration into society."** Sadly, I have to conclude this report with the overall assessment that the ACJ fails in its mission, the mental health treatment program and rehabilitation programs are not at all adequate, and the inadequacies of the mental health treatment and rehabilitation programs lead to the overutilization of use of force and solitary confinement, which in turn diminishes rather than enhances "the success of offenders' reintegration into society." I have outlined the remedies that must be effected so that Allegheny County Jail can proudly proclaim it is fulfilling its very admirable mission statement.

I reserve the right to supplement or amend this report upon receipt of additional information.

Respectfully submitted,

*Terry A. Kupers*  Date Feb. 13, 2023
Terry A. Kupers, M.D., M.S.P.

# Curriculum Vitae

# Terry Allen Kupers, M.D., M.S.P.

Office Address:
*484 Lake Park Ave, #338*, *Oakland, California 94610*
phone: 510-654-8333      email: kupers@igc.org

Institute Professor, Emeritus, Graduate School of Psychology,
     The Wright Institute
       2728 Durant Avenue, Berkeley, California 94704

Born:  October 14, 1943, Philadelphia, Pennsylvania

## Education:

B.A., With Distinction, Psychology Major, Stanford University, 1964
M.D., U.C.L.A. School of Medicine, 1968
M.S.P. (Masters in Social Psychiatry), U.C.L.A., 1974

## Training:

Intern (Mixed Medicine/ Pediatrics/ Surgery), Kings County Hospital/Downstate Medical
     Center, Brooklyn, New York, 1968-1969.
Resident in Psychiatry, U.C.L.A. Neuropsychiatric Institute, Los Angeles, 1969-
     1972
Registrar in Psychiatry, Tavistock Institute, London (Elective Year of U.C.L.A.
     Residency) 1971-1972
Fellow in Social and Community Psychiatry, U.C.L.A. Neuropsychiatric Institute, 1972-
     1974

License: California, Physicians & Surgeons, #A23440, 1968-

Certification: American Board of Psychiatry and Neurology (Psychiatry, #13387), 1974-

## Honors:

Alpha Omega Alpha, U.C.L.A. School of Medicine,1968.
Distinguished Life Fellow, American Psychiatric Association
Listed: Who's Who Among Human Services  Professionals (1995-); Who's Who in
     California (1995-);  Who's Who in The United States  (1997-);  Who's Who in
     America (1998-); International Who's Who in  Medicine (1995-);  Who's Who in
     Medicine and Healthcare (1997-);  The National Registry of Who's Who (2000-);
     Strathmore's Millenial Edition, Who's Who; American Biographical Institute's
     International Directory of Distinguished Leadership; Marquis' Who's Who in the

World (2004-); Marquis' Who's Who in Science and Engineering, (2006-); Who's Who Among American Teachers & Educators (2007-); The Global Directory of Who's Who (2012-); International Association of Healthcare Professionals' The Leading Physicians (2012-).

Helen Margulies Mehr Award, Division of Public Interest (VII), California Psychological Association, Affiliate of American Psychological Association, March 30, 2001.

Stephen Donaldson Award, Stop Prisoner Rape (Just Detention, Int'l), 2002.

Exemplary Psychiatrist Award, National Alliance for the Mentally Ill, 2005

William Rossiter Award for "global contributions made to the field of forensic mental health," Annual Meeting, Forensic Mental Health Association of California, March 18,2009, Monterey, California

Albert Nelson Marquis Lifetime Achievement Award, Marquis Who's Who, 2018-

Gloria Huntley Award, National Alliance on Mental Illness (NAMI), presented at annual NAMI meeting in Atlanta via video, July 15, 2020

## Clinical Practice:

Los Angeles County, SouthEast Mental Health Center, Staff Psychiatrist,  1972-1974

Martin Luther King, Jr. Hospital, Department of Psychiatry, Los Angeles; Staff Psychiatrist and Co-Director, Outpatient Department, 1974-1977.

Contra Costa County, Richmond Community Mental Health Center, Staff Psychiatrist and Co-Director, Partial Hospital, 1977-1981

Private Practice of Psychiatry, Los Angeles and Oakland, 1972 until retirement in 2017

## Teaching:

Assistant Professor, Department of Psychiatry and Human Behavior, Charles Drew Postgraduate Medical School, Los Angeles,  and Assistant Director, Psychiatry Residency Education, 1974-1977.

Institute Professor, Graduate School of Psychology, The Wright Institute, Berkeley, 1981 to present

Courses Taught at: U.C.L.A. Social Science Extension, California School of Professional Psychology (Los Angeles), Goddard Graduate School (Los Angeles), Antioch-West (Los Angeles), New College Graduate School of Psychology (San Francisco).

## Professional Organizations:

American Psychiatric Association (Distinguished Life Fellow); Northern California Psychiatric Society; East Bay Psychiatric Association (President, 1998-1999); American Orthopsychiatric Association (Fellow); American Association of Community Psychiatrists; Physicians for Social Responsibility; American Academy of Psychiatry and the Law.

## Committees and Offices:

Task Force on the Study of Violence, Southern  California Psychiatric Society, 1974-
      1975
Task Force on Psychosurgery, American Orthopsychiatric Association, 1975-1976
California Department of Health Task Force to write "Health Standards for Local
      Detention Facilities," 1976-77
Prison/ Forensic Committee, Northern California Psychiatric Society,  1976-1981;
      1994-
Psychiatry Credentials Committee, Alta Bates Medical Center, Berkeley, 1989-1994
      (Chair, Subcommittee to Credential Licensed Clinical Social Workers)
President, East Bay Chapter of Northern California Psychiatric Society, 1998-1999
Co-Chair, Committee on Persons with Mental Illness Behind Bars of the American
      Association of Community Psychiatrists, 1998-2003

Consultant/Staff Trainer:
Contra Costa County Mental Health Services; Contra Costa County Merrithew
      Memorial Hospital Nursing Service; Bay Area Community Services, Oakland;
      Progress Foundation, San Francisco; Operation Concern, San Francisco; Marin
      County Mental Health Services; Berkeley Psychotherapy Institute; Berkeley
      Mental Health Clinic; Oregon Department of Mental Health; Kaiser Permanente
      Departments of Psychiatry in Oakland, San Rafael, Martinez and Walnut Creek;
      Human Rights Watch, San Francisco Connections collaboration (Jail Psychiatric
      Services, Court Pre-Trial Diversion, CJCJ  and Progress Foundation); Contra
      County Sheriff's Department Jail Mental Health Program.

      Consultant to Protection & Advocacy, Inc. (Disability Rights), re Review of State
      Hospital Suicides

      National Advisory Panel, The Equitas Project, Denver, CO


## Forensic Psychiatry (partial list):

Testimony in Madrigal v. Quilligan, U.S. District  Court, Los Angeles, regarding
      informed consent  for surgical sterilization, 1977
Testimony in Rutherford v. Pitchess, Los Angeles Superior Court, regarding conditions
      and mental health services in Los Angeles County Jail, 1977
Testimony in Hudler v. Duffy, San Diego County Superior Court, regarding conditions
      and mental health services in San Diego County Jail, 1979
Testimony in Branson v. Winter, Santa Clara County Superior Court, regarding
      conditions and mental health services in Santa Clara County Jail, 1981
Testimony in Youngblood v. Gates, Los Angeles Superior Court, regarding conditions
      and mental health services in Los Angeles Police Department Jail, 1982
Testimony in Miller v. Howenstein, Marin County Superior Court, regarding conditions
      and mental health services in Marin County Jail, 1982
Testimony in Fischer v. Geary, Santa Clara County Superior Court, regarding
      conditions and mental health services in Santa Clara County Women's

Detention Facility, 1982

Testimony in Wilson v. Deukmejian, Marin County Sup Court, regarding conditions and mental health services at San Quentin Prison, 1983

Testimony in Toussaint/Wright/Thompson v. Enomoto, Federal District Court in San Francisco, regarding conditions and double-celling in California State Prison security housing units, 1983

Consultant, United States Department of Justice, Civil Rights Division, regarding conditions and mental health services in Michigan State Prisons, 1983-4

Testimony in Arreguin vs. Gates, Federal District Court, Orange County, regarding "Rubber Rooms" in Orange County Jail, 1988

Testimony in Gates v Deukmejian, in Federal Court in Sacramento, regarding conditions, quality of mental health services and segregation of inmates with HIV positivity or AIDS at California Medical Facility at Vacaville, 1989

Testimony in Coleman v. Wilson, Federal Court in Sacramento, regarding the quality of mental health services in the California Department of Corrections' statewide prison system, 1993

Testimony in Cain v. Michigan Department of Corrections, Michigan Court of Claims, regarding the effects on prisoners of a proposed policy regarding possessions, uniforms and classification, 1998

Testimony in Bazetta v. McGinnis, Federal Court in Detroit, regarding visiting policy and restriction of visits for substance abuse infractions, 2000

Testimony in Everson v. Michigan Department of Corrections, Federal Court in Detroit, regarding cross-gender staffing in prison housing units, 2001

Testimony in Jones 'El v. Litscher, Federal Court in Madison, Wisconsin, regarding confinement of prisoners suffering from severe  mental  illness in supermax, 2002

Testimony in Russell v. Johnson, Federal Court in Oxford, Mississippi, regarding conditions of confinement and treatment prisoners with mental illness on Death Row at Parchman, 2003

Testimony in Austin v. Wilkinson, Federal Court in Cleveland, Ohio, regarding proposed transfer of Death Row into Ohio State Penitentiary (supermax), August, 2005

Testimony in Roderick Johnson v. Richard Watham, Federal Court in Wichita Falls, Texas, regarding staff responsibility in case of prison rape, September, 2005

Testimony in Presley v. Epps, No. 4:05CV148-JAD, N.D., Oxford, Mississippi, 2005 & 2007, involving consitions in Supermax Unit 32 at Mississippi State Penitentiary and Treatment of Prisoners with Serious Mental Illness.

Testimony in DAI, Inc. v. NYOMH, Federal Court, So. Dist. NY, April 3, 2006,  regarding mental health care in NY Dept. of Correctional Services

Testimony in Neal v. Michigan DOC, State of Michigan, Circuit Court for the County of Washtenaw, January 30, 2008, File No. 96-6986-CZ, regarding custodial misconduct & sexual abuse of women prisoners

Testimony in Hadix v. Caruso, No. 4:92-cv-110, USDistCt, WDistMichiganTestimony, USDistCt, WDistMichigan, Grand Rapids, Michigan, regarding mental health care in prison, April 29, 2008

Testimony in John Doe v. Michigan D.O.C., Detroit, 2014.

Testimony in A.B. v. WA State Dept Soc'l & Health Services, USDistCtWDistWA, No. 14-cv-011 78-MJP, Seattle, March 17, 2015, regarding Competency Evaluations and Competency Restoration Treatment

Testimony (deposition) in Ashker v. Governor of California, USDistCtNoDistCA, Oakland, No. C 09-05796 CW, 2015, regarding confinement in excess of 10 years in Security Housing Unit at Pelican Bay State Prison.

Testimony in Dockery v. Hall, USDistCtSoDistMississippi, Jackson, No. 3:13CV326WHB-JCG, March 14-15, 2018, regarding psychiatric effects of conditions in solitary confinement Unit at Eastern Mississippi Correctional Facility.

Testimony (deposition) in John Doe et al. v. Michigan DOC, et al., Washtenaw County (MI) Circuit Court, Case Nos. 13-1196-CZ and 15-1006-CZ, August 7 & 8, 2019, Oakland, CA, regarding the situation of minors sentenced as adults to the Michigan D.O.C.

Testimony in Michael Hall (SC212933) et.al. & In Re Von Staich (SC212566), Sup. Ct., Co. of Marin, May 27, 2021. Case No. SC212933, et al, Case No. SC213244, et al., Case No. SC213534, et al.  Regarding COVID-19 and response by CDCR at San Quentin Prison.


## Journal Editorial Positions:

Men and Masculinities, Editorial Advisory Panel (in the past)
Juvenile Correctional Mental Health Report, Editorial Board (in the past)
Correctional Mental Health Report, Contributing Editor (current)


## Presentations and Lectures (partial list):

"Expert Testimony on Jail and Prison Conditions." American Orthopsychiatric Association Annual Meeting, San Francisco, March 30, 1988,  Panel 137: "How Expert are the Clinical Experts?

"The Termination of Psychotherapy." Psychiatry Department Grand Rounds, Mills/Peninsula Hospitals, Burlingame, February 24, 1989.

"Big Ideas, and Little Ones."  American Psychiatric Association Annual Meeting, San Francisco, April, 1989.

"Men in Psychotherapy." Psychiatry Department Grand Rounds, Mills/Peninsula Hospitals, Burlingame, September 29, 1989.

"Psychodynamic Principles and Residency Training in Psychiatry." The Hilton Head Conference, Hilton Head Island, South Carolina, March 15, 1991.

Panelist:  "The Mentally Ill in Jails and Prisons," California Bar Association Annual Meeting, Annaheim, 1991.

"The State of the Sexes: One Man's Viewpoint."  The Commonwealth Club of California, San Mateo, March 25, 1992.

Keynote Address:  "Feminism and the Family."  17th National Conference on Men and Masculinity, Chicago, July 10, 1992.

Panel Chair and Contributor: "Burnout in Public Mental Health Workers." Annual
    Meeting of the American Orthopsychiatric Association, San Francisco, May 22,
    1993.
Panel Chair and Contributor:  "Socioeconomic Class and Mental Illness." Annual
    Meeting of the American Psychiatric Association, San Francisco, May 26, 1993.
"Public Mental Health."  National Council of Community Mental Health Centers Training
    Conference, San Francisco, June 12, 1993.
Psychiatry Department Grand Rounds:  "Men's Issues in Psychotherapy." California
    Pacific Medical Center, San Francisco, February 24, 1993.
"The Effect of the Therapist's Gender on Male Clients in Couples and Family
    Therapy."  Lecture at Center for Psychological Studies, Albany, California, April
    15, 1994.
"Pathological Arrhythmicity and Other Male Foibles." Psychiatry Department Grand
    Rounds, Alta Bates Medical Center, June 7, 1993.
Roger Owens Memorial Lecture.  "Prisons and Mental Illness."  Department
    of          Psychiatry, Alta Bates Medical Center, March 6, 1995.
Keynote Address:  "Understanding Our Audience: How People Identify with
    Movements and Organizations."   Annual Conference of the Western Labor
    Communications Association, San Francisco, April 24, 1998.
"Men in Groups and Other Intimacies."  44th Annual Group Therapy Symposium,
    University of California at San Francisco, November 6, 1998.
"Men in Prison."  Keynote, 24th Annual Conference on Men and Masculinity,
    Pasadena, July 10, 1999.
"Trauma and Posttraumatic Stress Disorder in Prisoners" and "Prospects for Mental
    Health Treatment in Punitive Segregation."  Staff Training Sessions at New York
    State Department of Mental Health, Corrections Division, at Albany, August 23,
    1999, and at Central New York Psychiatric Institution at Utica, August 24.
"The Mental Health Crisis Behind Bars."  Keynote, Missouri Association for Social
    Welfare Annual Conference, Columbia, Missouri, September 24, 1999.
"The Mental Health Crisis Behind Bars."  Keynote, Annual Conference of the
    Association of Community Living Agencies in Mental Health of New York State,
    Bolton Landing, NY, November 4, 1999.
"Racial and Cultural Differences in Perception Regarding the Criminal Justice
    Population."  Statewide Cultural Competence and Mental Health Summit VII,
    Oakland, CA, December 1, 1999.
"The Criminalization of the Mentally Ill," 19th Annual Edward V. Sparer Symposium,
    University of Pennsylvania Law School, Philadelphia, April 7, 2000.
"Mentally Ill Prisoners."  Keynote, California Criminal Justice Consortium Annual
    Symposium, San Francisco, June 3, 2000.
"Prison Madness/Prison Masculinities," address at the Michigan Prisoner Art Exhibit,
    Ann Arbor, February 16, 2001.
"The Mental Health Crisis Behind Bars," Keynote Address,  Forensic Mental Health
    Association of California, Asilomar, March 21, 2001.
"Madness & The Forensic Hospital," grand rounds, Napa State Hospital, 11/30/01.
Commencement Address, The Wright Institute Graduate School of  Psychology, June
    2, 2002.

"Mental Illness & Prisons: A Toxic Combination," Keynote Address, Wisconsin Promising Practices Conference,  Milwaukee, 1/16/02.

"The Buck Stops Here: Why & How to Provide Adequate Services to Clients Active in the Criminal Justice System,"  Annual Conference of the California Association of Social Rehabilitation Agencies, Walnut Creek, California, 5/2/02.

Keynote Address, "Mental Illness in Prison," International Association of Forensic Psychotherapists, Dublin, Ireland, May 20, 2005

Invited Testimony (written) at the Vera Institute of Justice, Commission on Safety and Abuse in America's Prisons, Newark, NJ, July 19, 2005

Invited Testimony at the National Prison Rape Elimination Commission hearing in San Francisco, August 19, 2005

Lecture, Prisoners with Serious Mental Illness: Their Plight, Treatment and Prognosis," American Psychiatric Association Institute on Psychiatric Services, San Diego, October 7, 2005

Grand Rounds, "The Disturbed/Disruptive Patient in the State Psychiatric Hospital," Napa State Hospital, June 26, 2007

Lecture, "Our Drug Laws Have Failed, Especially for Dually Diagnosed Individuals," 19th Annual Conference, California Psychiatric Association, Huntington Beach, CA, October 6, 2007

Panel: "Mental Health Care and Classification," Prison Litigation Conference, George Washington University Law School, Washington, D.C., March 28, 2008.

Keynote Address: "Winning at Rehabilitation," Annual Meeting of the Forensic Mental Health Association of California, Monterey, California, March 18, 2009

Panel: "Construction of Masculinity and Male Sexuality in Prison," UCLA Women's Law Journal Symposium, Los Angeles, April 10, 2009

Panel:  "Solitary Confinement in America's Prisons," Shaking the Foundations Conference, Stanford Law School, October 17, 2009.

Commencement Address, San Francisco Behavioral Health Court Graduation Ceremony, October 21, 2009.

Panel:  "Negotiating Settlements of Systemic Prison Suits," Training & Advocacy Support Center, Protection & Advocacy Annual Conference, Los Angeles, June 8, 2010.

Grand Rounds, "Recidivism or Rehabilitation in Prison?," Alta Bates Summit Medical Center, November 1, 2010

Keynote Address: "Prison Culture & Mental Illness: a Bad Mix," University of Maryland Department of Psychiatry Cultural Diversity Day, Baltimore, Maryland, March 24, 2011.

Grand Rounds, "The Role of Misogyny & Homophobia in Prison Sexual Abuse," Alta Bates Summit Medical Center, October 17, 2011

Special Guest, "Offering Hope and Fostering Respect in Jail and Prison," 2011 ZIA Partners UnConvention, Asilomar Conference Center, October 24, 2011.

Invited Lecture, "Suicide Behind Bars: The Forgotten Epidemic," 2011 Institute on Psychiatric Services, American Psychiatric Association, San Francisco, October 28, 2011.

Lecture: "How Can We Help Persons with Mental Illness in the Criminal Justice System?," Solano County Re-entry Council, Fairfield, CA, January 15, 2012.

Lecture:  "The Prison System in the U.S.A.: Recent History and Development, Structure, Special Issues," Conference of the American Bar Association Rule of Law Initiative, Cross-National Collaboration: Protecting prisoners in the US and Russia, Moscow, Russia, January 20, 2012.

Continuing Medical Education (CME) Presentation: "Correctional Psychiatry Overview," The Center for Public Service Psychiatry of Western Psychiatric Institute and Clinic (co-sponsored by the American Association of Community Psychiatrists), national videoconference originating in Pittsburg, PA, February 2, 2012.

Grand Rounds, "Mental Health Implications of the Occupy Movement," Alta Bates Summit Medical Center, October 8, 2012

Invited Speaker: "Solitary Confinement: Medical and Psychiatric Consequences," Session: Multi-Year Solitary Confinement in California and the Prisoner Hunger Strikes of 2011-2012, American Public Health Association Annual Meeting, Moscone Convention Center, San Francisco, October 29, 2012.

Keynote Address:  "Solitary Confinement and Mental Health," Conference of the Midwest Coalition for Human Rights, Northeastern Illinois University, Chicago, November 9, 2012.

Symposium Presentation: "The Experience of Individuals with Mental Illness in the Criminal Justice System," American Psychiatric Association Annual Meeting, Moscone Center, San Francisco, May 20, 2013.

Presentation:  Incarceration and Racial Inequality in the U.S., Roundtable on the Role of Race and Ethnicity Among Persons Who Were Formerly Incarcerated, California Institute for Mental Health, Sacramento, California, February 28, 2014.

Testimony at Nevada Advisory Commission on the Administration of Justice on Isolated Confinement, Las Vegas, Nevada, March 5, 2014.

Lecture, "The Death Penalty and Mental Health," General Assembly of the World Coalition Against the Death Penalty, San Juan, Puerto Rico, June 21, 2014.

Staff Training: "Ethical Care in Managing and Treating the Disturbed/Disruptive Patient," Napa State Hospital, October 2, 2014.

Lecture: "The Multiple Traumas of Youth in Detention," American Psychiatric Association Institute on Psychiatric Services, San Francisco, November 1, 2014.

Guest Expert: Community Psychiatry Forum: "The Social, Economic and Political Impact of Incarceration."; The Center for Public Service Psychiatry at the University of Pittsburg, and the American Association of Community Psychiatrists, video-conference from Pittsburg, March 12, 2015.

Lecture: "The Struggles of People with Mental Illness in Jails," The Mental Health Board of San Francisco, San Francisco Department of Public Health, September 16, 2015.

Lecture: "A Psychoanalytic Response to the Effects of Forced Isolation in the Age of Mass Incarceration," Northern California Society for Psychoanalytic Psychology, Scientific Meeting, San Francisco, April 2, 2016.

Panel: "Mental Health, Neuroscience and the Physical Environment," Academy of Neuroscience for Architecture Conference, September 23, 2016, Salk Institute, University of California at San Diego.

Paper presentation: "Gender and Domination in Prison," Law Review Symposium on

Gender and Incarceration, Western New England School of Law, Springfield, MA, October 14, 2016.

Presentation, " Working with Experts: An Expert and Lawyer Conversation," with Rachel Higgins, New Mexico Criminal Defense Lawyers' Association, Solitary Confinement & Prisoner Civil Rights, Albuquerque, New Mexico, May 5, 2017.

Keynote Address: "Corrections, Solitary Confinement and Prisoner Mental Health," Conference on Supporting Prisoner Mental Health, Vancouver, British Columbia, June 2, 2017.

Webinar, "The Humane Imperative: Ending Solitary Confinement.  SAMHSA & NAMI, July 27,2017.

Lecture, "Masculinity Behind Bars: Violence on the Yards, Terror in Isolation," Center for the Study of Men and Masculinities, SUNY Stony Brook, delivered at Fordham University, Manhattan, October 24, 2017.

Lecture and Panel, "Solitary Confinement," Georgetown University, January 16, 2018

Participant, "National Summit on Mental Health & Criminal Justice Law & Policy," sponsored by the Equitas Project at Georgetown University, Washington, D.C., Jan. 17-18, 2018.

Featured Speaker, "Mental Illness and the Criminal Justice System," NAMI (National Alliance on Mental Illness), Contra Costa County, Feb 21, 2019

Presentation, "The Harm of Solitary Confinement," Washington State House Of Representatives, Public Safety Committee (by video), March 5, 2019.

Panel: "Solitary Confinement," University of California Human Rights Law Student Association and National Lawyers' Guild, University of California School of Law, Boalt Hall, Berkeley, March 5, 2019.

Panel: "Knowledge and Power: Contending with Science in Psychiatry," annual meeting of the American Psychiatric Association, San Francisco, May 19, 2019.

Panel: "Psychologists and Mass Incarceration," Healing Justice: Ending Mass Incarceration Conference, The Wright Institute, Berkeley, November 2, 2019.

Panel: "COVID-19 AND INCARCERATION: Mental Health Implications."  UCLA Center for Social Medicine, Zoom Conference, April 18, 2020.

Panel: Solitary Confinement in Queensland, and University of Queensland Law School, Australia, May, 2020, video available at <https://law.uq.edu.au/research/human-rights/solitary-confinement-panel>

Panel: Solitary Confinement: A Public Health Hazard, The Louisiana Stop Solitary Coalition, New Orleans via video, July 15, 2020

Panel: Open MI Door: Ending Segregation in the State of Michigan, Lansing via video https://www.facebook.com/MICitizensforPrisonReform/videos/384069609652610/

Presentation: "The Decimation of Life Skills and the SHU Post-Release Syndrome," International Symposium on Solitary Confinement, Thomas Jefferson University, Philadelphia, PA (virtual), November 5, 2020.

Panel Moderator & Panelist, "Mass Incarceration in the Pandemic: Health Care Inside & Out," UCLA Center for Social Medicine & UCLA Law COVID-19 Behind Bars Data Project, Los Angeles (virtual), May 8, 2021.

Presentation, "Correctional Psychiatry," The Center for Public Service Psychiatry of
Western Psychiatric Institute and Clinic, Pittsburg, PA via video, October 21,
2021.
Panelist, "Solitary Confinement: Peers Leading a Path Towards Elimination," Annual
Conference of the National Association of Peer Supporters, October 21, 2021.
Panelist, "From Baraga to Brazil: A Historic Conversation on Solitary Confinement,"
Human Rights Watch, HaltSolitary, Open MI Door & Unlock the Box, November
11, 2021, Detroit MI via video.
Participant, Roundtable: "Shifting the Approach: Alternatives to Solitary Confinement
for People Suffering From Mental Illness in Prison," from Tel Aviv, Israel via
Zoom, January 10, 2022
Panelist, "How Mental Health Information Can Be Used in Resentencing and in
Challenging Conditions of Confinement," at Denver virtual conference, Mental
Health, Resentencing, and Challenging Conditions of Confinement, April 26,
2022, Sponsored by Equitas Project and Eighth Amendment Project
Panelist, "Securing Mental Health Treatment for People in Custody," Prison Law and
Advocacy Conference, Northwestern School of Law, May 21, 2022.
Panelist, "Litigation Efforts to End Solitary," Symposium to End Solitary Confinement,
Costa Mesa, California, July 17, 2022.


## Books Published:

Public Therapy: The Practice of Psychotherapy in the Public Mental Health Clinic.  New
York:  Free Press/ MacMillan, 1981.  Re-published as e-Book, 2015, at
<http://www.freepsychotherapybooks.org/product/208-public-therapy-the-
practice-of-psychotherapy-in-the-public-mental-health-clinic/category_pathway-
14>
Ending Therapy: The Meaning of Termination.   New York: New York University Press,
1988. Re-published as e-Book, 2014, at
<http://freepsychotherapybooks.org/product/118-ending-therapy-the-meaning-
of-termination>
(Editor):  Using Psychodynamic Principles in Public Mental Health.    New Directions
for Mental Health Services, vol. 46.  San Francisco: Jossey-Bass, 1990.
La Conclusione della Terapia: Problemi, metodi, conseguenze.  Rome: Casa Editrice
Astrolabio, 1992. (trans. of Ending Therapy.)
Revisioning Men's Lives: Gender, Intimacy and Power.  New York: Guilford
Publications, 1993.  (trans. into Chinese, 2000; re-published as e-Book, 2014, at
< https://www.freepsychotherapybooks.org/ebook/revisioning-mens-lives-
gender-intimacy-and-power/>
Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About
It.  San Francisco: Jossey-Bass/Wiley, 1999.
(Co-Editor & contributor): Prison Masculinities.  Philadelphia: Temple University Press,
2001.
Solitary: The Inside Story of Supermax Isolation and How We Can Abolish It.
Berkeley, CA: University of California Press, 2017.

## Other Publications:

"The Depression of Tuberculin Delayed Hypersensitivity by Live Attenuated Mumps Virus," Journal of Pediatrics, 1970, 76, 716-721.

Editor and Contributor, An Ecological Approach to Resident Education in Psychiatry, the product of an NIMH Grant to the Department of Psychiatry and Human Behavior, Drew Medical School, 1973.

"Contact Between the Bars  -  A Rationale for Consultation in Prisons," Urban Health, Vol. 5, No. 1, February, 1976.

"Schizophrenia and History,"  Free Associations, No. 5, 1986, 79-89.

"The Dual Potential of Brief Psychotherapy,"  Free Associations, No. 6, 1986, pp. 80-99.

"Big Ideas, and Little Ones,"  Guest Editorial in Community Mental Health Journal, 1990, 26:3, 217-220.

"Feminist Men," Tikkun, July/August, 1990.

"Pathological Arrhythmicity in Men," Tikkun, March/April, 1991.

"The Public Therapist's Burnout and Its Effect on the Chronic Mental Patient." The Psychiatric Times, 9,2, February, 1992.

"The State of the Sexes: One Man's Viewpoint,"  The Commonwealth, 86,16, April, 1992.

"Schoolyard Fights." In Franklin Abbott, Ed., Boyhood.  Freedom, California: Crossing Press, 1993; Univeristy of Wisconsin Press, 1998.

"Menfriends."  Tikkun,  March/April, 1993

"Psychotherapy, Neutrality and the Role of Activism."  Community Mental Health Journal,1993.

"Review: Treating the Poor by Mathew Dumont."  Community Mental Health Journal, 30(3),1994, 309-310.

"The Gender of the Therapist and the Male Client's Capacity to Fill Emotional Space."  Voices, 30(3), 1994, 57-62.

"Soft Males and Mama's Boys: A Critique of Bly."  In Michael Kimmel, Ed., The Politics of Manhood: Profeminist Men Respond to the Mythopoetic Men's Movement (And Mythopoetic Leaders Respond).  Philadelphia: Temple University Press, 1995.

"Gender Bias, Countertransference and Couples Therapy."  Journal of Couples Therapy, 1995.

"Jail and Prison Rape." TIE-Lines, February, 1995.

"The Politics of Psychiatry: Gender and Sexual Preference in DSM-IV." masculinities, 3,2, 1995, reprinted in Mary Roth Walsh, ed., Women, Men and Gender,  Yale University Press, 1997.

"What Do Men Want?, review of M. Kimmel's Manhood in America." Readings, 10, 4, 1995.

Guest Editor, issue on Men's Issues in Treatment,  Psychiatric Annals,2,1, 1996.

"Men at Work and Out of Work," Psychiatric Annals, 2,1, 1996.

"Trauma and its Sequelae in Male Prisoners."  American Journal of Orthopsychiatry,

11

66, 2, 1996, 189-196.

"Consultation to Residential Psychosocial Rehabilitation Agencies."  Community
    Psychiatric Practice Section, Community Mental Health Journal, 3, July, 1996.

"Shame and Punishment: Review of James Gilligan's Violence: Our Deadly Epidemic
    and its Causes," Readings, Sept., 1996.

"Community Mental Health: A Window of Opportunity for Interracial Therapy," Fort/Da,
    2,2,1996.

"Men, Prison, and the American Dream," Tikkun, Jan-Feb., 1997.

"Dependency and Counter-Dependency in Couples," Journal of Couples Therapy, 7,1,
    1997, 39-47.  Published simultaneously in When One  Partner is Willing and the
    Other is Not,  ed. Barbara Jo Brothers, The Haworth Press, 1997, pp. 39-47.

"Shall We Overcome: Review of Jewelle Taylor Gibbs' Race and Justice," Readings,
    December, 1997.

"The SHU Syndrome and Community Mental Health," The Community Psychiatrist,
    Summer, 1998.

"Review of Jerome Miller's Search and Destroy," Men and Masculinities, 1, 1, July,
    1998.

"Will Building More Prisons Take a Bite Out of Crime?,"  Insight, Vol. 15, No. 21, June
    7, 1999.

"The Mental Health Crisis Behind Bars," Harvard Mental Health Letter, July, 2000.

"Mental Health Police?," Readings, June, 2000.

"The Men's Movement in the U.S.A.,"  in Nouvelles Approches des Hommes et du
    Masculine, ed. Daniel Weizer-Lang, Les Presses Universitaires du Mirail,
    Toulouse, France, 2000.

"Symptoms, Meanings and Social Progress," Voices, 36, 4, 2000.

"Psychotherapy with Men in Prison," in A New Handbook of Counseling &
    Psychotherapy Approaches for Men,  eds. Gary Brooks and Glenn Good,
    Jossey-Bass, 2001.

"A Very Wise Decision by the Montana Supreme Court," Correctional Mental Health
    Report, 5,3, 35-36, Sept./Oct., 2003.

"Review of William Roller's The Dead are Dancing," Psychiatric Services,  54,11,1660-
    1661, 2003.

"The Future of Correctional Mental Health," Correctional Mental Health Report, 6,1,
    May/June, 2004.

"Foreword," David Jones (ed.): Working with Dangerous People: The Psychotherapy of
    Violence, Oxon, UK: Radcliffe Medical Press Ltd., 2004.

"Malingering in Correctional Settings," Correctional Mental Health Report, 5, 6, 81-,
    March/April, 2004.

"Prisons," in Michael Kimmel & Amy Aronson (eds.), Men & Masculinities: A Social,
    Cultural, and Historical Encyclopedia, Santa Barbara, CA & Oxford, GB, ABC
    Clio, pp. 630-633, 2004.

"Mental Illness," in Michael Kimmel & Amy Aronson (eds.), Men & Masculinities: A
    Social, Cultural, and Historical Encyclopedia, Santa Barbara, CA & Oxford, GB,
    ABC Clio, pp. 537-539, 2004.

"Toxic Masculinity as a Barrier to Mental Health Treatment in Prison," Journal of
    Clinical Psychology, 61,6,1-2, 2005.

"Posttraumatic Stress Disorder (PTSD) in Prisoners," in <u>Managing Special Populations in Jails and Prisons</u>, ed. Stan  Stojkovic,Kingston, NJ: Civic Research Institute, 2005.

"Schizophrenia, its Treatment and Prison Adjustment," in <u>Managing Special Populations in Jails and Prisons</u>, ed. Stan Stojkovic, Kingston, NJ: Civic Research Institute, 2005.

"The Prison Heat Issue,"  <u>Correctional Mental Health Report</u>, 7,2, July/August, 2005.

"How to Create Madness in Prison," in <u>Humane Prisons</u>, Ed. David Jones, Oxford: Radcliffe Publishing, 2006.

 "Conditions on death row,Terrell Unit,Texas," in M. Mulvey-Roberts (Ed.), <u>Writing for their lives: Death Row USA</u> (pp. 69-77). Carbondale: University of Illinois Press, pp. 69-77, 2006.

 "Prison madness in Mississippi," in M. Mulvey-Roberts (Ed.), <u>Writing for their lives: Death Row USA</u>, Carbondale: University of Illinois Press, pp. 281-287, 2006.

"Working with Men in Prison,"  In <u>International Encyclopedia of Men and Masculinities</u>, 1 vol., eds. M. Flood, J.K. Gardiner, B. Pease, and K. Pringle. London & New York: Routledge, 2007.

"Post-Incarceration Civil Commitments and Public Mental Health: An Essay," Correctional Mental Health Report, 9,4, 2007.

"Violence in Prisons, Revisited," Hans Toch & Terry Kupers, <u>Journal of Offender Rehabilitation</u>, 45,3/4, 49-54, 2007.

"Posttraumatic Stress Disorder in Prisoners," <u>Correctional Health Care Report</u>, Vol. 9, Nos. 2 & 3, January/February, 2008

"Prison and the Decimation of Pro-Social Life Skills," in <u>The Trauma of Psychological Torture</u>, Editor Almerindo E. Ojeda, Vol 5 of <u>Disaster and Trauma Psychology Series</u>, Series Editor Gilbert Reyes, Westport, Connecticut: Praeger, 2008

"What To Do With the Survivors?: Coping With the Long-Term Effects of Isolated Confinement." <u>Criminal Justice and Behavior,</u> Vol. 35 No. 8, August 2008, pp. 1005-1016

"Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs," T.A. Kupers, T. Dronet, M. Winter, et al., <u>Criminal Justice and Behavior</u>, October, 2009.

"Introduction." King, R. (2009).  From the Bottom of the Heap: The Autobiography of Black Panther Robert Hillary King.  Oakland: PM Press.

"Mutual Respect and Effective Prison Management," in <u>Transforming Corrections: Humanistic Approaches to Corrections and Offender Treatment</u>, Editors David Polizzi & Michael Braswell, Durham: Carolina Academic Press, pp. 121-134, 2009.

"Preparing an Expert's Report," <u>Correctional Mental Health Report</u>, 12,1, 2010

"Treating Those Excluded from the SHU," <u>Correctional Mental Health Report</u>, 12,4, 2010.

"The Role of Misogyny and Homophobia in Prison Sexual Abuse," <u>UCLA Women's Law Journal</u>, 18,1, 2010.

Stuart Grassian & Terry Kupers, "The Colorado Study vs. the Reality of Supermax Confinement," <u>Correctional Mental Health Report</u>, Vol. 13, No. 1, May/June,

2011

"Preparing an Expert's Report," in <u>Practical Guide to Correctional Mental Health and the Law</u>, by Fred Cohen (with Terry Kupers,) Kingston, NJ: Civic Research Institute, 2011

"The Role of Psychiatry in Correctional Settings: A Community Mental Health Model," <u>Correctional Mental Health Report</u>, Vol. 13, No. 3, September/October, 2011

"Testimony of Terry Kupers, M.D., at August 23, 2011 Hearing of California Assembly Public Safety Committee Regarding Conditions at Pelican Bay State Prison Security Housing Units," <u>Correctional Law Reporter</u>, Vol XXIII, No. 4, December/January 2012

"A Community Mental Health Model for Corrections," <u>Correctional Mental Health Report</u>, Vol. 13, No. 5, January/February, 2012

"Programming Cells are Neither the Problem nor the Solution," <u>Correctional Mental Health Report</u>, 2012

"Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake?," <u>The Routledge Handbook of International Crime and Justice Studies</u>, Eds. Bruce Arrigo & Heather Bersot, Oxford: Routledge, 2013, pp. 213-232.

"The Psychiatrist's Obligation to Report Patient Abuse: A Dialogue with Fred Cohen," <u>Correctional Mental Health Report</u>, Vol 15, No. 5, Jan/Feb 2014

"Safety, Yes; Near Total Isolation and Idleness, No," <u>Correctional Law Reporter</u>, XXVI, No. 1, June/July 2014.

"A Community Mental Health Model in Corrections," <u>Stanford Law & Policy Review</u>, 26, 119-158, Spring, 2015.

Co-signatory, Brief of Amici Curiae, *Alfredo Prieto v. Harold C. Clarke,* Supreme Court of the U.S.A., No. 15-31, 2015.

Committee Member, Group for the Advancement of Psychiatry (GAP), *People With Mental Illness in the Criminal Justice System: A Cry for Help,* Washington, D.C.: American Psychiatric Association Press, 2016.

"How to Create Madness in Prison," in <u>Hell is a Very Small Place</u>, Editors Jean Casella, James Ridgeway & Sarah Shourd, New Press, 2016, pp. 163-178.

"The SHU Post-Release Syndrome," <u>Correctional Mental Health Report</u>, 17, 6, March/April, 2016.

"Alternatives to Long-Term Solitary Confinement," *Correctional Law Reporter*, Vol. XXVIII, No. 3, Oct. – Nov., 2016.

"Gender and Domination in Prison." *Western New England Law Review,* 39, 2017.

"The Asylum, The Prison and the Future of Community Mental Health," chapter in *Community Mental Health: Challenges for the 21st Century*, Editors  Jessica Rosenberg and Samuel J. Rosenberg, New York & London: Taylor & Francis/Routledge, 2017.

"Waiting Alone to Die,' In *Living on Death Row: The Psychology of Waiting to Die*, edited by Hans Toch, James Acker and V.M. Bonventre.  American Psychological Association Press, 2018.

"Posttraumatic Stress Disorder in Incarcerated Offenders, Treatment of," in the *Sage Encyclopedia of Criminal Psychology*, Sage Publications, 2019.

"Imprisonment and Stress," in the *Sage Encyclopedia of Criminal Psychology*, Sage Publications, 2019.

"Prospects for Correctional Mental Health Litigation*," Correctional Mental Health Report*, 21,4, November/December, 2019.

"ASPD Then and Now," *Correctional Mental Health Report*, 22, 1, May/June, 2020.

 "We Need to Talk Nondefensively About Race and Admit Shortcomings," *Psychiatric News,* American Psychiatric Association, Vol. 55, No. 14, July 17, 2020.

"Supermax Prison Isolation in Pre-Crime Society."   In *THE PRE- CRIME SOCIETY: Crime, Culture and Control in the Ultramodern Age.*  Eds. Bruce A. Arrigo & Brian G. Sellers, Bristol University Press, 2021.

"Review of *What We Know: Solutions from our Experiences in the Justice System*," Editor Jules Lobell, *Rutgers University Criminal Law and Criminal Justice Book Reviews*, September, 2021.

"Future Prospects for *Correctional Mental Health.*"  *Correctional Mental Health Report*, Vol. 23, No. 2, Fall, 2021, pp. 33-34.

"The Cell-Front Interview*." Correctional Mental Health Report,* Vo. 24, No. 4, Spring, 2022.

"Foreword," *Way Down in the Hole: Race, Intimacy, and the Reproduction of Racial Ideologies in Solitary Confinement*, A.J. Hattery & E. Smith, Rutgers University Press, 2022.

## Depositions and Court Testimony in Past Four Years
## by Terry A. Kupers, M.D.

Testimony in Dockery v. Hall, USDistCtSoDistMississippi, Jackson, No.
3:13CV326WHB-JCG, March 14-15, 2018, regarding psychiatric effects of
conditions in solitary confinement Unit at Eastern Mississippi Correctional
Facility.

Testimony in State v. Travis Smoot, Bakersfield Superior Court, Case No.
BF164146A, March 20, 2019, criminal trial about murder of
prisoner's cellmate.

Deposition in Jay Vermillion v. Mark Levenhagen, 1:15-cv-605-RLY-TAB,
U.S.Dist.Ct,So.Dist.Indiana, in San Francisco, May 30, 20
about effects of Solitary Confinement at Westville Corr. Facil.

Deposition in William Richards v. County of San Bernadino et al, Case No.
5:17-cv-00497-SJO-SP, USDistCtCentralDistCA, in Oakland, July 19,
2019, re exoneration following false conviction.

Deposition in John Doe et al. v. Michigan DOC, et al., Washtenaw County (MI)
Circuit Court, Case Nos. 13-1196-CZ and 15-1006-CZ, August 7 & 8,
2019, Oakland, CA.  Class action regarding effects on juveniles of
incarceration in adult prison facilities.

Deposition in Luong v. Alameda County, USDistCtNoDistCA No: 3:17-cv-06675-
EMC, September 5, 2019, Oakland, CA, re death in custody at Santa
Rita Jail Facility.

Deposition in Finley v. Huss et al, USDISTCtWestDistMichigan, North Division,
No. 2-18-cv-100, October 15, 2019, Oakland, CA, re self-harm in
solitary confinement.

Deposition in Andrew Wilson v. City of Los Angeles, U.S.Dist.Ct.CentralDist.CA,
CASE NO. CV18-05775-KS, April 24, 2020, Berkeley & Los Angeles,
telephonic, re exoneration following false conviction.

Deposition in Atayde vs. Napa State Hospital et al., Case # 1:16-cv-00398-DAD-SAB,
April 29, 2020, Berkeley, CA via video, re death by suicide in jail.

Deposition in Samuel Kolb vs. County of Placer, USDistCtEDistCA Case No. 2:19-cv-
00079-DB, July 8, 2020, Berkeley, CA via video, re police-involved shooting.

Deposition in Gosier/Malone v. Wicomico County, Maryland. USDistCt for the Dist of
Maryland. Case No. 1:19-CV-02412-SAG, March 4, 2021, Maryland/California
via video, re jail suicide.

Testimony at Trial (in person), State of Florida v. William E. Wells, Circuit Court of the Eighth Judicial Circuit, in and for Bradford County, Florida, Case No. 04-2019-CF-000706-A, April 27 & 28, 2021, Starke, Bradford County, Florida. Capital Murder Trial.

Deposition in Michael Hall (SC212933) et.al. & In Re Von Staich (SC212566), Sup. Ct., Co. of Marin, May 4, 2021. Case No. SC212933, et al, Case No. SC213244, et al., Case No. SC213534, et al.  Regarding COVID-19 and response by CDCR at San Quentin Prison.

Court Testimony (by video) in Michael Hall (SC212933) et.al. & In Re Von Staich (SC212566), Sup. Ct., Co. of Marin, May 27, 2021. Case No. SC212933, et al, Case No. SC213244, et al., Case No. SC213534, et al.  Regarding COVID-19 and response by CDCR at San Quentin Prison.

Deposition in Gerald Len Cooley v. William Jeha et. al, USDistCtNoDistCA, Case No. 4:18-cv-00719-YGR.  Video Deposition.  October 20, 2021.  Regarding effects of 4 month jail confinement following wrongful arrest.

Deposition in Martinez & M. Martinez v. City of Los Angeles, USDistCtCentralDistCAWestDiv, October, 2021.  Video Deposition.  Regarding false conviction/exoneration/innocence.

Testimony at Evidentiary Hearing (by video), Melende z v. Inch et al, USDistCtMidDistFlorida, Jacksonville, Florida, 3:20-cv-01023-BJD-JBT, January 21, 2022.   Regarding Solitary Confinement and Mental Health Issues for single prisoner.

Deposition in Michael Denton v. Karie Rainer, USDistCtWestDistWA,NO. 3:19-cv-05743-BHS-TLF, April 7, 2022.  Video Deposition.  Regarding long-term confinement of Prisoner with Mental Illness in Solitary Confinement.

Deposition in State of Florida vs. Keith Hartley Wittemen, Jr., Circuit Court of the 20th Judicial Circuit in and for Charlotte County, Case No. 92-000487CF – (SHC) (BRB), August 5, 2022, by video.  Re-sentencing consideration related to conviction for murder.

Testimony in court by video, State of Florida vs. Keith Hartley Wittemen,Jr., Circ. Ct of the 20th Judicial Circuit, Charlotte County, Florida.  Case No. 92-000487CF – (SHC) (BRB) Felony/Capital.   Re-sentencing hearing following almost 30 years in Florida DOC for murder that occurred when defendant was 17.

Testimony in court, Evidentiary Hearing, by video, State of Texas v John Falk, January 17, 2023.  Competency issues re prisoner on Death Row.

Deposition (by video), Melendez v. Inch et al, USDistCtMidDistFlorida, Jacksonville, Florida, 3:20-cv-01023-BJD-JBT, February 2, 2023. Regarding Solitary Confinement and Mental Health Issues for single prisoner.

Deposition (by video), Vega vs. Management & Training Corporation, Case No. 3:21-CV-01770-GPC-MSB, February 8, 2023.  Effects of solitary confinement for prisoner at the I.C.E. Imperial Regional Detention Facility

Testimony at Evidentiary Hearing, Michael Denton v. Karie Rainer, USDistCtWestDistWA, NO. 3:19-cv-05743-BHS-TLF, February 9, 2023, Federal Court in Seattle via video.  Effects of solitary confinement on prisoner with serious mental illness.