# IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

---

**SHAQUILLE HOWARD, BROOKE GOODE, JASON PORTER, KEISHA COHEN, AND ALBERT CASTAPHANY, on their own behalf and on behalf of all others similarly situated,**

Plaintiffs,

v.

**LAURA WILLIAMS, Chief Deputy Warden of Healthcare Services, ORLANDO HARPER, Warden of Allegheny County Jail; MICHAEL BARFIELD, Mental Health Director, ALLEGHENY COUNTY**

Defendants.

---

### CIVIL ACTION 2:20-CV-01389

---

## EXPERT REPORT OF

## BRADFORD E HANSEN

---

**February 16, 2023**

## I.   INTRODUCTION & SUMMARY OF OPINIONS

1.   My name is Brad Hansen.  I am a retired prison warden with over 42 years of correctional work in institutions as well as central headquarters at the Nebraska Department of Corrections.  My career has been focused on ensuring that prisons run effectively and that both correctional officers and inmates are kept safe in a high-stress and high-risk environment.  I have substantial expertise in the standards, policies, and practices relating to detention.  I have been retained by Plaintiff's counsel in this case to serve as an expert on these topics.

2.   I have been asked to render my opinion on the Allegheny County Jail Use of Force policies, customs and practices, training of staff in the use of alternatives to using force, and the policies, customs, and practices in using solitary confinement for general population and those incarcerated who are deemed mentally ill.

3.   My opinions, as outlined herein, are informed by my knowledge, skill, experience, training, and education, including over four decades of experience in this area and as a prison warden.  My opinions are also based on my knowledge of the Pennsylvania Code, Title 37 – Chapter 35 County Correctional Institutions Administrative Standards, regulations and facilities, the American Correctional Association ("ACA") Core Jail standards , Performance Based Standards and the National Commission on Correctional Health Care ("NCCHC") standards and my review of the policies, practices, and customs of the Allegheny County Jail.

4.   My opinions are also informed by over 100 hours of review of the relevant Allegheny County Jail documents, policy and procedures, the Allegheny County Jail Inspection Report dated 2021, NCCHC October 2019 Suicide Prevention Program Assessment, use of force reports, testimony and exhibits, discovery responses, the complaint and other court documents in this case. This also includes the writing of the expert witness report. I also visited the Allegheny County Jail on July 24, 2022, and toured the intake and reception area, a mental health living unit (Pod 5C) which was representative of the mental health units and the Pod 8E segregation unit.  A list of materials I have relied upon in forming my opinions is attached as **Exhibit A**.

5.   Based on my review of relevant materials and my experience, education, and training I conclude as follows:

   a.   **One**, jail standards as written in Title 37, the American Correctional Association Standards and the National Commission on Correctional Health Care Standards are designed to protect incarcerated individuals and safeguard humane conditions.

   b.   **Two**, to comply with these standards, Allegheny County Jail is required to use force only as a last result and never as punishment.

    c. **Three,** review of use of force reports and other documentation found a pattern of violations of policy and failure to protect incarcerated individuals

    d. **Four**, Allegheny County Jail failed to train all staff in the alternatives of using force which includes the use of de-escalation techniques.

    e. **Five**, Allegheny County Jail used force against mentally ill inmates and placed them in segregated confinement against national standards and protocols.

6.     Further details regarding these conclusions are provided in the report below.

7.     My work on this matter is ongoing and my opinions are based on the information I have reviewed to date. It is my understanding that additional documents and information may be forthcoming during the course of this litigation. I reserve the right to supplement my opinions as additional relevant information becomes available to me.

## II.    MY QUALIFICATIONS

8.     I have over 42 years of experience in all aspects of corrections, including assisting state correctional agencies and county jails in developing emergency preparedness training and security improvements. I retired as Warden of the Tecumseh State Correctional Institution, Tecumseh, Nebraska, on August 2, 2019. Since then, I have been retained as a Crisis Intervention/Conflict Resolution Instructor, a Use of Force instructor for Jail Administrators, and an expert witness. My CV, attached as **Exhibit B,** further details my background and qualifications.

9.     The complete list of cases that I have testified for as an expert witness is attached as **Exhibit C**.

10.     The rate sheet detailing the financial compensation I am receiving in this matter is attached as **Exhibit D**. My payment is not tied to the conclusions that I reach.

11.     I started my career as a correctional officer for the Nebraska Department of Corrections in 1977. I worked in Nebraska prisons over the next 20 years, from 1977 to 1997, first as a correctional officer and later as a Unit Administrator, responsible for managing all inmate housing units and developing prison standards and operating procedures.

12.     I was promoted to Department Emergency Management Supervisor and held that position for the next 19 years from 1997 to 2016. In that position, I managed the Emergency Tactical teams, which responded to prison emergencies. The Emergency Tactical teams included the Special Operations Response Team ("SORT"), Correctional Emergency Response Team ("CERT"), and the Crisis Negotiation Team ("CNT"). I developed training techniques for decision-making and assault strategies. I was responsible for conducting critical incident reviews to determine what went well and what could have been done better.

13. In 2003, I instituted the Division of Investigation and hired two full time law enforcement officers to conduct investigations, including criminal, administrative, workplace harassment, and Prison Rape Elimination Act ("PREA") investigations. I reviewed all reports and submitted them to proper authorities. My responsibilities included: developing and conducting training for institutional investigators; reviewing policy and making recommendations for staff oversight and accountability; reviewing and approving approximately 75 investigations per year; and reviewing use of force reports that rose to the level of possible abuse or unlawful use of force.

14. In 2012, I was given the additional responsibility of Training Administrator. As Training Administrator, I supervised the Department Training Academy, which included new officer training, in-service training, leadership training for supervisors, leadership training for executive staff, and further training to assist in the development of all staff. I implemented the Law Enforcement and Training Association's ("LETRA") Crisis Management training, which taught officers how to communicate with inmates, deescalate crisis events, conduct conflict resolution, and interview inmates to assist in determining if they are suicidal or experiencing a psychotic event. Staff were taught to document such interactions and refer to mental health specialists and shift supervisors when necessary.

15. From 2016 to 2019, I was appointed as a Warden at the Tecumseh State Correctional Institution, a 1000-bed maximum and medium custody institution, which included a 196-bed restrictive housing unit. As the Warden, I oversaw about 420 staff members.

16. I have been a consultant with LETRA from 1997 to the 2022. LETRA is a training organization in Campbell, California, specializing in emergency preparedness training, crisis intervention/conflict resolution, and use of force training. LETRA conducts emergency preparedness and use of force assessments in state prisons and county and city jails. I conducted emergency preparedness assessments and training in the South Carolina Department of Corrections, the Delaware Department of Corrections, Douglas County Jail in Omaha, Nebraska, the New Mexico Department of Corrections, and the Wyoming Department of Corrections. I conducted crisis intervention and conflict resolution training for the California Youth Authority and the Hawaii Department of Corrections. I taught use of force training at the Santa Clara County Jail, California.

17. I have done consultant work for the National Institute of Corrections ("NIC") from 1999 to 2008. I conducted instructor certification in crisis negotiations for the South Dakota Department of Corrections, the New Mexico Department of Corrections, and the Nevada Department of Corrections. In 2008, I conducted an emergency preparedness audit for the Washington State Department of Corrections.

18. Since retiring in 2019, I have accepted various engagements as an expert witness in litigation matters.

## III.   METHODOLOGY

19.   I was asked to assess the use of force customs, policies, and practices at the Allegheny County Jail.  This assessment pertains to the use of force according to standards such as Title 37, the American Correctional Association, National Commission on Correctional Health Care and the policies of Allegheny County Jail.  I reviewed use of force customs, policies, and practices as it pertains to those who are deemed incarcerated individuals with identified mental health disabilities.  I reviewed a representative sample of 16 individual use of force packets.

20.   There is a well-established methodology for addressing whether a prison, jail, or other detention center complies with applicable standards.  The first step is to determine applicable duties from reviewing relevant law and regulations, department policies and procedures, professional standards, and widely accepted correctional standards and practices.  The second step is to determine whether the jail, prison or detention facility and its staff complied with the identified duties by reviewing documents and other available information.  I have used these steps as a Warden when conducting inspections and after-action reviews, as a training administrator implementing and evaluating training courses, and as head of the division of investigations evaluating use of force complaints.

21.   This method has also been used to audit correctional institutions for accreditation by the American Correctional Association and the National Commission on Correctional Health Care.  It is also used as a significant component in critical incident reviews following major crises or emergencies in jails and prisons.  This method has long been used in conducting critical incident reviews, emergency readiness of institutions, security audits, and criminal and administrative investigations.

## IV.   ANALYSIS AND OPINION

### A. Jail standards as written in Title 37 of the Pennsylvania Code, and the ACA and NCCHC Standards are designed to Protect Incarcerated Individuals and Safeguard Humane Conditions.

22.   The Allegheny County Jail is required to follow the standards that are set in Title 37[1] and purports to adhere to the American Correctional Association standards for Jails.[2]  The policies, customs, and practices that Allegheny County has established in written policy is for the express purpose of issuing, developing, and requiring adherence to these standards to protect incarcerated individuals and safeguard humane conditions of confinement.

23.   What underlies all jail standards, including Title 37 and the American Correctional Association standards as well as state and federal law, regulations and long-standing

---

[1] Pennsylvania Code, Title 37, Chapter 95, County Correctional Institutions, Administrative Standards, Regulations and Facilities 95.141
[2] American Correctional Association, Core Jail Standards, and Performance-Based Standards

correctional practices across American corrections is a broad and critical duty of the correctional staff to protect individuals incarcerated in the facility. The duty to protect includes protection from harm by the use of force by staff, other incarcerated individuals, as well as the known risk of self-harm.

24.     It is important for the staff of correctional facilities to fulfill their duty to protect because one's ability to protect oneself is severely limited when detained or incarcerated. For instance, in a fire, individuals locked in cells cannot evacuate themselves, either staff unlock doors and provide a path to safety, or individuals may die of smoke inhalation. Similarly, an acutely ill individual cannot take himself to an emergency room; either staff provides that individual with access to medical or mental health care, or the results may be fatal. Incarcerated individuals are dependent on staff for everything from showers and food to visits and medical and mental health care.

25.     It is very important for staff to follow established policies and procedures in order to prevent staff abuse in using force as well as preventing undue psychological effects of use of force or long-term segregation and in particular the damage that can be done to those incarcerated individuals with identified mental health issues. Incarcerated individuals rely on staff for everything, they cannot decide what rules they are going to follow, whether or not they are given a disciplinary report or more importantly whether they are assigned to a segregation housing unit.

26.     In order to carry out this duty to protect, jail staff need to be trained to ensure that they are well equipped to manage the day-to-day issues that might arise in a jail. Failure to adequately train staff may create an unsafe environment for those who are detained or incarcerated in a jail, prison, or detention center and may create a risk of substantial harm.

    **B. Allegheny County Jail is required to use force only as a last alternative and never to be used as punishment.**

27.     It is my opinion that the custom and practices of the Allegheny County Jail allow for the overuse of force, fail to rely on alternative methods to avoid the use of force and fail to adhere to the Jail's own policies. I define the term excessive force not as a legal definition but defined as force that is used which exceeds what is necessary to gain compliance or control of a situation.

28.     Title 37, section 95.241(2) expressly states that "force shall be restricted to instances of justifiable self-defense, protection of others, protection of property, prevention of escapes, and to effect compliance with the rules and regulations of the facility when other methods of control are ineffective or insufficient and only the least amount of force necessary to achieve that purpose is authorized. Force may never be used as a means of punishment or revenge."[3] Title 37 also states that jails must have local policy that (A)

---

[3] Title 37, Chapter 95, County Correctional Institutions, section 95.241

6

identifies authorized purposes allowing for the use of force, (C) the appropriate limitations for the authorized use of force, (D) a force option, beginning with the least amount of force necessary and progressing through the degrees of non-deadly and deadly force, (H) training for staff in the use of force. Finally, that provision requires that each prison staff member involved in any use of force for other than routine inmate movement/escort/transportation shall submit a written report to the prison administrator and reported to the Department.[4]

29.    The American Correctional Association Core Jail standards state in standard 1-CORE-2B-01 "Use of Force – Restrictions on Use of Force" that the use of physical force is restricted to instances of justifiable self-defense, protections of others, protection of property, and prevention of escapes, and then only as a last resort and in accordance with appropriate statutory authority.  In no event is physical force used as punishment."

30.    The Allegheny County Jail Use of Force Policy has undergone many revisions since 2014 when it was originally written.  That is a good thing as new information should be learned from attending conferences, reading current literature on the use of force, looking at the statistics about the numbers and kinds of force that is being used and conducting a critical review of each use of force to determine if staff are following the use of force policy and if not, finding out why in order to change policy and procedure, training and discipline staff if necessary.

31.    The Use of Force Policy that was in effect in April of 2020 at ACJ (AC 002391-2400) states in the section

32.    ACJ Use of Force policy that was revised August of 2021 (AC 049582-049592) (after this litigation was initiated) included additional language which addressed the need for

33.    ACJ Use of Force policy that was revised February 2022 (AC 076616-076627) (also after this litigation was initiated) had the most revisions.  Included in the document was

---

[4] Id. Page 31-32

7

34.  Until recently, ACJ staff were trained and required to follow written policy and training
     when it comes to the use of the restraint chair. [5] The training states that the restraint chair

[8]

35.  In May of 2021 voters in Allegheny County approved a referendum prohibiting the use of
     a restraint chair, chemical agents, or leg shackles on any person in the custody of the
     Allegheny County Jail. This referendum also addresses solitary confinement and the use
     of segregation in an extensive way.

36.  It is important to point out that uses of force are more than putting hands on someone in a
     forceful way.  As defined in the monthly use of force numbers that are submitted to the
     state from each county jail in Pennsylvania, use of force is defined as physical, use of
     restraints, use of restraint chair, use of shackles, use of handcuffs, use of other restraints,
     chemical agents, stun devices, baton, firearms, and use of non-lethal force.

37.  The 2019 report issued by the Pennsylvania Office of County Inspections which lists
     monthly and annual numbers of Extraordinary Occurrences for all county jails in
     Pennsylvania documented that ACJ had the highest number of uses of force incidents out
     of 66 jails listed.[9] The number of uses of force was ▇ Warden Harper was questioned
     in his deposition about why the numbers are higher at ACJ than any other jail.[10] Warden
     Harper disagreed with the numbers because he states that ACJ counts even a touch as a
     use of force. Warden Harper states that even an escort hold is considered a use of force. [11]

38.  There is no documentation supporting Warden Harper's testimony that every touch
     equates to a use of force.  Rather, his own Use of Force policies dated 4/28/20[12], 8/2/21[13]
     and 2/1/22[14] state in section 2 "Reporting of Use of Force" paragraph 3 ▇▇▇▇▇▇▇

---

[5] AC_032734 – AC_032781 – Restraint Chair Training
[6] Id. AC_032738
[7] Id. AC_032739
[8] Id. AC_032741
[9] Exhibit 60
[10] Harper Depo; page 68 and 69
[11] Id. Page 69 line 20-24
[12] AC_002391 – AC_002400
[13] AC_049582 – AC_049491
[14] AC_076616 - 076627

██████████████████████████████████████████████████████████
███████████████████████ If Warden Harper's testimony is to be believed, he was not even following his own use of force policy.

39.    Even assuming that his testimony is accurate, one only has to look at those use of force numbers that do not have anything to do with handcuffs, shackles, or use of other restraints. For example, the restraint chair was used ▮▮ times in 2019. That number is ▮▮ times more than the 5 jails that were listed for Philadelphia. Similarly, ACJ used chemical agents ▮▮ times. Out of the ▮▮ listed uses of force that occurred, chemical agents were used 17% of the time. Stun devices were used ▮▮ times. The total number of times stun devices that were used in all 66 county jails was ▮▮ times. ACJ had approximately 50 % of all uses of force involving stun devices. Therefore, ACJ is an outlier in the use of force even if they include touches in those numbers. In any event, I fail to see any rationale reason for reporting as Warden Harper describes.

40.    The 2020 report issued by the Pennsylvania Office of County Inspections which lists monthly and annual numbers of Extraordinary Occurrences for all county jails in Pennsylvania documented that ACJ had ▮▮ uses of force which was more than 50% higher than the nearest large jail with similar numbers of incarcerated.[15] In 2020 ACJ used the restraint chair ▮▮ times. The four Philadelphia jails reported zero uses of the restraint chair in 2020. Out of a total of ▮▮ reports of the use of the restraint chair in all jails reporting for 2020 ACJ used the restraint chairs approximately 25% of that total. The use of the stun devices in 2020 for ACJ was ▮▮ times. The total number of uses of stun devices reported in all jails for 2020 was ▮▮. Approximately 35% of those numbers came from ACJ.

41.    The 2021 report issued by the Pennsylvania Office of County Inspections which lists monthly and annual numbers of Extraordinary Occurrences for all county jails in Pennsylvania documented that ACJ had ▮▮ uses of force which was approximately twice as much as any other jail reported. ACJ used the restraint chair ▮▮ times whereas the four Philadelphia jails did not use the restraint chair once. ACJ used stun devices ▮▮ times whereas the total number of uses of stun devices by all jails was ▮▮. ACJ was responsible for 38 % of all uses of stun devices. It should be noted that December of 2021 ACJ reported no uses of the restraint chair, shackles, and chemical agents. This was due to the referendum that took effect in December 2021.

42.    ACJ was using Tasers, OC and the restraint chair in ways that unnecessarily cause harm to the incarcerated individuals they were used against. ACJ staff uses tasers in one of two ways. One way is placing the taser directly against the body of the person in drive stun mode and the second way is by sending dart-like projectiles which administer a shock to a person located at a distance. The drive stun method is used to inflict pain on the incarcerated individuals in order to convince them to comply with the orders. When

---

[15] Exhibit 61

the darts are used, the electrical charge "overrides the nervous system causing uncontrollable contraction of the muscles which then allow staff time to restrain the incarcerated individual.  OC is a chemical reaction that is based on the stinging elements of the organic properties of the pepper plant.  OC is sprayed from a canister into the incarcerated individual's face area for pain compliance.  The spray causes extreme pain from burning.  The restraint chair is only to be used when further control is needed and only for a short amount of time for the individual to calm down and receive medical or mental health attention. Restraint chair used for anything else is considered punishment.

43.  ACJ has a specific policy for the use of the Emergency Restraint Chair. The policy number is 208 with an effective date 5/28/08 and a revision date of 4/28/2020. Under the procedural guidelines the following relevant sections are listed:



j. 

k.

l.

m.

n.

- •
- •
- •
- •

44. Nationally, the policy of the restraint chair has evolved over the recent years where now it is common practice that a restraint chair will not be used for more than two hours and only under extraordinary circumstances can the time be extended. Two hours is considered more than enough time to involve medical or mental health to determine a plan of action if the inmate continues to be uncontrollable while in the restraint chair. During that two hours inmates are checked on every fifteen minutes to talk to them, assess their control, determine if they should be released from the chair into a secure cell, check on their position in the chair and determine if medical or mental health should come back and assess them. Policy should also dictate that under no circumstances should supervisors assume that inmates have to stay in the chair for the entire two hours. Any longer than two hours should be documented as to the reason why and what steps were taken to try to remove the inmate from the chair.

45. The national standards are clear, when placing an inmate in restraints, whether it is handcuffs, restraint chair or four/five-point restraints on a bed, restraints are not used as punishment, and they are never applied for more time than is necessary. The ACA Core Jail Standards – first edition, states in standard 1-CORE-2B-02 -Restraint devices are never applied as punishment. There are defined circumstances under which supervisory approval is needed prior to application. Standard 1-CORE-2B-03 (mandatory standard) addresses the use of four/five-point restraints. This is the standard that correctional jails should follow since the restraint is the securing of both arms and both legs.[16]

---

[16] ACA Core Standards – first edition – page 20

46. Four/five-point restraints are used only in extreme circumstances and only when other types of restraints have proven ineffective. Advance approval is secured from the facility administrator/designee before an inmate is placed in a four/five-point restraint. Subsequently, the health authority or designee is notified to assess the inmate's medical and mental health condition, and to advise whether, based on serious danger to self or others, the inmate should be in a medical/mental health unit for emergency involuntary treatment with sedation and/or other medical management, as appropriate. If the inmate is not transferred to a medical/mental health unit and is restrained in a four/five-point position, the following minimum procedures are followed:

- Continuous direct visual observation by staff prior to an assessment by the health authority or designee
- Subsequent visual observations are made at least every fifteen minutes
- Restraint procedures are in accordance with guidelines approved by the designated health authority
- Documentation of all decision and actions

47. The National Commission on Correctional health Care (NCCHC) Standards for Health Services in Jails dated 2018 addresses when restraints are ordered by custody in standard J-G-01 Restraint and Seclusion paragraph 2:[17]

   a. When restraints are used by custody staff for security reasons, a qualified health care professional is notified immediately in order to:

   - Review the health record for any contraindications or accommodations required, which, if present, are immediately communicated to custody staff

   - Initiate health monitoring, which continues at medically appropriate intervals as long as the inmate is restrained. If the inmate's health is at risk, this is immediately communicated to appropriate custody staff

   - If health staff are not on duty when custody ordered restraints are initiated, it is expected that health staff review the health record and initiate monitoring upon arrival.

   b. If the restrained inmate has or develops a medical or mental health condition, the provider is notified immediately so that appropriate orders can be given.

---

[17] NCCHC Standards for Health Services in Jails – 2018, page 129

    c.  When health staff note use of restraints may be jeopardizing an inmate's
        health, this is communicated to custody staff immediately.

48.    It was my personal experience as a Warden that in order to make sure I was aware when
and for what reason the restraint chair was to be used, I moved the approval for the use
of the restraint chair from the shift supervisor to me. As head of the institution, I wanted
to make sure that we were not using the restraint chair for reasons that were not allowed.
This one act alone reduced the use of the restraint chair at the Tecumseh State
Correctional Institution where I was a Warden.

49.    Warden Harper when asked in deposition what the emergency restraint chair was, he
responded: "is a chair that's utilized to ensure that the individual that is violent – that is a
threat to themselves, a threat to others – this chair is used to prevent them from hurting
themselves and others and curb that violent attitude that they are toward themselves and
others." Warden Harper was asked if he knew how long the inmate can be placed in the
restraint chair, he responded "that he was unsure and would have to look at the policy."
Warden Harper was asked if staff were trained in the use of the restraint chair and he said,
"staff were, but was not sure what the training consisted of." Warden Harper admitted
that he did not participate in the annual training that staff are required to attend. Warden
Harper was asked the question in his deposition so is staff permitted to use force against
an inmate for any violation of ACJ policy? Warden Harper responded, "Absolutely."[18]

50.    Warden Harper's lack of understanding of the use of force policy which includes the
restraint chair is alarming. The statement that he made in his deposition at the end of his
explanation as to what circumstances the restraint chair can be used, is a prime example
of why the numbers of the use of the restraint chair in 2019, 2020 and 2021 where so high
at ACJ. These numbers represent a glaring and harmful misuse of the restraint chair. His
statement concerning use of the restraint to curb one's violent attitude is not why the
restraint chair is used. This understanding of the use of the restraint chair corresponds to
the statement of Randy Justice, Training Sgt. for ACJ, who testified that when an inmate
refuses a direct order, they go into the restraint chair.[19] The Warden admits that the
restraint chair is used as a device to change one's behavior and the Training Sgt admits
that if an inmate refuses a direct order, they will go in the restraint chair. This completely
violates ACJ policy on the use of restraint chairs and also ACA and NCCHC standards.
Supervisors were authorizing the use of restraint chair as punishment and discipline. ACJ
staff is using the restraint chair in retaliation for inmate behavior. If an inmate is verbally
threatening, disobeying any direct order, or disruptive they go in the restraint chair. The
restraint chair should only be used as a safety tool and used for those limited times when
it is absolutely necessary.

---

[18] Harper Depo, Andrews v ACJ page 97
[19] Justice Depo, Andrews v. ACJ page 108

51.   ACJ was using force on incarcerated individuals at an alarming rate. The numbers of use of force instances in all three years was higher than any other jail. It was apparent that the numbers don't lie but in reviewing all the materials I was given to develop this report I could not find where ACJ took initiative to figure out why there were so many uses of force and what actions could be implemented to lower them. As warden of a correctional facility, it is your duty to review such data to ensure that the numbers of uses of force are appropriate and within policy. This is one duty you cannot delegate to lower supervisory staff. Instead of reviewing this data with a critical idea, Warden Harper summarily dismissed the data. That is irresponsible and unreasonable.

52.   I reviewed 16 use of force packets that were put together by ACJ after force was used and there was not one use of force packet that was reviewed by Warden Harper. This is a complete failure on the part of Warden Harper. I am not opining that a warden must review each use of force packet, but I am suggesting that a warden review at least 75% of use of force packets. A warden must review each document and each video to determine if policy was being adhered to. Did the officer(s) use the least amount of force, did they try various methods (alternatives) to prevent the use of force, did they call for mental health to assist in order to prevent the use of force, did staff have the necessary training that teaches them how to use alternative methods and lastly are supervisors holding staff accountable for not following use of force policy? A warden will not understand the culture of how staff are using force without reviewing the use of force packets. My 42 years of experience in corrections, with the last 3 ½ years as Warden of a large maximum/minimum custody prison, helped me understand that staff will tell you what they think you want to hear and not what you need to hear. Use of force is one of the most critical components of your duty to protect individuals that are incarcerated in your facility. You cannot delegate those duties to anyone else.

53.   It is unreasonable that ACJ did not make substantive reviews and assessments into their uses of force. The uses of force got so intolerable that the citizens of Allegheny County voted to remove the use of the restraint chair, shackles, and chemical agents. I initially was taken aback by the results of this referendum. In my opinion the items that the citizens took away are reasonable tools that can be used if there is proper policy in place, staff understand that in all circumstances the least amount of force will be used, staff are trained in what alternatives they have, and staff will be held accountable if they do not abide by these policies. I do not blame the citizens of Allegheny County, I blame ACJ administration for not taking steps sooner to prevent this from happening. The numbers of uses of force had been high for years but ACJ accepted these actions as acceptable and necessary.

54.   I reviewed ACJ Correctional Officers Discipline Record 2017-July 2020.[20] I reviewed the document specifically to see the number of staff disciplined for use of force violations during this time period. I found no staff disciplines for 2017, 2018, 2019 and found 8

---

[20] AC_033607 – AC_33607

14

staff disciplines for use of force violations in 2020. Taking this document on face value as being true and accurate it confirms my opinion that staff at ACJ were not reviewing the uses of force in terms of were staff following use of force policy and looking to use other means to manage inmate misconduct. It is apparent that as ACJ administrators faced increasingly more pressure from the community to change their use of force policy and tactics there was additional review of the use of force reports beginning in 2020. This is a good thing but again it is unfortunate that ACJ administrators did not do these in years proceeding this increased pressure. Violations included:

a.

b.
c.
d.

e.

f.

g.

h.
i.

j.



55.   ACJ is required to be inspected by the Office of County Inspections and Services annually to determine whether or not ACJ follows the standards that are addressed in Title 37. On August 31, 2021, an inspection was completed at ACJ by the compliance team and a report was written and issued November 3, 2021.[21] There was a one-day tour of the facility and a review of the standards. It must be noted that the report does not review a key standard and that is the use of force standard. If documentation had been reviewed by the inspection team, I am sure they would have realized that the numbers for the uses of force for ACJ were much higher than any other jail in the state. If they had reviewed a percentage of use of force reports the inspection team would have realized that there were many instances where ACJ staff were not following Title 37 use of force standards. I am opining about this due to the fact that inspections are conducted to assist the county jails with an outside view of what is transpiring on a day-to-day basis. The one area that ACJ was most out of line in terms of numbers of uses of force was not reviewed nor mentioned in the report. The report that was sent to the Honorable Kim Berkeley

---

[21] Officer of County Inspections and Services – ACJ Inspection – November 5, 2021

Clark, Allegheny County Jail Oversight Board Chair was glowing and left the Chair with no information concerning the uses of force.

### C. Review of use of force reports found violation of policy and failure to protect incarcerated individuals.

56.   I reviewed a sampling of 16 use of force reports that involved class members, including videos where available. I will talk about each case in the paragraphs below but in general I found the following issues in the uses of force that the plaintiffs were subjected to:

   a.   Restraint chair was used as a punitive device as opposed to using the restraint chair only in those circumstances where the protection of the inmate is required.
   b.   Use of impact weapon on a mentally ill inmate when other less injurious methods should have been used.
   c.   In each case save one there was no evidence of de-escalation techniques. Direct verbal commands are not de-escalation.
   d.   Camera is required in all planned uses of force but several times the camera was not working or quit working.
   e.   Restraint chair form that was required to be filled out in its entirety was not filled out properly.
   f.   Staff deploying Tasers when there are enough staff available to manually secure the incarcerated individual. The incarcerated person was secured but still moving about. Staff wanted complete non-movement when several officers are on top of the incarcerated individual and while they are being tased.
   g.   Use of higher levels of force before other alternatives were used.
   h.   Staff not waiting for additional backup which may have resulted in no use of force.
   i.   No evidence that mental health was called to assist with the mentally ill incarcerated individual as policy allegedly requires.[22]
   j.   Officers putting hands on an individual which escalated the situation into a use of force.
   k.   Lack of proper review and investigation into each use of force. Chief Deputy Warden Zetwo testified when being questioned about using force to remove a person from the strip cell about the use of lower levels of force, "I would think so, but then again, I can't – **I can't second-guess someone who was there whenever that incident happened."[23]** Chief Deputy Zweto in essence is admitting that if a staff member determines that a certain level of force is needed than the use of force was correct. Rather than a review to ensure compliance with policy, this belief ratifies the excessive use of force by staff at ACJ.

---

[22] Warden Harper testified to such a policy, although until February 2022, the written policy included no such requirement outside the acute mental health units. Further, Defendants acknowledge they do not have any documentation that such a policy has been put into practice at any point in time, except to the extent that any individual's medical records might reference such a contact. See Stipulations
[23] Zetwo Depo: 92: 19-21(Walker v. Raible)

16

57.  On 7/23/2018 force was used on ▮▮▮▮▮▮▮▮▮.[24] Pod 5B was going in for count and ▮▮▮▮▮ was lingering around the dayroom. ▮▮▮▮▮ was approached by Officer ▮▮▮ telling ▮▮▮▮ to go in for count. ▮▮▮▮ refused to go in for count and Officer ▮▮▮ pulled out his handcuffs and order ▮▮▮ to cuff up. Officer ▮▮▮ reached out to grab ▮▮▮ arm and ▮▮▮ forcefully pulled away and pushed Officer ▮▮▮. Officer ▮▮▮ pulled his alarm and staff arrived at the scene put ▮▮▮ on the floor, cuffed him up and led him away.

   a.  Officer ▮▮▮ made a dangerous mistake by trying to grab ▮▮▮'s arm. As soon as ▮▮▮ refused to lock down Officer ▮▮▮ should have attempted to talk to ▮▮▮ and find out why he was not going into his cell for count. Officer ▮▮▮ should have tried de-escalation measures first.
   b.  Officer ▮▮▮ failed to read the situation and should have called for help once he realized he was going to cuff up ▮▮▮. Warden Harper did not review this use of force.

58.  On 9/12/2018 a force was used on ▮▮▮▮▮▮.[25] ▮▮▮ was in the intake area of ACJ and refused to be identified and had been sticking her head in the toilet and flooding the cell. A compliance team was assembled, and Sgt. ▮▮▮ gave several direct orders to come to the cell wicket to be handcuffed and she did not comply. Sgt. ▮▮▮ administered a two second burst of OC through the wicket and then shut the wicket. The cell door was opened, and the compliance team entered the cell and placed handcuffs on ▮▮▮. There is no indication that ▮▮▮ was not compliant at this point. The report then states that ▮▮▮ was placed into the restraint chair without further incident. ▮▮▮ remained in the restraint chair for approximately one hour and then placed on suicide watch.

   a.  ▮▮▮ was compliant after being sprayed with OC. Staff reports that it was for her safety. There was no need to place her in a restraint chair.
   b.  The use of force form that has a heading "Prior to the use of force" states that there was no attempt to talk to the inmate/new arrest (i.e., Mental Health Staff).
   c.  OC was used for disobeying a direct order when the door could have been opened and staff enter the room and physically handcuff ▮▮▮. There was no indication that she was going to fight the compliance team.
   d.  Use of force reports had conflicting information that was not reconciled with additional incident reports explaining why. One report stated one OC burst another report indicated two applications of OC.
   e.  Warden Harper did not review this use of force.

59.  On 9/13/2018 force was used on ▮▮▮▮▮▮.[26] A planned use of force was conducted by the compliance team on pod 5MD for forced medication ordered by Dr. ▮▮▮. ▮▮▮ was ordered to come to the wicket to be handcuffed for forced

---

[24] AC_258023 – AC_258039
[25] AC_008380 – AC_008396
[26] AC_008397 – AC_008410

medication. ███████ did not comply with the order. Mental Health nurse ███████ attempted to get ███████ to come to the wicket with negative results. Sgt. ███████ then utilized the pepper ball system using an inert round. Sgt. ███ gave ███████ an order to lay on the bunk and she complied. The compliance team entered the cell and used the shield to pin her against the bunk. Mental health nurses then entered the cell and administered an injection into the buttocks of ███████. Medical cleared ███████ from any injuries. The camera malfunctioned during the briefing and incident. The inert rounds contacted the cell bunk and ███████'s left thigh on her back side. The pepper ball system was used instead of OC due to ███████ having asthma.

   a. The pepper ball system is an impact weapon that is a higher level of force than the use of OC. The striking of ███████ on the back of her thigh with an inert round is painful. This striking had to hurt ███████ especially since she was naked. ███████ was refusing a direct order. She was not threatening to assault the staff nor was she aggressive in her actions. ███████ was refusing to come to the door.
   b. There was no aggression on the part of ███████ so the compliance team should have opened the door and entered as a team and secured ███████. There was no indication that the use of staff would not have worked. This would have been a much lower level of force and would have been an alternative to force.
   c. There was no indication why the forced medication had to happen at this exact time. Could staff have told ███████ that it needed to happen and that they would let her think about this action for a while and then come back and try to talk to her again.
   d. ███████ is a mentally ill inmate and time should have been used to get her to comply with the forced medication.
   e. Warden Harper did not review this use of force.

60. On 9/18/2018 force was used on ███████,[27] ███████ was secured in handcuffs in the housing unit's strip search cage but was threatening Officers and refusing to be escorted to his assigned cell 110. A compliance team was assembled. The report states that ███████ was cleared by medical for OC and Taser. The wicket was opened to the door of the strip search cage and several direct orders were given to ███████ to put his hands out so a tether could be attached to his handcuffs. ███████ continued to refuse. Sgt. ███████ administered a 1 second burst of OC and ███████ complied once the OC began to take effect. ███████ was being escorted to the shower for decontamination when he refused to walk, and staff carried him to the shower. After the shower ███████ began to yell and incite the other inmates in the pod. Staff began to escort ███████ back to his cell when he again refused to walk and was then carried back to his cell.

_____

[27] AC_077371 – AC_077386

    a. I reviewed the video that was submitted with the use of force, and it can be heard that ▮ was asking for Medical. There was no reason given to ▮ why he could not see Medical. Instead, Officers gave direct orders to place his hands in the wicket so a tether could be attached.

    b. Why did the movement out of the strip cell have to happen at that moment. Staff could have tried time and distance and continued to talk to ▮ so force would not have to be used.

    c. Staff did not explore alternative methods in order to not use force if at all possible.

    d. Warden Harper did not review this use of force.

61. On 12/10/2018 force was used on ▮ .[28] ▮ was on unit 3F and began to throw trays and medication towards the medication nurses. Staff and officers arrived and began to make a perimeter around ▮ . Staff had their jail issued tasers out. ▮ was kneeling at this time. Officer ▮ began to secure ▮ on the ground when he resisted resulting in a taser deployment. Officers ▮ and Officer ▮ then applied handcuffs and ▮ was escorted off of the unit.

    a. ▮ was kneeling and was taken to the ground to be handcuffed and started to resist and a taser was used against him. Why was the taser necessary? There were several staff. Why didn't they just put hands on ▮ and finish putting the cuffs on him? Why was an escalation of force needed?

    b. There was no evidence that staff tried to talk to ▮ to figure out what was upsetting him in order to try to de-escalate the situation.

    c. Warden Harper did not review this use of force.

62. On 12/15/2018 force was used on ▮ and ▮ .[29] Sgt. ▮ reported that ▮ and ▮ were hitting the cell lights in their cells. Officers responded to cell #1 and ▮ was handcuffed without incident. Staff responded to cell #2. Inmate ▮ was handcuffed without incident. Sgt. ▮ ordered two restraint chairs to be brought to the unit and both ▮ and ▮ were placed in the restraint chairs. Both inmates were taken to the intake area and placed in cell #9. Reports indicate that both inmates were placed in the restraint chair to protect them from harming themselves and prevent them from further damaging county property.

    a. Both inmates were compliant when handcuffs were placed on them but yet restraint chairs were used to secure both of them.

    b. Staff did not talk to either of the inmates to determine their issues and why they were hitting the lights. The report[30] indicates that both inmates stated that they

---

[28] AC_077458 – AC_077477
[29] AC_024980 – AC_025002
[30] AC_024992

19

were not going to leave the chairs until Administration talks to them.  Did staff ask them what they wanted to talk to the Administration about?

c. Restraint Chair Section form in the use of force packet on James Byrd[31] and ███████[32] were not filled out properly as there is no time out information on the form.

d. Warden Harper did not review this use of force.

63. On 2/25/2019 force was used on ██████████████[33] ██████████ was refusing to come to the wicket and have her hands cuffed so medical could give her ordered forced medication.  ███████████ refused the orders and mental health attempted to get compliance to no avail.  Several direct orders were given but ███████ did not follow them.  Captain █████ then administered a two second burst of OC into cell and then shut the wicket.  ███████ then complied with the orders, was handcuffed and the door was opened.  Medical then tried to administer the injection and ████████ started to resist and staff then used the EBID shield (similar to a taser but the shock comes from the front of the shield) and shocked her.  ███████████ was placed into the restraint chair and the injection was given.  ████████ was moved to cell H9 in the intake area and left in the restraint chair.

a. Mental Health tried to talk to ██████████ to comply but was unsuccessful.  This was a good attempt at de-escalation.

b. The restraint chair was used to administer the injection which was a proper use of the restraint chair.

c. Why was ██████████ left in the restraint chair after the injection had been completed.  Why not release her and put her back in her cell?

d. The Restraint Chair section[34] was not filled out properly so time out of chair was not recorded.

e. Warden Harper did not review the use of force.

64. On 4/14/2019 force was used on ██████████████[35] ████████ was housed in the segregation unit in cell 108 and had his front window covered.  ███████████ refused to uncover the window, so staff opened the cell door wicket at which time they observed a dark line around the neck of ████████ and he was threatening self-harm.  ███████ was instructed to come to the door and be cuffed up.  The door was opened with a number of staff waiting on the outside of the door.  An order was again given to ████████ to cuff up and he refused so he was shot with a taser.  Staff helped ████████ to the ground while the taser was cycling.  ████████ was placed in a restraint chair and moved to intake and place in cell #H9.

---

[31] AC_025001
[32] AC_025002
[33] AC_076847 – AC_076865
[34] AC_076865
[35] AC_077132 – AC_077157

a.  Staff used a taser because ▮▮▮▮▮▮▮▮ refused a direct order.  He was not threatening staff nor making any movement towards them.  ▮▮▮▮▮▮▮ was threatening self-harm.  There was no evidence that ▮▮▮▮▮▮▮ had a weapon and by the time the door was opened there were plenty of staff to go in and secure the inmate by physical force.  This was not done and is another example of using excessive force as a normal and accepted practice by ACJ staff.

b.  Direct orders were given to ▮▮▮▮▮▮▮ but there was no evidence that staff tried to talk to him to find out why he was doing what he was doing.  There was time to call for mental health to assist.  If ▮▮▮ tried to hurt himself staff were close enough to him to prevent any harm.

c.  ▮▮▮▮▮▮▮ was placed in a restraint chair.  This is appropriate at this point but only until mental health is called for an evaluation.  If it was determined that ▮▮▮▮▮▮ was suicidal then he should have been removed from the restraint chair and placed in suicide cell with the proper clothing and put on 15-minute checks.  He should not have been left in a restraint chair.

d.  The restraint chair section[36] indicates that ▮▮▮▮▮▮▮ was placed in the restraint chair at 1730 hours and the rest of the form was not filled out.

e.  Warden Harper did not review this use of force.

65.  On 5/30/19 force was used on ▮▮▮▮▮▮▮▮▮▮▮.[37]  The SERT team was being utilized to conduct a cell search of cell 112 on pad 8E.  Both inmates who were in the cell were told to get onto the ground.  ▮▮▮▮▮▮ did not comply with the order, but his cell mate did.  Sgt. ▮▮▮▮ then took ahold of ▮▮▮▮▮s legs and pulled him out of the cell.  ▮▮▮▮▮▮▮ then became resistive and combative.  Sgt. ▮▮▮▮ administered a 5 second drive stun with his taser to the upper left area of ▮▮▮▮▮.  Staff were then able to put handcuffs on ▮▮▮▮▮▮ and he was then placed in the restraint chair and secured in holding cell H9.

a.  The act of pulling ▮▮▮▮▮▮ out of the cell by his feet was an aggressive act on the part of staff and escalated the situation.  Even though staff have had confrontations before with ▮▮▮▮▮▮, staff should be careful, but they should never assume that the same issue will occur each and every time.

b.  There was no evidence that staff tried to talk to ▮▮▮▮▮▮ to de-escalate the situation as soon as they saw him start to get back up off of the floor.

c.  The SERT team was there with a full complement of staff, and they still felt the need to drive stun ▮▮▮▮▮▮ instead of using the physical force of the available staff.  Resisting is completely different than going after a staff member which was not the case.

d.  ▮▮▮▮▮▮ was placed in a restraint chair and placed in holding.  The Restraint Chair Section[38] was not filled out properly.

---

[36] AC_077137
[37] AC_077231 – AC_077243
[38] AC_077237

e. There is a picture of ████████ in the use of force report which shows him complacent in a restraint chair.  He should have been removed and placed back in his cell.

f. Warden Harper did not review the use of force.

66. On 1/8/2020 force was used on ████████████████ [39] A code 2 was called for pod 3D which meant that there were several inmates fighting on the top tier.  Numerous correctional staff responded, and orders were given to the inmates to get on the ground. Several of the inmates complied with the order. Staff were attempting to secure ████ ████████ into handcuffs when Captain ████ ordered him to stop resisting. Captain ████ then deployed his Taser, but ████████████ continued to resist.  Sgt. ████████ then gave orders to stop resisting and he deployed his Taser into ████, but he continued to resist.  Officer ████████ and Officer ████████ arrived at the scene and used several hand strikes with negative results. Sgt.████ had also responded to the code 2, and he disbursed a two second burst of OC into the facial area of ████████████. Officers were then able to secure ████████████ into handcuffs.  Another Taser was deployed into the chest of ████████████ while trying to secure him into the restraint chair, but he started to resist.  Staff were able to secure ████████████ into the restraint chair and moved him to the intake area and placed him into cell H9.  I reviewed video of the use of force[40].

a. ████████████ was angry due to him being required to get on the floor to cuff up.  Many other inmates were asked the same thing and complied with the order. This part was not on the video I reviewed but the reports indicate that other than giving direct orders there was no de-escalation nor verbal persuasion used in order to get him to comply.

b. The video shows approximately 7 staff standing over ████████████ on the floor of the upper tier.  Staff had his hands cuffed behind his back and with staff using pressure to keep his torso on the floor and two officers on each leg. ████████████ was ordered to stop squirming and a taser was deployed into ████ back which made him squirm even more which in turn created more tension at the scene.  In the approximately 12-minute video I saw staff use the Taser at least seven times on ████████████ even though there were seven or eight men who physically had hands on control.  Every time the Taser was used ████████████ squirmed even more.  The officers continued to create an environment where it was almost impossible for ████████████ to settle down. There was no talking or trying to reason with him.

c. Not only did I count 7 uses of Taser, (there may have been more) but OC was also deployed as written in the reports.  There was no video of this but the reports state that while staff had ████████████ on the floor, and he continued to struggle he was sprayed in the face with OC.  My experience with OC and the use of the canister indicates to me that the officer who used the OC had to get very close to

---

[39] AC_008502 – AC_008583
[40] ████████_01.08.2020p1.mp4 and ████████_01.08.2020p2.mp4

22

███████████████'s face in order to avoid contamination to the officers who were on the floor on top of ████████████. Training teaches that spraying the can of OC that close to the face of an individual can cause damage to the eyes. There was no indication in the use of force review that states this violation of training.

    d. There were also several strikes that were indicted in the written reports and the video confirms two strikes in the head area. It can be heard in the video that the strikes hit ██████████████'s head and not his neck or chest area. This is confirmed by ████████████ himself and also medical which confirmed marks on his face. There was no mention of this in the use of force review.

    e. The Restraint Chair Section[41] was not filled out completely.

    f. The use of force review that was signed off by Captain ██████, Major ███████ and Deputy Warden ████████ all indicated that staff actions are in accordance with ACJ policies and procedures.

    g. Warden Harper did not review the use of force.

67. On 1/23/2020 force was used on ██████████████.[42] ████████ was refusing to remove his arm from the wicket where he was assigned. ████████ refused a direct order from Officer ████████ to remove his arm at which time he put his Taser on ████████'s arm and drive stunned him. Once outside the cell force was used to place him on the ground and ████████ was then placed in a restraint chair and moved to cell H9 in the intake area.

    a. There was no evidence that Officer ██████ tried to talk to ████████ or use de-escalation techniques to try to get him to remove his arm from the wicket. Instead, a direct order was given, and a drive stun was administered immediately. There was no time allowed for ████████ to consider his options.

    b. ████████ was placed in a restraint chair and moved to H9. There was no need for a restraint chair except for punishment. Once ████████ removed his arm and the wicket was closed, a misconduct report should be issued for his actions and ████████ should have been secured back in his cell.

    c. Restraint Chair section[43] was not filled out completely.

    d. Warden Harper did not review the use of force.

68. On 2/26/2020 force was used on ██████████████.[44] ████████████ was refusing to come out of the strip cage on Level 8 Pod E. Staff were assembled, direct orders were given, and ████████████ was sprayed with OC. I reviewed the video of the use of force[45] and Sgt. ████████ indicated that medical cleared ████████ for OC and Taser even though he had asthma. OC was delivered and ████████ stripped and complied with the order. ████████████ was handcuffed and taken to the shower for decontamination without any further incident. Medical was on

---

[41] AC_008581

[42] AC_258006 – AC_258022

[43] AC_258013

[44] AC_258071 – AC_258088

[45] ████████_02.26.2020.MTS

site and started to give ▮▮▮▮▮▮ breathing treatments. A restraint chair was called for and ▮▮▮▮▮▮ was secured in the restraint chair and moved to cell H10 without any further problems.

    a. There was no written evidence nor video evidence that showed staff trying to find out why ▮▮▮▮▮▮ was refusing a strip search. There was no attempt at de-escalation. There were only direct orders given before OC was administered.

    b. There was no documentation that explained why Medical approved the use of OC when Medical knew that ▮▮▮▮▮▮ had asthma.

    c. ▮▮▮▮▮▮ did not threaten staff once sprayed and complied with orders while in the shower for decontamination and receiving breathing treatments.

    d. There is no explanation as to why ▮▮▮▮▮▮ was placed in the restraint chair. The only explanation is the restraint chair was used as punishment.

    e. Restraint Chair Section[46] was not filled out completely.

    f. Warden Harper did not review the use of force.

69. On 4/24/2021 force was used on ▮▮▮▮▮▮ .[47] SERT was searching for contraband in housing unit 8D. Sgt. ▮▮▮▮▮▮ gave orders for ▮▮▮▮▮▮ to come out of his cell, but he ignored the order and continued to work on his tablet. Staff attempted to have ▮▮▮▮▮▮ stand upright at which time he began to pull away. Officer ▮▮▮▮▮▮ grabbed the arm of ▮▮▮▮▮▮, and he was then physically removed from his cell and placed on the ground in order to secure him. Once on the ground ▮▮▮▮▮▮ complies being handcuffed without incident. ▮▮▮▮▮▮ was cleared to be placed on Pre-Hearing status and was cleared for segregation by medical.

    a. There was no effort to try de-escalation in order to encourage ▮▮▮▮▮▮ to comply. Only direct orders were given.

    b. ▮▮▮▮▮▮ was sent to prehearing status in segregation due to disobeying a direct order. ▮▮▮▮▮▮ should have been released, issued a misconduct report, and returned to his cell.

    c. Warden Harper did not review the use of force.

70. On 6/6/2021 force was used on ▮▮▮▮▮▮ .[48] A cell search was being performed on the cell in housing unit 5C cell 2 which housed ▮▮▮▮▮▮ who was on suicide status. ▮▮▮▮▮▮ was handcuffed through the door and Sgt. ▮▮▮▮▮▮ entered the cell to conduct the search. Once completed Sgt. ▮▮▮▮▮▮ gave ▮▮▮▮▮▮ a direct order to return to his cell and he refused to enter. Sgt. ▮▮▮▮▮▮ placed ▮▮▮▮▮▮ on the ground and used his Taser and deployed it into the belly of ▮▮▮▮▮▮ with no effect. Sgt, ▮▮▮▮▮▮ then used his Taser again due to ▮▮▮▮▮▮ resistance. Additional officers arrived and Sgt. ▮▮▮▮▮▮ deployed the Taser in drive stun

---

[46] AC_258080
[47] AC_008485 – AC_008501
[48] AC_033529 – AC_033547

mode and gained compliance. ████████ was placed back into his cell once seen by medical.

   a. There was no evidence that Sgt. ████████ used talking and/or de-escalation techniques in trying to persuade ████ to go back into his cell. Sgt. ████████ did not give ████████ an opportunity to explain why he did not want to go back to his cell. Instead, Sgt. ████████ immediately went to force.
   b. The force resulted in the use of the Taser three times on someone who was suffering for emotional trauma due to being on suicide watch.
   c. This was a higher amount of force than was needed.
   d. The review of the use of force was ratified by Captain ████████ and Major ████████ and they determined that the actions of Sgt. ████████ were in accordance with ACJ policies and procedures.
   e. Warden Harper did not review the use of force.

71. On 6/22/2021 force was used on ████████████████ [49] ████████ refused to enter his cell as directed by staff. ████████████ stated that he was not going into his cell IP3 which was in Processing.  Staff were then ordered by Sgt. ████████ to escort ████████ back to his cell.  Staff attempted to grab ████████' arm when he pulls away and attempts to break free from the staff.  Staff take ████████ to the ground where he continued to struggle with the staff.  Sgt. ████ deploys his Taser to the upper back of ████████.  He continued to struggle so Sgt. ████ follows up with a drive stun to ████████' right buttocks that proved effective. ████████ was cuffed with his hands behind his back and Medical showed up to remove the tasers from ████████.  ████████████ was placed back in his cell.

   a. Staff escalated the situation by attempting to grab the arm of ████████. This can be seen as a very aggressive move and in this case elicited an aggressive action from ████████. ████████ was disobeying a direct order but was not aggressive nor threatening at the time of the direct order and attempt to grab him.
   b. ████████ was never asked why he was refusing to go back into his cell nor given time to understand the necessity of returning to his cell.
   c. Staff were quick to go to force before other alternatives were explored.
   d. Use of force was not reviewed by Warden Harper

72. On 9/12/2021 force was used on ████████████ . ████████ was in Processing in cell IP5 and was seen via institutional camera walking towards the Officers desk. ████████ was refusing to go back to his cell. Officer ████████ placed his hand on the upper right shoulder of ████████ which at that time he pulled away and ended up face to face with Officer ████████. Once this occurred Officer ████████ and ████████████ became engaged with each other. Officer ████████ then became engaged with ████████ and can be seen using a knee strike against Timothy ████ towards

---

[49] AC_077343 – AC_077356

the left upper area/lower left area.  Additional Officers responded to the scene to secure
████████████████  Hand strikes towards the head and facial area were used by responding
staff to control ████████████.  A restraint chair was brought to the scene and ██████
█████ was secured in the restraint chair and moved to cell H9.

73.  The report written by Officer ███████ indicates that he told ████████ to continue
with his medical evaluation while in process and to properly put on his mask.  Instead of
walking towards his cell ████████ walked toward the vending machines.  Officer
████████ states in his report that when he attempted to escort ████████ back into
his cell by grabbing his arm ████████ turned and faced him and tried to assault
him.  Officer ███████ then reacted and took ████████ to the ground.  Officer
████████ grabbed Officer ████████'s left arm and pinned it under his body.  Officer
████████ had his keys in his right hand. Staff responded to the scene and a taser was
used to gain compliance.

   a.  Officer ████████ used verbal skills to try to get ████████ back to his cell.
      Two mistakes were made by Officer ████████ that escalated the situation. The
      first one was he told ████████ that he was going to be secured due to rule
      violation.  There was no need to escalate the situation by informing ████████
      ████ he was going to be punished for his actions.  This is not de-escalation this
      is escalation.  Officer ███████ should have waited for additional staff to arrive
      "which is staff presence" to verbally convince ██████ to return to his cell.
      The second mistake was the action of Officer ████████ putting his hand on
      ████████.  This is almost always seen as aggressive by the inmate
      especially when ████████ was in the process of moving back to his cell.
   b.  Officer ███████ claimed ████████ tried to assault him but the video
      review by Captain ████ did not indicate that was the case.  In fact, there is
      nowhere in the report by Captain ████ where that was mentioned. Use of force
      reviews must account for inconsistencies between written reports and video
      evidence.
   c.  This use of force review was noticeably different in that Captain ████ reviewed
      the need for force by using the Graham factors which are six reasonableness
      factors: 1) Prior Knowledge, 2) Mismatch 3) Proximity to weapons, 4)
      Environment, 5) Number of Officers to Subject, and 6) Injury or exhaustion.  This
      is an attempt to show that a more thorough review of the use force was conducted.
      The problem with this method is that it missed the most obvious issue.  Captain
      ████ failed to address the issue that Officer ███████ escalated the situation to the
      point where force was needed.
   d.  The Restraint Chair section of the use of force report was not filled out
      completely.[50] There was no indication of when ████████ was removed for
      the restraint chair.
   e.  There was nothing mentioned as to why a restraint chair was needed.  Once
      ████████ was secured, he should have been placed back in his cell and

---

[50] AC_033554

uncuffed. There was no indication at this time that ███████ was out of control and needed intervention by placing him in a restraint chair. The restraint chair was used as punishment.

    f.  Warden Harper did not review this use of force.

74.  I also reviewed eighteen other use of force packets in connection with another matter involving Allegheny County Jail. *Walker v. Raible.* Those other use of force packets were consistent with my review described above and buttress my conclusions for this report.

75.  From my review of these reports, ACJ correctional staff routinely uses more force than necessary. ACJ correctional staff routinely uses the restraint chair as punishment. ACJ correctional staff routinely tase inmates when unnecessary. There was only one instance of mental health staff being involved in a use of force, and that instance involved forced psychotropic medication—an event for which mental health staff had to be present for other obvious reasons. And this one instance was also the only example of a true attempt at de-escalation. These practices are in violation of all of the above-described policies, are objectively unreasonable, and create a significant risk of substantial harm.

76.  The review of these reports confirms my opinion that the customary use of force practices that ACJ staff used on a routine basis was understood as usual, necessary, and completely acceptable to control the incarcerated individuals in their control. There were no expectations that staff perform differently when deciding how to manage an inmate that was refusing a direct order. The is no mention in the ACJ use of force policy that incarcerated individuals are expected to comply immediately to a direct order. In my years of experience, I have never seen that stated in any use of force policy. ACJ staff considered direct orders as verbal de-escalation, but they are not. Giving a direct order is an escalation and there are many alternatives prior to reaching a direct order. Lack of understanding this principle resulted in years of ACJ staff using force at a much higher level than was necessary.

   **D.  Allegheny County Jail failed to train all staff in the alternatives of using force which includes the use of de-escalation techniques.**

77.  Quality training is essential in the adult learning cycle to ensure that staff understand policies, procedures, how to perform required tasks, demonstrate required tasks and then observed to ensure they understand and perform the task correctly. Most importantly quality training involves the discussion and understanding of why the policy is written the way it is and the reasoning behind it. Good training will instill upon the trainee the culture of the institution and why we teach each staff person to treat each other with respect as well as the incarcerated individuals that are detained in the facilities we operate. Staff must understand the use of force policy and how it relates to the culture of the facility. This is accomplished not by reviewing the policy on-line but by being in a classroom setting.

78. There are two basic use of force trainings that are essential to making sure staff understand the culture of how and when force is appropriate. Both types of training must be classroom based. The first training is use of force and what force is and what are accepted practices and what practices are not accepted. The second is understanding the steps and techniques to avoid using force sometimes called "crisis intervention training or de-escalation training".

79. Use of force training should be taught at new hire training that includes a discussion as to what it says and what it means. There should be an understanding that the staff are expected to use the "least amount of force possible" and examples of what that means. Principles such as "why now" and "time and distance" are essential principles staff must understand and practice. Staff need to understand that more often than not it is better to do nothing. Staff need to understand that they are to enforce the rules as written but there are ways to enforce those rules that provide a humane way of encouraging incarcerated individuals to follow them. Is the act so egregious that force must be used immediately such as a fight or staff assault or is there time to talk to the incarcerated individual and give him/her time to decide whether or not to comply with the direction. An example is taking the wicket hostage. One of the uses of force reviews that I completed in the above section brings this principle to light. The staff member gave a direct order to the incarcerated individual to remove his arm, he didn't, and the staff member immediately withdrew his Taser, and drive stunned his arm. The staff member should have used the principle "why now". The ACJ policy does not state that disobeying a direct order must be complied with immediately in all circumstances. Staff must learn this principle and how to distinguish between a clear emergent situation as opposed to a situation where the staff member can wait. Staff must understand that force begets more force, and also understand that an institution where staff use less force and more listening, talking, and understanding is always the most humane way to manage an institution.

80. A report that was written by the Human Rights Watch report titled "Callous and Cruel"[51] examines the need for good use of force training which supports my opinion. The report states "Use of force training for correctional officers in the academy as well as in-service training often fail to give correctional officers the knowledge and skills to make sound judgements as to when force is necessary in any given situation and, if so, how much force should be used. It typically prioritizes physical containment over inmate management through non-forceful means, including verbal negotiation and de-escalation strategies, being respectful to inmate concerns, and the judicious cooling off periods. The training does not give officers the skills "to anticipate, stabilize and diffuse situations that might give rise to conflict. Training and the supervision after training can help custody staff understand that force alone cannot keep a facility safe and secure, that unnecessary and excessive force creates the need for more force. Supervisors must constantly impress upon front-line staff the message that inmate violence and misconduct decline and facilities are safer when staff establish rapport with prisoners, are respectful to them, and are responsive to their legitimate questions and concerns."

---

[51] Callous and Cruel – May 12, 2015 – Human Rights Watch – www.hrw.org/report/2015/05/12

81. Staff should be taught that there is implicit force and there is explicit force and there are different levels of force. For example, low level implicit force is a correctional officer uniform. A higher level of implicit force may be a look or a gesture by a correctional officer that indicates to the incarcerated individual to stop what they are doing, or it is time to wrap up their activities. A direct order is a much higher level of force which now is telling the individual that time is up, or this is going to happen. Many times, situations in a housing unit will stop because of staff presence and not because of any words or orders given. Force goes up the continuum to where, if necessary, hands-on level of force needs to be used or even the use a restraint chair or Tasers, OC or even higher.

82. The principles of force are reinforced by supervisors who respond to the scene of a use of force and who review the use of force reports that are written by the correctional officers. Reports must be compared to the video that is available. They must thoroughly understand what the use of policy states and what the principles are behind the words in the policy. The use of force training for new supervisors at ACJ lacks the depth that is necessary to reinforce the use of force policies with the staff.[52] The training for new supervisors that I reviewed does not discuss the topics I mentioned above. The performance objectives for the class were ███████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████. The power point training does talk about de-escalation, but it does not describe what that is and what to look for in terms of staff actions and words in a use of force. This training is not about the principles of force but about the mechanics of a use of force packet. As noted previously, Deputy Zetwo did not understand the purpose of his review, and there were zero instances of discipline for noncompliance with policy in 2017, 2018 and 2019. While ACJ nominally performed a use of force review, there was no substance to that review.

83. The second kind of use of force training that all staff in the facility should be required to take is the de-escalation training or sometimes called crisis intervention training. The training should be in class training where lengthy discussions can occur discussing use of force examples, what principles are part of de-escalation, videos of past use of forces so staff can learn what went well and where they could improve and plenty of role playing on the part of staff, so they learn and practice the techniques. ACJ does not have this kind of training. ACJ does have a training program which is titled ████████████
████████████████████████████████████.[53] This is not de-escalation training this is strictly communication training. There is a big difference.

---

[52] AC_00775772 – AC-077616
[53] AC_077244 – AC_077289

84. I reviewed ACJ In-Service training for the years 2017-2021.[54] IPC communication was included in each training year but there was no de-escalation training. There was no use of force training until 2020. A discussion concerning use of force should be an annual class for all correctional staff including all administrative staff. Changes in policy should be discussed and problems and issues should be talked about and practiced if necessary. ACJ uses Power DMS to provide on-line training.[55] This is appropriate but there are some training requirements that cannot be trained adequately on-line. One of those classes is use of force.

85. ACJ must have good de-escalation training if they truly believe that the least amount of force is to be used each and every time. If staff are not trained, then what options do they have but to start at a higher level of force than is necessary. Direct orders are not the lowest form of communication. Warden Harper testified that ACJ is currently not providing de-escalation training.[56] De-escalation training or crisis intervention training has been emphasized for prison and jail staff the past couple of decades. While I was training administrator for Nebraska, I hired LETRA (Law Enforcement and Training Association) and had instructors trained in crisis intervention in 2012[57]. Nebraska then required every staff member to be trained in this course including the Director, Mental and Medical staff, and all correctional staff. It changed the culture as to how staff looked at force and how it was used. The course is now engrained into the culture of Nebraska and each supervisor reviews each use of force with an eye to staff practicing de-escalation skills.

86. It must be understood that line staff will more than likely be the first ones that notice something is different with an incarcerated individual. That is why every correctional officer needs this training no matter what housing unit they are working. The training must be mandatory for every new hire and a mandatory refresher training at least every 2 years. Supervisors must be part of that training since they will be talking to staff, reviewing use of force, and helping understand the changes in ACJ policy. One of the first classes I taught during a section on defusing skills which emphasized one of the principles "talking and listening", an experienced correctional officer raised his hand and very politely said "you now want me to talk to the inmates?". This is the kind of change in culture that is necessary.

87. The Jail's current practices violate Title 37, the ACA standards and ACJ's own policies and are objectively unreasonable. ACJ administration was well aware of the need of de-escalation training but did not implement such training. Based on the aggregate use of force numbers, which demonstrate the overuse of force at ACJ, and their supposed

---

[54] Exhibit 1
[55] AC_077674 – AC_077678
[56] Harper Depo: page 57 lines 9-19
[57] LETRA, Institutional Crisis Intervention and Conflict Resolution, revised 10/5/2015

30

review of use of force packets, the administration had to know of the need for de-escalation. In fact, at the time of this report, more than two years after this litigation was instituted, ACJ is still struggling to implement de-escalation training. Additional use of force training and de-escalation training should have been purchased or created and started immediately upon seeing the above data and use of force packets. It is unacceptable in 2023 that ACJ does not have de-escalation training that gives staff the tools to solve a crisis or issue without having to resort to higher levels of force. My years of experience as a training administrator and Warden leaves me dumbfounded as to the delay of this training. This failure has created a significant risk of substantial harm to those incarcerated.

88. A proper de-escalation training/crisis intervention class should contain an extensive discussion on why ACJ is teaching the course, expectations of staff that they will utilize the skills they are taught. At a minimum a course should contain:

    a. A review of force and where de-escalation fits
    b. Staff safety – how to remain safe in situations and how not to escalate them
    c. De-escalation techniques
    d. How to talk to incarcerated individuals to find out what they are angry about or why they are not wanting to do what they are asked
    e. Referral – staff learning about how to observe behavior and refer to the proper programs, i.e., medical, and mental health.
    f. How to safely manage a confrontation with an incarcerated individual.
    g. How to intervene if a staff member is not following policy
    h. Management of Psychiatric and Suicidal Crises

89. Such training is especially important for mental health patients, who may have more trouble responding to direct orders and who may need additional time to understand and comply with Jail procedures.

90. ACJ must train all staff immediately. With the referendum taking effect there is more emphasis on uses of force and why there are so many. More significantly, it is important for the incarcerated individuals who are detained at ACJ. ACJ revised their use of force policy on 2/1/22 which included language concerning de-escalation.[58] One wonders why this language was added only in 2022.

    a. Paragraph 4 on page 2 of the above policy states ███████

    b. Paragraph 5 on page 2 of the above policy states ███████

---

[58] AC_076616 – AC_076627

c.  Paragraph 6 on page 2 of the above policy states "

91.  This is excellent additional language to put into a use of force policy. These new conditions, if conveyed and implemented, will change the culture in ACJ as to how and when force is necessary. Unfortunately, I do not believe that ACJ will be successful with this new policy. ACJ put out this new use of force policy and didn't train the staff on what this new policy looks like in day-to-day interactions between staff and inmates. Staff have not been trained in de-escalation techniques. ACJ did not provide an opportunity for staff to attend training and thoroughly discuss what those new skills look like. Staff were not able to practice communication skills that are useful in de-escalating a situation to the point where force is not needed. Staff do not know what time and distance means. ACJ administration is doing their staff a disservice. Staff will be held accountable for a policy they don't even understand. Training should have been completed for all staff from the Warden on down and each division including medical and mental health before the policy went into effect. That is the only way ACJ will ensure that all staff will understand the new policy and put it into practice.

92.  ACJ also has no training for correctional staff on how to identify individuals with mental health conditions, how to communicate with individuals with mental health conditions, and how and when to refer individuals to mental health. This is an important component to any jail training program. Warden Harper was aware of the fact that many of the incarcerated individuals that were received at ACJ had mental health issues but failed to provide the proper training to assist staff with managing such individuals. This additional training should be packaged in the use of force training, de-escalation training and crisis intervention training. The lack of such training is in violation of applicable standards and is objectively unreasonable.

   **E. Allegheny County Jail used unnecessary force against mentally ill inmates and placed them in segregated confinement against national standards and protocols.**

93.  ACJ lacks the necessary training and policy which requires special consideration by staff when managing mentally ill inmates. I opine on this conclusion not because I am a mental health expert nor a medical expert but because my 42 years of experience of working in corrections and the last 3 years of expert witness work. It has been widely known for at least the last two decades that detainees and incarcerated individuals that are placed in jails and prisons have increasingly arrived with mental health issues. It has taken time and money to provide the necessary resources to provide the kind of staffing and training for correctional staff to manage these individuals.

94. It is well known that US prisons and jails have taken on the role of mental health facilities. This new role for them reflects, to a great extent, the limited availability of community-based outpatient and residential mental health programs and resources, and the lack of alternatives to incarceration for men and women with mental disabilities who have engaged in minor offenses. According to one recent estimate, correctional facilities confine at least 360,000 men and women with serious conditions such as schizophrenia, bipolar disorder, and major depression. In a federal survey, 15 percent of state prisoners and 24 per cent of jail inmates acknowledged symptoms of psychosis such as hallucinations or delusions.[59]

95. ACJ has used force against mentally ill incarcerated individuals and placed them in segregated units (isolated 23 hours out of 24 hours per day) contrary to current research and national understanding. This expert report details the use of force against mentally ill individuals that were unnecessary if ACJ were provided the appropriate use of force training and supervision when it comes to mental health incarcerated individuals.

96. It is important that the ACJ administration as well as all staff understand the fact that many prisoners with mental disabilities can pose difficult management challenges for correctional staff. Staff must understand the difference between behavior problems and problems due to mental health issues. My years of experience has seen the needed transition from the belief that incarcerated individuals are misbehaving and that they know what they are doing. Staff do not understand that mental health problems can make it difficult for incarcerated individuals to adapt to an extremely regimented life in a very difficult and hostile environment such as incarceration. Jails and prisons are not the most hospitable environments, and it is extremely difficult for the person who does not have mental health issues to cope with the day-to-day pressures of incarceration. When incarcerated individuals with mental illness violate facility rules, they are disciplined with the same rules as incarcerated individuals that do not have mental illness. Allegheny County Jail's overuse of force, then, has a particularly significant impact on the mental health population.

97. ACJ Use of Force Policy that has a revision date of 8/2/21[60] states in section 5 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This policy fails to address incarcerated individuals in general population and those in segregation. Before a planned use of force is used on any incarcerated individual, staff should first contact mental health and find out whether or not this person could be mentally ill or could be suffering from decomposition due to mental illness.

---

[59] Callous and Cruel – May 12, 2015 – Human Rights Watch – www.hrw.org/report/2015/05/12
[60] AC_049582 – AC_049591

98. ACJ should have a provision that allows the mental health staff member to be able to make the decision on whether or not force should be used in situations where there is time to talk and assess the incarcerated individual. Correctional staff should be the ones who use force as a last resort, but it should not be their final decision on those who are deemed suffering from a mental illness episode. This one change in policy alone will start to change the culture of the institution. ACJ should start the process of changing from security centric to programming and management without force centric.

99. Prior to 2020, ACJ offered no mental health training that would educate correctional staff about the different needs of mentally ill inmates. One such class was finally started in late 2020. [61] Randy Justice testified that



.[65]

100. The class above is a start to what should be an opportunity for ACJ to provide a necessary service to the ACJ population and is understanding mental health issues and how to help the individual by referring the signs and symptoms to mental health or medical if appropriate. The training should not instruct students that they are being taught the signs and symptoms in order to <u>assess</u> the individual. Staff learn the signs and symptoms so they can accurately <u>refer</u> them to medical and mental health. Medical and Mental Health can then make a more informed decision. Correctional staff become part of the team. This class should be included in annual training in order to ensure that staff remember what their responsibilities are.

101. ACJ staff who are not new hires are being taught by a staff member from the Department of Human Services. This training is good in the fact that it is being offered but I am concerned that it is being offered by someone who is not a correctional staff member. An instructor who does not have the correctional knowledge and information to answer questions concerning day to day observations in a correctional setting from well-seasoned staff will not be able to provide adequate answers. They certainly will not be able to provide examples and scenarios that are correctional based, so staff can relate and understand the key points.

---

[61] Exhibit 30: Mental Health First Aid USA (Revised)
[62] Justice Depo: page 136, lines 1-6
[63] Id. Page 138-139, lines 23-25 and lines 1-5
[64] Id. Page 136 lines 3-6
[65] Exhibit 1

102. The VERA institute of Justice wrote an Evidence Brief in April 2021 stating the impacts of solitary confinement on incarcerated people.[66] They found the following impacts:

   a. Solitary confinement can lead to serious and lasting psychological damage
   b. Solitary is particularly harmful for people with preexisting mental illness.
   c. Psychological harms may worsen the longer someone stays in solitary.
   d. Negative mental health repercussions can persist long-term.
   e. Solitary is associated with an increased risk of self-harm and suicide.

103. Chief Deputy Laura Williams testified that there had been a form titled medical and mental health clearance placement that required staff to fill out in order to place someone into segregation. Laura Williams stated this form had been in effect since 2014.[67] This allowed mental health staff to place an incarcerated individual into the mental health unit instead of segregation. Laura Williams stated that this form was initiated due to the many standards referencing the risk of placing individuals with severe mental health disorders in restrictive housing.[68] This was a good step that ACJ took to assist in managing those individuals who had mental illness. However, this practice was not always followed. Further, even if followed, the form does not sufficiently identify those who could be at risk. A form limited to current symptoms, without a consideration of the individual's history and conditions, cannot reasonably be thought to protect those who are at risk. The use of force packets I reviewed on the above individuals who were deemed to have mental health disabilities were still placed in segregation.

104. The Allegheny County referendum that was voted on and passed in 2021 understood the need to pass a requirement for ACJ that Solitary Confinement, meaning the confinement of a detainee or inmate in a cell or other living space for more than 20 hours a day has devastating and lasting psychological consequences on all persons, but especially for vulnerable populations, including youth and persons with diagnosed or undiagnosed cognitive or emotional abuse. Unfortunately, solitary is still a reality for many at ACJ. According to Warden Harper, the entire jail was on lockdown from the time the prohibition on solitary confinement went into effect until May of 2022—a period of almost six months.[69] The justification reported to the Jail Oversight Board for this 6-month lockdown was "COVID," but Warden Harper did not create any documentation to support or justify the decision to keep the entire population isolated for this extended period.[70] Moreover, the "out of cell time" provided is just another form of solitary confinement. The measures taken by Allegheny County to avoid solitary do no such thing. This violates all applicable correctional standards and is objectively unreasonable.

---

[66] VERA Institute of Justice – The Impacts of Solitary Confinement – April 2021 – vera.org
[67] Laura Williams Depo page 63 lines 2-24
[68] Id. Page 64 lines 20-25
[69] Harper Depo: 175-177, 189-90
[70] Id.

### F. Conclusion

105. ACJ consistently used more force than was necessary in managing general population as well individuals identified with mental illness. There was improper assessment and review of use of force reports in order to hold staff accountable for violating the use of force policy. Incarcerated individuals were subjected to harm and abuse due to lack of oversight.  Training was not conducted to ensure that all staff knew what de-escalation techniques were.  ACJ staff consistently used Tasers, OC, and the restraint chair for inmate management when other alternatives were available.  ACJ staff consistently used solitary confinement as a management tool for mentally ill inmates when knowing the harm that could be caused by that act.  ACJ violated their own use of force policy and continued to concentrate on force as a management tool.  These practices violated Title 37, ACA and NCCHC standards and in many cases, ACJ's own policies, and were objectively unreasonable.  Moreover, from my review, these violations were based on systemic, and gross deficiencies, which should have been obvious to any jail administrator.

Bradford E Hansen

Bradford E Hansen

2/11/2023

Date

# Exhibit A

**Bates #**

| | |
|---|---|
| AC_008380 | AC_077819 |
| AC_008485 | AC_077822 |
| AC_ 009502 | AC_080040 |
| AC_024963 | AC_080044 |
| AC_024090 | AC_080125 |
| AC_033529 | AC_080154 |
| AC_033548 | AC_080282 |
| AC_076847 | AC_077244 |
| AC_077132 | AC_007613 |
| AC_077231 | AC_007615 |
| AC_077343 | AC_007617 |
| AC_077371 | AC_007619 |
| AC_077458 | AC_007620 |
| AC_0258006 | AC_007621 |
| AC_0258023 | AC_009004 |
| AC_0258040 | AC_032784 |
| AC_0258054 | AC_037686 |
| AC_0258071 | AC_032788 |
| AC_008124 | AC_032792 |
| AC_008125 | AC_032794 |
| AC_032730 | AC_032878 |
| AC_032734 | AC_032880 |
| AC_032868 | AC_049539 |
| AC_033571 | AC_077922 |
| AC_033607 | AC_077923 |
| AC_ 076616 | AC_078834 |
| AC_077572 | AC_084552 |
| AC_077244 | AC_182222 |
| AC_007587 | |
| AC_007606 | |
| AC_007718 | |
| AC_007829 | |
| AC_033077 | |
| AC_033572 | |
| AC_033572 | |
| AC_033573 | |
| AC_033576 | |
| AC_076684 | |
| AC_077572 | |

**Depositions**

Michael Barfield
Ashley Brinkman
Laura Williams
Nora Gillespie
Warden Harper
Jason Beasom
Robyn Smith
Randy Justice
Stephanie Frank
Warden Harper – Andrews v. ACJ
Randy Justice – Andrews v. ACJ
Chief Deputy Zweto – Walker v. Raible
Exhibits 1-73

**Use of Force Reports**

AC_008380
AC_008397
AC_008485
AC_008502
AC_024963
AC_024980
AC_033529
AC_033548
AC_076847
AC_077132
AC_077231
AC_077343
AC_077371
AC_077458
AC_258006
AC_258023
AC_258040
AC_25805f4
AC_258071

**Videos**

Castepheny_ 01.08.2020p1.AVI
Castepheny_ 01.08.2020p1.MP4
Castepheny _ 01.08.2020p2.AVI
Castepheny _ 01.08.2020p2.MP4
Cohen _ 09.12.2018.MPG
Cohen _ 09.13.2018-cam541.mov
Cohen _ 09.13.2018-cam543.mov
Cohen _ 09.13.2018.AVI
Howard _ 02.26.2020.MTS

**Documents**

Title 37
Complaint
Title 37 Inspection Report 11/5/2021
ACA Jail Core Standards, Frist Edition 2010
NCCHC standards
Callous and Cruel – May 12, 2015 – Human Rights Watch
Vera Institute of Justice – Impacts of Solitary Confinement April 2021
Stipulations of Fact

**Exhibit B**

# Bradford E Hansen

3640 J Street, Lincoln, NE 68510
(402) 476-1517 • bhansen0723@gmail.com

**V.      SUMMARY**

Forty-four years of progressive experience in all aspects of adult corrections coupled with specialization in Investigations, Emergency Preparedness Training Development, Crisis Intervention, Conflict Resolution, and Institutional Security Evaluations.

**VI.      PROFESSIONAL EXPERIENCE**

**Consultant: Hansen Criminal Justice Consulting |** 2019 – Present
- Serve as expert witness and subject matter expert related to in-custody use of force matters, training needs assessments, suicide prevention, crisis intervention and restrictive housing evaluations.
- Act as lead instructor for Crisis Intervention and Conflict Resolution Training Course.

**Warden |** 2016 – 2019
Tecumseh State Correctional Institution (TSCI)
- Served as the Chief Executive Officer of the maximum/medium security facility that houses adult male inmates and prepares inmates to transition to lesser custody levels including community custody over time when programming and sentence requirements are met. This facility housed 1,000 maximum and medium inmates which included a 196-bed restrictive housing unit.
- Directed the work of 420 staff in the areas of security, staff training, medical, mental health, unit management, development of procedures and post orders, accreditation, and reception/orientation, inmate classification concerning segregation and protective custody status.
- Planned, organized, and coordinated prison operations with other functions within the agency to ensure program objectives and standards are established and attained.
- Conducted critical review of serious incidents, including disturbances, inmate death, and staff assaults against inmates.
- Reviewed use of force reports to ensure compliance with policy.
- Managed $2.3 million annual budget.

- Other duties included testifying in front of legislative committees as well as answering interrogatories and testifying in court.

**Investigations Supervisor** | 2003 – 2016
Nebraska Department of Correctional Services (NDCS)
- Designed and led the NDCS Investigations Unit.  Supervised all NDCS investigations statewide at ten prisons, two community corrections centers, and in the community with nexus to State corrections.
- Supervised criminal and administrative investigations involving staff, parolee, inmate, drug trafficking, assault, sexual assault, PREA, fugitive locate and apprehension operations, terroristic threats, special assignments, outside agency assistance, and internal affairs investigations of prison staff and management.
- Reviewed related policy and made recommendations for staff oversight and accountability.
- Assisted facility administrators and command staff with investigative process and investigative planning on sensitive or complex cases.  Served as liaison with external law enforcement and County Attorney Offices throughout Nebraska.

**Agency Training Administrator** | 2012 – 2016

NDCS

- Oversaw and supervised the Department training academy, which included new officer training, in-service training, leadership training for supervisors, leadership training for executive staff and development of new training to assist in the development of all staff.
- Implemented LETRA's Crisis Management training, which included training on communication skills with inmates, how to deescalate crisis events, how to conduct conflict resolution and how to interview inmates to determine if they are suicidal or experiencing a psychotic episode. Staff were taught to document such interactions and make referral to mental health specialists and/or shift supervisors.  The course is four days in length and all staff were required to attend the training.
- Implemented policy, procedure, and training for the implementation and use of chemical agents. Certified in Franklin-Covey 7 Habits for Highly Effective People and Leadership: Great Teams, Great Leaders, Great Results.

**Agency Emergency Management Supervisor** | 1997 – 2015

NDCS

- Supervised the Emergency Tactical teams which included the Special Operation Response Team (lethal force team), Correctional Emergency Response Teams (less lethal team which used impact weapons as well as gas delivery systems) and the Crisis Negotiation Team.

- Developed training, techniques, decision making and assault plan development. Selected and approved all members. Certified as an Emergency Preparedness instructor and instructed all department employees in the emergency preparedness plan.
- Conducted critical incident reviews to determine what went well and what could have been done better. The critical incident review included a written report as well as an action plan with identified tasks to be completed.
- Developed and implemented emergency plans for each institution which included a pandemic emergency plan for the swine flu in 2009.
- Developed and implemented Department policy and training concerning the use of Oleoresin Capsicum (OC) as a personal protection for staff and the use of pepper ball delivery system in powder form *pelargonic acid vanillyl amide* (PAVA) in 2012.

### Officer/Unit Administrator/Administrative Assistant for NDCS | 1977 – 1997

Lincoln Correctional Center and Nebraska State Penitentiary

- Started as a correctional officer and promoted through the ranks to unit administrator.
- Responsible for managing all inmate housing units, classification, accreditation, litigation reports, member of the executive team that developed standards and operating procedures, conducted inspections to ensure compliance with safety and sanitation standards.

VII.    **CONSULTING AND TRAINING EXPERIENCE**

### Consultant: LETRA | 1997 – present

LETRA, Inc. of Campbell, California

- Conducted Emergency Preparedness assessments in Washington State and Alabama which included visiting institutions, interviewing staff, evaluating day to day security, reviewing current emergency plans and making recommendations for improvement.
- Initiated and supervised state-wide emergency preparedness training for South Carolina Department of Corrections, Delaware Department of Corrections, New Jersey Department of Corrections, Douglas County Jail, Omaha, Nebraska, and New Mexico Department of Corrections.  All states included instructor training and certification.
- Conducted Crisis Intervention – Conflict Resolution instructor training for the California Youth Authority and the Hawaii Department of Corrections.
- Conducted training of new instructors for Crisis-Intervention-Conflict Resolution March 1-13, 2020, Stockton, California for the California Youth Authority.
- Conducted Use of Force training for the Santa Clara County, California jail system.

### National Institute of Corrections (NIC) | 1999 – 2008

Conducted instructor certification in Crisis Negotiations in South Dakota Department of Corrections, New Mexico Department of Corrections, and Nevada Department of Corrections.

**Nebraska Department of Corrections (February 6 – February 24, 2023)**

Certified new instructors to teach Institutional Crisis Intervention and Conflict Resolution – II – this course teaches students the skills to defuse and de-escalate crisis situations.

## VIII.   EDUCATION

**Bachelor of Arts (BA)** | Graduated 1976
University of Nebraska at Lincoln

## IX.   INSTRUCTOR-LEVEL CERTIFICATIONS

- Lean Six Sigma Executive Green Belt | 2018
- Franklin Covey Great Leaders Instructor | 2010
- Franklin Covey Seven Habits Instructor | 2007
- Advanced Emergency Preparedness for Commanders | 2002
- LETRA Master Instructor | 2001
- Crisis Negotiator Basic Class | 1999

## X.   AWARDS, PUBLICATIONS, AND ADDRESSES

- Keynote Speaker for Correctional Association of Correctional Training Personnel | 2019
- Published "Preparing Leaders for Tomorrow" in Corrections Today | 2012
- Use of Force Discussion with Jail Administrators - University of Omaha-Nebraska Criminal Justice Department - April 2022

## XI.   PROFESSIONAL ORGANIZATIONS

- American Correctional Association
- Correctional Peace Officers Foundation
- Chamber of Commerce

# Exhibit C

## CASES TESTIFIED IN THE LAST 4 YEARS

1.   *Estate of Casey Teskoski v. Wood County* (Wood County Jail) (Case No. 3:19-cv-00095) (suicide).  Expert witness for the plaintiff re Prison Policies and Procedures / Suicide.  2019. deposed 2020

2.   *Estate of Trequelle Tyreke Vann-Marcouex v. Wood County* (Wood County Jail) (Case No. 3:19-cv-00094).  Expert witness for the plaintiff re Prison Policies and Procedures / Suicide.  2019. deposed 2020

3.   *Estate of Brandi M. Lundy v. State of Tennessee* (Tennessee Department of Corrections) (Claim No. T20191358).  Expert witness for the claimant re Prison Policies and Procedures / Suicide.  2020. Deposed – 2021. Testified – 2022

4.   *Estate of Scott Hultman v. County of Ventura, Ventura County Sheriff's Office, Bill Ayu, et.al., United States District Court Central District of California – Western Division, Case No. 2:21-cv-6280* Expert Witness for the plaintiff re customs, practice, and policies, deposed 2022

5.   *Horton v. Parsons, et al.* (Case No. 3:17-cv-01915-WHA) Expert Witness for plaintiff re Use of Force. Deposed 2022,

6.   *Thomsen v. Naphcare, et.al* (Case No. 3:19-cv-00969-AC) Expert Witness for wrongful death. Deposed 2022

7.   *Vega v. Management and Training Corporation* (Case No. 3-21-ev-01770-GPC-LR) Expert Witness for plaintiff re Protective Custody, Classification.  Deposed 2023

44

## Exhibit D

Bradford E Hansen
3640 J Street
Lincoln, Nebraska 68510

Email:      bhansen0723@gmail.com
Phone:      402-476-1517

### *Expert Witness Fee Schedule*

1. Conference calls, document review, interviewing staff/inmates, attend meetings, on-site evaluation, writing reports – 225.00 an hour

2. Testimony at deposition or trial:  250.00 per hour (Minimum charge $1,000 or 4 hours per day)

3. Airfare, car rentals, lodging, incidentals while on travel status: Cost reimbursable

4. Retainer:  2,000

5. Initial case review, typically up to 4 hours:  No charge if not retained or if case declined.  Charged at case preparation rate if retained and case accepted.