# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| SHAQUILLE HOWARD, BROOKE | : | |
| GOODE, JASON PORTER, KEISHA | : | Case No. 20-cv-1389 |
| COHEN and ALBERT CASTAPHANY, on | : | |
| their own behalf and on behalf of all others | : | |
| similarly situated, | : | |
| | : | ELECTRONICALLY FILED |
| Plaintiffs, | : | |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| LAURA WILLIAMS, Chief Deputy Warden | : | |
| of Healthcare Services; ORLANDO | : | |
| HARPER, Warden of Allegheny County Jail; | : | |
| MICHAEL BARFIELD, Mental Health | : | |
| Director; ALLEGHENY COUNTY; | : | |
| | : | |
| Defendants. | | |

## CONSENT ORDER AND JUDGMENT

This 30th day of July, 2024 ("Effective Date"), the Court hereby approves the Parties' settlement and enters this Consent Order and Judgment ("Consent Order").

## I. Background

a. This Consent Order is an agreement entered into by and among the Plaintiff Class and the Defendant Allegheny County (the "County") on its own behalf and on behalf of the following Allegheny County officials or employees.

b. The purpose of this agreed Consent Order is to protect the constitutional rights of the individuals incarcerated at Allegheny County Jail ("ACJ"). The terms and requirements of this Consent Order will be interpreted to be consistent with the measures necessary to protect those constitutional rights.

c. On September 15, 2020, Plaintiffs Shaquille Howard, Brooke Goode, Jason Porter, Keisha Cohen and Albert Castaphany filed a Complaint against the County and certain former ACJ officials alleging that they were violating the constitutional and statutory rights of the Plaintiff Class and depriving them of appropriate and necessary mental health care. In particular, the Complaint alleged that Defendants did not have sufficient

staff to provide the appropriate level of care, failed to adequately train Mental Health Staff, failed to adequately train Correctional Staff to be able to identify the signs and symptoms of mental illness, failed to provide a sufficient process to screen and diagnose individuals with mental health conditions, failed to provide any therapeutic counseling, failed to use problem lists or treatment plans, failed to provide any case management for mental health patients, failed to provide adequate medication management, failed to sufficiently and timely respond to requests for mental health care, and failed to maintain any quality improvement program for their mental health care "program." The Complaint further alleged that Defendants failed to maintain adequate and appropriate policies with respect to de-escalation and use of force, failed to train staff on de-escalation techniques, used excessive amounts of force on Plaintiff Class members, used force on Plaintiff Class members more often than appropriate, punished individuals for requesting mental health care or for manifestations of their diseases, and inappropriately placed those with mental health conditions into isolated confinement, which exacerbated their conditions and caused them to decompensate. The Complaint sought injunctive and declaratory relief on behalf of the Plaintiff Class.

d. On October 31, 2022, the Court certified the Plaintiff Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2). The certified Plaintiff Class is defined as: "All individuals currently or in the future incarcerated at Allegheny County Jail and who have, or will in the future have, a serious mental health diagnosis, disorder or disability as recognized in the DSM-V, including but not limited to depression, anxiety, post-traumatic stress disorder, schizophrenia, bipolar disorder, or borderline personality disorder."

e. The Class has consented to the dismissal of the individually-named Defendants contingent on the entry of this Consent Order.

f. Prior to entering into this agreed Consent Order, the Plaintiff Class and Defendants engaged in extensive discovery, including depositions of numerous County employees and the production of hundreds of thousands of pages of documents.

g. The Parties began discussing potential avenues for settlement in early 2021. The Parties' counsel had dozens of meetings over a period of years, some of which were facilitated by mediators, at which the parties' negotiated the terms outlined in this agreed Consent Order. This Consent Order is the culmination of substantial effort by the Parties and their counsel, and arms-length negotiations over a period of many years.

h. On March 21, 2024, the Court preliminarily approved the Parties' settlement that encompasses this agreed Consent Order, ordered that notice of the proposed settlement be provided to the Plaintiff Class, and scheduled a final hearing to assess the proposed settlement to be held on June 11, 2024. After consideration of the parties' Joint Motion for approval of their settlement and this Consent Order and Judgment, and after hearing

and an opportunity for all Plaintiff Class members and others to be heard, the Court hereby approves of the Parties' settlement, and enters this Order and Judgment.

i.  This Settlement Agreement is in compromise of a disputed claim or claims embodied in the lawsuit filed by Plaintiffs and is entered into to avoid further costs and expenses of protracted litigation of this lawsuit.  This Settlement Agreement shall not be construed as an admission of liability or wrongdoing on the part of Allegheny County, its officers, officials, employees, agents, attorneys, representatives, successors, heirs, and/or assigns, such liability and/or wrongdoing being expressly denied on behalf of and by Allegheny County.

By their counsel's signatures below, the Parties stipulate and agree as follows, and it is HEREBY ORDERED, ADJUDGED and DECREED as follows:

## II.    Jurisdiction

a.  This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)((3)-(4)).

b.  This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred in Allegheny County, in the Western District of Pennsylvania.

## III.    Definitions

For purposes of this Consent Order, the following definitions apply:

a.  ACBOC means the Allegheny County Bureau of Corrections, on whose behalf various ACJ policies were issued.

b.  ACJ means the Allegheny County Jail.

c.  ACA means the American Correctional Association.

d.  AHN means Allegheny Health Network.

e.  Class Counsel means the Pennsylvania Institutional Law Project, the Abolitionist Law Center and Whiteford, Taylor & Preston LLP.

f.  Consent Order means this Consent Order and Judgment, agreed to by the parties and approved by the Court.

g. Correctional Staff means employees of the County or any contracting agency, whose primary responsibility is maintaining custody or control of the incarcerated population and ensuring safety and security throughout the jail.

h. County means the County of Allegheny, a county government organized and existing under the laws of the Commonwealth of Pennsylvania.

i. Days are measured in calendar days; weekend days are included.

j. Effective Date means the day identified above, on which this Consent Order was approved by the Court.

k. Deputy HSA—Behavioral Health means the County employee designated as the most senior administrator for behavioral health care services at ACJ.

l. Deputy Warden of Health Care Services means the County employee designated as the most senior administrator for health care services at ACJ.

m. To "implement" a policy, procedure, system or other remedial measure means putting in place the policy, procedure, system or other remedial measure, including informing, instructing or training all appropriate personnel as needed or as required by this Agreement, and consistently following, applying or using the policy, procedure, system or other remedial measure.

n. The term "include" or "including" means "include, but is not limited to" or "including but not limited to."

o. Interim Required Staffing Levels means the temporary Staffing Levels identified in Section IV of this Consent Order.

p. Mental Health Director means a person who by virtue of education, experience or certification (e.g., MD, DO, PhD, LCSW, LPC, MSN, MPH, MHA, FACHE, CCHP-MH) is capable of assuming responsibility for arranging all levels of mental health care and ensuring the quality and accessibility of mental health services for incarcerated persons.

q. Mental Health Staff means Qualified Mental Health Professionals and staff supporting those professionals, employed by the County or any contracted agency or employer to provide, or assist in providing, mental health services for the incarcerated population at ACJ.

r.  Monitor means the person or persons designated pursuant to Section XVII of this Consent Order.

s.  Monitoring Period means the period of time during which the Monitor shall submit Monitor Reports as referenced in Section XVII of this Consent Order.

t.  NCCHC means the National Commission on Correctional Health Care.

u.  Parties means the Plaintiff Class and the Defendant Allegheny County on its own behalf and on behalf of the Warden of ACJ, the Deputy HSA – Behavioral Health (as defined herein) and the Deputy Warden of Health Care Services (as defined herein).

v.  Plaintiff Class means all individuals currently or in the future incarcerated at Allegheny County Jail and who have, or will in the future have, a serious mental health diagnosis, disorder or disability as recognized in the DSM-V, including but not limited to depression, anxiety, post-traumatic stress disorder, schizophrenia, bipolar disorder, or borderline personality disorder.

w.  Qualified Health Care Professional means physicians, physician assistants, nurses, nurse practitioners, mental health professionals and others who by virtue of their education, credentials and experience are permitted by law to evaluate and care for patients.

x.  Qualified Mental Health Professional means psychiatrists, psychologists, psychiatric social workers, psychiatric nurses and others who by their education, credentials and experience are permitted by law to evaluate and care for the mental health needs of patients.

y.  Reporting Period means the period of time for which the County will submit reports, as referenced in Section XVI of this Consent Order.

z.  Required Staffing Levels means the permanent Staffing Levels identified after the assessment described in Section IV of this Consent Order.

aa. Segregation means confinement of a class member in a cell by one's self or with a cellmate a) as a consequence of a disciplinary violation, or b) for any administrative reason, including but not limited to a determination that the individual presents a security risk in a general population setting or requires protective custody. Segregation specifically includes Administrative Custody, Disciplinary Segregation, Protective Custody, Administrative Protective Custody, Restricted Housing, or Investigative Status, as defined in ACBOC Policy 231, or any status other than general population.

bb. Staff includes Correctional Staff, Mental Health Staff and any other persons employed by the County or any contracted agency and whose primary responsibilities involve services performed at ACJ.

cc. Supervisor or Supervisory Staff means County correctional staff with the rank of Captain or above and the Health Services Administrator.

dd. Use of Force means an instance where Staff use their hands or other parts of their body, objects, instruments, chemical agents, electric devices, firearm, or any other physical method to restrain, subdue or compel an Incarcerated Person to act in a particular way, or stop acting in a particular way. This term shall not include moving, escorting, transporting, or applying restraints to a complaint Incarcerated Person.


## IV.    Staffing

a. The Parties agree that, given the current estimated incarcerated population of 1,700, and the inability currently to perform an appropriate needs assessment, the current number of budgeted positions (if filled) is an appropriate Interim Required Staffing Level for purposes of this Consent Order. The Interim Required Staffing Levels are as follows:

1. <u>Positions available pursuant to contract with Allegheny Health Network ("AHN"):</u>

    (a) Director of Psychiatry (full-time) (must be independently licensed)

    (b) 2 full-time equivalent ("FTE") on-site psychiatrists (must be independently licensed)

    (c) 0.8 FTE tele-psychiatrist (must be independently licensed)

    (d) 1.0 FTE on site psychologist (must be independently licensed)

    (e) 5 FTE nurse practitioners or physician assistants (must be independently licensed, psychiatric practitioners)

    (f) 1 FTE behavioral health consultant (must be independently licensed)

2. <u>County positions:</u>

    (a) Mental Health Director (must be independently licensed)

    (b) 8 mental health therapists (must be independently licensed)

    (c) 9 FTE mental health registered nurses (and 2 part time) (must be independently licensed)

(d) 11 FTE mental health specialists (and 2 part time)

(e) 5 FTE behavioral health rehabilitation specialists (and one part time)

(f) 1 discharge planner

3.  Total positions for Interim Required Staffing Levels: 47.3, with 29.8 of those positions requiring independent licensure.

b.  If the incarcerated population is reduced, the Interim Required Staffing Levels shall be reduced proportionally. For example, if the population is reduced by 10% (to 1,530), then the Interim Required Staffing Levels for non-licensed staff likewise would be reduced by 10%. If the population is reduced by 20%, staffing levels for non-licensed staff would be reduced by 20%. The number of staff requiring independent licensure similarly would decrease.

c.  <u>Recruitment Efforts</u>

1.  Realizing that past recruitment efforts have been unsuccessful, the County shall undertake aggressive efforts to fill all mental health positions.

2.  The County hired a recruiter in late 2022 and hired another recruiter focused on open health care positions.

3.  These recruiters will assess the reasons the County has not previously filled these positions (or kept them filled), and the County will make adjustments as necessary to make those positions more attractive, and to improve recruitment and retention.

d.  <u>Meeting the Interim Required Staffing Levels and Assessment to Identify Ongoing Required Staffing Levels</u>

1.  The County will fill 80% of the Interim Required Staffing Levels within six (6) months of the Effective Date.

2.  The County will provide reports to the Court, to the Monitor and to Class Counsel for each Reporting Period identifying current staffing levels, total population, new hires and their positions, and employee departures, so that compliance with these requirements can be confirmed.

3.  If the County is not in compliance, the County also will provide, to the Monitor and to Class Counsel documentation of all recruitment efforts, exit interviews and other documentation appropriate to determine the reasons for the County's non-compliance. The County will provide other information reasonably requested by, the Monitor or Class Counsel so that those parties can assess the reasons for its non-compliance.

4.  Within one hundred (180) days of reaching 80% of Interim Required Staffing Levels, the County shall commence an assessment of staffing levels to determine whether the Interim Required Staffing Levels are appropriate for meeting the needs of the population.  This assessment  should include a "workload analysis" for each job description (i.e., psychiatrist, nurse practitioner, psychologist, therapist, etc.), an assessment of wait times, average times for each type of intervention (initial assessment, follow-up appointment, medication monitoring by psychiatrist, rounds in restricted housing, etc.), the caseload for each staff member, the frequency and extent of counseling sessions, the percentage of the mental health population with ongoing psychotherapy needs, a needs assessment for those in restricted housing, and other factors designed to determine whether current staffing is appropriate to the needs of the population.  This assessment shall be performed in compliance with the NCCHC staffing models, as articulated in its 2001 Correctional Health Care Guidelines for the Management of an Adequate Delivery System, the National Institute of Corrections, or comparable authority, and shall result in a written report.

5.  The completed assessment will be shared with the Court, the Monitor and Class Counsel, and upon reasonable request, the County shall also share the underlying information on which the report is based.  If any interested party raises concerns or questions regarding the report, the Parties shall meet and if necessary, a conference with the Court will be scheduled.  Upon acceptance of the report, including any modifications to the report based on these meetings and conferences, the Required Staffing Levels will be adjusted consistent with the report's results.

6.  The County will continue to provide reports as outlined in paragraph (ii) above and further information as requested, consistent with paragraph (iii) above, until the Consent Order terminates pursuant to section XVIII herein.

e.  <u>Non-compliance</u>

1.  If the County is not in compliance with the above-described staffing levels (either the Interim Required Staffing Levels or the Required Staffing Levels), the Court will hold a hearing to explore the reasons for non-compliance.  Failure to meet the required staffing levels ***shall*** result in one or more of the following actions, depending on the severity of the non-compliance, the period of non-compliance, and the reasonableness of the efforts toward meeting those staffing levels:

    (a) Mandatory improvements in recruitment efforts, geared toward the specific reasons for non-compliance as demonstrated at the hearing.  These improvements may include, among other measures, mandated increases in offered salaries and benefit packages and other fringe benefits, use of recruiters, and other steps to improve the attractiveness of the open positions.

    (b) Mandatory improvements in retention efforts, geared toward the specific reasons for non-compliance as demonstrated at the hearing.  These

improvements may include, among other measures, mandated increases in salaries and benefit packages and other fringe benefits, and other steps to improve retention.

(c)  Monetary penalties for non-compliance.

(d)  Referral to a panel of three judges to consider an order to decrease the jail population in order to meet the Required Staffing Levels, consistent with 18 U.S. §3626.

(e)  Such other remedy as the Court deems appropriate.

2.  If the County is not in compliance at the next reporting period, the Court will hold another hearing to evaluate the reasons for non-compliance. Repeated non-compliance shall result in more severe mandatory requirements or penalties.

3.  If the County is not in compliance for two consecutive reporting periods, the County in addition shall convene a series of meetings with the following agencies and groups in an effort to explore ways to lawfully and voluntarily reduce the jail population so that the Required Staffing Levels are met: Allegheny County Jail, Allegheny County District Attorneys' Office, Allegheny County Court of Common Pleas, Criminal Division, Allegheny County Office of the Public Defender, Justice Related Services, Class Counsel and community representatives selected by agreement between the County and Class Counsel.


**V.    Training**

a.  <u>Training requirements for Mental Health Staff</u>

1.  The County recently developed a multi-stage healthcare orientation for all new hires consistent with ACBOC Policy 2308, NCCHC Standard J-C-09, and ACA standards 4-ALDF-7B-05 and 4-ALDF-7B-09. The County commits to maintaining that orientation in compliance with Policy 2308 (revision date 1/23/2020), subject to revisions and improvements. The requirements of Policy 2308 (revision date 1/23/2020) are incorporated herein by reference.

2.  In addition to the above-described orientation, the County shall provide specific mandatory in-person training for all Mental Health Staff (not just new hires) "on delivery of mental health services in the correctional setting" (substantially as described in NCCHC standards J-C-01; J-C-03, and MH-C-03), which shall include all mental health and all relevant medical policies and procedures, typical mental health needs of the jail population, and confidentiality. Nothing in this provision shall require the County to seek or obtain certification with NCCHC.

3.  The County also will provide advanced mandatory in-person training for individuals working on acute units (AC 7865; NCCHC assessment)

4.  The County will develop specialized mandatory in-person training for intake screeners (as recommended in the NCCHC assessment, p. 20-21).  This training will include at a minimum: (i) the importance of effective intake screening to the County's policies and goals; (ii) practice using the screening forms; (iii) the intent of the inquiries on these forms; (iv) effective communication and interviewing skills that convey compassion; (v) use of case studies to practice identifying symptoms of depression and other mental illnesses and signs of emotional response to incarceration; (vi) common psychotropic medications and their purpose; (vii) criteria for referral to mental health; (viii) personal biases that may hinder objective risk screening and assessment; and (ix) periodic observation of screening performance by the Mental Health Director.

5.  The above training will utilize trainers from, and be developed in coordination with, the National Institute of Corrections, or another entity approved by Class Counsel, subject to the dispute resolution procedure.

6.  The above training programs must be commenced within 180 days of settlement approval and must be provided every other year thereafter.  For new hires, the above training will be provided within 90 days of hire date.

b.  Training requirements for Correctional Staff

1.  The County recently has updated its suicide prevention training to include Mental Health Services and Suicide Prevention/Intervention (AC, 33573, AC 77719-77805, Exhibit 32 to Justice Deposition), and Suicide Prevention and Intervention (AC 33576, Exhibit 31 to Justice Deposition).  Consistent with ACBOC Policy 304 (review dated 5/6/2021), the County will maintain this training, subject to revisions and improvements.

2.  The County also shall provide specific mandatory in-person training for Correctional Staff on, among other things, (1) how to recognize signs and symptoms of mental illness; (2) communicating with incarcerated individuals who have positive signs of mental illness; and (3) procedures for appropriate referral of incarcerated individuals with MH complaints (consistent with NCCHC standards J-C-04; MH-C-04).  The recently implemented Mental Health First Aid training partially complies with this requirement.  The County shall continue this training or a substantively equivalent training, and will provide additional training relating to these same issues specifically in the correctional context.

3.  The County will provide advanced mandatory in-person training for individuals working on acute units, receiving screening or segregated housing areas (consistent with NCCHC standards MH-C-04 and MH-G-02, and ACA Standard 5-ACI-1D-10).  The County believes that this requirement does not violate the County's Collective Bargaining Agreement and agrees to make reasonable efforts to enforce this requirement; however, in the event that an arbitrator, the Pennsylvania Labor Relations Board, or a Court of competent jurisdiction

determines that this requirement does violate the County's Collective Bargaining Agreement, this requirement will be deemed satisfied by such a ruling.

4. At all times at least 75% of Staff present on each unit must be current in the above training (consistent with NCCHC standard MH-C-04).

5. These programs will utilize trainers from, and be developed in coordination with, the National Institute of Corrections or another entity approved by Plaintiffs.

6. The above training must be provided within 180 days of settlement approval and must be provided annually thereafter.  For new hires, the above training will be provided within 90 days of hire date.

c. <u>Training requirements for use of force and de-escalation</u>

1. The County shall provide all Correctional Staff mandatory, in-person use of force training every other year and virtual training each year in which in-person training does not take place, which substantially includes the following components:

   (a) Review of the Jail's Use of Force Policy, as revised in February 2022, and all changes from prior versions;

   (b) Emphasis that the underlying premise of the Use of Force Policy is to use the least amount of force possible, and examples of what that means;

   (c) Discussion of principles of "why now" and "time and distance," and the fact that disobeying a direct order does not require an immediate response in all circumstances;

   (d) Discussion of the fact that force alone cannot keep a facility safe and secure and that unnecessary and excessive force creates the need for more force;

   (e) Discussion of the fact that violence and misconduct decline and facilities are safer when staff establish rapport with incarcerated persons, are respectful to them, and are responsive to their legitimate questions and concerns.

   (f) At all times at least 75% of Staff present on each unit must be current in the above training.

2. The County shall provide all Staff mandatory, in-person de-escalation training, annually, which includes the following components:

   (a) Principles of de-escalation and techniques;

   (b) How to talk to incarcerated persons to find out why they are angry or disobedient;

   (c) How to safely manage a confrontation with an incarcerated person;

(d) How to intervene if a staff member is not following policy or training;

(e) Use of scenarios where varying amounts of force are appropriate, and discussion of how to use the least amount of force possible under different scenarios;

(f) Review of videos of past uses of force so staff can learn what went well and where they could improve;

(g) Role-playing so staff can learn and practice the techniques of de-escalation.

3.   These programs will utilize trainers from, and be developed in coordination with, the National Institute of Corrections, or another entity approved by Class Counsel, subject to the dispute resolution procedure.

4.   The above training must be provided within 180 days of settlement approval and must be provided annually thereafter.  Priority will be given to staff participating in special response units.  For new hires, the above training will be provided within 90 days of hire date.

d.   Medication Administration Training

1.   The County shall provide Medical Administration training in compliance with NCCHC standard J-C-05 to all employees who administer or deliver prescription mental health medication to incarcerated persons.  This training shall include matters of security, accountability, common side effects, appropriate mechanisms to address non-adherence to medication regimens by incarcerated persons, maintaining appropriate amounts of medication, how to anticipate and prevent shortages, and documentation of administration of medicines.  This training will be approved both by the Mental Health Director and by AHN.

2.   This program will utilize trainers from, and be developed in coordination with, the National Institute of Corrections or another entity approved by Class Counsel, subject to the dispute resolution procedure.

3.   The above training must be provided within 180 days of settlement approval and must be provided annually thereafter.  For new hires, the above training will be provided within 90 days of hire date.

e.   Implementation of training

1.   Documented annual performance reviews of Mental Health Staff shall be conducted by the Deputy HSA- Behavioral Health or other individual who is independently licensed and who has sufficient seniority and qualifications, including the clinical performance review required by NCCHC standard J-C-02.

2.   The County shall conduct or have conducted on its behalf, regular audits of training as follows:

(a) The Mental Health Director and Deputy HSA- Behavioral Health will review each of the trainings identified in Section V of this Consent Order at least annually and recommend changes to or improvements in those trainings. This review and recommended changes will be documented.

(b) Every six months, a designated individual will question a random sample of Correctional Staff with respect to (1) signs and symptoms of mental illness; (2) communicating with incarcerated individuals who have positive signs of mental illness; and (3) procedures for appropriate referral of incarcerated individuals with mental health complaints. The purpose of this review is to assess the efficacy of the training described above. Results of these reviews will be documented and provided to the Mental Health Director and Deputy HSA- Behavioral Health.

(c) Every six months, a designated individual will audit or review the intake screening process to assess how well the screening is identifying those with mental health conditions. The purpose of this review is to assess the efficacy of the training described above. Results of these reviews will be documented and provided to the Mental Health Director and Deputy HSA- Behavioral Health.

(d) Every six months, a designated individual will question a random sample of Correctional Staff and Mental Health Staff with respect to use of force and de-escalation. The purpose of this review is to assess the efficacy of the training described above. Results of these reviews will be documented and provided to the Mental Health Director and Deputy HSA- Behavioral Health.

f.  The Monitor shall assess training and compliance with the above requirements for the Monitoring Period. The Monitor's assessment shall include:

1.  Review of written training materials for each of the above-described trainings;

2.  Periodic attendance at live training sessions and access to online training sessions;

3.  Review of documentation of attendance at training sessions and completion of online training sessions;

4.  Review of audits conducted by or on behalf of the County to ensure training is being implemented properly, and accompanying documentation described above;

5.  Review of annual performance reviews to assess thoroughness and efficacy of those reviews; and

6.  The Monitor's own audit of implementation of training, to include whatever components the Monitor deems appropriate.

**VI.    Clinical Autonomy**

a.  Qualified Health Care Professionals ("QHCP") shall have autonomy with respect to clinical decisions.  Clinical decisions shall be made without interference from other personnel.

b.  Non-clinical staff (non-QHCPs) shall have no input or decision making authority in the following:

1.  Decisions regarding medication, including distribution of medication;

2.  Whether any patient should be admitted or discharged from an acute pod;

3.  Whether patient is a danger to self or others (once a clinician is able to be present and make that determination);

4.  Whether a patient should be on suicide watch, and when any such watch should cease;

5.  Decisions regarding treatment modalities and frequency of those modalities, including individual counseling, group counseling, eligibility for programming, encounters with a QHCP, etc.;

6.  Patient's access to blankets, paper, writing instruments, books and hygiene items (except when such access is being denied for security reasons).

c.  All Staff (including Mental Health Staff, Correctional Staff and all others) must report any attempts by non-clinical staff to interfere with clinical decisions.

d.  All Staff will be made aware of these changes through written communications and periodic training.

**VII.    Receiving Screening and Mental Health Screening and Evaluation**

a.  <u>Receiving screenings upon arrival.</u>

1.  The Receiving Screening for each individual shall take place as soon as possible but not later than 24 hours after arrival at ACJ.

2.  Screenings shall be conducted by a QHCP, and shall be consistent with ACBOC Policy 305.

3.  The screenings shall comply with NCCHC standard MH-E-02.

b. <u>Mental Health Screening and Evaluation</u>

   4. All incarcerated individuals will receive an initial mental health screening and evaluation within 14 days of admission, or sooner if clinically indicated. Individuals with positive findings (i.e., potential need for treatment) will receive a subsequent, comprehensive mental health evaluation by a psychiatrist, as described in ACBOC Policy 2506. When a psychiatrist is not available to conduct this evaluation, it may be performed by a licensed mental health counselor.

   5. The Mental Health Screening and Evaluation shall be conducted by a QMHP, or a QHCP with documented training.

   6. The initial assessment process shall comply with NCCHC standard J-E-05.

c. Private interview space will be provided for the receiving screening and the mental health screening and evaluation. The County shall conduct no more than two mental health screening and evaluations at a time; when two such screenings and evaluations are conducted at the same time, they shall be conducted at opposite ends of the screening room (of the four stations in that room, the screenings will be conducted at stations one and four).

d. Screeners and initial assessors shall receive training annually, which will include at a minimum: (i) the importance of effective intake screening to the County's policies and goals; (ii) practice using the screening forms; (iii) the intent of the inquiries on these forms; (iv) effective communication and interviewing skills that convey compassion; (v) use of case studies to practice identifying symptoms of depression and other mental illnesses and signs of emotional response to incarceration; (vi) common psychotropic medications and their purpose; (vii) criteria for referral to mental health; (viii) personal biases that may hinder objective risk screening and assessment; and (ix) periodic observation of screening performance by the Mental Health Director.

e. As part of the Receiving Screening, screeners will verify a patient's medications through SureScripts and contact pharmacies reported by the patient. For patients transferred from another facility, screeners will obtain healthcare paperwork to verify medication and other necessary treatment. As part of the Mental Health Screening and Evaluation, the QMHP or QHCP will verify that these requirements have been completed and take corrective action if not. If the screener is not able to verify medications at the Receiving Screening, and the patient has a serious mental health condition, the patient shall be seen by an advanced prescribing practitioner within seven days of admission so that medications can be prescribed based on an appropriate examination.

f. Screeners and assessors must have access to electronic health records of those who have previously been incarcerated at ACJ, and must access those records to inform

the screening and assessment process.

g. The Monitor shall assess the results of these changes by, among other things, making unannounced visits to observe screenings and assessments, a review of documentation of completed screenings and assessments, and a review of the number of screenings and assessments that result in referrals for further mental health evaluation, as compared to the number of referrals that would be expected, and whatever other mechanisms the Monitor deems appropriate.

## VIII. Health Records

a. The County shall utilize individual treatment plans for each mental health patient, not just those in the acute mental health units. Progress notes do not constitute a treatment plan. Rather, treatment plans will be documented and will include, at a minimum: (i) frequency of follow up for evaluation and adjustment of treatment modalities; (ii) adjustment of psychotropic medications, if indicated; (iii) referrals for psychological testing, medical testing, and evaluation, including blood levels for medication monitoring as required; (iv) when appropriate, instructions about diet, exercise, personal hygiene and adaptation to the correctional environment; and (v) documentation of treatment goals and objectives, interventions necessary to achieve those goals, and notation of clinical progress. The treatment plans for those in observation status or an acute mental health unit also must include plans for monitoring once the patient is removed from observation status or an acute unit.

b. The individual treatment plan shall be created no later than during the evaluation subsequent to the Mental Health Screening and Evaluation described above and must be updated every 120 days. The plan will be referenced during all encounters to ensure care is consistent with that plan.

c. The County shall utilize Problem Lists within the Electronic Health Record, and these Problem Lists will be referenced during all encounters.

d. The County shall comply with NCCHC standard J-A-08 with respect to clinical records. The clinical record will contain, at a minimum, (i) a problem list containing medical and mental health diagnoses and treatments, suicide risk and known allergies; (ii) initial mental health assessment forms or medical summaries; (iii) record of psychological tests administered and dates of administration; (iv) progress notes of all significant findings, diagnoses, treatments and dispositions; (vi) orders for prescribed medication and medication administration records; (vii) consent and refusal forms; (viii) release of information forms; (ix) place date and time of each clinical encounter; (x) the individual treatment plan; and (xi) signature and title of each documenter.

e. The Monitor shall assess the results of these changes by, among other things, reviewing Health Records or a random sampling of Health Records to monitor

16

compliance, and whatever other mechanisms the Monitor deems appropriate.

## IX.    Mental Health Encounters

a.  Those who are referred for further mental health evaluation after the Mental Health Screening and Evaluation described above shall be examined by a psychiatrist or advanced prescribing practitioner within fourteen days of the referral.

b.  Sick call requests or requests for mental health services will be triaged by a Qualified Health Care Professional ("QHCP") within 24 hours of submission of such a request by the incarcerated person (consistent with ACBOC Policy 2508 and NCCHC standard MH-E-05). At the time of triage, a QHCP will place the individual into the appropriate queue for a follow up substantive encounter. If the request or the triage suggests an immediate or expedited encounter is appropriate, a QHCP will expedite the encounter as clinically appropriate.

c.  The County shall take steps to ensure that the wait time for substantive encounters with a QHCP averages less than 7 days, and in no event is greater than 14 days.

d.  The County shall take steps to ensure that the wait time for substantive encounters with a psychiatrist averages less than 21 days and in no event is greater than 42 days. These deadlines do not apply to scheduled follow-ups, which shall be held on or before the date identified in the patient's records.

e.  In each encounter, the QHCP shall note in the Electronic Health Record an appropriate period for a follow-up encounter. The County shall institute procedures to ensure that follow-up encounters occur within the time frames identified in the patients' records.

f.  Segregation rounds.

1.  Segregation rounds, for any person housed in Segregation as defined above, will be conducted by a QHCP at times when it is anticipated that patients will be awake.   If a patient is asleep or non-responsive for two consecutive Segregation rounds, an additional round to those patients will be conducted within 24 hours to ensure that the individual can be appropriately assessed.

2.  Each QHCP conducting Segregation rounds shall receive training on the impact of Segregation.

3.  The purpose of the Segregation round is to triage and determine each individual's mental health needs. The QHCP conducting rounds shall ask the incarcerated individual questions designed to assess their mental health state (not just "how are you feeling today" or "are you feeling suicidal") and shall document their own observations of the individual's behavior and responses. If it is determined that

any particular individual has a need for mental health services, whether or not the individual affirmatively discloses mental health needs or affirmatively requests treatment, that person will be seen in compliance with the time frames outlined above.

## X.      Privacy and Confidentiality

a. The County shall provide appropriate privacy and confidentiality for mental health encounters, as determined by a QHCP.

b. Individual therapies and assessments as well as group therapies must be provided in an area with private interview space, not cell-side and not in a pod's general recreation area.

c. Segregation rounds or triage in response to mental health requests may be initially conducted cell-side, but substantive encounters must be held in a private interview space.

d. The County shall either (a) convert one cell in each housing pod into a private interview space; (b) create private interview spaces in a central location; or (c) some combination of the above  These interview spaces shall be equipped with wired connections and technology to facilitate remote or virtual therapeutic counseling and also will be used for in-person mental health encounters, including therapeutic counseling, assessments or evaluations, responses to sick call requests, or other substantive encounters.  The interview spaces will be operational within six months of the Effective Date.

## XI.     Educational Programming

a. Within two months of the Effective Date, the County shall establish in the mental health units: (a) a psychoeducational group intervention program; and (b) a psychiatric nursing group intervention program.  It is understood that this programming is educational, not therapeutic.

b. Within one month after a psychologist is hired but not later than ten months after the Effective Date, the County shall implement a behavior management intervention program for the population in Restricted Housing.  This program will be designed to reduce the length of stay both in Restricted Housing and at ACJ overall, reduce recidivism, and identify opportunities for diversion from restricted housing to support rehabilitation.  This program will be designed and implemented under the authority of a licensed psychologist.

   c.  <u>Other programming</u>

     1.  The County shall continue to offer the chaplaincy program, library services, educational programs and substance abuse programs, as advertised on the County's website.

     2.  In addition, the County shall create programming that will be available to any individual housed at ACJ who desires to participate and who remains at ACJ more than seven days, provided that a Chief Deputy Warden or designee has not made an individualized determination that such individual's participation would be inconsistent with the security needs of ACJ.  The programmatic offerings shall include at a minimum, cognitive behavioral programs (such as Thinking for a Change), parenting programs, survivors of violence programs, vocational skills programs and other programs designed to educate individuals on healthy life choices, dealing with traumatic situations and skills to help reduce recidivism.

     3.  The County shall have at least three of these programs operating within six months of the Effective Date, and at least five of these programs operating within twelve months of the Effective Date.  These programs may be administered by ACJ staff or by outside organizations working with ACJ.  Each program must allow for participation of up to 40 individuals, in groups of no more than 20 individuals.  Each program will be held at least annually, and will also be available to those in Segregation, subject to security concerns of each individual program.

   d.  The Monitor shall assess compliance with the above requirements annually for the Monitoring Period.  The Monitor's assessment shall include:

     1.  Review of records of programs offered, attendance at those programs, and content of those programs.

     2.  Review of records of any individualized determinations excluding individuals from programming sessions.

     3.  Any other mechanism or review deemed appropriate by the Monitor.

     4.  The Monitor shall make recommendations for changes to or improvements in programming.

**XII.  Psychotherapy (therapeutic counseling)**

   a.  Within six months of the Effective Date, the County shall fill the following positions to support the onboarding, development and skills of clinical staff, particularly with respect to their involvement with counseling and psychotherapy: (a) Director of Mental Health; (b) Staffing Educator; and (c) Deputy HSA - Behavioral Health.

b. Consistent with the provisions of the Consent Order relating to staffing, within six months of the Effective Date, the County shall have 6 full-time licensed therapists capable of conducting in-person or tele-psychotherapy sessions.

c. It is understood that each therapist will need some time to receive training and build up to a full case load. Each therapist will begin conducting counseling sessions within one month of their start date, and will have a full case load within four months of their start date. In other words, within ten months of the Effective Date, at least 6 therapists will have a full case load of counseling sessions. A full case load consists of at least 30 individual counseling sessions per week, and not more than 75 patients.

d. Individual counseling shall be conducted as set forth below. Until such time as the County has sufficient staffing, the County will establish a mechanism for identifying those patients with the greatest need to ensure those patients receive counseling, and will create a wait list for others. This mechanism shall be in place within ninety days of the Effective Date.

e. "Individual Counseling" means regularly-scheduled one-on-one therapeutic counseling sessions, either in person or remotely, between a psychologist or Pennsylvania-licensed counselor and an incarcerated person. Each session shall be scheduled to last for a minimum of thirty (30) minutes, or longer within the discretion of the psychologist or licensed counselor. Counseling sessions shall occur bi-weekly, unless the psychologist or licensed counselor makes an individualized determination that for clinical reasons sessions for a particular individual should be more or less frequent.

f. Unless a licensed counselor or psychologist makes an individualized determination documented in the Electronic Health Record that for clinical reasons a particular individual should be excluded from counseling, Individual Counseling ***shall*** be provided to each incarcerated individual who:

1. has been flagged as having a Serious Mental Illness by the Department of Human Services;

2. has a current or past diagnosis within the past two years (as confirmed by medical records received by or in the possession of ACJ) of any of the following conditions: Substance-Induced Psychotic Disorder (F10.159, F10.259, F10.959, F12.159, F12.259, F12.959, F13.159, F13.259, F13.959, F14.159, F14.259, F14.959, F15.159, F15.259, F15.959, F16.159, F16.259, F16.959, F18.159, F18.259, F18.959, F19.159, F19.259, F19.959), Schizophreniform Disorder (F20.81), Schizophrenia (F20.9), Delusional Disorder (F22 (any type)), Brief Psychotic Disorder (F23 (any type)), Schizoaffective Disorder (F25.0, F25.1), Other Psychotic Disorders (F06.0, F06.2, F28, F29), Bipolar I and II (F.31 (any type)), Major Depressive Disorder (F32 (any type), F 33 (any type)), Borderline Personality Disorder (F60.3).

3. is placed, or has been placed, in any of the Mental Health Housing Units;

20

4.  has a history of self-harm, including any suicide attempt, or documented suicidal ideation within the previous 24 months;

5.  is referred to Individual Counseling by any Mental Health Staff.

h.  A Mental Health Therapist or higher level Mental Health Staff Member shall conduct a Mental Health Evaluation of all eligible patients within 45 days of admission or receipt of referral to establish treatment planning needs, frequency and duration of treatment, if applicable.

i.  Individual Counseling shall continue during any times when the incarcerated individual is in segregated, disciplinary, restricted or protective housing.

j.  Individual Counseling sessions shall be conducted in private, in the private interview spaces as described in Section X or some other location with a similar level of privacy.

k.  Each Individual Counseling session shall be documented in the Electronic Health Records, and this documentation will include the counselor's notes of the session and the start and end time of the session.  The Deputy HSA- Behavioral Health or Compliance Coordinator shall establish an additional system or mechanism to document each session so that compliance with these requirements can be assessed by the Deputy HSA- Behavioral Health and the Monitor.

l.  Individual Counseling shall continue until a licensed counselor or psychologist determines that continued counseling would not be therapeutically beneficial to the individual. Prior to the termination of Individual Counseling the patient must be permitted to express their own opinion regarding their preference and assessment of the benefits of Individual Counseling. The reasons for discontinuance, and the patient's own opinion, will be documented.

m.  If an individual refuses to attend their Individual Counseling for three sessions in a row, refuses to participate in counseling, or has engaged in serious misconduct during the session, they may be removed from the above requirements for a period of six months. A refusal form with the patient's signature or with a notation that the patient refused to sign must be completed any time counseling is voluntarily refused. After the six month period, they shall again be scheduled for Individual Counseling.

n.  The County shall establish a process to review the performance of those conducting the Individual Counseling sessions.   This process, and the reviews themselves, will be documented.

o.  The Monitor shall assess compliance with the above requirements annually for the Monitoring Period.  The Monitor's assessment shall include:

1.  Review of a representative sample of electronic health records documenting counseling sessions.

2.  Review of the County's records of review of the counseling sessions as described above.

3.  Review of records of any individualized determinations excluding individuals from counseling sessions or reducing the frequency of such sessions to less than once per month.

4.  Interviews of a representative sample of those conducting counseling sessions and those participating in counseling sessions.

5.  Any other mechanism or review deemed appropriate by the Monitor.

6.  The Monitor shall make recommendations for changes to or improvements in counseling.

## XIII. Medication Management

a.  The Monitor shall conduct, or appoint someone, with defendant's approval that will not be unreasonably withheld, appropriate to conduct, a review of ACJ's medication management and administration of psychotropic medications. This review will include an assessment of security, accountability, appropriate mechanisms to address non-adherence to medication regimens by incarcerated persons, maintaining appropriate amounts of medication, how to anticipate and prevent shortages, and documentation of administration of medicines. Upon completion of the review, the Monitor or their designee, shall prepare a report outlining any recommendations.

b.  Upon receipt of the above-described report, the Parties will meet and discuss the report's recommendations and if they cannot agree on changes to implement, either party may petition the Court to make that determination. The Court will retain jurisdiction to resolve this dispute.

## XIV. Use of Force

a.  Use of Force Policy and Practice

1.  The County agrees that the language of ACBOC Policy No. 207 (2/1/22 revision) will not be changed so as to lessen the requirements of de-escalation or intervention by Mental Health Staff. In particular, the language added with the 2/1/22 revision will not be eliminated or limited in scope.

2.  In addition, the County will set forth in policy the provisions outlined below and will provide training for both Correctional Staff and Mental Health Staff so they can comply with these provisions.

3.  Whenever a Correctional Staff member determines there is a need to use force on an individual reasonably believed to have a mental health condition, or whenever a Correctional Staff member sees a fellow offer begin to use force on an individual reasonably believed to have a mental health condition, the officer will alert Mental Health Staff so that they may intervene as soon as it is safe to do so. Known prior mental health treatment or prescription of psychotropic medications, known prior requests for mental health care, reported hallucinations or paranoia, aberrant behavior, and previous or current housing on an acute unit, are all indications that an individual could reasonably be believed to have a mental health condition.

4.  Whenever they witness a Use of Force or are advised of a Use of Force, Mental Health Staff will attempt to de-escalate the situation in order to remove or reduce the need for force, subject to considerations of personal safety.

5.  If Mental Health Staff concludes that a particular Use of Force is contraindicated from a healthcare standpoint, the Use of Force will cease as soon as that determination is made, until such time as Supervisory Staff consider Mental Health Staff's findings and nevertheless conclude that force is warranted because of an imminent and serious threat to the safety of a person or the institution. If Mental Health Staff determines that the extent of force should be reduced, the force will be reduced in compliance with that determination until such time as Supervisory Staff consider Mental Health Staff's findings and nevertheless conclude that force is warranted because of an imminent and serious threat to the safety of a person or the institution.

6.  If force is used, upon completion of the Use of Force, Mental Health Staff will evaluate the individual to assess the impact of the Use of Force on the individual's mental health condition. This evaluation will be documented in the individual's Electronic Health Record.

7.  Mental Health Staff will document whenever they are called to participate in a potential Use of Force event, regardless of whether force is actually used, and shall indicate in that documentation whether force was used, the nature and extent of force used, and whether Mental Health Staff findings were accepted or overridden by correctional staff. The purpose of this requirement is to assist in tracking the efficacy of these requirements and to report to the Monitor.

8.  The County will implement the revised Use of Force Policy and the requirements stated herein by, among other things, (a) including the revised Policy and strategies for meeting the requirements of that Policy into Use of Force training, (b) training Supervisory Staff on the requirements of the Policy, including the requirements for Planned Uses of Force and the need to address these requirements during the review of Use of Force reports and videos, (c) imposing discipline for violation of the Policy, as described further below.

b. <u>Planned Uses of Force on those with mental health conditions</u>

1. Prior to any planned use of force, Supervisory Staff shall report to the scene to de-escalate the situation.

2. If the Supervisor is unable to de-escalate the situation, Supervisory Staff will contact the Mental Health Staff to de-escalate the situation.

3. De-escalation attempts shall be recorded by video or closed-circuit television.

4. Prior to any planned use of force, qualified Mental Health Staff shall assess whether any mental health conditions could be contributing to the incident or circumstances surrounding the incident, and if the individual has a mental health condition, the qualified Mental Health Staff shall make the determination whether force would be contra-indicated.

5. It shall be the responsibility of Supervisory Staff to contact Mental Health Staff and request the above assessment prior to the implementation of force.

6. Mental Health Staff shall advise Supervisory Staff if they determine that a mental health condition could be contributing to the incident or circumstances surrounding the incident, or if they determine that force is contra-indicated from a healthcare standpoint. If Mental Health Staff so finds, force shall not be used unless and until Supervisory Staff consider Mental Health Staff's findings and nevertheless conclude that force is warranted because of an imminent and serious threat to the safety of a person or the institution.

7. Mental Health Staff will document their assessment of the individual and their recommendation related to the Use of Force in the Electronic Health Record.

8. Supervisory Staff will document the request for assessment and the results of the assessment in the Use of Force report.

9. If force is used notwithstanding the above measures, upon completion of the Use of Force, medical and Mental Health Staff will conduct a triage screening to identify any injury or acute condition requiring immediate treatment. Mental Health Staff will schedule a follow up appointment to occur within 14 days of the Use of Force to determine if any treatment planning needs have changed as result of the Use of Force.

10. Supervisory Staff will document whenever Mental Health Staff are called in, regardless of whether any force is actually used, and shall indicate in that documentation whether force was used, the nature and extent of force used, and whether Mental Health Staff findings were accepted or overridden by Correctional Staff. The purpose of this requirement is to assist in tracking the efficacy of these requirements and to report to the Monitor.

c.  Reviews of Use of Force Incidents (Planned or Unplanned)

   1.  The review of each Use of Force report and video by the applicable Captain, Major and Deputy Warden of Operations will be documented and will include a review for the following:

      (a)  Compliance with the Use of Force Policy;

      (b)  De-escalation and intervention efforts required by the Policy and the requirements of the Consent Order;

      (c)  Mental health assessment required by the Consent Order, as described above;

      (d)  The appropriateness of the level of force used;

      (e)  Identifying opportunities for avoiding Use of Force or the extent of force used; and

      (f)  Recommendations for improved or additional training, changes to policy or other mechanisms to reduce the frequency or extent of force used.

   2.  A random sample of at least twenty percent of all Uses of Force against Plaintiff Class Members (excepting those Uses of Force that result from fights between two or more incarcerated individuals) will be reviewed by the Mental Health Director, the Deputy HSA—Behavioral Health, or other qualified individual.  This review will be documented and will include a review for each of the above-described elements.

      (a)  The Mental Health Director will maintain documentation of the total number of Uses of Force against those with mental health conditions, the date of each such use of force, the type of force used, the pod or location in which such force was used, and the specific mental health condition of the individual on whom force was used.

      (b)  The Mental Health Director will periodically evaluate the frequency of Use of Force against those with mental health conditions, and will report to the Warden any change in frequency.

d.  Discipline for violations of Use of Force Policy

   1.  The County shall impose discipline for violations of the Use of Force Policy and the above requirements.  The type and extent of discipline to be determined by Supervisory Staff.

   2.  The County will maintain documentation of the nature of each violation, the discipline imposed for each violation, and whether that violation involved an individual with a mental health condition.

e. One-Year Review of Use of Force

1. One year after the Effective Date, the Parties will evaluate the efficacy of the above provisions and whether additional changes are necessary or appropriate. As part of this review, the County will share with Class Counsel the documentation identified in paragraphs (A)(vii), (B)(vii), (B)(x), (C)(ii), and (D)(ii).

2. In the event the Parties disagree whether further changes are appropriate and no other procedure to resolve the impasse is agreed to, either party may move the Court for relief, which may include request for an appointment of an independent expert to review the current Use of Force levels and develop recommendations to reduce the frequency of Use of Force, whose findings must be implemented by the County.

f. Internal Reviews by the County

1. The County shall designate an individual to review its compliance with the above Use of Force requirements.

2. This review will include an evaluation of all, or a representative sample of at least twenty percent of all Use of Force reports and videos and Electronic Health Records (excepting those Uses of Force that result from fights between two or more incarcerated individuals) for compliance with the above requirements, generation of reports regarding the Uses of Force that were avoided by using the procedures described above, the documentation maintained by the Mental Health Director with respect to Uses of Force as described above, review of any discipline imposed as a result of violations of these requirements, and any other information necessary or appropriate to evaluate the County's compliance. This audit also will include the designated individual questioning a random sample of Supervisory Staff and Mental Health Staff to assess their awareness of these requirements and compliance with these requirements.

3. The designated individual shall prepare and submit reports regarding the results of the review each Reporting Period, and this report shall be provided to the Court, the Monitor and counsel for the Parties.

g. Monitoring

1. The Monitor shall assess compliance with the above requirements during the Monitoring Period.  The Monitor's assessment shall include:

   1. Review of the training implementing the revised Use of Force Policy.

   2. Review of all Use of Force reports for compliance with the above-stated requirements.

3.  Review of the Electronic Health Records of those individuals subjected to force, for compliance with the above-stated requirements.

4.  Review of the documentation of the Use of Force report reviews by the Captain, Major, Deputy Warden of Operations and Mental Health Director.

5.  Review of the data maintained by the Mental Health Director, as described above.

6.  Review of records of discipline of officers who were determined to have violated the Use of Force Policy or the above requirements.

7.  Any other mechanism or review deemed appropriate by the Monitor.

8.  The Monitor shall make recommendations for changes to or improvements in Use of Force policies and procedures and the implementation of the above requirements.

## XV.    Use of Segregation

a.  Section 205-30 of the Allegheny County Code prohibits solitary confinement at ACJ except in emergencies.  For purposes of the Code, solitary confinement is defined as confinement of a detainee or inmate in a cell or other living space for more than 20 hours a day.

b.  The Parties recognize and accept the substantial literature addressing the impact of isolation on those with mental health conditions and others. In light of this literature and Section 205-30 as described above, the County shall take the following precautions to ensure that Plaintiff Class members are not harmed by placement into Segregation.

c.  At all times, when in Segregation, as defined above, except in emergencies, Plaintiff Class Members shall receive a minimum of four out-of-cell hours daily.  Use of cages, such as in Pod 8E, shall not constitute out-of-cell time for Plaintiff Class Members. Rather, out of cell time for Plaintiff Class Members must include meaningful social interaction and treatment.

d.  Whenever a lockdown or emergency (for whatever reason) affects Plaintiff Class Members for more than 36 hours in a 48 hour period, those individuals shall receive the same "Segregation rounds" as described below, for the duration of the lockdown or emergency.  The County shall adopt and implement a policy to ensure that such individuals are added to the Mental Health Staff's Segregation rounds.

e.  ACBOC Policy 2600 states: "The facility and program administrator, or designee, and the responsible clinician, or designee, consult prior to acting regarding . . . seriously

27

mentally ill . . . inmates in the following areas: (a) housing assignments . . . (c) disciplinary measures." Further, ACBOC Policy 2702 states: "Upon notification that an inmate is placed in Segregation: (a) a QHCP reviews the inmate's health record; (b) if existing mental health needs requires accommodation, custody staff are notified." Any incarcerated person with a serious mental illness qualifies for accommodation under Policy 2702 and will receive appropriate accommodations.

f.   Prior to placement of any Plaintiff Class Member into Segregation as defined above, a QMHP will review the incarcerated person's health record and conduct an assessment of the individual to determine if placement into Segregation is contraindicated. This determination will be based both on the individual's current symptoms and behavior and on their health records. Each QMHP who conducts such assessments will be trained on the literature discussing the impacts of Segregation or solitary confinement on those with mental illness.

If the QMHP determines that placement into Segregation is contraindicated, the individual will not be placed into Segregation, although that individual may be placed in a Mental Health Unit. If the QMHP determines that placement into Segregation is not contraindicated, placement into Segregation nevertheless will be limited to a maximum of 28 days, provided that this period may be extended for additional 28 day periods where, for each such extension, (1) Supervisory Staff makes an individualized determination that continued placement in Segregation is necessary to avoid an ongoing security risk, and documents that individualized determination, and (2) a QMHP determines that continued placement in Segregation is not contraindicated, and documents that determination.

g.   The County shall proactively monitor Plaintiff Class Members in Segregation for decompensation or increased mental health symptoms.

1.   Each Staff member conducting Segregation rounds will be regularly updated on the literature regarding the adverse impact of Segregation and potential effects.

2.   Mental Health Staff shall inform Correctional Staff of the literature regarding the impacts of Segregation on mental health, and any Correctional Staff working on segregated units should receive regular updates on this literature.

3.   The purpose of the Segregation round is to triage and determine each individual's mental health needs. The QHCP conducting rounds shall ask the incarcerated individual questions designed to assess their mental health state (not just "how are you feeling today" or "are you feeling suicidal"), and shall document their own observations of the individual's behavior and responses. If it is determined that any particular individual has a need for mental health services, whether or not the individual affirmatively discloses mental health needs or affirmatively requests

treatment, that person will be seen in compliance with the time frames outlined above.

4.   If a patient is sleeping or non-responsive for two consecutive days during Segregation rounds, another visit should be scheduled at a different time so that adequate assessment can be made.

5.   Every Plaintiff Class Member should have a more robust encounter in a confidential setting once per week where a more fulsome assessment can be performed.

6.   As a result of any of these rounds or assessments, pursuant to ACBOC Policy 2508, if the incarcerated individual's medical or mental health condition contraindicates continued assignment to Segregation, the assistant director of nursing will be notified and will notify the shift commander to have the inmate placed in an appropriate treatment setting until the individual's health condition improves.

## XVI.  Implementation, Audits and Reporting

a.   The County shall review and revise ACJ's existing policies, procedures, protocols, training curricula and practices to ensure that they are consistent with, incorporate and address all provisions of this Consent Order.  The County shall notify Staff Members of any material revisions and, where necessary, train Staff Members on these changes.

b.   The County shall revise and/or develop, as necessary, other written documents, such as logs, handbooks, manuals and forms, to effectuate the terms of this Consent Order.

c.   The County shall designate a County employee who shall serve as Compliance Coordinator.  The Compliance Coordinator shall report directly to the Warden and the County Manager.  The Compliance Coordinator shall be responsible for coordinating compliance with this Consent Order and shall serve as the County's point of contact for the Monitor and Class Counsel.

d.   To better ensure that the requirements of this Consent Order are being implemented and having the intended effect, the County will conduct audits or reviews of their compliance with these requirements.

1.   With respect to staffing, the County will conduct the reviews and submit the information identified in Section IV(d) of this Consent Order.

2.   With respect to training, the County will conduct the reviews and submit the information identified in Section V(e) of this Consent Order.

3. With respect to clinical issues and improvements, the audit will include a review of written communications and training regarding clinical autonomy, documentation of completed screenings and assessments, review of data regarding the number of referrals for mental health evaluation as compared to the number of referrals that would be expected, documentation of the timeliness of mental health encounters and compliance with the above-described requirements. This audit will also include randomized review of electronic health records to ensure consistent and appropriate use of treatment plans and problem lists, and timeliness of mental health encounters, and any other information necessary or appropriate to evaluate the County's compliance with the above requirements. This audit also will include the designated individual questioning a random sample of Mental Health Staff to assess staff's autonomy in making clinical decisions, to assess their awareness of these requirements, and compliance with these requirements.

4. With respect to therapeutic counseling, the audit will include review of a representative sample of health records documenting counseling sessions, review of records of any individualized determinations excluding individuals from counseling sessions or changing the frequency of counseling sessions to fewer than once per month, and interviews with a representative sample of those conducting counseling sessions and those participating in counseling sessions.

5. The County shall conduct reviews of Mental Health therapists, consistent with Section XII(m) of this Consent Order.

6. With respect to Use of Force, the County will conduct the reviews and submit the information identified in Section XIV(f) of this Consent Order.

   With respect to segregation, the audit will include a review to ensure that all Plaintiff Class Members are receiving a minimum of four hours of out-of-cell time daily, consisting of meaningful social interaction, congregate activities and/or rehabilitative programs, a review of segregation placement forms or other documentation of pre-segregation assessments, a review of notes from segregation rounds and follow up appointments scheduled from those rounds, and a review of the training on the literature relating to the psychological impacts of segregation.

e. The Compliance Coordinator shall submit periodic compliance reports to the Monitor and Class Counsel. These Compliance Reports shall be provided to the Monitor and Class Counsel within thirty days after the end of each Reporting Period. The first Reporting Period shall begin on the Effective Date and end four months after the Effective Date. Each subsequent Reporting Period will be for the following four month period. Each Compliance Report shall at a minimum include the following:

    1.  a description of the actions that the County has taken during the Reporting Period to comply with each provision of this Consent Order.

    2.  a description of any instances during the Reporting Period when the County was unable to comply with a provision of this Consent Order;

    3.  the information reviewed by the County with respect to its audits or reviews for compliance with the Consent Order, including the information specified above.

f.   The County shall maintain sufficient records to document that the requirements of this Consent Order are being properly implemented, including any records required by or developed pursuant to this Consent Order. The County shall maintain and provide to the Monitor, upon request, all records or other documents relevant to verify that they have taken the actions described in the Compliance Reports.

g.   If Class Counsel in good faith believe that the County may not be in compliance with any obligation under this Consent Order, Class Counsel shall contact the Monitor (below) to obtain information and/or documents relevant to Class Counsel's particular concerns regarding the County's compliance.

## XVII. Monitoring

a.   Dr. Bandy X. Lee will serve as the Monitor and shall be responsible for assessing the County's compliance with this Consent Order. If at any time during the term of this Consent Order, the Monitor is unable to serve, the Parties shall make a good faith effort to promptly agree on a replacement. In the event the Parties cannot agree on a replacement, the Parties shall recommend candidates to the Court, and the Court shall appoint a new Monitor from the names submitted by the Parties.

b.   The County shall bear all reasonable fees, costs and expenses of the Monitor, including payments to the Monitor's staff, if any. The Monitor may hire or consult with such additional qualified staff as is reasonably necessary to fulfill their duties pursuant to this Consent Order without duplication of effort. The Monitor shall submit an invoice for their services, and the services of their consultants and staff, to the County on a monthly basis. Payment of such invoices will be made within 60 days of receipt. If the County objects to any fees, costs or expenses as unreasonable, unnecessary or duplicative, the County shall submit the invoice to the Court for a determination of reasonable fees, costs and expenses.

c.   The Monitor shall enter into an appropriate confidentiality agreement. The Monitor's staff shall be subject to the same access rights and confidentiality limitations as the Monitor.

d.  The Monitor shall be permitted to initiate and receive *ex parte* communications with all Parties.

e.  In order to perform their responsibilities under this Consent Order, the Monitor shall have access to: (a) ACJ and its various pods and facilities; (b) ACJ Staff Members, agents and contractors; (c) incarcerated persons; (d) non-privileged County documents and records; and (e) all documents identified in Sections IV through XVI of this Consent Order.  The Monitor shall have the right to conduct confidential interviews of incarcerated persons, to speak to Staff Members outside the presence of other Staff Members or Supervisors, and to observe training courses required by this Consent Order.  The Monitor's ability to interview Staff Members shall be subject to the employee's right to representation, if any, under state law or any appliable Collective Bargaining Agreement.

f.  Upon request to the Monitor, Class Counsel shall have access to information and other materials related to the provisions of this Consent Order, provided that privileged information shall not be shared with Class Counsel absent the County's consent.

g.  The Monitor's review will include the following:

1.  With respect to a review of staffing, review of items described in Section IV(d) of the Consent Order;

2.  With respect to training, review of items described in Section V(f) of the Consent Order;

3.  With respect to receiving screenings and mental health screenings and evaluations, review of items described in Section VI(g) of the Consent Order;

4.  With respect to health records, review of items described in Section VII(e) of the Consent Order;

5.  With respect to mental health encounters, review of the County's various queues by which the County tracks encounters and wait periods, reports generated by the County to track progress with respect to wait times, and any other documents or information the Monitor deems appropriate;

6.  With respect to segregation rounds, a review of health records or a random selection of health records of mental health patients housed in segregation, and any other documents or information the Monitor deems appropriate;

7.  With respect to privacy, a tour of the private interview spaces being constructed, a review of health records or other records documenting the use of those private

interview spaces, and any other documents or information the Monitor deems appropriate;

8. With respect to educational programming, review of the items described in Section XI(d) of the Consent Order;

9. With respect to therapeutic counseling, review of the items described in Section XII(o) of the Consent Order;

10. With respect to use of force, review of the items described in Section XIV(g) of the Consent Order;

11. With respect to segregation, review to ensure that all Plaintiff Class Members are receiving a minimum of four hours of out-of-cell time daily, consisting of meaningful social interaction, congregate activities and/or rehabilitative programs, a review of segregation placement forms or other documentation of pre-segregation assessments, a review of notes from segregation rounds and follow up appointments scheduled from those rounds, and a review of the training on the literature relating to the psychological impacts of segregation, and any other information the Monitor deems appropriate.

h. For each Reporting Period, the Monitor shall file with the Court and provide the Parties a report describing the efforts the County has taken to implement the requirements of this Consent Order and evaluating the extent to which the County has complied with each substantive provision of this Consent Order ("Monitor Report").

i. The Monitor shall issue a Monitor Report within 90 days following each Reporting Period. The Monitor Report shall be provided to the Parties in draft form for comment at least 30 days prior to their issuance, and the Parties shall provide the Monitor with their comments, if any, within 21 days after receipt. The Monitor shall consider the Parties' comments, and make any changes they deem appropriate before issuing the final report. The Monitor Reports shall be written with due regard for the privacy interests of individual Incarcerated Persons and Staff Members. The Monitor shall redact individual-identifying information as necessary.

j. Each Monitor Report shall evaluate the status of compliance with each substantive provision of this Consent Order using the following standards:

1. *Substantial Compliance*: has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision;

2. *Partial Non-compliance*: has achieved compliance on some components of the relevant provision of this Agreement, but significant work remains; or

    3.   *Full Non-compliance*: has not met most or all of the components of the relevant provision of this Agreement.

k.  The Monitor shall be responsible for independently verifying any representations from the County regarding their progress toward compliance, including but not limited to any representations included in the Compliance Reports and examining supporting documentation where applicable. Each Monitor Report shall describe in detail the steps taken by the Monitor and/or their staff to assess compliance with each substantive provision of the Consent Order, and the factual basis for the Monitor's findings concerning the extent to which the County has complied with each provision.

l.  The Monitor Report may include recommendations from the Monitor for ways to address areas of Partial Non-compliance or Full Non-compliance, or to improve the County's programs or services.

m.  The Monitor Reports filed with the Court shall be public documents, subject to legal requirements relating to patient and inmate confidentiality and privacy law, and the identity of individual employees responsible for alleged misconduct or who were subject to disciplinary action shall not be included in any public report, unless required or authorized by law or any applicable collective bargaining agreement.

n.  The Monitor shall continue to provide services and submit Monitor Reports until this Consent Order terminates, as described below (the "Monitoring Period").

## XVIII. Compliance and Enforcement

a.  This Court shall have continuing jurisdiction over this action to ensure compliance with the terms of this Consent Order until it terminates. The Parties consent to the jurisdiction of this Court over any proceedings seeking to enforce the terms of this Consent Order.

b.  The Court may schedule hearings or conferences, as it deems fit, to monitor progress toward Substantial Compliance.

c.  As set forth in Section IV(e) of this Consent Order, if at any time the County has not complied with the Interim Required Staffing Levels or the Required Staffing Levels. the Court shall schedule a hearing to explore the reasons for non-compliance.

d.  Other than with respect to Section XVIII(c) above, if Class Counsel believes the County is not in Substantial Compliance with any obligation under this Consent Order, Class Counsel shall, before seeking judicial action, give written notice of the

failure to the County and the Monitor. Within 20 days of receipt of such notice, the County shall respond in writing to Class Counsel and the Monitor setting forth its position with respect to whether it is in compliance with the relevant terms of the Consent Order and what actions, if any, it proposes to take to address the alleged lack of compliance. The Parties shall engage in good faith negotiations to attempt to resolve the dispute. If, within 40 days of the notice from Class Counsel (or a longer period as agreed upon by the Parties), the Parties have been unable to resolve the dispute, the Parties may seek relief from the Court. The Parties commit to work in good faith to avoid enforcement actions. In the case of an emergency related to the provisions in this Consent Order, posing an immediate threat to the safety of well-being of an Incarcerated Person, Class Counsel may seek judicial action without regard to the notice and negotiation requirements set forth in this paragraph.

e. This Consent Order shall terminate only upon a finding by the Court that the County has achieved Substantial Compliance with the provisions of this Agreement and has maintained such Substantial Compliance for a period of 24 months. The burden shall be on the County to demonstrate such compliance by a preponderance of the evidence.

f. The County shall implement all reasonable measures to avoid or minimize any failure to timely carry out any requirements of this agreement. If any unforeseen circumstance occurs that cause such a failure, the County shall notify Class Counsel and the Monitor within 20 days after it becomes aware of the unforeseen circumstances and their impact on the County's ability to comply with a requirement of this Agreement. The notice shall describe the cause of the failure to perform and the measures taken to prevent or minimize the failure.

## XIX.  Stipulation Pursuant to 18 U.S.C. §3626

a. The Parties stipulate and agree, and the Court finds, that this Consent Order complies in all respects with the provisions of 18 U.S.C. §3626(a). The Parties further stipulate and agree, and the Court finds, that the prospective relief in this Consent Order is narrowly drawn, extends no further than is necessary to correct the violations of federal rights as alleged by the Plaintiff Class, is the least intrusive means necessary to correct these violations, and will not have an adverse impact on public safety or the operation of a criminal justice system. Accordingly, the Parties agree and represent that the Consent Order complies with the provisions of 18 U.S.C. §3626(a).

## XX.  Attorneys' Fees and Expenses

a. Absent an agreement with respect to fees and expenses beforehand, within sixty days of the Effective Date, Class Counsel will file a petition for reimbursement of fees,

costs and disbursements incurred in this action and in investigating and prosecuting the claims asserted, up to and including the Effective Date. The County agrees not to oppose the petition except to object to the reasonableness of the requested fees if it deems such an objection appropriate.

b. The County shall bear reasonable fees, costs and expenses of Class Counsel in monitoring compliance with the Consent Order, as outlined in this Consent Order. Class Counsel shall designate two individuals who will serve as the primary individuals to monitor compliance with this Consent Order on their behalf. Class Counsel shall submit an invoice documenting their fees and costs (redacting privileged information) to the County on a monthly or other regular basis. Payment of such invoices will be made within 60 days of receipt. If the County objects to any fees, costs or expenses as unreasonable, unnecessary or duplicative, the County shall submit the invoice to the Court for a determination of reasonable fees, costs and expenses.

c. Payment of fees and costs with respect to enforcement of this Consent Order does not create an attorney-client relationship between any Class Counsel and the County. Nor does payment of fees and costs entitle the County to obtain any information otherwise protected by the attorney-client or work product privileges.

## XXI.  Notifications

a. Any notice required to be served on Class Counsel shall be provided by email to the following:

> Alexandra Morgan-Kurtz
> **Pennsylvania Institutional Law Project**
> 247 Fort Pitt Blvd., 4th Floor
> Pittsburgh, Pa 15222
> amorgan-kurtz@pilp.org

> Jaclyn Kurin
> **Abolitionist Law Center**
> P.O. Box 8654
> Pittsburgh, PA  15221
> jkurin@alcenter.org

b. Any notice required to be served on the County shall be provided by email to the following:

> Rosalyn Guy-McCorkle
> County Solicitor

36

Allegheny County Law Department
300 Fort Pitt Commons Building
445 Fort Pitt Blvd.
Pittsburgh, PA 15219
412) 350-11245
Rosalyn.GuyMccorkle@AlleghenyCounty.us

John A. Bacharach
Assistant Solicitor
Allegheny County Law Department
300 Fort Pitt Commons Building
445 Fort Pitt Blvd.
Pittsburgh, PA 15219
412) 350-1150
john.bacharach@AlleghenyCounty.us

Dennis Biondo, Jr.
Assistant Solicitor
Allegheny County Law Department
300 Fort Pitt Commons Building
445 Fort Pitt Blvd.
Pittsburgh, PA 15219
(412) 350-1150
dennis.biondoj@AlleghenyCounty.us

## XXII. Miscellaneous

a. This Consent Order constitutes the entire integrated agreement of the Parties. No prior or contemporaneous communications, oral or written, will be relevant or admissible for purposes of determining the meaning of any provisions herein in this litigation or in any other proceeding.

b. This Consent Order shall be applicable to, and binding upon, all Parties, and their officers, agents, employees, assigns and successors in office.

c. Failure by any Party to enforce this entire Consent Order or any provision thereof with respect to any deadline or other provision herein shall not be construed as a waiver of the Party's right to enforce other deadlines or provisions of this Consent Order.

d. If any provision of this Consent Order is declared invalid for any reason by a court of competent jurisdiction, said finding shall not affect the remaining provisions of the Consent Order.

e.  The Parties agree not to assert any challenge to the validity, lawfulness or enforceability of any provision of this Consent Order.

f.  The Parties agree to defend any action challenging any provision of this Consent Order.  The Parties shall notify each other of any court challenge to this Consent Order.  In the event any provision of this Consent Order is challenged in any local or state court, removal or transfer to this Court shall be sought, to the extent that removal or transfer is available under applicable law.


BY THE COURT:



s/Christopher B. Brown

United States Magistrate Judge



AGREED on behalf of Plaintiff Class



Keith E. Whitson, Class Counsel


AGREED on behalf of Defendant



John Bacharach



38