IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| SHAQUILLE HOWARD, BROOKE GOODE, JASON PORTER, KEISHA COHEN and ALBERT CASTAPHANY, on their own behalf and on behalf of all others similarly situated, | : : : : : : : | Case No. 20-cv-1389 |
|  | : : | ELECTRONICALLY FILED |
| Plaintiffs, | : : |  |
| v. | : : | JURY TRIAL DEMANDED |
|  | : : |  |
| LAURA WILLIAMS, Chief Deputy Warden of Healthcare Services; ORLANDO HARPER, Warden of Allegheny County Jail; MICHAEL BARFIELD, Mental Health Director; ALLEGHENY COUNTY; | : : : : : : |  |
| Defendants. |  |  |

# MONITOR'S SECOND REPORT

Pursuant to Section XVII of the Consent Order, the Monitor appointed by this Court submits the attached Monitor's First Report evaluating Defendants' compliance with the terms of the Consent Order through March 31, 2025. The Monitor prepared this report as the second of regular reports to be filed of record for a minimum period of 24 months. Subsequent reports will be filed according to the following schedule:

| | |
|---|---|
| Monitor's Third Report | November 3, 2025 |
| Monitor's Fourth Report | March 2, 2026 |
| Monitor's Fifth Report | June 30, 2026 |
| Monitor's Sixth Report | November 2, 2026 |

I am available to answer any questions the Court may have regarding this report and Defendants' compliance with the Consent Order at such times as are convenient for the Court.

DATED:  June 30, 2025                    Respectfully submitted,

                                        By: _Bandy Lee_____
                                        Bandy X. Lee, M.D., M.Div.
                                        Monitor

# MONITOR'S SECOND REPORT

## I.    Introduction

a.    The Agreement between Plaintiffs Shaquille Howard *et al*., on behalf of themselves and of all others similarly situated, v. Defendants Laura Williams *et al*., on behalf of Allegheny County (the "County") and of Allegheny County officials or employees, requires system-wide reform of Allegheny County Jail ("ACJ"), as prescribed in 16 substantive provisions. The two-year Agreement began on July 30, 2024.

b.    The overall goal is to have sufficient staff to provide the appropriate level of care, to train adequately Mental Health Staff, to train adequately Correctional Staff to be able to identify the signs and symptoms of mental illness, and to provide a sufficient process to screen and diagnose individuals with mental health conditions, to provide any therapeutic counseling, to use problem lists or treatment plans, to provide any case management for mental health patients, to provide adequate medication management, to sufficiently and timely respond to requests for mental health care, and to maintain any quality improvement program for their mental health care "program".

c.    Additional goals include maintaining adequate and appropriate policies with respect to de-escalation and use of force, training staff on de-escalation techniques, avoiding the use of excessive amounts of force on Plaintiff Class members, avoiding use of force on Plaintiff Class members more often than appropriate, avoiding punitive approaches to individuals for requesting mental health care or for manifestations of their diseases, and avoiding inappropriately placing those with mental health conditions into isolated confinement, which can exacerbate their conditions and cause them to decompensate.

d.    The Consent Order provides that the Court-appointed Monitor ("Monitor") "shall assess compliance with … requirements during the Monitoring Period." This Second Report sets forth an assessment of the progress made during the period from November 30, 2024, through March 31, 2025.

e.    I have been brought on board as Monitor, as a forensic psychiatrist and expert on violence with 25 years of experience. I taught at Yale School of Medicine and Yale Law School for 17 years before transferring to Harvard Medical School, where I am a member of the Harvard Program in Psychiatry and the Law. I am president of the World Mental Health Coalition and cofounder of the Violence Prevention Institute. I have consulted with governments on prison reform and community violence prevention, such as New York, Connecticut, Massachusetts, Alabama, California, Ireland, and France, in addition to the U.S. Senate. In 2013, I wrote a report that helped initiate reforms at Rikers Island, a correctional facility in New York City known for exceptionally high levels of violence, and am currently being consulted to help reduce violence in the 44 prisons of New York State. In addition to the WHO,

I have served as an expert consultant for the United Nations, UNESCO, the World Economic Forum, and the National Academy of Medicine. My clinical practice specializes in treating violent offenders, and I have served as an expert witness for criminal and civil courts in approximately 200 cases.

f. Above all, I am a developer of programs and structures that are intended to help create a safer environment for everyone. Far too often, corrections and mental health are seen as systems in opposition, when our goals are mutual: with communication, understanding, and flexibility in thinking, we can achieve our shared goal of mutual safety and "sanity". Improving one area will invariably improve the other! We are in a time of great flux, and the educational experience goes both ways: Correctional Staff are increasingly needing to apply mental health principles, while Mental Health Workers must learn to treat an underserved, undertreated population in frequent contact with the carceral system.

## II.  Background

a. As one of the largest county-run jails in Pennsylvania, ACJ is the primary detention center for individuals awaiting trial or serving sentences for misdemeanor and felony offenses in Allegheny County. The current site on the North Side of Pittsburgh opened in 1995, replacing an older facility that had been in operation for more than a century. The new jail was intended to accommodate a growing incarcerated population with modernized amenities and greater security. The overcrowding from mass incarceration and the subsequent security needs, however, outpaced these structural provisions.

b. ACJ is unique among jails, in that it has come under exceptional criticism but has also implemented exceptional reforms. After several lawsuits and investigations highlighted deficiencies in medical care, especially mental health care and the treatment of chronic illnesses, and several deaths, Allegheny County officials began exploring reforms. Improvements focused around jail conditions, intensive oversight by community organizations and advocacy groups, and the current Consent Order. Despite all the difficulties, the challenges that ACJ faces are not unique but ubiquitous. ACJ therefore has the opportunity to highlight the various problems plaguing the American carceral institution and to serve as a model of reform for the nation.

c. A major, underlying problem is that correctional facilities have become *de facto* mental hospitals for our society. Therefore, addressing the mental health crisis, as well as the growing concerns over safety and reducing human costs, make criminal justice reform urgent. Because a large percentage of incarcerated persons suffer from untreated mental health issues, a complicated intersection between criminal justice and mental health has formed. The lack of adequate mental health care in jails and prisons exacerbates suffering and increases strain for correctional staff, ultimately undermining the safety and effectiveness of the justice system.

d. The United States has the highest incarceration rate in the world, with over 2 million

individuals behind bars, a figure that has doubled over the past four decades. One of the most pressing issues is the overcrowding in prisons and jails. Many facilities operate well beyond capacity, leading to inhumane living conditions, inadequate medical or mental health services, and a lack of educational or vocational programs. Inmates are subjected to unsafe conditions, with increased violence, limited access to basic necessities, and overreliance on lockdowns and solitary confinement. The overcrowding also exacerbates the strain on prison staff, leading to higher rates of stress, burnout, and safety concerns. Reform is therefore essential to improving conditions for both incarcerated individuals as well as prison staff.

### III.    Criminal Justice Reform in an International Context

a.  For context, it may be useful briefly to go over some successful prison reform projects around the globe, especially in Western Europe, where there have been some notable successes in grappling with overcrowded facilities, high recidivism rates, human rights concerns, and the failure of traditional punitive models. Reforms have focused on humane rehabilitation, reintegration, and reimagining correctional systems that can better serve both inmates and society.

b.  For example, Norway focused on humane incarceration and is now considered a global leader in prison reform. Its philosophy centers around creating a "normal" environment, meaning that life inside prison should resemble life outside as closely as possible. Halden Prison, which exemplifies this approach, opened in 2010, offering private rooms with *en-suite* bathrooms, flat-screen televisions, and access to shared kitchens and living areas. Incarcerated persons are encouraged to participate in educational and recreational activities. What is special about the facility is that it emphasizes strong relationships between staff and inmates, with correctional officers being trained to act as mentors and support figures, rather than enforcers. The results have been impressive: the country has one of the lowest recidivism rates in the world—around 20%—compared to more than 60% in the United States. This suggests that fostering rehabilitation and social reintegration, and treating incarcerated persons with dignity, is far more effective than simple punishment.

c.  Germany is perhaps the next notable country in prison reform. By emphasizing reintegration through responsibility, those incarcerated in German prisons often wear their own clothes, cook their own meals, and are given access to work and education programs. The system is built around preparing inmates to return to society, while the loss of liberty is conceived as sufficient for punishment. JVA Hünefeld facility focuses on having "open prisons," so that incarcerated persons can leave during the day to work or to study and then return in the evening. They are also encouraged to maintain family and community ties, which research shows is a key factor for successful reintegration. Germany's recidivism rate is low, and public support for their rehabilitative model is high, reflecting a cultural and legal commitment to promoting productive lives post-incarceration.

d.  The Netherlands has achieved one of the most dramatic reductions in prison

4

population in the world, closing more than half of its prisons between 2005 and 2020. This was made possible through policy reform, or a combination of decriminalization, sentencing reform, and investment in alternatives to incarceration. The justice system makes use of community service, electronic monitoring, and psychiatric care over incarceration for nonviolent and low-risk offenders. In other words, rather than imprisoning individuals with addiction or mental health issues, the country has expanded access to treatment facilities and social services. A holistic model not only reduces reoffending but also costs significantly less than maintaining a large prison population, allowing for fiscal and social benefits.

e.  Scotland's reform agenda through the Scottish Violence Reduction Unit (SVRU), focused on reducing incarceration and improving community safety through early intervention and restorative justice, is a program in which I have personally been involved. Launched in 2005, it treats violence as a public health issue and starts with community interventions targeting the root causes of crime: poverty, trauma, and social exclusion. This has allowed Scotland to invest in community sentencing and diversion programs, which significantly diminished the prison population, as well as violent crime rates. The approach confirmed that social investment is far more effective than punishment in creating safer communities.

## IV.    Criminal Justice Reform in the U.S. Context

a.  The United States falls far behind other advanced countries in prison reform efforts, despite gaining considerable ground over the past two decades, in response to increasing calls to reduce mass incarceration, discrimination of marginalized groups, inhumane prison conditions, and high recidivism rates. Among the most scrutinized practices are solitary confinement and the use of force by correctional staff, which have drawn national and international criticism. We have still not improved enough that, were we to apply to be a part of the European Union, we would be accepted. Therefore, these are a large problem and also a concern for ACJ.

b.  Solitary confinement, regardless of how it is called, involves isolating prisoners in small cells for 22 to 24 hours a day with minimal human contact. Studies have linked prolonged solitary confinement to severe mental health consequences, including depression, anxiety, hallucinations, and suicide.[1] Violence rates against the self and against others also increase, as a rule.[2] The practice is particularly harmful to juveniles, young adults, and individuals with preexisting mental illness. Several states have enacted reforms to limit or abolish the use of solitary confinement. For instance, I have helped in the passage of the Humane Alternatives to Long-Term (HALT) Solitary Confinement Act in 2021 in New York State, which limits solitary

---

[1] Grassian, S. (2006). Psychiatric effects of solitary confinement. *Washington University Journal of Law & Policy, 22*, 325–383; Haney, C. (2018). The psychological effects of solitary confinement: A systematic critique. *Crime and Justice, 47*(1), 365–416.

[2] Luigi, M., Dellazizzo, L., Giguere, C. E., Goulet, M. H., Potvin, S. & Dumais, A. (2022). Solitary confinement of inmates associated with relapse into any recidivism including violent crime: A systematic review and meta-analysis. *Trauma, Violence & Abuse, 23*(2), 444–456.

confinement to no more than 15 consecutive days and bans it for vulnerable populations. However, without adequate staff training and enforcement of the law, only minimal reduction of solitary confinement has occurred. A program in San Francisco, the Resolve to Stop the Violence Project (RSVP), which now has become a premier alternative to solitary confinement, involves intensive socialization methods—the opposite of isolation—to achieve close to 100% reduction of violent incidents in-house[3] and up to 83 percent reduction in violent recidivism post-release after just four months in the program.[4]

c.  At the federal level, the Obama administration released a Department of Justice (DOJ) report in 2016, recommending a reduction in solitary confinement use and improved conditions for those in segregation.[5] Although implementation has been inconsistent, it is a significant shift in guidance for the Bureau of Prisons (BOP).

d.  Excessive use of force by correctional officers has also been a focus of reform, particularly regarding physical assaults, misuse of restraints, and the deployment of chemical agents. Investigations have revealed systemic abuse in some facilities, worse in juvenile and immigration detention centers. A 2022 DOJ report on Alabama prisons, for example, detailed widespread violence and excessive force by staff, resulting in federal litigation.

e.  Transparency, accountability, and the adoption of de-escalation techniques are found to be the most effective in the reduction of use of force. De-escalation training, particularly in mental health and crisis intervention, significantly reduces the frequency and severity of use-of-force incidents.[6,7] Programs like Crisis Intervention Teams (CIT's) have been adapted to correctional settings to help staff manage volatile situations nonviolently.[8] In some states, such as Oregon and Washington, the implementation of trauma-informed care and behavior management frameworks has correlated with a reduction in violent encounters and disciplinary segregation.[9] The Prison Rape Elimination Act (PREA), in which I was also involved, has indirectly impacted use-of-force policies by mandating reporting and response to inmate abuse. Consent decrees have also played a role in states such

[3] Lee, B. X. & Gilligan, J. (2005). The Resolve to Stop the Violence Project: Transforming an in-house culture of violence through a jail-based programme. *Journal of Public Health, 27*(2), 149–155.

[4] Gilligan, J. & Lee, B. X. (2005). The Resolve to Stop the Violence Project: Reducing violence in the community through a jail-based initiative. *Journal of Public Health, 27*(2), 143–148.

[5] U.S. Department of Justice (2016). *Report and Recommendations Concerning the Use of Restrictive Housing*. Washington, DC: U.S. Department of Justice.

[6] Comartin, E. B., Ekhomu, J., Martin, J. & Gover, A. R. (2022). The impact of de-escalation training on correctional officer attitudes and behavior: A randomized controlled trial. *Journal of Criminal Justice, 82*, 101947.

[7] Engel, R. S., McManus, H. D. & Isaza, G. T. (2020). Moving beyond 'best practice': Experiences in police reform and a call for evidence to reduce officer-involved shootings. *Annals of the American Academy of Political and Social Science, 687*(1), 146–165.

[8] Watson, A. C., Morabito, M. S., Draine, J., & Ottati, V. (2010). Improving police response to persons with mental illness: A multi-level conceptualization of CIT. *International Journal of Law and Psychiatry, 33*(4), 279–288.

[9] Cloud, D. H., Drucker, E., Browne, A., & Parsons, J. (2015). Public health and solitary confinement in the United States. *American Journal of Public Health, 105*(1), 18–26.

as Mississippi, where a 2010 consent decree allowed oversight of the handling of the mentally ill population and the use of force.

f.  Despite incremental progress through legislation, litigation, and policy changes, however, U.S. prison reform leaves a lot to be desired. Even in areas where there is significant improvement, implementation varies widely by state and facility, and more uniform and lasting reforms are necessary. In many ways, ACJ has the potential to set a national example by planning and implementing long-lasting reforms, especially through a cultural change, which already appears to be underway.

## V.     Criminal Justice Reform in the Pennsylvania Context

a.  ACJ is nestled in Pennsylvania's landscape of significant shifts toward criminal justice reform. Pennsylvania has endeavored to address overcrowding, racial disparities, and the overuse of detention, while reducing its prison population from a peak of over 51,000 inmates in 2013 to approximately 37,000 in 2023, through sentencing changes and increased use of diversion programs. The state incarcerates about 73,000 individuals when accounting for jails, parole, and probation. The closure of Rockview State Prison and Quehanna Boot Camp, additionally, project a savings of over 100 million dollars in the state's future budget.

b.  Similarly, ACJ since 2018 has successfully reduced 26 percent of the average daily population to reach, as of March 14, 2025, the average daily population of 1,744 (out of a capacity of 3,156 inmates). The jail has been part of the Safety + Justice Challenge, focusing on reducing unnecessary detention and promoting alternatives to incarceration.[10] The facility is accredited by the National Commission on Correctional Health Care (NCCHC), employs 561 staff members, and currently has demonstrated deeply-committed, rehabilitation-minded leadership.

c.  ACJ is in a unique position to transform a largely dehumanizing and traumatizing environment into a rehabilitative one. On average, jails do not create positive outcomes for residents, staff, or victims and survivors. Emerging evidence shows that prisons undermine the health and wellbeing of residents as well as staff. From a humanitarian, public health, and practical safety perspective, change from this *status quo* is greatly needed. The Consent Order is an opportunity to reduce the harm to all those involved by improving dignity, optimizing humane interactions, maximizing mental health, and providing incarcerated people the tools they need to be the best versions of themselves both in-house and when they return to the community, hopefully with a greater likelihood never to return. Changing from our cultural reliance on punitive incarceration as the primary response to interpersonal harm will take time, but the results are worthwhile and, according to now multiple studies, positive change may come sooner than commonly believed.

---

[10] https://safetyandjusticechallenge.org/our-network/allegheny-county-pa/

## VI.  Site Visit and Virtual Meetings

a.  In this Reporting Period, I requested virtual meetings with ACJ staff on March 21, 2025, and on April 28, 2025; attended virtually a Jail Oversight Board meeting on May 1, 2025; and made my third site visit on June 12, 2025. Deputy Warden of Health Services Holly Martin has continued to take the lead in both virtual and on-site meetings to include all relevant and available correctional and mental health staff. The first virtual meeting also included Warden Trevor Wingard. Deputy Warden Martin remains my chief coordinator for all contacts and document collection. My on-site visit included meetings with various staff members in charge of talent acquisition, reentry educational programming, behavioral health staffing and case load, segregation, and use of force, as well as a tour of unit 8D, where the RTU will move to, in order to be closer to the DTU for the facilitation of programming.

b.  In between, I spoke with Jail Oversight Board member and formerly incarcerated person, Ms. Bethany Hallam, on her exchanges with residents about their experiences of segregation and use of force (this replaced my direct interviews for this Report, given time constraints, but will be made up for at my next visit). The County has also approved Dr. Matthew Buttice, for my enlistment of his help with data analysis, and this Second Report already reflects substantial assistance from him.

## VII.  Rights and Responsibilities

a.  I continue to draw information from: (a) access to ACJ's pods and facilities; (b) Staff Members, agents, and contractors; (c) incarcerated persons; (d) non-privileged County documents and records; and (e) all documents identified in Sections IV through XVI of the Consent Order. In addition to the records I have asked for and accessed on site, I have been offered remote reviews of correctional and mental health documentation.

b.  I have additionally offered myself as a resource, helping to facilitate progress and, in addition to documenting ACJ's efforts to Plaintiff Class and community members, I have encouraged staff members' to make use of my availability as a consultant with considerable experience in correctional reform who shares the goal of achieving ends that will ultimately be beneficial to all Parties. Several staff members have already done so, asking for literature on the harmful effects of solitary confinement for their own education, as well as for sample use of force guidelines that have been successful, on which ACJ's guidelines might be modeled. During my latest visit, I have been asked whether there might be some creative use for the large cages in 8D, such as to separate well-behaved residents from others, and to release them from the restrictive handcuffs, which have been deterring residents from participation in groups.

## VIII.  Documents and Dates

a.  As outlined in my First Report, which was mostly qualitative, this Second Report

endeavored to focus more heavily on the specific documents that the Consent Order requires to record progress. Deputy Warden Martin kindly offered to be the focal person for gathering the documents as outlined in my First Report, and also with the help of Deputy Health Services Administrator Debbie Scovill and others, most of the specific documents were identified and reviewed. For the Third Report, we will now aim for a more specific breakdowns, as follows:

1. Staffing
   i. Staffing levels, total population, new hires and their positions, and employee departures.
   ii. If the County is not yet in compliance with Provision IV(d)(1), which requires the County to fill 80% of the Interim Required Staffing Levels within six months of the Effective Date, documentation of all recruitment efforts, exit interviews, and any other documentation that would help explain the reasons for noncompliance.

2. Training
   i. Written training materials and attendance records for all training provided in response to Provision V.
   ii. Documentation associated with any audits conducted by the County to ensure training is being conducted properly.
   iii. A list of all current mental health and correctional staff that includes assignment information allowing us to identify all staff assigned to a housing unit at a given point in time and all staff who administer or deliver prescription mental health medication to incarcerated individuals.
   iv. The list provided in response to request item 2(a) will allow us to identify a sample of staff to include in a follow-up request that will address training records and performance reviews.

3. Clinical Autonomy
   i. Written communication and training provided in response to Provision VI.
   ii. All reports alleging possible interference with clinical decisions and records documenting the handling and outcome of those allegations.

4. Receiving Screening and Mental Health Screening and Evaluation
   i. Documentation describing the quality assurance tool and process identified in the Compliance Report for the second reporting period ("Second Compliance Report") for auditing the intake screening process.
   ii. Audit results from the Current Reporting Period and the relevant records used to assess compliance of the sample reviewed.

5. Health Records
   i. A list of current incarcerated individuals that includes information allowing us to identify all individuals who are mental health patients.

     ii.    The list provided in response to request item 5(a) will allow us to identify a sample of incarcerated individuals to include in a follow-up request that will address health records.

6. Mental Health Encounters
   i. The percentages of relevant incarcerated individuals whose follow-up examinations, triage, or substantive encounters occurred outside of the required timeframes required in Provisions IX(a-d).
   ii. A list of current incarcerated individuals that includes information allowing us to identify all individuals who were referred for further mental health evaluation after initial Mental Health Screening and Evaluation and who were housed in segregation during the Current Reporting Period.
   iii. A list of all sick call requests for mental health services.
   iv. The lists provided in response to request items 6(b) and 6(c) will allow us to identify a sample of relevant incarcerated individuals and sick call requests to include in a follow-up request that will address health records and documentation associated with segregation rounds.

7. Privacy and Confidentiality
   i. A list of all housing units with information allowing us to identify those that have operational non-contact healthcare spaces.
   ii. Updated information about the level 1 mental health clinic described in the Second Compliance Report.

8. Educational Programming
   i. List of all education programming offered to incarcerated individuals, including those required in Provision XI.
   ii. Written training materials and attendance records for all educational programs.
   iii. A list of all incarcerated individuals who were excluded from program sessions during the Current Reporting Period.
   iv. The list provided in response to request item 8(c) will allow us to identify a sample of incarcerated individuals to include in a follow-up request that will address individualized determination records.

9. Psychotherapy (Therapeutic Counseling)
   i. Staffing information for the positions required in Provisions XII(a-b) and documentation of recruitment efforts for unfilled positions, if any.
   ii. Documentation associated with all efforts to build a process for reviewing the performance of those conducting counseling sessions, as required by Provision XII(n).
   iii. A list of therapists conducting individual counseling sessions.
   iv. A list of current incarcerated individuals that includes information allowing us to identify all individuals receiving individual counseling sessions or whose counseling sessions were discontinued during the Current Reporting Period.

     v.    The lists provided in response to request items 9(d) and 9(e) will allow us to identify a sample of therapists and relevant incarcerated individuals to include in a follow-up request that will address caseload and health records.

10. Medication Management

     i.    Any documentation that the County thinks would be beneficial to review prior to determining the next steps in conducting the review of medication management and administration of psychotropic medications required in Provision XIII(a).

11. Use of Force

     i.    Documentation describing the audit process identified in the Second Compliance Report for the QI Manager and Deputy Health Services Administrator - Behavioral Health review of use of force incidents.

     ii.    Audit results from the Current Reporting Period.

     iii.    A list of use of force incidents that occurred during the Current Reporting Period.

     iv.    The list provided in response to 11(c) will allow us to identify a sample of force incidents to include in a follow-up request for use of force reports and associated evidence, including video recordings and the subject's health records.

     v.    Investigation and discipline records associated with all use of force incidents that led to determinations during the Current Reporting Period that the Use of Force Policy was violated.

12. Segregation

     i.    A list of incarcerated individuals who were housed in segregation during the Current Reporting Period.

     ii.    The list provided in response to request item12(a) will allow us to identify a sample of relevant incarcerated individuals to include in a follow-up request that will address health records and documentation associated with segregation rounds.

**Table 1.** Sample Compliance Measures for the Third Monitoring Report

| Section | Provision Number | Quantitative Compliance Measure, if Any | Tentative Threshold for Substantial Compliance |
|---------|------------------|------------------------------------------|------------------------------------------------|
| Staffing | IV(a) | | |
| Staffing | IV(b) | | |
| Staffing | IV(c) | | |
| Staffing | IV(d) | 1. Staffing records will document that Interim Required Staffing Levels are met. | 1. 80% |
| Staffing | IV(e) | | |

| Training | V(a) | 1. A sample of new mental health staff training records will document attendance of the most current multi-stage healthcare orientation. 2. A sample of mental health staff training records will document attendance of the most current in-person training on the delivery of mental health services in a correctional setting. 3. A sample of training records for mental health staff working on acute units will document attendance of the most current advanced in-person training. 4. A sample of intake screener training records will document attendance of the most current specialized in-person training. | 1. 75% 2. 75% 3. 75% 4. 75% |
|---|---|---|---|
| Training | V(b) | 1. A sample of correctional staff training records will document attendance of the most current suicide prevention training. 2. A sample of correctional staff training records will document attendance of the most current mental health first aid training. 3. A sample of training records for correctional staff working on acute units, receiving screening, or segregated housing areas will document attendance of the most current relevant advanced in-person training. | 1. 75% 2. 75% 3. 75% |
| Training | V(c) | 1. A sample of correctional staff training records will document attendance of the most current use of force training. 2. A sample of correctional staff training records will document attendance of the most current de-escalation training. | 1. 75% 2. 75% |
| Training | V(d) | 1. A sample of training records for staff who administer or deliver prescription mental health medication will document attendance of the most current medical administration training. | 1. 75% |
| Training | V(e) | 1. Correctional staff sampled and surveyed as part of the regular audits will provided answers consistent with the most current mental health training. 2. Correctional and mental health staff sampled and surveyed as part of the regular audits will provide answers that are consistent with the most current use of force and de-escalation training. | 1. 90% 2. 90% |
| Training | V(f) | | |
| Clinical Autonomy | VI(a) | | |
| Clinical Autonomy | VI(b) | | |
| Clinical Autonomy | VI(c) | | |

| | | | |
|---|---|---|---|
| Clinical Autonomy | VI(d) | 1. A sample of staff training records will document reception of written communications or attendance of training related to clinical autonomy and the requirement to report interference attempts. | 1. 75% |
| Screening and Mental Health Screening and Evaluation | VII(a) | 1. A sample of screening records will document that individuals received Receiving Screening within 24 hours of arrival at ACJ. | 1. 90% |
| Screening and Mental Health Screening and Evaluation | VII(b) | 1. A sample of screening records will document that individuals received an initial Mental Health Screening and Evaluation within 14 days of admission to ACJ. 2. A sample of screening records will document that individuals with positive findings received a subsequent mental health evaluation by a psychiatrist or licensed mental health counselor. | 1. 90% 2. 90% |
| Screening and Mental Health Screening and Evaluation | VII(c) | 1. A sample of screening records will document that individuals received the Receiving Screening and Mental Health Screening and Evaluation in a private interview space. | 1. 90% |
| Screening and Mental Health Screening and Evaluation | VII(d) | 1. A sample of training records for screeners and initial assessors will document attendance of the most current intake-related training. | 1. 75% |
| Screening and Mental Health Screening and Evaluation | VII(e) | 1. A sample of screening records will document that screeners verified a patient's medication through SureScripts and contacted the relevant pharmacy. 2. A sample of screening records will document that those with a serious mental health condition and for whom medications could not be verified were seen by an advanced prescribing practitioner within 7 days of admission to ACJ. | 1. 90% 2. 90% |
| Screening and Mental Health Screening and Evaluation | VII(f) | 1. A sample of screening records will document that screeners accessed electronic health records to inform the screening and assessment process. | 1. 90% |
| Screening and Mental Health Screening and Evaluation | VII(g) | | |

| | | | |
|---|---|---|---|
| Health Records | VIII(a) | 1. A sample of treatment plans will document frequency of follow up for evaluation and adjustment of treatment modalities.<br>2. A sample of treatment plans will document adjustment of psychotropic medications, if indicated.<br>3. A sample of treatment plans will document referrals for psychological testing, medical testing, and evaluation, as required.<br>4. A sample of treatment plans will document instructions about diet, exercise, personal hygiene and adaptation to the correctional environment, as appropriate.<br>5. A sample of treatment plans will document treatment goals and objectives, interventions necessary to achieve those goals, and notation of clinical progress. | 1. 90%<br>2. 90%<br>3. 90%<br>4. 90%<br>5. 90% |
| Health Records | VIII(b) | 1. A sample of treatment plans will document that they were created no later than the date of the Mental Health Screening an Evaluation.<br>1. A sample of treatment plans will document updates every 120 days.<br>1. A sample of health records will document reference to a treatment plan. | 1. 90%<br>2. 90%<br>3. 90% |
| Health Records | VIII(c) | 1. A sample of health records will document reference to problem lists. | 1. 90% |
| Health Records | VIII(d) | 1. A sample of health records will include a problem list containing medical and mental health diagnoses and treatments, suicide risk, and known allergies.<br>2. A sample of health records will include initial mental health assessment forms or medical summaries.<br>3. A sample of health records will include a record of psychological tests administered and dates of administration.<br>4. A sample of health records will include progress notes of all significant findings, diagnoses, treatments and dispositions.<br>5. A sample of health records will include orders for prescribed medication and medication administration records.<br>6. A sample of health records will include consent and refusal forms.<br>7. A sample of health records will include release of information forms.<br>8. A sample of health records will include the place, date, and time of each clinical encounter.<br>9. A sample of health records will include the individual treatment plan. | 1. 90%<br>2. 90%<br>3. 90%<br>4. 90%<br>5. 90%<br>6. 90%<br>7. 90%<br>8. 90%<br>9. 90%<br>10. 90% |

|  |  | 10. A sample of health records will include signature and title of each documenter. |  |
|---|---|---|---|
| Health Records | VIII(e) |  |  |
| Mental Health Encounters | IX(a) | 1. A sample of health records will document that those referred for further mental health evaluation after the Mental Health Screening and Evaluation are examined by a psychiatrist or advanced prescribing practitioner within 14 days of the referral. | 1. 90% |
| Mental Health Encounters | IX(b) | 1. A sample of sick call request records will document triage within 24 hours of submission.<br>2. A sample of sick call request records will document that those indicating that an immediate or expedited encounter was appropriate were expedited. | 1. 90%<br>2. 90% |
| Mental Health Encounters | IX(c) | 1. The average wait time for substantive encounters with a QHCP.<br>2. A sample of health records will document that substantive encounters with a QHCP were held within 14 days. | 1. 7 days<br>2. 90% |
| Mental Health Encounters | IX(d) | 1. The average wait time for substantive encounters with a psychiatrist.<br>2. A sample of health records will document that substantive encounters with a psychiatrist were held within 42 days. | 1. 21 days<br>2. 90% |
| Mental Health Encounters | IX(e) | 1. A sample of health records will document the appropriate period for a follow-up encounter.<br>2. A sample of health records will document that follow-up encounters occurred within the identified time frames. | 1. 90%<br>2. 90% |
| Mental Health Encounters | IX(f) | 1. A sample of segregation records will document that an additional round was conducted within 24 hours if patients were asleep or non-responsive for 2 consecutive rounds.<br>2. A sample of training records for staff conducting segregation rounds will document attendance of the most current training about the impact of segregation.<br>3. A sample of segregation records will document appropriate questions, responses, and observations.<br>4. A sample of segregation records will document follow-up encounters, if necessary, were held within the required time frames. | 1. 90%<br>2. 75%<br>3. 90%<br>4. 90% |
| Privacy and Confidentiality | X(a) | 1. A sample of health records will document that encounters were held in a private and confidential setting. | 1. 90% |

| Privacy and Confidentiality | X(b) | 1. A sample of health records will document that therapies and assessments were held in a private setting. | 1. 90% |
|---|---|---|---|
| Privacy and Confidentiality | X(c) | 1. A sample of health records will document that encounters held in response to mental health requests were held in a private setting. | 1. 90% |
| Privacy and Confidentiality | X(d) | | |
| Educational Programming | XI(a) | | |
| Educational Programming | XI(b) | | |
| Educational Programming | XI(c) | 1. Programming records will document that educational programs were held at least once in the prior year.<br>2. A sample of programming records will document that no more than 20 individuals participated in programming sessions.<br>3. A sample of programming records will document appropriate individualized determinations whenever individuals were excluding from programming sessions. | 1. 5 programs<br>2. 90%<br>3. 90% |
| Educational Programming | XI(d) | | |
| Psychotherapy (therapeutic counseling) | XII(a) | 1. Staffing records will document that the Director of Mental Health position is filled.<br>2. Staffing records will document that the Staffing Educator position is filled.<br>3. Staffing records will document that the Deputy HSA - Behavioral Health position is filled. | 1. 1 filled position<br>2. 1 filled position<br>3. 1 filled position |
| Psychotherapy (therapeutic counseling) | XII(b) | 1. Staffing records will document that full-time licensed therapist positions are filled. | 1. 6 filled positions |
| Psychotherapy (therapeutic counseling) | XII(c) | 1. A sample of health records will document at least 6 therapists held at least 30 individual counseling sessions per week.<br>2. A sample of health records will document that at least 6 therapists had fewer than 75 patients. | 1. 90%<br>2. 90% |
| Psychotherapy (therapeutic counseling) | XII(d) | | |
| Psychotherapy (therapeutic counseling) | XII(e) | 1. A sample of health records will document that individual counseling sessions were scheduled for at least 30 minutes.<br>2. A sample of health records will document individual counseling sessions were held bi-weekly or in a frequency consistent with documented individualized determinations. | 1. 90%<br>2. 90% |

| | | | |
|---|---|---|---|
| Psychotherapy (therapeutic counseling) | XII(f) | 1. A sample of health records will document that individuals meeting at least one of the requirements identified in Provision XII(f) were provided individual counseling or have a documented individualized determination indicating that they should be excluded from counseling. | 1. 90% |
| Psychotherapy (therapeutic counseling) | XII(g) | | |
| Psychotherapy (therapeutic counseling) | XII(h) | 1. A sample of health records will document that a mental health therapist or higher level mental health staff member conducted a mental health evaluation on all eligible patients within 45 days of admission to ACJ or referral. | 1. 90% |
| Psychotherapy (therapeutic counseling) | XII(i) | 1. A sample of health records will document that individuals in segregated, disciplinary, restricted, or protective housing received individual counseling. | 1. 90% |
| Psychotherapy (therapeutic counseling) | XII(j) | 1. A sample of health records will document that individual counseling sessions were held in a private setting. | 1. 90% |
| Psychotherapy (therapeutic counseling) | XII(k) | 1. A sample of health records will document individual counseling sessions, including the start and end time of each session. | 1. 90% |
| Psychotherapy (therapeutic counseling) | XII(l) | 1. A sample of health records for individuals with discontinued individual counseling will document the reasons for the discontinuance and the patient's opinions. | 1. 90% |
| Psychotherapy (therapeutic counseling) | XII(m) | 1. A sample of health records for individuals who refuse individual counseling will include a signed refusal form. 2. A sample of health records for individuals who have been removed from individual counseling will document scheduling individual counseling after 6 months. | 1. 90% 2. 90% |
| Psychotherapy (therapeutic counseling) | XII(n) | | |
| Psychotherapy (therapeutic counseling) | XII(o) | | |
| Medication Management | XIII(a) | | |
| Medication Management | XIII(a) | | |

17

| Use of Force | XIV(a) | 1. A sample of force records will document that correctional staff alerted mental health staff if an incident involved individuals reasonably believed to have a mental health condition. 2. A sample of force records will document that mental health staff attempted to de-escalate the situation if present for a force incident. 3. A sample of force records will document that force was ceased or reduced if mental health staff determined the force was contraindicated. 4. A sample of force records will document evidence of an imminent and serious threat if supervisory staff decided to resume force despite mental health staff determinations. 5. A sample of force and health records will document that mental health staff evaluated the subject of force incidents. 6. A sample of relevant health records will document mental health staff notes about incidents for which they were called to participate. 7. A sample of supervisor training records will document attendance of the most current force-related training. | 1. 90% 2. 90% 3. 90% 4. 90% 5. 90% 6. 90% 7. 75% |
|---|---|---|---|
| Use of Force | XIV(b) | 1. A sample of force records for planned uses of force will document that supervisory staff reported to the scene or contacted mental health staff to report to the scene to de-escalate the situation. 2. A sample of force records for planned uses of force will include video recordings of de-escalation attempts. 3. A sample of force records for planned uses of force will document that mental health staff assessed the circumstances and made a determination about whether force was contraindicated. 4. A sample of force records for planned uses of force will document that supervisory staff contacted mental health staff to request an assessment and the results of the assessment. 5. A sample of force records for planned uses of force will document an imminent and serious threat to safety if supervisory staff authorized force despite mental health staff determinations that force was contraindicated. 6. A sample of relevant health records for planned uses of force will document mental health staff assessments. 7. A sample of force records for planned uses of force will document that medical and mental | 1. 90% 2. 90% 3. 90% 4. 90% 5. 90% 6. 90% 7. 90% |

| | | | |
|---|---|---|---|
| | | health staff conducted a triage screening and scheduled a follow up to occur within 14 days. | |
| Use of Force | XIV(c) | 1. A sample of force records will document command staff review that assessed compliance with the Use of Force Policy.<br>2. A sample of force records will document command staff review that assessed de-escalation efforts.<br>3. A sample of force records will document command staff review that assessed the mental health assessment.<br>4. A sample of force records will document command staff review that assessed the appropriateness of the level of force used.<br>5. A sample of force records will document command staff review that identified opportunities for avoiding force or the extent of force used.<br>6. A sample of force records will document command staff review that identified recommendations for training or changes to policy.<br>7. Force records for incidents involving Plaintiff Class Members will document review by qualified mental health staff. | 1. 90%<br>2. 90%<br>3. 90%<br>4. 90%<br>5. 90%<br>6. 90%<br>7. 20% |
| Use of Force | XIV(d) | 1. Discipline records for violations of the Use of Force Policy will document the nature of the violation, the discipline imposed, and whether or not the violation involved an individual with a mental health condition. | 1. 90% |
| Use of Force | XIV(e) | | |
| Use of Force | XIV(f) | 1. Force records will document the results from an internal audit. | 1. 20% |
| Use of Force | XIV(g) | | |
| Use of Segregation | XV(a) | | |
| Use of Segregation | XV(b) | | |
| Use of Segregation | XV(c) | 1. A sample of segregation records will document that individuals received a minimum of 4 out-of-cell hours a day. | 1. 90% |
| Use of Segregation | XV(d) | 1. A sample of segregation records will document that individuals received segregation rounds if a lockdown or emergency affected Plaintiff Class Members for more than 36 hours in a 48 hour period. | 1. 90% |

| Use of Segregation | XV(e) | 1. A sample of segregation records will document that a QHCP reviewed health records and notified custody staff of necessary accommodations, if necessary. 2. A sample of segregation records will document that individuals received necessary accommodations, if necessary. | 1. 90% 2. 90% |
|---|---|---|---|
| Use of Segregation | XV(f) | 1. A sample of segregation records will document that a QMHP conducted an assessment prior to placement of a Plaintiff Class Member into segregation and determined that such placement was not contraindicated. 2. A sample of segregation records will document that individuals were not held in segregation for more than 28 days without documentation of supervisory staff and QMHP approval. 3. A sample of segregation records will document that individuals were not held in segregation for more than 56 days. | 1. 90% 2. 90% 3. 90% |
| Use of Segregation | XV(g) | 1. A sample of training records for staff working on segregated units will document reception of the most current literature on the impacts of segregation. 2. A sample of segregation records will document appropriate questions, responses, and observations. 3. A sample of segregation records will document that individuals were not held in segregation for more than 56 days. 4. A sample of segregation records will document that an additional round was conducted within 24 hours if patients were asleep or non-responsive for two consecutive rounds. 5. A sample of segregation records for Plaintiff Class Members will document a weekly assessment in a private setting. 6. A sample of segregation records will document that individuals were placed in an appropriate treatment settings if an assessment determined that their medical or mental health condition contraindicated continued placement in segregation. | 1. 75% 2. 90% 3. 90% 4. 90% 5. 90% 6. 90% |

b. For each Reporting Period, I will file with the Court a Monitor Report, describing the efforts the County has taken to implement the requirements of the Consent Order and evaluating the extent to which the County has complied with each substantive provision of the Consent Order.

c. The Report will evaluate the status of compliance with each substantive provision of the Consent Order, using the following standards:

1. *Substantial Compliance*: has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision;

2. *Partial Non-compliance*: has achieved compliance on some components of the relevant provision of this Agreement, but significant work remains; or

3. *Full Non-compliance*: has not met most or all of the components of the relevant provision of this Agreement.

The dates I will be filing these Monitor Reports over the next year will be: October 31, 2025; March 2, 2026; and June 30, 2026.

The County will receive drafts of these Reports four weeks in advance of those dates, on: October 3, 2025; February 2, 2026; and June 2, 2026.

Your inputs will be due: October 24, 2025; February 23, 2026; and June 23, 2026.

d. Each Monitor Report will describe in detail, with each substantive provision, the independent verification of any progress the County has made toward compliance, including but not limited to any representations included in the Compliance Reports and examining supporting documentation where applicable.

e. The Monitor Report may include recommendations for ways to address areas of Partial Non-compliance or Full Non-compliance, or to improve the County's programs or services.

## SUBSTANTIVE PROVISIONS

### A. Findings

a. Since the beginning of my involvement as Monitor, I have been impressed with how the ACJ Staff have risen to the occasion, embraced the requirements of the Consent Order, and made many positive steps toward improvement. This has created excellent momentum, as research in psychological science shows that people are more likely to engage with and sustain change when it is seen not only as a requirement, but as an opportunity for meaningful improvement. The aim is not only to meet the standards but to use those expectations as a foundation for lasting, positive change. Those implementing the changes may have recognized the benefits in their daily work and how those changes can enhance the wellbeing of everyone involved. Naturally, then, this leads to a cycle of learning, growth, and pride in our own work. The changes being implemented are difficult ones, and we must also use the positive experiences to motivate us through the difficulties as well. We are starting from a deeply challenging environment—one that is almost uniformly harmful and counterproductive—but it does not have to remain that way. I wish to encourage

everyone in this effort to exercise adequate self-care, as well as to know that I consider my role to be to facilitate, not just to document.

b. Compared to the First Report, which was mostly qualitative, the current Second Report was more challenging, given the many documents that were required. A number went missing by the time my draft report was due, on June 2, 2025, resulting in certain substantive provisions falling into *Partial Non-compliance*. Multiple exchanges and clarifications were made by email, and then a densely-packed visit arranged to go over all the necessary documents during my visit on June 12, 2025, and afterward. With great mobilization and excellent response, almost all the documentary requirements were fulfilled by the time ACJ's input on the Report was due, on June 23, 2025. Hence, my overall assessment of progress from November 30, 2024, through March 31, 2025, is: ***Substantial Compliance***.

c. The pace of progress has also been satisfactory, allowing for further upgrading of the quality and quantity of documentation. Sample compliance measures for the Third Report have been set in **Table 1**, so as to describe in detail the extent to which the County has complied with each provision of the Consent Order.

d. For the Second Report, the County's compliance with each provision and areas that need further attention in order to be in full compliance are outlined under the substantive provisions, as follows.

## B.  Substantive Provision: Staffing

a. The Parties agree that, given the current estimated incarcerated population of 1,700, and the inability currently to perform an appropriate needs assessment, the current number of budgeted positions (if filled) is an appropriate Interim Required Staffing Level for purposes of this Consent Order. The Interim Required Staffing Levels are as follows:

1. Positions available pursuant to contract with Allegheny Health Network ("AHN"):
   (a) Director of Psychiatry (full-time) (must be independently licensed)
   (b) 2 full-time equivalent ("FTE") on-site psychiatrists (must be independently licensed)
   (c) 0.8 FTE tele-psychiatrist (must be independently licensed)
   (d) 1.0 FTE on site psychologist (must be independently licensed)
   (e) 5 FTE nurse practitioners or physician assistants (must be independently licensed, psychiatric practitioners)
   (f) 1 FTE behavioral health consultant (must be independently licensed)

2. County positions:
   (a) Mental Health Director (must be independently licensed)
   (b) 8 mental health therapists (must be independently licensed)
   (c) 9 FTE mental health registered nurses (and 2 part time) (must be independently licensed)
   (d) 11 FTE mental health specialists (and 2 part time)

(e) 5 FTE behavioral health rehabilitation specialists (and one part time)
(f) 1 discharge planner

3. Total positions for Interim Required Staffing Levels: 47.3, with 29.8 of those positions requiring independent licensure.

b. Compliance with Provision IV(d)(1) requires the County to fill 80% of the Interim Required Staffing Levels within six months of the Effective Date. The Interim Required Staffing Levels can be reduced proportionally to reductions in the incarcerated population below 1,700. The Second Compliance Report indicates that incarcerated population remained above 1,700 and that the County filled 77% of the positions associated with the Interim Required Staffing Levels, less than the required 80%. **Table 2** provides details about the required and filled positions.

**Table 2:** Interim Required Staffing Levels and Current Staffing as of March 31, 2025

| Position | Required Staff | Current Staff |
|---|---|---|
| Mental Health Director | 1 | 1 |
| Director of Psychiatry | 1 | 1 |
| On-Site Psychiatrist | 2 | 1 |
| Tele-Psychiatrist | 0.8 | 0.4 |
| On-Site Psychologist | 1 | 1 |
| Nurse Practitioners or Physician Assistant | 5 | 5 |
| Behavioral Health Consultant | 1 | 0 |
| Mental Health Therapists | 8 | 7 |
| Mental Health Registered Nurse (Full Time) | 9 | 10 |
| Mental Health Registered Nurse (Part Time) | 2 | 2 |
| Mental Health Specialist (Full Time) | 11 | 6 |
| Mental Health Specialist (Part Time) | 2 | 2 |
| Behavioral Health Rehabilitation Specialist (Full Time) | 5 | 2 |
| Behavioral Health Rehabilitation Specialist (Part Time) | 1 | 0 |
| Discharge Planner | 1 | 1 |

c. Based on the reporting period ending March 31, 2025:
1. Current incarcerated population was 1,787 (1,555 adult males, 218 adult females, and 14 juveniles-all male).
2. 77% of Interim Required Staffing Level positions were filled (37.4/48.3), with 92.9% of independently licensed positions filled (27.4/29.8).
3. There were four (4) staff departures between December 1, 2024, and March 31, 2025 (2 APPs, 1 therapist, and 1 mental health specialist) and one (1) behavioral health rehabilitation specialist vacated this role to move into another role at ACJ.
4. One (1) APP and one (1) mental health registered nurse were added.
5. There are no staff departures planned.

d. <u>Meeting the Interim Required Staffing Levels and Assessment to Identify Ongoing</u>

23

Required Staffing Levels

1. The Consent Order specified that County will fill 80% of the Interim Required Staffing Levels within six (6) months of July 30, 2024. As of March 31, 2025, 77% of Interim Required Staffing Level positions have been filled, and despite 80% staffing having been reached in early January 2025, the County was temporarily falling slightly below expectations.

2. This information comes from the Compliance Report to the Monitor, with the last Reporting Period ending on March 31, 2025.

3. For my June 2, 2025, draft report, recommendations were made for the County to examine its past recruitment efforts and to augment what was successful while abandoning what was not. It was suggested to undertake aggressive efforts to fill all mental health positions. For example, the County hired a recruiter in late 2022 and hired another recruiter focused on open health care positions. These recruiters were suggested to assess the reasons the County has not previously filled (or kept filled) these positions, and the County make adjustments as necessary to make those positions more attractive, in order to improve recruitment and retention. I requested documentation of increased recruitment efforts for the Third Report.

4. By my visit on June 12, 2025, the above recommendations were either being done or fulfilled. A talent recruitment officer had been hired, aggressive recruitment efforts made beginning at the training level, and a new behavioral health consultant hired to begin in July 2025. This would bring the staffing level back to 80%. Hence, while technically the staffing level was below 80% at the cutoff date of the last report, ending on March 31, 2025, the active and creative recruitment efforts in the interim, a detailed reflection on the recruitment methods, and now long-term plans in place not only to bring in a new hire but to keep them over time has more than made up for any momentary deficiencies. For each position, I reviewed the number of applications, resignations, hires, and acceptances of offers, and most were ahead in keeping positions filled.

e. Overall assessment of provision: Partial non-compliance, but very close to Substantial compliance.

f. Further stipulations in the Consent Order:

1. Within one hundred (180) days of reaching 80% of Interim Required Staffing Levels, the County shall commence an assessment of staffing levels to determine whether the Interim Required Staffing Levels are appropriate for meeting the needs of the population. This assessment should include a "workload analysis" for each job description (i.e., psychiatrist, nurse practitioner, psychologist, therapist, etc.), an assessment of wait times, average times for each type of intervention (initial assessment, follow-up appointment, medication monitoring by psychiatrist, rounds in restricted housing, etc.), the caseload for each staff member, the frequency and extent of counseling sessions, the percentage of the mental health population with ongoing psychotherapy needs, a needs assessment for those in restricted housing, and other factors designed to determine whether current staffing is appropriate to the needs of the population. This assessment shall be performed in compliance with the NCCHC staffing models, as articulated in its 2001 Correctional Health Care Guidelines for the Management of an Adequate Delivery System, the National Institute of Corrections, or comparable

authority, and shall result in a written report.

2. The completed assessment will be shared with the Court, the Monitor and Class Counsel, and upon reasonable request, the County shall also share the underlying information on which the report is based. If any interested party raises concerns or questions regarding the report, the Parties shall meet and if necessary, a conference with the Court will be scheduled. Upon acceptance of the report, including any modifications to the report based on these meetings and conferences, the Required Staffing Levels will be adjusted consistent with the report's results.

### C. Substantive Provision: Training

a. Training requirements for Mental Health Staff

1. Provision V(a) requires the County to provide a multi-stage healthcare orientation to all new hires, specific mandatory in-person training for all mental health staff "on delivery of mental health services in the correctional setting," advanced mandatory in-person training for staff working on acute units, and mandatory in-person training for intake screeners. The Second Compliance Report indicates that the County is in compliance with all four of these requirements. My direct observations revealed that the Mental Health Staff demonstrate proficiency with their appropriate expectations and understanding of the challenges involved—and the extra effort that it takes to provide even the basic standard of care within a correctional setting. This understanding is crucial for adjusting and planning for the additional effort it takes to deliver proper care. In addition to their independent licensure requirements, **Table 3** lists the trainings the County has recently scheduled for this purpose. For the Third Monitoring Report, I would like to verify with a sample of mental health staff that at least 75% have completed the training.

**Table 3.** Sample Training Schedule for Mental Health Staff

| |
|---|
| 5-21-25. One hour of training provided by Pittsburgh Action Against Rape (PAAR). The training explained how PAAR works in the jail to help support clients and how to communicate between PAAR and the jail. |
| 6-3-25. Three hours of Emotion Focused Therapy with a focus on using it with trauma patients in a corrections setting. |
| 6-4-25. One hour of training provided by Ashlee Groover, LPC, on Eye Movement Desensitization and Reprocessing (EMDR) and how it is administered in the jail with current patients. |
| As per the clinical behavioral health supervisor, help has been requested from the Department of Human Services to bring in the training, Seeking Safety, and is awaiting confirmation. |

b. Training requirements for Correctional Staff

1. Provision V(b) requires the County to maintain its training on mental health services and suicide prevention/intervention and to provide specific mandatory in-person training for all correctional staff on, among other things, signs and symptoms of mental illness, communicated with incarcerated individuals with signs of mental illness, and procedures for referring incarcerated individuals with mental health complaints. The County is also required to provide advanced mandatory training for staff working on acute units, receiving screening or

segregated housing areas. At all times, 75% of correctional staff present on each unit must be current with the required training. The Second Compliance Report indicates that the County's Correctional Crisis Response and Intervention training addresses these requirements and that 29% of staff received the training during this reporting period. The County plans to deliver this training on a weekly basis and to have all staff trained by the end of the year. Observing and attending a number of training sessions revealed relative openness and flexibility among correctional staff toward the changing needs of the correctional system. I requested and received electronic in-service training, as in **Figure 1**, which is assigned to all existing officers biannually, although it was given annually this year because of updates to the training content from 2024. I reviewed the specific written training material for correctional staff working on mental health pods, to supplement on-the-job shadowing, and the emphasis on mental health seemed adequate, as in **Table 4**. Additional training consists of Infectious Disease, Medical Confidentiality, Chronic Health Conditions that Can Lead to Acute Conditions, Medical Emergencies, Side Effects/Adverse Reactions to Meds., Dental Emergencies, and Detox/Intoxication Training are done electronically biannually. Suicide prevention is done electronically annually (in addition to the in-person CRIT training annually), and CPR/BLS is hands-on/in-person biannually.

2. The Third Monitoring Report will review staffing assignments for a sample of housing units to assess compliance with the requirement that 75% of staff present on a unit are current on required training.

**Figure 1.** Sample Electronic In-Service Training Program

| Type | Element Name | Element Description |
|---|---|---|
| Document | Protecting Yourself from Blood Borne Pathogens & Infectious Disease 2025 | This training content covers procedures with respect to infectious or communicable diseases amongst the incarcerated population. |
| Document | MEDICAL CONFIDENTIALITY DURING TRANSPORTS, ETC 2025 | Training content covers expectations of confidentiality, HIPAA regulations, permitted disclosures and protecting health information during routine interactions with population, healthcare staff |
| Document | CO chronic conditions revised 4.14.2025 | |
| Document | Medical Emergency for CO training REVIEWED April 2025 | |
| Document | Adverse Reactions & Side Effects To Medication 2025 | CO training content covers some side effects and adverse reactions to medications. Reviewed April 2025 |
| Document | ACJ Dental Emergencies 2025 | |
| Document | Safely Managing Intoxication & Inmates Going Through Withdrawal April 2025 | Officer training regarding substance use, overdose and withdrawal, updated April 2025 |

**Table 4.** Mental Health/Suicide Indicators Outlined in Post Orders (Standard Operating Procedure)

| 1. Suicide identification signs: |
|---|
| • Sadness<br>• weeping spells<br>• anxiety and restlessness<br>• mood swings (extreme happiness to sadness)<br>• excessive smoking<br>• repetitive, continuous sleep disturbances<br>• confusion and irritability |

• decreased interest in daily activities (hygiene, appearance, eating, sleeping)
• hinting at suicide (e.g. "This is the last time we meet," "I will put an end to all this suffering," "There is no point going on")
• difficulty in decision-making
• self-injurious behavior (starving, injuring self)
• having strained and difficult relations with spouse or other family members;
• becoming highly religious/atheist
• Exercising special care in distributing money or property.

2. Mental Health Identification:

• Inability to coherently express ones self
• Change in performance of daily activities
• Inappropriate sudden withdrawal from interacting with others.
• Unfounded refusal to participate in programs.
• Irrational non-purposeful verbalizations or behaviors.
• Sudden non-compliance with psychiatrically and/or physiologically necessary medical treatments.
• Inability to comprehend and/or blatant refusal to follow concise verbal instructions. (i.e. memory impairment, dementia, Alzheimer's, etc.)
• If at any time during the interaction with an inmate you have witnessed or determined that an inmate may be at risk. The Shift Commander and The Psychology department must be notified during normal working hours. The medical department will be notified for non-normal working hours.
• When an inmate has been deemed high or moderate risk for suicide or mental deterioration the Shift Commander and affected Medical staff must be notified.

    c.  <u>Training requirements for use of force and de-escalation</u>
        1.  Provision V(c) requires the County to provide all correctional staff mandatory in-person training on the use of force every other year and virtual training each year that in-person training is not required. The County is also required to provide annual mandatory in-person training on de-escalation to all staff. The Second Compliance Report does not address required use of force training, but it does indicate that the County's Correctional Crisis Response and Intervention (CRIT) training addresses the required de-escalation training and that 29% of staff received it during this reporting period. A review of written material given to me on the CRIT showed 120 minutes of "Scenario-Based Skills Training—De-Escalation Communication Skills"; 120 minutes of "Scenario-Based Skills Training—De-Escalation Strategies"; and 300 minutes of "Scenario-Based Skills Training—Verbal De-Escalation Scenarios." A review of sample videos, sample documentation, and written recommendations, provided and explained by the supervising major and QI manager, revealed detailed assessments of each use of force incident and their use as a teaching tool. For the Third Monitoring Report, I would like to request training records for a sample of staff to document 75% completion of the required use of force and de-escalation training.

    d.  <u>Medication Administration Training</u>
        1.  Provision V(d) requires the County to provide medication administration training to all staff who administer or deliver prescription mental health medication to incarcerated individuals. The Second Compliance Report indicates that the County provides this training annually to all staff who administer medications

and that new hires complete it within 90 days of hire. I confirmed that registered nurses do the scheduling, and if a patient misses a certain number of doses, an automatic report is generated, a registered nurse does a review, and then a psychiatrist does a review. For the Third Monitoring Report, I would like to request training records for a sample of staff to verify that 75% have completed the required training.

e.  Overall assessment of provision: Partial non-compliance.

f.  Recommendations include provision of the above requested records, so as to corroborate compliance with at least 75% of the staff.

## D.  Substantive Provision: Clinical Autonomy

a.  Provision VI requires the County to ensure that Qualified Health Care Professionals have autonomy with respect to clinical decisions and that staff report any attempts by non-clinical staff to interview with clinical decisions. The Second Compliance Report does not include information about compliance with these requirements. In my direct interviews of mental health providers and observing them in their clinical rounds gave an impression of clinical autonomy. One psychiatrist specifically reported a "much better" working environment over his two-year experience at ACJ, with a more supportive administration, better communication, less yelling and greater patience on the part of Correctional Staff, and no interference in his ability to make clinical decisions. For documentation, I requested and received HIPAA (Health Insurance Portability and Accountability Act) instructional guidelines, a memo on the Confidentiality of Health Records Policy, and a memo on Medical Autonomy Policy, as in **Table 5**. All revealed that the facility took these issues seriously, and by all accounts was implementing them.

**Table 5.** Excerpt from Confidentiality of Health Records Policy

| NCCHC/ACA Compliance Indicators: |
|---|
| NCCHC J-A-03 Medical Autonomy |
| 1. Clinical decisions are determined by qualified healthcare professionals and implemented in an effective and safe manner. |
| 2. Administrative decisions are coordinated, if necessary, with clinical needs so that patient care is not jeopardized. |
| 3. Custody staff supports the implementation of clinical decisions. |
| 4. Health staff recognizes and follow security regulations. |
| NCCHC/ACA Compliance Indicators: |
| ACA 5-ALDF-4D-02 Provision of Treatment |
| 1. Clinical decisions are the sole province of the responsible clinician and are not countermanded by nonclinicians. |

b.  Overall assessment of provision: Substantial compliance.

## E.  Substantive Provision: Receiving Screening and Mental Health Screening and Evaluation

a.  Provision VII requires the County to, among other things, ensure that each individual

arriving at the ACJ undergoes a receiving screening within 24 hours, that incarcerated individuals receive initial mental health screening and evaluation within 14 days of admission, and that staff responsible for the screening and evaluations receive annual training. Further, as part of the receiving screening, staff are required to verify prescribed medications, if any, through SureScripts. If the screener is not able to verify medications, and the patient has a serious mental health condition, a provider is requested to see the patient within 7 days, although this may at times be difficult to implement. The Second Compliance Report indicates that the County has developed an audit tool and reports to begin assessing compliance with these requirements and will begin using them during the next reporting period. I have reviewed a sample month of all screening and evaluation results, as well as numerous individual samples, and found them to be thorough and satisfactory. An on-the-spot computer-generated analysis showed that a total of 29,526 referrals were made, and they were seen within 20.50 days. During the last reporting period, 4136 referrals were made, and they were seen within 11.03 days, which is not only well within compliance but shows the improvements that have been made over time.

b. Overall assessment of provision: Substantial compliance.

## F.  Substantive Provision: Health Records

a. Provision VIII requires the County to, among other things, create individualized treatment plans for all mental health patients no later than during evaluations subsequent to mental health screenings and to update these plans every 120 days. It also requires the County to ensure that clinical records include, among other things, a problem list and information about each clinical encounter. The Second Compliance Report does not address these requirements. A spot sampling of a few health records generally showed appropriate documentation to the medical standard of care. In preparation for the Third Monitoring Report, I would like to request clinical records for a larger sample of relevant incarcerated individuals to assess compliance with these requirements.

b. Overall assessment of provision: Substantial compliance.

## G.  Substantive Provision: Mental Health Encounters

a. Provision IX places certain requirements on the County related to mental health evaluation referrals, requests for mental health services, and segregation rounds.

b. **Referrals:** Provision IX(a) requires the County to ensure that incarcerated individuals referred for further mental health evaluation are examined by a psychiatrist or advanced prescribing practitioner within 14 days of the referral. The Second Compliance Report indicates that the average wait time for these examinations during the reporting period is 7 days. It does not report the number of examinations that occurred after the required 14 days. In preparation for the Third Monitoring Report, I would like to request clinical records for a sample of relevant incarcerated individuals to assess compliance with the 14-day requirement.

c. **Requests:** Provision IX(b) requires the County to ensure that sick call requests and request for mental health services are triaged by a QHCP within 24 hours of submission. Provisions IX(c-d) require that, following these requests, substantive encounters with a QHCP occur within 14 days and that the average wait time is less than 7 days and that substantive encounters with a psychiatrist occur within 42 days and that the average wait time is less than 21 days. Provision IX(e) requires the County ensure that QHCPs document the appropriate period for a follow-up encounter and that those follow-up encounters occur within the time frames identified. The Second Compliance Report provides average wait times for a number of positions, including therapists (20.57 days) and mental health registered nurses (23.4 hours). It does not report the number of requests that were triaged after the required 24 hours or the substantive encounters with QHCPs and psychiatrists that occurred after the required 14 and 42 days, respectively. It also does not address follow-up encounters. In preparation for the Third Monitoring Report, I would like to request clinical records for a sample of relevant incarcerated individuals to assess compliance with these requirements.

d. **Segregation Rounds:** Provision IX(f) requires the County to ensure that a QHCP conducts segregation rounds for all incarcerated individuals housed in segregation. It requires that these rounds be conducted at a time when incarcerated individuals are anticipated to be awake and sets expectations for what information the QHCP will document during the rounds. The Second Compliance Report indicates that segregation rounds are conducted once a day and lists the information collected during these rounds. This is consistent with observations made during a spot site visit, but in preparation for the Third Monitoring Report, I would like to request documentation of segregation rounds for a sample of incarcerated individuals housed in segregation to assess regularity and depth of these inquiries.

e. Overall assessment of provision: Substantial compliance.

## H.  Substantive Provision: Privacy and Confidentiality

a. Provision X requires the County to provide private space for mental health encounters, assessments, and therapies. The Second Compliance Report indicates that a private space was piloted in a housing unit during the reporting period and that quotes were received for construction of private space in April 2025. This should be an improvement over the current, large gym space has been partitioned into counseling "offices", with open partitions that offer little privacy and little feel of a clinic. However, in the meantime, at least a partial solution seemed to have been found: during my June 12, 2025, visit, I was informed that mezzanine rooms for the pods—previously for attorneys but now in disuse—were being repurposed as therapy rooms, and this seemed to resolve many issues, including privacy, confidentiality, and lack of therapy space. While the therapists would have to adjust—giving patient lists to correctional staff in advance, and being unable quickly to go to another patient if one were not available, etc.—but other aspects seemed to be more efficient for both correctional and mental health staff. I look forward also to seeing how the private space develops, as having the multiple options can only enhance privacy and confidentiality.

    b.  Overall assessment of provision: Substantial compliance.

**I.  Substantive Provision: Educational Programming**

    a.  Provision XI requires the County to establish psychoeducational group, psychiatric nursing group, and behavior management intervention programs. It also requires that the County continue to offer certain existing programming; develop additional programs, including cognitive behavioral programs, parenting programs, survivors of violence programs, vocational skills programs; and ensure that minimum requirements related to frequency, attendance, and accessibility to incarcerated individuals are met. The Second Compliance Report indicates that psychoeducational groups are being provided in mental health housing units, the Diversionary Treatment Unit provides structured group out of cell time weekly, the Re-Entry and Education Center currently provides more than 20 programs on site, and that ACJ plans to develop additional programming this year. I have received a description of current classes, which range from "Harm Reduction" to "Mind Training" to "Relationship Building & Maintenance" for Re-Entry, and "Pre-GED" to "Workforce Literacy" to "Computer Literacy" to "College Inside/Out Courses" for the Education Center, to name just a few. Weekly schedules and attendance sheets revealed active participation. In preparation for the Third Monitoring Report, I would like to request specific training materials and actual percentages of participation. )Of note, in the process I discovered that ACJ has an excellent intensive re-entry program that has been effective in reducing recidivism—it currently has 132 participants who are followed throughout their incarceration and then nine months in the community, beginning with daily follow-up.)

    b.  Overall assessment of provision: Substantial compliance.

**J.  Substantive Provision: Psychotherapy**

    a.  Provision XII places certain requirements on the County related to staffing/caseloads and individual counseling of incarcerated individuals.

    b.  **<u>Staffing and Caseloads:</u>** Provisions XII(a-b) requires the County to fill positions for a Director of Mental Health, Staffing Educator, Deputy Health Services – Behavior Health, and six full-time licensed therapists. Provisions XII(c-d) require that the therapists have a full case load of at least 30 individuals counseling sessions a week and not more than 75 patients and that the County develop a triage process to ensure incarcerated individuals with the greatest need receive counseling. The Second Compliance Report indicates that the County has filled the Mental Health Director, Deputy Health Services – Behavioral Health, and therapist positions. It does not address the Staffing Educator position. The Second Compliance Report indicates that the average therapist caseload is 38.5, and that one therapist has a caseload under 30. An examination of this one therapist's caseload, however, revealed that she is exclusively seeing patients for Eye Movement Desensitization and Reprocessing (EMDR), which is a needed service that takes time, and therefore she cannot see more than 20 or 25 patients a week. I will therefore count this as compliance. The rest carried caseloads of 30 patients or more, or two part-time psychiatrists carried a greater load

when combined.

c. **Individual Counseling:** Provisions XII(e-n) define individual counseling and identify various requirements, including that sessions will last for a minimum of 30 minutes and that a Mental Health Therapist or higher-level Mental Health Staff Member conduct an evaluation of all eligible patients within 45 days of admission or receipt of referral. This area seems generally to have improved, and the Second Compliance Report indicates that the average intervention time for Mental Health Therapy Encounters is 39.11 minutes. It also provides the average wait time for various mental health encounters. In preparation for the Third Monitoring Report, I would like to request clinical records for a sample of relevant incarcerated individuals to assess compliance with the individual counseling requirements.

d. Overall assessment of provision: Substantial compliance.

## K. Substantive Provision: Medication Management

a. Provision XIII requires a review of ACJ's medication management and administration of psychotropic medications that will include an assessment of, among other things, security, accountability, and appropriate mechanisms to address non-adherence to medication regimens by incarcerated persons. The Second Compliance Report does not address this requirement, but I confirmed during my visit on June 12, 2025, that registered nurses do the scheduling, and if a patient misses a certain number of doses, an automatic report is generated, a registered nurse does a review, and then a psychiatrist does a review. For the Third Monitoring Report, I would like to request training records for a sample of staff to verify that 75% have completed the required training.

b. Overall assessment of provision: Partial non-compliance.

## L. Substantive Provision: Use of Force

a. Provision XIV requires the County to, among other things, revise its Use of Force (UOF) Policy to include various requirements of staff, establish a review process for command staff and mental health staff to review force incidents for compliance with policy, discipline staff who violate the policy, and develop an internal process for assessing compliance with the various requirements. The Second Compliance Report indicates that the QI Manager reviewed 5 force packets and found that 100% complied with policy requirements associated with de-escalation, mental health assessments, and the level of force used. It also indicates that the Deputy Health Services Administrator – Behavior Health reviewed all 26 force incidents during the reporting period and found that:

- • 92% demonstrated full compliance with the Use of Force Policy;
- • 73% complied with de-escalation and intervention effort requirements;
- • 92% contained a mental health assessment; and
- • 11% presented learning/training opportunities.

I personally had a chance to review sample videos, sample documentation, and written recommendations with the supervising major and QI manager during my June 12, 2025, visit, which revealed detailed assessments of each use of force incident. A detailed review of mental health conditions that are identified, challenges to de-escalation and intervention efforts, and how training, proper supervision, and stress reduction were handled was possible at this time. The obvious attention given to this issue is supported in the above numbers. Mental health is called to be present when there is a planned use of force, but otherwise evaluations are generally done afterward and rather scant. It appears that a more detailed assessment and input from mental health could further contribute to improvement. The Second Compliance Report lacked any plan of response to policy violations, but overall use of force incidents are down substantially compared to the First Monitoring Period, and ACJ is to be commended for this progress. Sample successful policies were requested and provided, which the chief correctional officer took seriously and indicated he would make use of it, potentially as a model.[11]

    b.  Overall assessment of provision: Substantial compliance.

## M.  Substantive Provision: Use of Segregation

    a.  Provision XV establishes various requirements associated with the use of segregation, including that Plaintiff Class Members held in segregation receive a minimum of four hours of daily out-of-cell time, a QMHP conduct assessments prior placement to determine if segregation is contraindicated, and that staff proactively monitor Plaintiff Class Members in segregation for decompensation or increased mental health symptoms. Overall, use of segregation has decreased moderately since the First Monitoring Period, as follows:

**Table 6.** Use of Segregation during the Last Monitoring Period, Ending March 31, 2025

| |
|---|
| In December 2024, ACJ as a whole or specific pods were on lockdown for 14 out of 31 days with no indication if all class members received required out of cell time, therapeutic counseling, educational programming, and segregation rounds. 1C (women's RHU) was on lockdown 11 days. 8E (men's RHU) was on lockdown for 9 days. 5C (men's acute mental health pod) was on lockdown for 10 days, 5MD (women's acute mental health pod) was on lockdown for 9 days, and 5D was on lockdown for 9 days. There were approximately 16 class members who were held in solitary confinement because of their medical condition and did not receive out of cell time. |
| In January 2025, ACJ as a whole or specific pods were on lockdown for 18 out of 31 days with no indication if all class members received required out of cell time, therapeutic counseling, educational programming, and segregation rounds. 1C was on lockdown for 10 days. 8E was on lockdown for 10 days, 5C was on lockdown for 8 days, 5MD was on lockdown for 12 days, and 5D was on lockdown for 7 days. There |

---

[11] Los Angeles County Sheriff's Department: https://pars.lasd.org/Viewer/Manuals/11239; Denver Sheriff Department: https://public.powerdms.com/DENVERSAFETY/documents/682511 (courtesy of Dr. Matthew Buttice).

were approximately 19 class members who were held in solitary confinement because of their medical condition and did not receive out of cell time.

In February 2025, ACJ as a whole or specific pods were on lockdown for 20 out of 28 days with no indication if all class members received required out of cell time, therapeutic counseling, educational programming, and segregation rounds. 1C was on lockdown for 8 days. 8E was on lockdown for 7 days, 5C was on lockdown for 8 days, 5MD was on lockdown for 8 days, and 5D was on lockdown for 7 days. There were approximately 17 class members who were held in solitary confinement because of their medical condition. The County's Segregation Report states they did not receive out of cell time.

In March 2025, ACJ or specific pods were on lockdown for 19 out of 30 days with no indication if all class members received required out of cell time, therapeutic counseling, educational programming, and segregation rounds. 1C was on lockdown for 15 days. 8E was on lockdown for 15 days, 5C was on lockdown for 13 days, 5MD was on lockdown for 16 days, and 5D was on lockdown for 11 days. There were 13 class members who were held in solitary confinement because of their mental health condition. The County's Segregation Report states they did not receive out of cell time.

b.  Still, these remain concerning levels, and the shortage of staff has continued to affect service delivery. Education about the harmfulness of lengthy solitary confinement to both mentally ill and violence-prone populations has been requested and distributed by Deputy Warden Martin to QMHP's. Perhaps notably, individuals segregated for medical/mental health reasons dropped from 2 to 0 between the two Reporting Periods. I was also informed that baseline sentences of 30 days have been reduced to 15 days, and that there is more supervision on how sentences are dispensed. Recommendations were made to sentence early and for short durations, for maximal control and minimal aggravation of behavior.

c.  The Second Compliance Report discusses out of cell time for the male Diversionary Treatment Unit and describes the questions asked during segregation rounds. It also indicates that segregation rounds are completed once a day for those housed in restrictive housing units. I personally reviewed health records and documentation of segregation rounds for several incarcerated individuals housed in segregation and found them to be adequate.

d.  A question was raised regarding the use of a large, recreational cage that would be at ACJ's disposal, once the RTU moves to 8D; see **Figures 2** and **3**. It has been proposed that the large cages could be furnished with tables and chairs and be used to separate well-behaved residents from others. In other words, in the large cage, residents could be released from the restrictive handcuffs and be further encouraged to participate in groups (without reverting back to the small cages, which are restricted in the Consent Order, despite incarcerated persons complaining that the handcuffs feel more restrictive than the small cages). Alternatively, well-behaved individuals may be managed outside, with neither handcuffs nor cage, while more behaviorally-problematic residents can be safely contained in the large cage. Both alternatives seem to offer options, favoring keeping the large cage rather than removing it. The chief correctional officer agreed to consider these options, keeping

34

in mind the security policies for RTU residents.

e.   Overall assessment of provision: Substantial compliance.

**Figure 2.** Large Caged Recreational Space in Unit 8D



**Figure 3.** Interior of the Caged Recreational Space in Unit 8D



**N. Summary**

    a. As noted previously, my specific focus during this Reporting Period has been seeing documentary proof of ongoing progress and the considerable efforts by ACJ staff in implementing large-scale changes pursuant to the Consent Order. In what remains a challenging correctional environment—marked by institutional constraints, staffing demands, and the complex needs of a vulnerable population—the dedication and responsiveness of staff are exceptional. The steps taken so far reflect a genuine commitment to reform. While initially, written documentation as outlined within the Consent Order had been lacking, all staff were highly responsive in providing that, too, especially during my site visit on June 12, 2025. Therefore, my overall assessment of progress from November 30, 2024, through March 31, 2025, is: ***<u>Substantial Compliance</u>***.

    b. For the next Reporting Period, however, it is advised that the documentation be provided in a timely manner, in accordance with the quantitative compliance measures. Flags that were raised in the previous Reporting Period, such as use of force and use of segregation, were promptly and admirably responded to. Sustained improvement, building upon the foundation already laid, is now encouraged. One suggested improvement might be the participation of mental health staff during use of force incidents, wherever possible, planned or unplanned. Documentation of post-use of force evaluations need to be more robust, detailing any potential harm or areas of improvement for avoiding use of force altogether.

    c. Evidence of progress, nevertheless, is substantial, and documenting this progress will need continued focus. Whereas this Second Report has centered around the presence of documents—which were readily forthcoming when requested—the Third Report will stress much more timely and precise (in terms of percentages of completion) documentation. Dr. Buttice has and will be assisting with the data analysis. Therefore, please study the sample compliance measures in Table 1 and prepare as necessary to sustain *Substantial compliance*. Continued investment in this documentation of improvements in the mental health infrastructure and cross-disciplinary collaboration will aid in fulfilling the goals of the Consent Order, as well as in developing a safe, humane, and treatment-conducive environment that could become an inspiration for others.

Respectfully submitted,

Bandy X. Lee, M.D., M.Div.
Monitor